UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

═══════════════════════════════════════════

JAN P. HOLICK, JR., STEVEN MOFFITT,
JUSTIN MOFFITT, GURWINDER SINGH,
and JASON MACK,

                    Plaintiffs, on behalf of themselves
                    and all others similarly situated,

     -against-

CELLULAR SALES OF NEW YORK, LLC, and
CELLULAR SALES OF KNOXVILLE, INC.,

                Defendants.

═══════════════════════════════════════════

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
Case No. 1:12-CV-584 (NAM/DRH)

═══════════════════════════════════════════

## TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                     ii

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT                            1

STATEMENT OF FACTS                                                      3

ARGUMENT                                                                7

POINT I:

    PLAINTIFFS HAVE MADE A *PRIMA FACIE* SHOWING
    THAT THIS COURT HAS PERSONAL JURISDICTION OVER        7
    CELLULAR SALES OF KNOXVILLE, INC.

POINT II:

    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER
    PLAINTIFFS' CLAIMS AND THERE IS NO BASIS TO DISMISS
    THEM FOR MEDIATION                                     18

CONCLUSION                                                              25

# TABLE OF AUTHORITIES

## Cases

*AirTran N.Y., LLC v. Midwest Air Group, Inc.*, 46 A.D.3d 208, 218 (1st Dept. 2007) ..........13, 14

*American Center for Law and Justice-Northeast, Inc. v. American Center for Law and Justice, Inc.*, 12 CIV. 730, 2012 WL 2374728, at *5 (D. Conn. June 22, 2012) ..................................21

*AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 460 (EDNY 1985) ..............................................21

*Ayyash v. Bank Al-Madina*, 04 CIV. 9201 (GEL), 2006 WL 587342, at *5 ...............................18

*Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 10 CIV 1455, 2011 WL 4529668, at *6 (EDNY Sept. 27, 2011) .......................................................21

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) ...........................7

*Bellomo v. Pennsylania Life Co*, 488 F.Supp. 744, 746 (SDNY 1980) .......................................14

*Best Van Lines, Inc v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) .........................................16, 17

*Board of Educ. v. Cracovia*, 36 A.D.2d 851 (2d Dept. 1971) ......................................................22

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) ..........................................................8

*Cachillo v. Insmed, Inc.*, 833 F.Supp.2d 218, 225 (NDNY 2011) .................................................7

*CB Richard Ellis, Inc. v. American Env'tal Waste Mgmt.*, 98 CIV 4183, 1998 WL 903495, at *2 (EDNY Dec. 4, 1998) ......................................................................................................21

*Cf. Glover v. St. Louis-San Francisco Railway*, 393 U.S. 324, 429-30 (1969) ...........................23

*Clinton v. Jones*, 520 U.S. 681, 706 (1997) ...............................................................................23

*CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 368 (2d Cir. 1986) .............................................17

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ...........................................8

*First City, Texas-Houston, N.A. v. Rafidian Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998) .............9

*Fischbarg v. Doucet*, 9 N.Y.3d 375, 383-384 (2007)..............................................................16, 17

*Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 536-37 (1967)..................8, 13, 14

*Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 119-20 (1967) ........................................8, 13

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F.Supp.2d 308, 319 (SDNY 2004) ........11

*Giuda v. Home Savings of America, Inc.*, 793 F.Supp.2d 611, 620 (EDNY 2011) .....................24

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, -- U.S. --, 131 S. Ct. 2846, 2851 (2011).......8

*H. Heller & Co. v. Novacor Chemicals Ltd.*, 726 F.Supp. 49, 54 (SDNY 1988) ........................10

*Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir. 1997)............................................21

*Hoguet Newman Regal & Kenney, LLP v. Rubin*, 11 CIV 5377, 2011 WL 5838362, at * 1 (SDNY Nov. 18, 2011)........................................................................................................24

*Island Wholesale Wood Supplies, Inc. v. Blanchard Industries, Inc.*, 101 A.D.2d 878, 879-80,(2d Dept. 1984)...........................................................................................................17

*Jacobs v. Felix Bloch Erben Verlag Fur Buhne Film Und Funk KG*, 160 F.Supp.2d 722, 734 (SDNY 2001).............................................................................................................10, 11

*Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184-85 (2d Cir. 1998).......................................10

*Johnson v. Ward*, 4 N.Y.3d 516, 519 (2005).............................................................................17

*King County, Wash v. IKB Deutsche Industriebank AG*, 712 F.Supp.2d 104, 114 (SDNY 2010)..........................................................................................................................passim

*Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 864 (2d Cir. 1996) ........................................10

*Kreutter v.McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988).....................................................16

*Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936).....................................................24

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 n. 9 (2d Cir. 2012).............8

*Lynn v. General Elec. Co.*, 03 CIV 2662, 2005 WL 701270, at *6 (D. Kansas Jan. 20, 2005)....22

*Marakova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ........................................ 19

*Matter of Chris O'Connell, Inc.*, 235 A.D.2d 248, 249 (1st Dept. 1997) ........................ 22

*N-Tron Corp. v. Rockewell Automation, Inc.*, 09 CIV 0733, 2010 WL 653760, at \*4-\*5 (S.D. Alabama 2010) ........................................................................................... 20, 24

*Paramedics Electromedicina Comercial LTDA. v. GE Medical Systems Information Technologies, Inc.*, 02 CIV 9369, 2003 WL 23641529, at \* 8-\*9 (SDNY 2003) .................... 23

*People v. Concert Connection, Ltd.*, 211 A.D.2d 310 (2d Dept. 1995) ........................ 17

*Public Administrator v. Royal Bank*, 19 N.Y.2d 127, 131-32 (1967) .................... 11, 12

*Rabinowitz v. Kaiser-Frazer Corp.*, 198 Misc. 707, 710-11 (Sup Ct., Kings Co. 1950) ............. 12

*Reers v. Deutsche Bahn AG*, 320 F.Supp.2d 140, 156 (SDNY 2004) ........................ 11

*Roberts v. H. Gin Realty Co.*, 185 A.D.2d 209, 209 (1st Dept. 1992) ........................ 22

*Rochester Community Individual Practice Ass'n, Inc v. Finger Lakes Ins. Co., Inc.*, 281 A.D.2d 977, 979 (4th Dept. 2001) ........................................................................... 22

*Salim Oleochemical v. M/V Shropshire*, 278 F.3d 90, 92-93 (2d Cir. 2002) .................. 24

*Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) ............................................................................................. 21

*Spiegel v. Schulmann*, 603 F.2d 72, 76 (2d Cir. 2010) ......................................... 8

*Swartz v. Westminister Services, Inc.*, 10 CIV 1722, 2010 WL 3522141, at \*2 (M.D. Florida Sept. 8, 2010) .................................................................................................. 25

*Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 101-102 (1965) .................................................................................................... 11, 12

*Tese-Milner v. De Beers Centenary A.G.*, 613 F.Supp.2d 404, 416 (SDNY 2009) ............... 11

*Titu-Serban Ionescu v. E.F. Hutton & Company S.A.*, 434 F.Supp. 80, 83 (SDNY 1977) ........... 10

*Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Cent. Region*, -- U.S. --, 130 S.Ct. 584, 596 (2009) .................. 20

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984) ................................................................................................ 10, 11, 12

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) ........................ 7

*Wiwa v. Royal Dutch Petroleum*, 226 F.3d 88, 95 (2d Cir. 2000) .............................. 13

**Statutes**

28 U.S.C. § 1331 ............................................................................................... 20

28 U.S.C. § 1367 ............................................................................................... 20

29 U.S.C. § 216(b) ............................................................................................ 20

9 U.S.C. § 3 ..................................................................................................... 24

CPLR 301 ................................................................................................... passim

CPLR 302(a) ............................................................................................... passim

Article 75 of the CPLR ................................................................................. 21, 22

CPLR 7501 ..................................................................................................... 22

**Other Authorities**

Black's Law Dictionary (8th ed. 2004) .................................................................. 22

Wright & Miller, <u>Federal Practice and Procedure</u>: Civil 3d § 1350, at p. 106 ................. 19, 20

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JAN P. HOLICK, JR., STEVEN MOFFITT,
JUSTIN MOFFITT, GURWINDER SINGH,
and JASON MACK,

                Plaintiffs, on behalf of themselves
                and all others similarly situated,

    -against-

CELLULAR SALES OF NEW YORK, LLC, and
CELLULAR SALES OF KNOXVILLE, INC.,

                Defendants.

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
Case No. 1:12-CV-584 (NAM/DRH)

### PRELIMINARY STATEMENT
### AND SUMMARY OF ARGUMENT

      This Memorandum of Law is submitted on behalf of plaintiffs Jan P. Holick, Jr., Steven

Moffitt, Justin Moffitt, Gurwinder Singh, and Jason Mack (hereinafter "Plaintiffs") in opposition

to defendants' motions to dismiss Plaintiffs' Complaint. Defendants' Cellular Sales of Knoxville,

Inc. ("CSOKI") and defendant Cellular Sales of New York, LLC ("Cellular Sales of New York")

(collectively, "Defendants") make two motions.  First CSOKI argues that there is no personal

jurisdiction over CSOKI.  Second, both Defendants argue that the Court lacks subject matter

jurisdiction.  Defendants' motions should be denied in their entirety.

      The factual allegations in the Complaint and evidence submitted on this motion establish

that Cellular Sales of New York is but one branch of CSOKI's fully integrated, nationwide

business enterprise. CSOKI operates retail store locations exclusively selling Verizon Wireless

products in various regional markets. New York is Cellular Sales of New York's regional market. Cellular Sales of New York is a direct arm and agent of CSOKI's nationwide business enterprise. The record shows that CSOKI exercises extensive control of Cellular Sales of New York's business operations, is deeply involved in the day-to-day operation of the integrated business, and directly benefits from Cellular Sales of New York's business. Defendants represent on the internet that CSOKI and Cellular Sales of New York are an integrated business. This is also how CSOKI has presented itself in various media outlets. These facts collectively show defendants to be one integrated entity.

Plaintiffs have made a *prima facie* showing under Section 301 of the New York Civil Practice Law and Rules (the "CPLR") that this Court has personal jurisdiction over CSOKI because Cellular Sales of New York admittedly does business in New York. and Cellular Sales of New York is both a "mere department" and agent of CSOKI.

Plaintiffs have also made a *prima facie* showing that their claims arise out of CSOKI's transacting business and entering into contracts for goods and services by CSOKI directly or through its agents. Thus Section 302(a)(1) of the CPLR provides jurisdiction.

Therefore, Defendants' claim that this Court does not have personal jurisdiction over CSOKI must be denied, or at the very least this Court's decision on Defendants' motion should be held in abeyance pending jurisdictional discovery and further submissions that explore the business relationship between CSOKI, Cellular Sales of New York, and the Sales Representatives that work within New York.

Based on legal principle and the facts of this case, there is also no basis to dismiss Plaintiff's Complaint for lack of subject-matter jurisdiction because Plaintiffs allegedly failed to mediate as required by contract prior to filing suit. Non-binding mediation will not result in any decision or findings by a neutral third-party, and the history of the parties' dispute reveals that

non-binding mediation will not yield an effective resolution of Plaintiffs' claims. As such, the non-binding mediation invoked by Defendants does not fall within the meaning of "arbitration" under the Federal Arbitration Act (the "FAA") or Article 75 of the CPLR, and it need not be compelled under New York common law.  Since mediation is not the equivalent of arbitration, the failure to mediate is not a condition precedent to commencing suit. Even if this Court decides that it should order the parties to conduct non-binding mediation, the interest of judicial economy and other equitable factors provide that this case should be stayed pending the completion of non-binding mediation.

## STATEMENT OF FACTS

### I.  Plaintiff's Complaint

Plaintiffs brought this action seeking compensation from Defendants for violations of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq.*, the New York State Labor Law (the "Labor Law"), Article 6, § 190 *et seq.*, and Article 19, § 650 *et* seq., and the New York State common law arising from their misclassification as independent contractors rather than employees. (Affirmation of Ronald G. Dunn dated June 29, 2012 ["Dunn Aff."], Ex. AA [Complaint], ¶¶ 1-7, 117-147).

Defendants operate retail store locations throughout New York where Sales Representatives sell Verizon Wireless products and services on Defendants' behalf to customers who enter the fixed location stores. (Dunn Aff., Ex. AA [Complaint], ¶¶ 12, 19, 22, 27). Plaintiffs allege that Defendants jointly exercised substantial control over how Plaintiffs' performed their duties as Sales Representatives, and therefore were and are Defendants' employees under the FLSA and Labor Law. (Dunn Aff., Ex. AA [Complaint], ¶¶ 14, 16, 18, 24, 28-30, 33-57, 69, 71-72, 76-78, 82-84, 94, 94-97). Because Defendants' misclassified Plaintiffs

as independent contractors, Plaintiffs allege that they were deprived of overtime compensation and minimum wages required under the FLSA and the Labor Law, and were subject to unlawful wage deductions in violation of the Labor Law. Defendants were unjustly enriched at Plaintiffs; expense in violation of the New York Common Law. (Dunn Aff., Ex. AA [Complaint], ¶¶ 58-65, 73-74, 79-80, 85-86, 91-92, 98-99).

## II.     The Business Relationship Between CSOKI and Cellular Sales of New York

CSOKI is the parent company of Cellular Sales of New York and is headquartered and maintains its principal place of business in Knoxville, Tennessee. Defendants admit that "CSOKI is the owner and sole member" of Cellular Sales of New York, and Cellular Sales of New York "conducts Business Operations only in New York" – i.e. "retail sales of Verizon Wireless services and related equipment and accessories." (Affidavit of Julie Dean, sworn to June 8, 2012 [the "Dean Aff."], ¶¶ 3-4). While Defendants claim that CSOKI is merely the "holding company of various subsidiary companies...in various states, including Tennessee and New York," both the allegations in the Complaint and the Affidavit of Jan P. Holick Jr., sworn to June 27, 2012 (the "Holick Aff."), reveal that Cellular Sales of New York is a branch of a nationwide, wholly integrated retail sales operation headed by CSOKI. As the these record facts support, Cellular Sales of New York conducts "Business Operations" in New York that CSOKI would otherwise perform but for its use of the corporate form of Cellular Sales of New York to operate in New York, as the profits made at the retail store locations operated by Cellular Sales of New York directly benefits CSOKI and its nation-wide business and partnership with Verizon Wireless.

The record evidence supports that CSOKI exercises extensive control over Cellular Sales of New York's internal and retail store operations as part of its nationwide retail sales operation. Defendants specifically represent on their shared website and in the media, that they are one business. (Holick Aff., ¶¶ 8-14, 25, Exs. A-E, L). CSOKI chooses Cellular Sales of New York's'

executive personnel, controls the assignment of Sales Representatives at Cellular Sales of New York's retail locations, and provides a "@cellularsales.com" e-mail address to everyone performing work on behalf of, either CSOKI or its subsidiary companies. (Holick Aff, ¶¶ 9, 16-17, 19-20, 26 30-31, Exs. D, F-H, M, P, T, U-W, Z). CSOKI pays the salaries and reimburses the business expenses of Cellular Sales of New York's executive personnel (Holick Aff., ¶ 30). CSOKI will only allow Cellular Sales of New York to open a retail store upon its authorization, and CSOKI inspects each retail store opened for compliance with CSOKI policies (Holick Aff., ¶¶ 18, 32). Cellular Sales of New York's executive personnel specifically represent they work on behalf of CSOKI, and CSOKI recruiting personnel specifically recruits Sales Representatives to work at retail store locations nominally operated by Cellular Sales of New York. (Holick Aff., ¶¶ 15-21, Ex. F-H; Dunn Aff., Ex. AA [Complaint], ¶¶ 17, 22). CSOKI provides and manages Cellular Sales of New York's product inventory. (Holick Aff., ¶ 29). CSOKI administers and controls Cellular Sales of New York's marketing, accounting, and sales system for the sale of Verizon Wireless products (Holick Aff., ¶¶ 33-35, 42, Exs. O-Q, Y). The profits from sales and other payments made at each of the retail store locations in New York go directly to benefit CSOKI. (Holick Aff., ¶¶ 34-37, Exs. Q-S).

The record evidence further reveals that CSOKI exercises substantial control over the Sales Representatives themselves. CSOKI requires that Sales Representatives incorporate as limited liability companies and sign Independent Sales Agreements (the "Agreements") with Cellular Sales of New York as a condition of performing as Sales Representatives, and these Agreements are drafted by CSOKI. (Holick Aff., ¶ 26, Ex. M; Dunn Aff., Ex. AA [Complaint], ¶ 30). By CSOKI mandate, Sales Representatives can only sell Verizon Wireless products pursuant to CSOKI's business arrangement with Verizon Wireless. (Holick Aff., ¶ 28). CSOKI provides formal paid training to Sales Representatives and directs them on appropriate dress,

recordkeeping obligations, the manner by which sales to customers are made, and other performance standards. (Holick Aff., ¶¶ 22-23, 38-40 Exs. I, T-X; Dunn Aff., Ex. AA [Complaint], ¶¶ 36-37, 45-47, 50-52). Sales Representatives are specifically denominated as CSOKI's agents in the agreements the Sales Representatives have customers sign, and Sales Representatives make payments arising from the sales of Verizon Wireless products and bill payments on Verizon Wireless service plans to CSOKI. (Holick Aff., ¶ 36-37, Exs. R-S). The Chief Executive Officer of CSOKI has direct contact with Sales Representatives regarding concerns of Sales Representatives and CSOKI's plans to resolve them. (Holick Aff., ¶ 43, Ex. Z).

III.    **History of Attempted Dispute Resolution Prior to Commencement of Action**

Almost a year prior to the commencement of this action, the lead Plaintiff in this case, Jan P. Holick, Jr., through counsel outlined the fundamental claims made in this case and broached settling the matter with Defendants. (Holick Aff., ¶¶ 44-45; Dunn Aff., ¶¶ 5, 7-8, Exs. B, D). In response, Defendants' counsel in response stated that the claims had no merit and he would get back to counsel "if there was anything more to talk about" without raising mediation as an option.  It was evident at that time that settlement discussions would not accomplish the intended result of changing Defendants' business practices in New York. (Holick Aff., ¶ 45, Dunn Aff., ¶¶ 6, 8, Ex. C). .

At approximately the same time, the lead Plaintiff filed for unemployment insurance with the New York State Unemployment Insurance Board. (Holick Aff., ¶ 46; Dunn Aff., Ex. 9). After the Board's initial determination finding that the lead Plaintiff was an employee of Cellular Sales of New York, Cellular Sales of New York challenged the determination, which resulted  in a written decision from an Administrative Law Judge upholding the initial determination. (Holick Aff., ¶ 46; Dunn Aff., ¶ 9, Ex. AA [Complaint], ¶ 70, Ex. B). The Judge's determination is currently on appeal to the New York State Unemployment Insurance Board. (Holick Aff., ¶

Dunn Aff., ¶ 9). Cellular Sales of New York has never invoked mediation in an attempt to settle the lead Plaintiff's assertion that he was an employee, although that is the fundamental claim from which every claim asserted in the Complaint arises. (Holick Aff., ¶ 47; Dunn Aff., ¶10).

## ARGUMENT

### POINT I

### PLAINTIFFS HAVE MADE A *PRIMA FACIE* SHOWING THAT THIS COURT HAS PERSONAL JURISDICTION OVER CELLULAR SALES OF KNOXVILLE, INC.

**A.    Standard of Review of a FRCP 12(b)(2) Motion Pre-Discovery in New York**

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith…legally sufficient allegations of jurisdiction," and "[a]t that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990); *see also Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)(plaintiff's burden carried "by making a prima facie showing of jurisdiction"). Plaintiff's burden to make its *prima facie* showing can be satisfied "through his own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Whitaker*, 261 F.3d at 208. When "the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Id*; *see also Cachillo v. Insmed, Inc.*, 833 F.Supp.2d 218, 225 (NDNY 2011) ("The Court is to accept all averments of jurisdictional facts as true, and construe the pleadings, affidavits, and any doubts in Plaintiff's favor.")(citations omitted).

If Plaintiffs make a *prima facie* showing in opposition to Defendants' motion that CSOKI is subject to personal jurisdiction within a New York state court under New York statute, then

this Court can exercise personal jurisdiction over CSOKI. *Spiegel v. Schulmann*, 603 F.2d 72, 76 (2d Cir. 2010). There are two types of personal jurisdiction: general and specific. "General jurisdiction is authorized where the defendant's 'affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 n. 9 (2d Cir. 2012), *quoting Goodyear Dunlop Tires Operations, S.A. v. Brown*, -- U.S. --, 131 S. Ct. 2846, 2851 (2011). CPLR 301 is the New York general jurisdiction statute. *Id.* "'Specific jurisdiction,' however, 'depends on an affiliation between the forum and the underlying controversy, principally, activity, or an occurrence that takes place in the forum State and is therefore subject to the State's regulations.'" *Id.*, *quoting Goodyear*, 131 S. Ct. at 2851. This type of personal jurisdiction is exercised in New York under CPLR 302(a). *Id.*

A *prima facie* showing of personal jurisdiction under CPLR 302(a) comports with due process and requires no further analysis, while if Plaintiffs' make a *prima facie* showing under CPLR 301, CSOKI's minimum contacts with New York required under *International Shoe v. Washington*, 326 U.S. 310, 316 (1945) is satisfied and the burden shifts to Defendants to make a "compelling case" that exercising general jurisdiction over CSOKI is unreasonable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 119-20 (1967), *quoting Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 536-37 (1967); *King County, Wash v. IKB Deutsche Industriebank AG*, 712 F.Supp.2d 104, 114 (SDNY 2010).

Rather than make a final determination on whether this Court has personal jurisdiction over CSOKI without any discovery having been conducted, this Court can hold its decision in abeyance pending jurisdictional discovery and submissions based thereon. "[G]enerally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue; but until she

8

has shown a reasonable basis for assuming jurisdiction, she is not entitled to any other discovery." *First City, Texas-Houston, N.A. v. Rafidian Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998) (holding that District Court abused discretion by ruling on jurisdictional motion when Court did not allow plaintiff "a fair opportunity to conduct jurisdictional discovery…."). As one judge of the Southern District explained:

> "District courts have considerable discretion in determining how best to handle jurisdictional questions," *Best Van Lines, Inc. v. Walker,* No. 03 Civ. 6585, 2004 WL 9642009, at *3 (S.D.N.Y. May 5, 2004), citing *CutCo Indus. v. Naughton,* 806 F.2d 361, 364-65 (2d Cir.1986), and "generally" may permit a plaintiff to conduct "limited discovery with respect to the jurisdictional issue." *Filius v. Lot Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir.1990); *see also APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003) (cautioning that "a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction" (quoting *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C.Cir.2000)). Such discovery has typically been authorized where the plaintiff has made "a threshold showing that there is some basis for the assertion of jurisdiction[,] facts that would support a colorable claim of jurisdiction." *Daval Steel Prods, v. M.V. Juraj Dalmatinac,* 718 F.Supp. 159, 162 (S.D.N.Y.1989); *see also Strategem Dev. Corp. v. Heron Int'l N.V.,* 153 F.R.D. 535, 547-48 (S.D.N.Y.1994) (authorizing jurisdictional discovery where plaintiff "made a sufficient start" toward establishing jurisdiction, though not a prima facie showing).[7]

*Ayyash v. Bank Al-Madina*, 04 CIV 9201 (GEL), 2006 WL 587342, at *5 (SDNY Mar. 9, 2006).[1]

## B.   *Prima Facie* Showing that Cellular Sales of New York is a "Mere Department" of CSOKI under CPLR 301

There is no dispute in this case that Cellular Sales of New York operating retail stores that exclusively sell Verizon Wireless products within New York and is subject therefore to Court's exercise of personal jurisdiction under CPLR 301 and CPLR 302(a). There is also no dispute that Cellular Sales of New York is wholly owned by CSOKI and is therefore CSOKI's subsidiary.

---

[1] All unpublished or slip opinions cited in this Brief are attached to this Brief as **Appendix A.**

General jurisdiction over a defendant under CPLR 301 arises when the defendant is "doing business" within New York state. Since CSOKI is the parent company of Cellular Sales of New York—which indisputably does business in New York—the question then becomes whether parent's control of the subsidiary is "pervasive enough that the corporate separation is more formal than real," and therefore the subsidiary is a "mere department" of the parent subjecting the parent to personal jurisdiction in New York. *Jacobs v. Felix Bloch Erben Verlag Fur Buhne Film Und Funk KG*, 160 F.Supp.2d 722, 734 (SDNY 2001), *quoting H. Heller & Co. v. Novacor Chemicals Ltd.*, 726 F.Supp. 49, 54 (SDNY 1988). The inquiry requires "a fact-specific inquiry into the realities of the actual relationship between" the Defendants. *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 864 (2d Cir. 1996).

Four factors must be assessed when determining whether CSOKI can be subject to personal jurisdiction under CPLR 301 because of its parent-subsidiary relationship with Cellular Sales of New York: (1) "common ownership,"; (2) "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies exercised by the parent." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984); *see also Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184-85 (2d Cir. 1998) (applying *Beech* factors); *King County, Wash.*, 712 F.Supp.2d at 112-13 (applying *Beech* factors); *Jacobs*, 160 F.Supp.2d at 734-37 (applying *Beech* factors).

When assessing the factors, Courts ascertain whether the "separate corporations function, in reality, as 'integral' parts of a 'united endeavor.'" *Jacobs*, 160 F.Supp.2d at 734, *quoting Titu-Serban Ionescu v. E.F. Hutton & Company S.A.,* 434 F.Supp. 80, 83 (SDNY 1977). "While the first factor—common ownership—is 'essential' for an assertion of jurisdiction, '[t]he other three

are important, but not essential.'" *Kings County, Wash.*, 712 F.Supp.2d at 111, *quoting Tese-Milner v. De Beers Centenary A.G.*, 613 F.Supp.2d 404, 416 (SDNY 2009). Therefore, "'[t]he overall weighing of the various factors thus necessitates a balancing process, and not every factor need weigh entirely in the plaintiffs' favor.'" *Id.*, *quoting Reers v. Deutsche Bahn AG*, 320 F.Supp.2d 140, 156 (SDNY 2004). Moreover, "[w]hen applying the Beech test, '[e]stablishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than is necessary to pierce the corporate veil for purposes of liability.'" *Id.*, *quoting GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F.Supp.2d 308, 319 (SDNY 2004).

Applying the *Beech* factors to the record reveals that Plaintiffs have made a *prima facie* showing that Cellular Sales is a "mere department" of CSOKI doing business within New York.

Defendants admit the "essential" first factor by admitting that CSOKI wholly owns Cellular Sales of New York.

The second factor—Cellular Sales of New York's "financial dependency" on CSOKI—is shown by: (1) CSOKI's financing and control over Cellular Sales of New York's product inventory sold in retail stores; (2) CSOKI's reimbursement of Cellular Sales of New York's executive personnel's business expenses; and (3) CSOKI's performing Cellular Sales of New York's accounting and maintenance of Cellular Sales of New York's books and records through a centralized computer system. *Beech*, 751 F.2d at 121, *citing Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 101-102 (1965) *and Public Administrator v. Royal Bank*, 19 N.Y.2d 127, 131-32 (1967); *Jacobs*, 160 F.Supp.2d at 735-36 (noting Plaintiff provided "no credible evidence" rebutting that parent and subsidiary maintain separate "books and records" and have their "own bank accounts.").

11

The third factor—"the degree" CSOKI "interferes in the selection and assignment of" Cellular Sales of New York's "executive personnel and fails to observe corporate formalities"— is shown by: (1) CSOKI choosing Cellular Sales of New York's regional directors; (2) Cellular Sales of New York's executives and recruiting personnel identifying themselves as representing CSOKI; (3) CSOKI paying the salaries of Cellular Sales of New York's regional directors;  and (4) CSOKI assigning Sales Representatives to work at retail stores operated by Cellular Sales of New York. *Beech*, 751 F.2d at 121, *citing Royal Bank*, 19 N.Y.2d at 132, *Taca International Airlines*, 15 N.Y.2d at 101, *and Rabinowitz v. Kaiser-Frazer Corp.*, 198 Misc. 707, 710-11 (Sup Ct., Kings Co. 1950).

The fourth factor—"the degree of control over the marketing and operational policies of" Cellular Sales of New York "exercised by" CSOKI—is shown by: (1) CSOKI's representations that the retail stores Cellular Sales of New York operates are branches of CSOKI's nationwide retail enterprise; (2) Cellular Sales of New York's inability to open retail store locations without CSOKI's approval; (3) CSOKI's inspection of retail stores operated by Cellular Sales of New York for compliance with CSOKI policies; (4) CSOKI's training of the Sales Representatives working in the retail stores operated by Cellular Sales of New York; (5) CSOKI engaging in centralized advertising and marketing endeavors on behalf of Cellular Sales of New York; (6) CSOKI providing a centralized accounting and sales system for Cellular Sales of New York; and (7) CSOKI's extensive control over the performance of the Sales Representatives who perform in Cellular Sales of New York's retail stores and direct contract with the Sales Representatives. *Beech*, 715 F.2d at 122, *citing Boryk v. deHavilland Aircraft Co.*, 341 F.2d 666, 668 (2d Cir. 1965), *Public Administrator*, 19 N.Y.2d at 131-32, *and Taca International Airlines*, 15 N.Y.2d at 101; *Kings County, Wash.*, 712 F.Supp.2d at 113.

668 (2d Cir. 1965), *Public Administrator*, 19 N.Y.2d at 131-32, *and Taca International Airlines*, 15 N.Y.2d at 101; *Kings County, Wash.*, 712 F.Supp.2d at 113.

The record support for all four factors, provides a *prima facie* showing that Cellular Sales of New York is a "mere department" of CSOKI doing business within New York sufficient to establish personal jurisdiction over CSOKI.

### C.   *Prima Facie* Showing that Cellular Sales of New York is an Agent of CSOKI under CPLR 301

Separate from the "mere department" test, this Court can exercise personal jurisdiction over CSOKI is established under CPLR 301 if the Court finds that CSOKI "affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." *Wiwa v. Royal Dutch Petroleum*, 226 F.3d 88, 95 (2d Cir. 2000), *citing Frummer.*, 19 N.Y.2d at 537 *and Gelfand*, 385 F.23d at 120-21; *see also AirTran N.Y., LLC v. Midwest Air Group, Inc.*, 46 A.D.3d 208, 218 (1st Dept. 2007)(citing *Gelfand* for proposition that "[w]hen a subsidiary provides services sufficiently important to a foreign corporation that, but for the subsidiary's actions, the parent company's employees and officers would have to enter the state to provide those services themselves, it becomes the agent of the parent.").

There is no need for a "formal agency agreement" between CSOKI and Cellular Sales of New York, nor does there need to be a showing that CSOKI "exercised direct control over" Cellular Sales of New York for an agency relationship to be found. *Wiwa*, 226 F.3d at 95 (citations omitted); *AirTran*, 46 A.D.3d at 219 (quoting *Wiwa*). What matters is Cellular Sales of New York "must be primarily employed by" CSOKI and "not engaged in similar services for other clients." *Id.* The cornerstone of the analysis is that the Cellular Sales of New York does "all

13

the business which" CSOKI "could do were it here by its own officials." *Frummer*, 19 N.Y.2d at

537; *Gelfand*, 385 F.2d at 121 (interpreting *Frummer* to mean "that a foreign corporation is

doing business in New York 'in the traditional sense' when its New York representative provides

services beyond 'mere solicitation' and these services are sufficiently important to the foreign

corporation that if it did not have a representative to perform them, the corporation's own

officials would undertake to perform substantially similar services); *AirTran*, 46 A.D.3d at 219

("apparent" that subsidiary "is doing in New York what" subsidiary "would do if it were here

instead."). As the New York Court of Appeals stated in *Frummer*:

> We are not unmindful that litigation in a foreign jurisdiction is a burdensome
> inconvenience for any company. However, it is part of the price which may be
> properly demanded of those who extensively engage in [interstate] trade. When
> [CSOKI's] activities…through an agent, become as widespread and energetic as
> the activities in New York conducted by [Cellular Sales of New York], they
> receive considerable benefits from such foreign business and may not be heard to
> complain about the burdens

(19 N.Y.2d at 538).

Since Defendants admit that CSOKI is the parent company of Cellular Sales of New

York, their parent-subsidiary relationship "is enough to give rise to a strong inference of a broad

agency relationship." *AirTran*, 46 A.D.3d at 219, *citing Frummer*, 19 N.Y.2d at 538 ("the fact

that the two [defendants] are commonly owned is significant only because it gives rise to a valid

inference as to the broad scope of the agency in the absence of an express agency agreement….")

*and Bellomo v. Pennsylania Life Co*, 488 F.Supp. 744, 746 (SDNY 1980) ("Where…subsidiaries

are created by the parent, for tax or corporate finance purposes, to carry on business on its behalf,

there is no basis for distinguishing between the business of the parent and the business of the

subsidiaries."). Because CSOKI is Cellular Sales of New York's parent company, "there is a

presumption, in effect, that" CSOKI "is sufficiently involved in the operation of" Cellular Sales

of New York "to become subject to jurisdiction." *Id.*

Plaintiff has submitted sufficient evidence to make a *prima facie* showing that Cellular Sales of New York is CSOKI's agent doing business in New York, thus supporting the exercise of personal jurisdiction over CSOKI.

CSOKI's <u>entire</u> business is a nationwide retail store operation exclusively selling Verizon Wireless products pursuant to its business partnership with Verizon Wireless. Cellular Sales of New York can only perform as an exclusive Verizon Wireless retailer pursuant to CSOKI's business partnership with Verizon Wireless, and its retail sale of Verizon Wireless products is its only business. Indeed, Sales Representatives operating out of Cellular Sales of New York's retail store operations cannot sell any product competing with Verizon Wireless as mandated by CSOKI. Defendants share they same website, CSOKI represents that Cellular Sales of New York and its Sales Representatives are part of CSOKI's integrated business group on the website and in the media, and Cellular Sales of New York can only open new retail store locations on CSOKI's approval. Sales made by Sales Representatives at retail stores operated by Cellular Sales of New York go directly to benefit CSOKI as payments for Verizon Wireless products and services go directly to CSOKI, and the Cellular Sales of New York's operation of exclusive Verizon Wireless retail stores directly benefits CSOKI's business partnership with Verizon Wireless.

Therefore, Plaintiff have made a *prima* facie showing that Cellular Sales of New York does business in New York as CSOKI's agent and CSOKI would have entered into New York but for its creation of Cellular Sales of New York. Defendants fail to put forward any "compelling" reasons why this Court should not exercise personal jurisdiction on due process grounds. Therefore, personal jurisdiction over CSOKI under CPLR 301 is established.

### D.    *Prima Facie* <u>Showing that CSOKI by itself and through Agents Transacts Business and/or Contracts for Services in New York under CPLR 302(a)(1)</u>

New York's specific jurisdiction statute, CPLR 302(a), provides in pertinent part:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state.

Under CPLR 302(a)(1), CSOKI will be subject to specific jurisdiction on Plaintiffs' claims if: (1) by itself or through agents it transacts business within New York or contracts for services to be provided in New York; and (2) Plaintiffs' claims arise from those transactions or contracts. *Best Van Lines, Inc v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007).

For the first requirement, an agent of CSOKI can be found if an entity or individual "acted for the benefit of and with knowledge and consent of" CSOKI, and that CSOKI "exercised some control over [the agent] in the matter." *Kreutter v.McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). While Plaintiffs and other Sales Representatives' unilateral activities as agents of CSOKI cannot be imputed to CSOKI for this agency analysis, CSOKI's independent activities with Plaintiffs and in activities of CSOKI's other agent in New York—Cellular Sales of New York—can establish jurisdiction. *See, e.g. Fischbarg v. Doucet*, 9 N.Y.3d 375, 383-384 (2007)(principal's solicitation of New York agent's services and active communication with agent sustains jurisdiction under CPLR 302(a)(1)).

For the first requirement, "New York courts define 'transact[ing] business' as purposeful activity-'some act by which defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Best Van Lines*, 490 F.3d at 246. "There is no definitive test to determine if" CSOKI "has purposefully availed itself of the privilege of conducting activities in New York. The totality of" CSOKI's "contacts must be reviewed to determine whether jurisdiction is proper." *Kings County,*

*Wash.*, 712 F.Supp.2d at 111, *citing CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 368 (2d Cir. 1986). The other aspect of the first requirement, "supply[ing] goods or services" within New York, simply requires CSOKI to have taken affirmative steps to provide goods or services within New York pursuant to a contractual arrangement. *Island Wholesale Wood Supplies, Inc. v. Blanchard Industries, Inc.*, 101 A.D.2d 878, 879-80,(2d Dept. 1984).

"The second requirement, the so-called nexus test, is interpreted very narrowly by the New York Courts." *Best Van Lines*, 490 F.3d at 246 (internal quotes and citations omitted). There must be a "substantial relationship" between Plaintiffs' claims and any transaction of business or supply of goods and services pursuant to contract in New York. *Fischbarg*, 9 N.Y.3d at 284; *Johnson v. Ward,* 4 N.Y.3d 516, 519 (2005). The mere fact that Plaintiff and others similarly situated are not in privity with CSOKI's contractual arrangement to supply goods or services within New York fails to negate the "substantial relationship." *See Island Wholesale*, 101 A.D.2d at 879-80; *People v. Concert Connection, Ltd.*, 211 A.D.2d 310 (2d Dept. 1995).

In light of these legal principles, Plaintiffs have submitted a *prima facie* showing sufficient to exercise specific jurisdiction over CSOKI. Specific agreements that Plaintiffs and other similarly situated had customers sign recognized their status as CSOKI agents, while the question of Cellular Sales of New York's status as CSOKI's agent is addressed in Point I(C), *supra*. By itself, CSOKI transacted business in New York by, amongst other things, recruiting Sales Representatives in New York to perform as Sales Representatives, requiring Sales Representatives to sign Agreements it drafted as a condition of Sales Representatives performing in New York, engaging in direct contact with Sales Representatives regarding their performance, authorizing the opening of retail store locations operated by Cellular Sales of New York, and actively inspecting retail store locations operated by Cellular Sales of New York for compliance with CSOKI policies. Through its agent Cellular Sales of New York, CSOKI operated its

nationwide business as an exclusive Verizon Wireless retailer within New York. CSOKI has a contractual business arrangement with Verizon Wireless for itself and its subsidiary to sell Verizon Wireless products within New York, and CSOKI specifically supplies the Verizon Wireless product inventory to Cellular Sales of New York for sale by Sales Representatives pursuant to that arrangement. Plaintiffs specifically plead that CSOKI was their employer.  Thus, all of Plaintiffs' claims directly and substantially relate to and arise from these contacts with New York.

As this Court need not engage in a due process analysis upon a *prima facie* showing of personal jurisdiction under CPLR 302(a)(1), this Court therefore should deny Defendants' motion to dismiss CSOKI from this action on personal jurisdiction grounds.

**E.** **Plaintiffs Are Minimally Entitled to Jurisdictional Discovery Prior to a Determination on this Court's Personal Jurisdiction Over CSOKI**

Even if this Court finds that Plaintiffs have not submitted a *prima facie* showing of jurisdiction over CSOKI under CPLR 301 or CPLR 302(a)(1) at this time, which Plaintiffs vigorously dispute, this Court should exercise its discretion on a FRCP 12(b)(2) motion and hold this motion in abeyance pending jurisdictional discovery and submissions based thereon. Plaintiffs have been able to provide a "threshold showing that there is some basis for the assertion of jurisdiction." *Ayyash v. Bank Al-Madina*, 04 CIV. 9201 (GEL), 2006 WL 587342, at *5 (quotations omitted). This Court at the very least should allow Plaintiffs to explore through discovery the exact business relationship between CSOKI, Cellular Sales of New York, and Sales Representatives that operate within the retail store locations in New York nominally operated by Cellular Sales of New York.

**POINT II**

## THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS AND THERE IS NO BASIS TO DISMISS THEM FOR MEDIATION

### A.     Standard of Review on a FRCP 12(b)(1) Motion

CSOKI also asserts, under FRCP 12(b)(1), that this Court has no power to adjudicate Plaintiffs' claims based on the nature of the claims themselves. *King County, Wash.*, 712 F.Supp.2d at 112 ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the court lacks statutory or constitutional power to adjudicate the case"), *citing Marakova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Whether or not parties have stated a claim upon which relief can be granted—i.e. a FRCP 12(b)(6) claim—must not be confused with a Court's holding that it has no power to adjudicate the asserted claims at all under FRCP 12(b)(1). Wright & Miller, Federal Practice and Procedure: Civil 3d § 1350, at p. 106 ("Nor, as many courts have noted, should a motion under Rule 12(b)(1) be confused with a motion under Rule 12(b)(6) to dismiss for failure to state a claim under federal or state law because the two are analytically different.  As many courts have observed, the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication to whether a cognizable legal claim has been stated.").

Just like on a FRCP 12(b)(2) motion, this Court can consider "sworn affidavits, correspondence between the parties, contracts, or other relevant documents" to reach its determination whether it has subject-matter jurisdiction. (*King County, Wash.*, 712 F.Supp.2d at 112, *citing Marakova*, 201 F.3d at 113). ).

### B.     A Contractual Condition Precedent Cannot Divest this Court of Subject-Matter Jurisdiction

Even assuming *arguendo* that Federal or New York state law requires this Court to force Plaintiffs to submit its asserted claims to non-binding mediation as ostensibly required by the

Agreements, Plaintiffs signed with Cellular Sales of New York, which Plaintiffs vigorously dispute, that fact <u>does not</u> mean that this Court is divested of subject-matter jurisdiction to hear Plaintiffs' claims.

This Court is empowered to hear Plaintiffs' claims pursuant to the FLSA under 28 U.S.C. § 1331 as a federal question, and Congress specifically granted federal courts the power to hear claims under the FLSA pursuant to 29 U.S.C. § 216(b). Since Plaintiffs' Labor Law and New York common law claims are inextricably intertwined with the facts underlying the FLSA claim, this Court has subject-matter jurisdiction to hear them under 28 U.S.C. § 1367.

"[I]t is a cardinal rule upheld by countless federal cases that the parties may not... destroy jurisdiction by agreement or by consent." Wright & Miller, <u>Federal Practice and Procedure</u>: Civil 3d § 1350, p. 128 . "Subject-matter jurisdiction properly comprehended...refers to a tribunal's power to hear a case, a matter that can never be forfeited or waived." *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Cent. Region*, -- U.S. --, 130 S.Ct. 584, 596 (2009). Whether or not Plaintiffs were required to go to mediation prior to filing a suit on claims arising under the Agreements may go toward the viability of Plaintiffs claims and appropriately tested under a FRCP 12(b)(6) motion, but it cannot deprive this Court of subject-matter jurisdiction. *N-Tron Corp. v. Rockewell Automation, Inc.*, 09 CIV 0733, 2010 WL 653760, at *4-*5 (S.D. Alabama 2010)(collecting cases in support of denying FRCP 12(b)(1) motion to dismiss on grounds that Plaintiff failed to go to contractually obligated mediation before filing suit because "it conflates non-performance of a contractual condition precedent with deprivation of subject-matter jurisdiction.").

Defendants could have made a FRCP 12(b)(6) motion, but instead raised purely jurisdictional objections. As Plaintiffs' failure to submit its claims to mediation as ostensibly

obligated by the Agreements does not rise to a jurisdictional defect, this Court should deny Defendants' FRCP 12(b)(1) motion.

**C.    Non-Binding Mediation Invoked by Defendants Need Not Be Compelled under Federal or New York Law**

Even if this Court finds that it can determine whether to compel Plaintiffs to mediate their claims on a FRCP 12(b)(1) motion, nothing under Federal or New York law requires that result.

First, the non-binding mediation envisioned under the Agreements does not fall within the meaning of "arbitration" under either the FAA or Article 75 of the CPLR. The Second Circuit has not yet addressed whether non-binding alternative dispute resolution is "arbitration" under the FAA. *American Center for Law and Justice-Northeast, Inc. v. American Center for Law and Justice, Inc.*, 12 CIV. 730, 2012 WL 2374728, at *5 (D. Conn. June 22, 2012). However, the District Courts within the Second Circuit that have found non-binding dispute resolution to be "arbitration" under the FAA all appear to require that one fundamental attribute of arbitration be present: the neutral third-party conducting the alternative dispute resolution reaches a decision. *See Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 10 CIV 1455, 2011 WL 4529668, at *6 (EDNY Sept. 27, 2011)("if the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration."), *quoting AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 460 (EDNY 1985); *CB Richard Ellis, Inc. v. American Env'tal Waste Mgmt.*, 98 CIV 4183, 1998 WL 903495, at *2 (EDNY Dec. 4, 1998)(relying on *AMF Inc.*); *see also Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.*, 390 F.3d 684, 689 (10th Cir. 2004)("Central to any conception of classic arbitration is that the disputants empowered a third power to render a decision settling their dispute); *Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir. 1997)("the essence of arbitration" is that parties "agreed to arbitrate [their] disputes through to completion, i.e. to an

award made by a third-party arbitrator."). This is the same under CPLR 7501. *Matter of Chris O'Connell, Inc.*, 235 A.D.2d 248, 249 (1st Dept. 1997)(compelling an agreement to "mediate" rather than "arbitrate" under CPLR 7501 because agreement provides "[t]he proceedings shall be conducted as the mediator directs, with written findings."); *Board of Educ. v. Cracovia*, 36 A.D.2d 851 (2d Dept. 1971)(arbitration that yields an advisory opinion is "arbitration" under CPLR 7501). Instead, the plain language of the Agreements envision "a neutral third party who tries to help the disputing parties reach a mutually agreeable solution" without the neutral rendering a decision or factual findings on Plaintiffs' claims. *Lynn v. General Elec. Co.,* 03 CIV 2662, 2005 WL 701270, at *6 (D. Kansas Jan. 20, 2005), *quoting* Black's Law Dictionary (8th ed. 2004)(definition of mediation).

Second, regardless of whether this Court finds that the Agreements' mediation clauses falls within the FAA or Article 75 of the CPLR, basic New York contract law allows this Court to excuse Plaintiffs from abiding by the Clause based on Cellular Sales of New York's conduct prior to the commencement of this action. It is a fundamental precept of contract law that "a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." *Rochester Community Individual Practice Ass'n, Inc v. Finger Lakes Ins. Co., Inc.*, 281 A.D.2d 977, 979 (4th Dept. 2001); *Roberts v. H. Gin Realty Co.*, 185 A.D.2d 209, 209 (1st Dept. 1992)("[i]t is a familiar principle that one who frustrates the other party's fulfillment of a condition precedent…cannot avail himself of that condition precedent as a defense.").

On the record facts, the lead Plaintiff and his counsel, approximately a year prior to the commencement of this action, outlined the fundamental claims made in the case and broached settling the matter with Defendants. Defendants' counsel in response stated that the claims had no merit and he would get back to counsel "if there was anything more to talk about" without invoking mediation. At that point, it was evident that any sort of non-binding settlement

no merit and he would get back to counsel "if there was anything more to talk about" without invoking mediation. At that point, it was evident that any sort of non-binding settlement discussions would be fruitless. Moreover, at the same time, the lead Plaintiff became embroiled in a dispute with Cellular Sales of New York over his entitlement to unemployment insurance involving the same fundamental claim involved in this action: whether he was misclassified as an independent contractor when working as a Sales Representative. This dispute is still ongoing. Yet Defendants have <u>never</u> invoked non-binding mediation under the Agreements as a method of settling the claims. Plaintiffs' failure to further press for mediation after Defendants' own refusal to in good faith attempt engage Plaintiffs in settlement discussions upon Plaintiffs' prompting and invoke mediation under the Agreements as the appropriate method of engaging in those discussions cannot now be wielded as a sword by Defendants to force non-binding mediation on the claims that will unlikely yield an effective resolution. *Cf. Glover v. St. Louis-San Francisco Railway*, 393 U.S. 324, 429-30 (1969) (employees not required to exhaust grievance procedure "where the effort to proceed formally with contractual or administrative remedies would be wholly futile."); *Paramedics Electromedicina Comercial LTDA. v. GE Medical Systems Information Technologies, Inc.*, 02 CIV 9369, 2003 WL 23641529, at * 8-*9 (SDNY 2003)("Tecnimed cannot now use its own refusal to mediate to avoid arbitration."), *rev'd in part on other grounds*, 359 F.3d 645 (2d Cir. 2004).

D.   <u>**Staying this Action is the Appropriate Step if this Court Decides to Compel Non-Binding Mediation**</u>

If this Court determines that it should nevertheless compel the parties to the non-binding mediation under the Agreements, the appropriate course of conduct for this Court is to stay this action pending completion of mediation.

23

discretion to stay proceedings as an incident to its power to control its own docket."); *Giuda v. Home Savings of America, Inc.*, 793 F.Supp.2d 611, 620 (EDNY 2011) (under 9 U.S.C. § 3, "[t]he district court can exercise its discretion to stay the proceeding or can conclude that the litigation should be dismissed), *citing Salim Oleochemical v. M/V Shropshire*, 278 F.3d 90, 92-93 (2d Cir. 2002); *Hoguet Newman Regal & Kenney, LLP v. Rubin*, 11 CIV 5377, 2011 WL 5838362, at * 1 (SDNY Nov. 18, 2011) ("[a] district court has the discretion to choose between dismissing and staying the matter" that must "be first submitted to non-binding mediation and then, if necessary, to arbitration").[2] "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of its judgment, which must weight competing interests and maintain an even balance." *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936).

Here, on weighing the interests of the parties and this Court, this Court should find that the issuance of a stay is the best course of action if it determines to compel non-binding mediation. First, "a dismissal renders an order appealable," while "the granting of a stay is an unappealable interlocutory order," and "[u]nnecessary delay...through appellate review is disfavored." *Salim*, 278 F.3d at 93; *Giuda*, 793 F.Supp.2d at 620. Second, given the non-binding nature of the mediation, it is likely that Plaintiffs claims will be before this Court once again, and if stayed until mediation is complete, the parties will be in the same position as though mediation had occurred prior to the commencement of this action without any prejudice to Defendants. *N-Tron Corp.*, 09 CIV 733, 2010 WL 643760, at * 8 ("staying this action for a discrete period of

---

[2] There is no discretionary authority to dismiss a pending action found to be subject to arbitration under CPLR 7503(a). The provision states that when an issue "claimed to be arbitrable is involved in an action pending in a court," upon the grant of a motion compelling that arbitration, "the order shall operate to stay a pending or subsequent action, or so much of it as is referable to arbitration," and the interest of judicial economy is the rationale. CPLR 7503(a), *see Princeton Information, Ltd. v. Marcus*, 235 A.D.2d 234 (1st Dept. 1997)(dismissal of pending action inappropriate since "a judicial action may be required after the arbitration.").

time to require negotiation and mediation...would place [defendant] in precisely the same bargained-for position it would have occupied had [plaintiff] complied with the dispute resolution clause before filing suit in the first place."). Third, dismissal of the proceeding will yield the possibility that Plaintiffs' and other similarly situated individuals' claims under the FLSA for overtime and minimum wage compensation in certain workweeks will be time-barred as being beyond the two-year statute of limitation for claims under the FLSA. *See id.* ("[A] dismissal without prejudice would be tantamount to a dismissal with prejudice, effectively barring it from ever litigating its fraud and deceit claims...because of the now-expired limitations period."). Lastly, a "stay, pending mediation, will...foster the possibility for a settlement before the attorneys' fees and costs associated with this litigation grow to a point where the option of settling is rendered futile." *Swartz v. Westminister Services, Inc.*, 10 CIV 1722, 2010 WL 3522141, at *2 (M.D. Florida Sept. 8, 2010).

On this basis, staying rather than dismissing this action is an appropriate use of this Court's discretion.

## CONCLUSION

### DEFENDANT'S MOTIONS TO DISMISS SHOULD BE DENIED

Dated: Albany, New York
      June 29, 2012

Respectfully submitted,

GLEASON, DUNN, WALSH & O'SHEA

By: _____
     Ronald G. Dunn, Esq.  (Bar Roll No. 101553)
     Daniel A. Jacobs, Esq.  (Bar Roll No. 515241)
     *Attorneys for Plaintiffs*
     40 Beaver Street
     Albany, NY 12207
     (518) 432-7511

TO:   C. Larry Carbo III
Chamberlain, Hrdlicka, White, Williams & Aughtry
Attorney for Defendants
1200 Smith Street, Suite 1400
Houston, Texas 77002

Joseph M. Dougherty, Esq.
Hinman Straub
Attorneys At Law
121 State Street
Albany, NY 1693

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAN P. HOLICK, JR., STEVEN MOFFITT,
JUSTIN MOFFITT, GURWINDER SINGH,
and JASON MACK,

                    Plaintiffs, on behalf of themselves
                    and all others similarly situated,

     -against-

CELLULAR SALES OF NEW YORK, LLC, and
CELLULAR SALES OF KNOXVILLE, INC.,

               Defendants.

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
Case No. 1:12-CV-584 (NAM/DRH)

# APPENDIX

Ayyash v. Bank Al-Madina, Not Reported in F.Supp.2d (2006)

RICO Bus.Disp.Guide 11,038

2006 WL 587342
United States District Court,
S.D. New York.

Adnan Abou AYYASH, Plaintiff,
v.
BANK AL-MADINA, United Credit
Bank, Rana Abdelrahim Koleilat, Taha
Abdelrahim Koleilat, Bassel Abdelrahim
Koleilat, Rene Moawad, Joumana Mohamad
Ayyas, and John Does 1-10, Defendants.

No. 04 Civ. 9201(GEL). | March 9, 2006.

**Attorneys and Law Firms**

Daniel H. Weiner, Hughes Hubbard and Reed LLP, New York, N.Y. (David G. Liston and Michael D. Tiger, on the brief), for plaintiff.

Bradley I. Ruskin, Proskauer Rose LLP, New York, N.Y. (Peter J.W. Sherwin and Matthew J. Morris, on the brief), for defendant Rene Moawad.

**Opinion**

**OPINION AND ORDER**

LYNCH, J.

*\*1* Plaintiff Adnan Abu Ayyash brings this action against various Lebanese entities and individuals, claiming that through a scheme to defraud masterminded by defendant Rana Koleilat, defendants stole and laundered through the United States and other countries more than one billion dollars belonging to Ayyash, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), and New York law. Defendant Rene Moawad now moves to dismiss the complaint for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), lack of personal jurisdiction, id. 12(b)(2), improper venue on the basis of forum non conveniens, id. 12(b)(5), and as to the RICO claims, failure to state an actionable claim, id. 12(b)(6). For the following reasons, Moawad's motion will be dismissed, without prejudice to refiling after limited jurisdictional discovery.

**BACKGROUND**

Ayyash, a Lebanese national currently residing in Saudi Arabia and with no personal or professional ties to the United States, is the majority owner of two banks in Lebanon, Al-Madina Bank ("Madina") and its affiliate, United Credit Bank ("UCB") (collectively "the Banks"). (Compl.¶¶ 6-8.) Ayyash alleges that defendants, all Lebanese nationals employed by or associated with the Banks, conspired "to acquire control and conduct the affairs" of the Banks through a pattern of racketeering activity "including wire fraud, money laundering, forgery and embezzlement," primarily for the purpose of enriching themselves. (Id. ¶¶ 3-4, 47-51.) This conspiracy was masterminded by defendant Rana Abdelrahim Koleilat, officer and advisor to the General Manager of Madina, and involved a number of Koleilat's family members and fellow bank employees, including defendant Moawad, who is alleged to be Koleilat's boyfriend. (Id. ¶¶ 1, 12.) The conspiracy existed from November 1999 to February 2003, until "[d]efendants and their corrupt enterprise" caused the Banks' collapse (id. ¶¶ 5, 53), resulting in "one of the largest scandals in modern Lebanese history" (Pl. Mem. at 6). [1]

The mechanics of defendants' conspiracy are somewhat hazy, but it is alleged that Rana, a high-level Madina employee with "unfettered access to all financial and operational information" at the bank, engaged, with the assistance of others, in a series of forgeries that induced Ayyash to transfer approximately $670 million into the bank, funds which Koleilat then siphoned to herself and her co-conspirators. (Id. ¶¶ 23-24, 27-37.) Ayyash transferred these funds to what he believed was his personal account at Madina, but which was actually a "dummy" account set up by Koleilat. (Id . ¶¶ 29-31.) These funds were transferred from the dummy account to defendants' personal accounts at the Banks, and then to accounts "around the world," in order "to segregate [the funds] further from Al-Madina Bank and UCB." (Id. ¶ 46.)

Significant for the present motion, Ayyash claims that among these international transfers were wires "through and to accounts in the United States" of funds stolen by defendants, transfers intended to "promote the carrying on of unlawful activity, i.e., the defrauding of the foreign banks Al-Madina Bank and UCB" (id. ¶¶ 38, 42, 45). The complaint and an investigative consultant's declaration submitted by Ayyash specifically discuss four such wire transfers:

*\*2* • On or about October 15, 2002, a $1 million transfer from Moawad's UCB account to his account

with Banque Safra France, which allegedly was routed through Wachovia Bank in New York and UBS AG in Stamford, Connecticut. (*Id.* ¶ 39; McLaughlin Decl. ¶ 5.) It is unclear whether the funds were ultimately transferred to France or "remained in the United States in an account of or at a branch of Banque Safra France." (McLaughlin Decl. ¶ 6.)

- On or about October 18, 2002, a $500,000 transfer from Moawad's UCB account to his account at EDF Man International, Inc., a London-based bank, through Wachovia Bank in New York. (Compl.¶ 40.) While not entirely clear, the consultant claims that "the available documentation indicates that the transaction terminated in the United States at EDF Man's Chase Manhattan Bank account [in New York] held on Moawad's behalf." (McLaughlin Decl. ¶ 8.)

- On or about November 20, 2002, a $560,000 transfer from Moawad's UCB account to his account with Ferrier Lullin N Cie SA, a Swiss bank, through Wachovia NA, New York to an account at UBS AG in Stamford held by Ferrier Lullin. (Compl. ¶ 41; McLaughlin Decl. ¶ 9.) Ayyash's consultant claims that "the available documentation indicates that the transaction terminated in the United States at Ferrier Lullin's [UBS] account." (McLaughlin Decl. ¶ 10.)

- On January 29, 2003, a $1 million transfer from Moawad's UCB account, through Wachovia Bank in New York, to an account held by the Bank of Beirut for the benefit and credit of Moawad. Ayyash's consultant states that "[b]ased on the available documentation, the funds could have remained in the United States in an account of the Bank of Beirut." (McLaughlin Decl. ¶¶ 11-12.)

As to all these transactions, Ayyash's consultant would need "further documentation" to "definitively conclude" where the transactions terminated. (*Id.*)

Ayyash's expert also states that during this period (October 2002-February 2003), Moawad's UCB account was receiving large deposits from other accounts at Madina and UCB, including four transfers from December 2002 to February 2003 from Kolcilat's UCB and Madina accounts totaling approximately $20 million (*Id.* ¶¶ 16-26.) As with the other transactions discussed by Ayyash's expert, "[b]ased on the current record, it is unclear whether these statements reflect the entire transactions or whether these transactions originated or terminated in locations or accounts not reflected on the documents." (*Id.* ¶ 26.)

Ayyash alleges that the conspiracy led ultimately to the Banks' collapse. Specifically, Kolcilat triggered a liquidity crisis at the Banks by issuing more than $150 million in checks in her and her co-conspirators' names between December 2002 and January 2003, "in an attempt to withdraw the remaining balance of suspected laundered money from Al-Madina Bank and UCB." (*Id.* ¶¶ 53-54.) Ayyash attempted to avert this crisis by infusing the Banks with $470 million of his own funds; the attempt was unsuccessful and Ayyash never recovered these funds. (*Id.* ¶ 55.)

*3 Ayyash attempted through a number of means to recover the more than $1 billion he lost, without success. First, Ayyash contacted Kolcilat and threatened to sue her if she did not return his money. Kolcilat convinced Ayyash that she would pay him back by transferring to him a $4 billion account she held in a Swiss bank, if Ayyash would give Kolcilat a check to cover the amount in the account over what she owed him. (*Id.* ¶ 58.) Ayyash complied and made out checks to Kolcilat, only to later discover that the bank account did not exist. Kolcilat used Ayyash's checks to pay off some of her own debts, in particular providing the Central Bank with check for 310 million euros drawn on the Arab Bank in Paris. (*Id.* ¶ 60.)

Ayyash has also attempted to bring suit against Kolcilat and her co-conspirators in Lebanon, but he alleges that these suits have been thwarted by the Lebanese courts and Central Bank, which allegedly are subject to pressure from "high-level officials" who may have participated in the conspiracy. (Pl. Mem. at 38-40; Def. Mem. at 27-28; Sardouk Decl. ¶¶ 10-23.) In fact, instead of taking action against Kolcilat and her cohorts, Ayyash alleges that the Lebanese government has (wrongly) brought suit against *Ayyash* in connection with the Banks' collapse. (Pl. Mem. at 38-40.)

Ayyash subsequently commenced this action against numerous defendants, including the Banks themselves, Rana Koleilat, three of Koleilat's family members, Moawad, and ten unnamed Doe defendants-presumably Bank employees who participated in the conspiracy-asserting RICO and state common-law claims against some or all of the defendants in connection with the alleged fraud and money laundering at the Banks. Since the filing of the complaint, Ayyash has voluntarily dismissed the complaint as to the Banks, and the Court dismissed the complaint as to Koleilat without prejudice on February 27, 2006, Ayyash having been unable to locate her and serve her with process. Moawad is the only remaining defendant who has entered an appearance in this

Ayyash v. Bank Al-Madina, Not Reported in F.Supp.2d (2006)

RICO Bus.Disp.Guide 11,038

case, and he now moves to dismiss the complaint as to him primarily on procedural grounds, arguing that neither he nor the alleged conspiracy at issue has sufficient ties to the United States for this Court to exercise jurisdiction, and that in any case, Lebanon, and not the United States, is the proper forum to address this controversy.

### DISCUSSION

Moawad moves to dismiss on four grounds, lack of subject matter jurisdiction, lack of personal jurisdiction, improper forum, and failure to state an actionable claim under RICO. Those arguments will be addressed in turn.

### I. *Subject-Matter and Personal Jurisdiction*

On a motion to dismiss for lack of subject-matter or personal jurisdiction, the plaintiff bears the burden of persuasion. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). The nature of the plaintiff's burden

> varies depending on the procedural posture of the litigation. Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed.R.Civ.P. 11, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations. After discovery, the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant.... At that point, the prima facie showing must be factually supported.

**\*4** *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990) (emphases omitted). Because the parties have not conducted discovery, the question is whether Ayyash's allegations and the supporting materials, taken in the light most favorable to Ayyash, make out a prima facie showing, that is, "legally sufficient allegations of jurisdiction." *Robinson,* 21 F.3d at 507; *Ball,* 902 F.2d at 197. The relevant jurisdictional standards overlap, and focus on the contacts between this dispute, Moawad, and the United States, and the materiality of those contacts to the alleged conspiracy.

First, as to subject-matter jurisdiction under RICO, the Second Circuit has held that while foreign entities are not, due to their foreign status alone, shielded from RICO's reach, the statute's extraterritorial application is limited. *North-South Fin. Corp. v. Al-Turki,* 100 F.3d 1046, 1052 (2d Cir.1996).[2] In *Al-Turki,* the court discussed two tests (one of which must be met) that can be used to determine whether that limit is satisfied: the "conduct" and "effects" tests. *See id.* at 1052.[3] The conduct test, on which Ayyash relies here, requires that "conduct that is both material to the completion of the fraud" and directly caused the alleged injury have occurred in the United States. *Id.*[4]

As to personal jurisdiction over Moawad, Ayyash points to two sources of authority. First, New York's long-arm statute, N.Y.C.P.L.R. § 302(a)(1), which requires that Moawad have "purposely availed" himself of the benefits and protections of New York law, through business contacts with New York that are neither "random" nor "fortuitous," and can be said to have "provide[d] [Moawad] with notice that [he] might be subjected to suit in courts of [New York]." *Bozell Group, Inc. v. Carpet Co-op of Am. Assoc.,* No. 00 Civ. 1248, 2000 WL 1523282, at \*6-\*7 (S.D.N.Y. Oct. 11, 2000). Those contacts must also bear a "substantial nexus" to Ayyash's claims. *Id.* Second, Fed.R.Civ.P. (4)(k)(2) would provide for jurisdiction over Moawad if he (1) were not subject to jurisdiction under New York law and (2) had "sufficient contacts with the United States, as a whole ... to satisfy the requirements of the due process clause of the Fifth Amendment." *Daventree Ltd. v. Rep. of Azerbaijan,* 349 F.Supp.2d 736, 760 (S.D.N.Y.2004). Similar to New York's long-arm statute, the Due Process Clause requires both that Moawad have "purposely availed" himself of the benefits and protections of the laws of the United States and that Ayyash's RICO claims "arise[ ] out of or relate[ ] to [Moawad's] contacts." *Id.* Further, the Due Process Clause requires the court to determine whether it would be "reasonable" to assert jurisdiction over Moawad, looking to a number of factors including "the burden that the exercise of jurisdiction will impose on [him]" and "the interests of [the United States] in adjudicating the case." *Id.* at 762 (quotation omitted).[5]

**\*5** At first glance, the jurisdictional nexus between this Lebanese controversy and the United States seems dubious. However, the complaint and supporting materials assert that as a part of defendants' conspiracy to defraud the depositors of Madina and UCB, and "with the intent to promote ... the defrauding of the foreign banks Al-Madina Bank and

UCB" (Compl.¶ 45), Moawad "ordered" the wire transfer of more than $3 million dollars to bank accounts abroad, that these funds were routed through United States banks, and that at least some (and possibly all) of these funds were ultimately deposited in United States bank accounts held on Moawad's behalf. (*Id.* ¶¶ 39-41.) Around the time that Moawad executed these transfers, there was a substantial influx of funds into Moawad's UCB bank account, including approximately $20 million from Rana Koleilat, the alleged mastermind of the fraud on the Banks. It is further alleged that these transfers "are representative of similar transactions used by defendants to carry out their scheme of wire fraud, money laundering, forgery, credit card fraud and embezzlement" (*id.* ¶ 43),[6] and that these international wire transfers were designed to "segregate" or distance funds from Madina and UCB (*id.* ¶ 46).

Moawad attempts to minimize the significance of the wire transfers (at least those he allegedly ordered), denying that he has directly conducted any business or been involved in any commercial transaction in the United States, denying that he maintains any bank accounts in the United States, and stating that he was unaware that the transfers discussed in the complaint were routed through the United States. (Moawad Decl. ¶¶ 4-8.) But in addition to evidence that two separate accounts were held "on Moawad's behalf" in the United States (McLaughlin Decl. ¶¶ 8, 11-12), Ayyash has produced a letter dated February 20, 2003, from Moawad to Ayyash, in which Moawad, in connection with a contemplated purchase of a Czech hotel, specifically requests that Ayyash deposit $28 million into the Connecticut-based Ferrier Lullin account that was allegedly held on Moawad's behalf and used in perpetrating defendants' conspiracy. (Tiger Decl. Ex. Q; McLaughlin Decl. ¶ 9.)

Ayyash primarily argues that whether or not the allegations and evidence produced at this stage constitute a prima facie showing of subject-matter and personal jurisdiction, they are enough to warrant limited jurisdictional discovery to further explore the connections between Moawad, the alleged fraud conspiracy, and the United States. "District courts have considerable discretion in determining how best to handle jurisdictional questions," *Best Van Lines, Inc. v. Walker,* No. 03 Civ. 6585, 2004 WL 9642009, at *3 (S.D.N.Y. May 5, 2004), citing *CutCo Indus. v. Naughton,* 806 F.2d 361, 364-65 (2d Cir.1986), and "generally" may permit a plaintiff to conduct "limited discovery with respect to the jurisdictional issue." *Filius v. Lot Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir.1990); *see also APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003) (cautioning that "a court should take care to

give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction" (quoting *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C.Cir.2000)). Such discovery has typically been authorized where the plaintiff has made "a threshold showing that there is some basis for the assertion of jurisdiction[,] facts that would support a colorable claim of jurisdiction." *Daval Steel Prods, v. M.V. Juraj Dalmatinac,* 718 F.Supp. 159, 162 (S.D.N.Y.1989); *see also Strategem Dev. Corp. v. Heron Int'l N.V.,* 153 F.R.D. 535, 547-48 (S.D.N.Y.1994) (authorizing jurisdictional discovery where plaintiff "made a sufficient start" toward establishing jurisdiction, though not a prima facie showing).[7]

**\*6** Ayyash has made a sufficient showing to warrant such jurisdictional discovery. As to subject-matter jurisdiction under RICO, while the Second Circuit has indicated that jurisdiction is "not necessarily" supported where "a scheme ... is linked solely to the United States by alleged predicate acts of ... wire fraud," *Al-Turki,* 100 F.3d at 1052, and has held that the conduct test is not satisfied where the transfer of funds into or out of the United States is merely incidental, "preparatory," or "peripheral" to the principal fraud, *id.* at 1048, 1053 (no jurisdiction where wire transfers were merely preparatory for fraud wholly perpetrated overseas), courts have held the jurisdictional requirement satisfied where a wire transfer into or from the United States is integral to the fraud. *See Madanes v. Madanes,* 981 F.Supp. 241, 251 (S.D.N.Y.1997) (subject-matter jurisdiction where wire transfers were integral to fraud because they served to hide assets from plaintiff); *United States v. Approx, $25,829,681.80,* No. 98 Civ. 2682, 1999 WL 1080370, at *4 & n. 2 (S.D.N.Y. Nov. 30, 1999) (noting subject-matter jurisdiction under conduct test where tainted foreign funds were transferred through New York account, where transfers constituted underlying RICO predicates); *see also Bank of Crete, S.A. v. Koskotas,* No. 88 Civ. 8412, 1991 WL 177287, at *6 (S.D.N.Y. Aug. 30, 1991) (jurisdiction where defendant transferred funds from plaintiff's U.S. bank account to defendant's U.S. account for personal use). In this case, the complaint alleges that wire transfers through and to the U.S., which constitute the wire-fraud and money laundering predicates underlying the RICO claims, were similarly integral to defendants' conspiracy. The complaint alleges generally that Moawad's transfers (and other similar transfers) were intended to promote the carrying on of the fraud on the Banks (Compl.¶ 45), and specifically that the international transfers of funds were used to "segregate" or distance the stolen funds from Madina and UCB (*id.* ¶ 46),

RICO Bus.Disp.Guide 11,038

presumably to make it more difficult for those funds to be located and returned to the victimized depositors.

Assuming arguendo that these allegations do not constitute a prima facie showing of subject-matter jurisdiction, they at least constitute a "sufficient start" at making such a showing. *Strategem Dev. Corp.,* 153 F.R.D. at 547-48. Moreover, Ayyash claims that jurisdictional discovery may provide further evidence on a number of different fronts, including, clarifying the nature of the four U.S. transactions that have already been identified, identifying additional U.S. transactions in which Moawad was involved (and specifically, establishing Moawad's involvement with Madina's and UCB's U.S. accounts, which were "open and extremely active" at the time of defendants' conspiracy (Pl. Mem. at 24)), and helping to clarify the relationship between these transactions and the alleged conspiracy. For these reasons, the Court declines to rule on the issue of subject-matter jurisdiction until such discovery has occurred. For essentially the same reasons, a ruling as to personal jurisdiction at this time would also be premature.

## II. *Forum Non Conveniens*

**\*7** While the Court declines to rule as to jurisdiction, it may nonetheless address Moawad's argument that it should, as a matter of discretion, dismiss this action on forum non conveniens grounds because Lebanon is a more appropriate forum for this case to go forward. *See Grace v. Rosenstock,* 228 F.3d 40, 55-56 (2d Cir.2000); *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.,* 927 F.Supp. 731, 735 (S.D.N.Y.1996).

Forum non conveniens is a tool granted to courts so that they may, at their discretion, "resist imposition upon [their] jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947). Although the district courts are accorded broad discretion to dismiss a case on forum non conveniens grounds, the Second Circuit has adopted a three-step inquiry to guide the exercise of that discretion:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum, Ltd. v. Access Indus.,* 416 F.3d 146, 153 (2d Cir.2005). "Any review of a forum non conveniens motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" *Id.* at 154, quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 (1981). "Indeed, it is generally understood that, 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed,'" *id.,* quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. at 508, although the degree of deference to the plaintiff's choice of forum can vary depending on the circumstances, e.g., whether the United States is the plaintiff's home forum or not, and whether the choice of the U.S. forum was made for legitimate or "forum-shopping" reasons. *Iragorri v. United Techs. Corp.,* 274 F.3d 65, 72 (2d Cir.2001) (*in banc* ).

Moawad contends, in essence, that litigation of this matter in the United States is inappropriate because (1) the plaintiff and defendants are Lebanese nationals, none of whom resides in the United States, and the plaintiff has no personal or professional ties to the United States; (2) at issue is alleged fraud and money laundering at two Lebanese banks, conduct which plaintiff does not allege has had any impact on the United States or any American individuals or entities; (3) if this case were to go to trial, the parties and the critical third-party witnesses and evidence all exist in Saudi Arabia and Lebanon, not in the United States; and (4) the adequacy of Lebanon as an alternative forum is confirmed not only by prior caselaw, but by the fact that Ayyash himself has commenced litigation in Lebanon against these very defendants. There is thus some force to defendants' argument that the sole reason Ayyash commenced this action in the United States is for the treble damages that are available for private civil actions brought under the RICO banner, and that this case should consequently be dismissed on forum non conveniens grounds. (Def. Mem. at 1, 33-42; Reply at 13-19.)

**\*8** On the other hand, Ayyash argues that even if Lebanon were an otherwise adequate forum, recent political turmoil in Lebanon has rendered the Lebanese courts and Central Bank "subject to political control." In this "volatile atmosphere," the litigation of high-profile and politically-charged cases such as this one is compromised, a point bolstered by the alleged inaction and obstructive conduct of the Lebanese courts and Central Bank in connection with Ayyash's Lebanese actions. (Pl. Mem. at 35, 37-40.) Further, Ayyash claims that as part of the fraud conspiracy, funds belonging to Ayyash and other depositors of the Banks were transferred to the United States, Iraq, Switzerland, and France, and that "Dr. Ayyash may need to depose individuals and seek production

Ayyash v. Bank Al-Madina, Not Reported in F.Supp.2d (2006)

RICO Bus.Disp.Guide 11,038

of documents in these institutions' home countries, discovery that Dr. Ayyash may undertake in this Court" (*id.* at 35), but presumably not in Lebanon. Finally, Ayyash contends that there is a material connection between the United States and defendants' conspiracy, namely Moawad's wire transfers through and to United States banks, and that jurisdictional discovery may provide additional evidence of U.S. contacts and the relationship between those contacts and defendants' fraud.

At this stage, the Court declines to decide which of the parties' accounts should drive the forum non conveniens inquiry. As noted above, Ayyash is entitled to limited jurisdictional discovery to explore the connections between Moawad, the United States, and defendants' fraud. A fuller understanding of these connections is also relevant to the forum non conveniens analysis, and will aid the Court in determining the extent to which events and evidence in the United States are implicated in the dispute, and thus the level of deference to be accorded to Ayyash's choice of forum. *See Iragorri*, 274 F.3d at 71 ("The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice").

### III. *Merits*

Finally, Moawad moves to dismiss the RICO claims against him for failure to state a claim upon which relief may be granted. *See* Rule 12(b)(6). (Def. Mem. at 34-43.) Because the Court has not yet determined whether it may exercise jurisdiction over Moawad or the claims at issue in this case, consideration of the merits at this juncture would be premature. *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir.1963) (*in banc*).

### IV. *Limited Jurisdictional Discovery*

For the foregoing reasons, the Court will permit Ayyash to conduct jurisdictional discovery before ruling on Moawad's objections. That discovery will be limited to the following issues, suggested by Ayyash in his motion papers (Pl. Mem. at 23-25):

- The four U.S. transactions identified in the complaint and supporting declaration.

- Moawad's business contacts in the United States, including his use or maintenance of U.S. bank accounts and his use of or involvement with Madina's and UCB's U.S. accounts, at the time of the alleged conspiracy.

- **\*9**  • Activity in Moawad's Madina and UCB accounts at the time of the conspiracy, including the transfers into those accounts (by Rana Koleilat and unknown individuals) identified by Ayyash's investigative consultant. (McLaughlin Decl. ¶¶ 16-25).

Following this discovery, Moawad may re-assert his challenges to the Court's jurisdiction and the propriety of venue (and, of course, as to the merits).

### CONCLUSION

For the foregoing reasons, Moawad's motion to dismiss is denied, without prejudice to refiling upon the completion of limited jurisdictional discovery. The parties shall appear before the Court for a case management conference on Friday, March 17, 2006, at 3:00 p.m.

SO ORDERED.

**Parallel Citations**

RICO Bus.Disp.Guide 11,038

Footnotes

1    Ayyash alleges that defendants used certain of the proceeds of the fraud to "provide material support to international terrorist organizations." He specifically alleges that Rana paid $3.5 million to " 'Al-Shaheed,' a front organization for Hezbollah, the well-known terrorist organization." (Compl.¶ 48.) Ayyash also claims that "Rana and other members of the conspiracy" laundered money though Madina for the benefit of the Central Bank of Iraq, which was allegedly operating contrary to accepted banking practices. (*Id.* ¶¶ 49-52.)

2    In a line of cases ending with *Al-Turki*, the Court of Appeals characterized the limit on RICO's extraterritorial application as a constraint on courts' "subject-matter jurisdiction ." 100 F.3d at 1051; *accord Alfadda v. Fenn*, 935 F.2d 475, 479 (2d Cir.1991). However, the Supreme Court has recently cautioned against the "profligate" use of jurisdictional terminology when discussing potential defects in a plaintiff's claim, and highlighted specifically the tendency of courts to term the non-existence of a critical fact a "jurisdictional defect" rather than merely the failure to prove an element of the claim-so called "drive-by jurisdictional rulings." *Arbaugh v. Y & H Corp.*,-U.S.-,-S.Ct.-, 2006 WL 397863, at \*6-\*9 (Feb. 22, 2006). As noted by the *Arbaugh* Court, such imprecision

Ayyash v. Bank Al-Madina, Not Reported in F.Supp.2d (2006)

RICO Bus.Disp.Guide 11,038

has significant consequences. Unlike merits challenges, challenges to a court's subject matter jurisdiction cannot be waived and can be raised even after trial has concluded and judgment has been entered. *Id.* Moreover, factual disputes as to jurisdictional questions are typically resolved by the judge in a pre-trial hearing, not by a jury at trial. For that reason, the Supreme Court held in *Arbaugh* that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 2006 WL 397863, at \*8. In this case, the RICO statute is silent about its extraterritorial effect, *id.,* and thus does not indicate whether the required "nexus" to the United States is simply an element of a RICO claim or a jurisdictional constraint.

The Supreme Court's decision in *Arbaugh* may require that the Court of Appeals review its treatment of the question of RICO's extraterritorial effect. However, in this case neither party challenges the characterization of the issue as jurisdictional in nature, and this Court is any event bound by the Court of Appeals' decisions until such time as they are directly overruled by that court or the Supreme Court.

3    The *Al-Turki* court recognized that the application to RICO of these tests, drawn from the securities and antitrust contexts, may be inappropriate, stating "[we] do not assume that congressional intent in enacting RICO justifies a similar approach to the statute's foreign application." 100 F.3d at 1052. The Court nevertheless applied those tests because, as in this case, the parties assumed that those tests were applicable. *Id.* To date no other test has been proposed.

4    The effects test requires that the fraud itself have had a substantial effect on the United States. *Id.* While Ayyash does not advance the effects test as a basis for jurisdiction, he purports to reserve the right to make such an argument "should discovery uncover additional information demonstrating that defendants' scheme affected domestic individuals or institutions." (Pl. Mem. at 13 n. 5.)

5    C.P.L.R. § 302(a)(1) and Fed.R.Civ.P. 4(k)(2) are the only provisions discussed in Ayyash's motion papers. (Pl. Mem. at 26-29.)

6    Moawad argues (in passing) that this Court may not credit those allegations regarding the American transactions and the relationship of those transactions to defendants' fraud, that are pleaded "on information and belief," citing *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997) (holding fraud allegations may not be pleaded "on information and belief" except when subject matter is peculiarly within defendants' knowledge). (Def. Mem. at 16-17.) Ayyash responds, convincingly, that the details of Moawad's transactions and defendants' conspiracy are peculiarly within their knowledge, and, to the extent necessary, he has provided numerous detailed factual allegations regarding that conspiracy to base any pleading made on "information and belief." (Pl. Mem. at 19.) In any event, Moawad has apparently abandoned this argument as he fails to respond to Ayyash's contentions in his reply brief.

7    Moawad contends that Ayyash must make a prima facie showing of jurisdiction before this Court may authorize jurisdictional discovery, relying on *Jazini v. Nissan Motor Corporation,* 148 F.3d 181 (2d Cir.1998). That reliance is misplaced. In *Jazini,* the Court held only that the district court in that case did not abuse its discretion by denying jurisdictional discovery where the plaintiff failed to make a prima facie showing, not that a district court may never do so. Moreover, in making its ruling, the *Jazini* court focused on the paucity of the factual allegations in that plaintiff's complaint, as well as the unique policies at work when foreign parent corporations are sued on the basis of the presence of their subsidiaries in the United States. *Id.* at 185-86. *Jazini* did not purport to lay down a categorical rule, a fact that has since been recognized by a Second Circuit panel. *See Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft,* 31 Fed. Appx. 738, 739 (2d Cir.2002) (unpublished); *see also In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 28 (2d Cir.2003) (authorizing jurisdictional discovery where allegations constituted "arguable" jurisdictional basis, so plaintiff could develop facts in support of prima facie showing). Indeed, such a categorical rule would seem to conflict with the plain language of Fed.R.Civ.P. 12(d), which authorizes a district court to hold in abeyance a motion to dismiss for lack of subject-matter or personal jurisdiction "until ... trial."

**End of Document**                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 653760
Only the Westlaw citation is currently available.
United States District Court,
S.D. Alabama,
Southern Division.

N–TRON CORPORATION, Plaintiff,
v.
ROCKWELL AUTOMATION, INC., Defendant.

Civil Action No. 09–0733–WS–C. | Feb. 18, 2010.

**Attorneys and Law Firms**

Gregory R. Jones, Louis Clifton Norvell, Orrin K. Ames, III, Patrick J. Ward, Hand Arendall LLC, Mobile, AL, for Plaintiff.

Mack B. Binion, Margaret M. Miller, Briskman & Binion, P.C., Mobile, AL, for Defendant.

Opinion

**ORDER**

WILLIAM H. STEELE, District Judge.

**\*1** This matter comes before the Court on defendant's Motion to Dismiss, Alternatively Motion for Summary Judgment (doc. 10), plaintiff's Motion to Amend Complaint (doc. 16), plaintiff's Motion for Leave to File Reply (doc. 20), and defendant's Motion to Strike (doc. 25). The Motions have been extensively briefed and are ripe for disposition.

**I. Nature of the Action.**

On November 6, 2009, plaintiff, N–Tron Corporation, filed a Complaint (doc. 1) against defendant, Rockwell Automation, Inc., in this District Court. Subject matter jurisdiction was predicated on 28 U.S.C. § 1332, and was bolstered by allegations that N–Tron and Rockwell are citizens of different states, and that the amount in controversy exceeds $34 million.

According to the well-pleaded allegations of the Complaint, which are accepted as true for purposes of defendant's Rule 12(b)(6) motion,[1] the parties entered into a contract styled "Encompass Memorandum of Membership" (hereinafter, "MoM") in September 2002, for the purpose of facilitating cooperative marketing efforts for their complementary product lines. NTron's membership in the Encompass Program related to its EtherNet/IP switches, which enable efficient communication between process control and other industrial automation computer networks. Prior to entering into the MoM, and at various times thereafter spanning a period of several years, N–Tron sought and received express assurances from Rockwell that Rockwell had no intention of developing its own EtherNet/IP switch products. In reliance on those assurances, N–Tron executed the MoM, joined and participated in Rockwell's Encompass Program, and renewed its annual membership for five years. Pursuant to that membership, N–Tron promoted Rockwell's products, trained Rockwell sales personnel on the marketing of EtherNet/IP switches, and educated Rockwell about EtherNet/IP products and markets. N–Tron alleges, however, that Rockwell was secretly developing its own line of EtherNet/IP products during this time period. Rockwell unveiled its competing products in November 2007, shortly after it unilaterally terminated N–Tron's membership in the Encompass Program. Beginning in November 2007, N–Tron maintains, Rockwell notified its customers that it expected them to transition fully to the Rockwell EtherNet/IP products, and began pressuring distributors to stop selling N–Tron products, even where those distributors had established contracts or ongoing business arrangements with N–Tron.

On the strength of these factual allegations, N–Tron's Complaint levels causes of action against Rockwell for breach of contract (on the theory that Rockwell's conduct amounted to a breach of the terms of the MoM), fraudulent misrepresentation (based on Rockwell's alleged false statements to N–Tron as to its intentions to develop and market Ethernet/IP switch products), deceit and fraudulent nondisclosure of Rockwell's development of competing products, tortious interference with contract (on the theory that Rockwell knowingly and intentionally interfered with N–Tron's contracts with its distributors in an attempt to induce the distributors to breach those contracts), and tortious interference with business relationships (relating to Rockwell's alleged efforts to induce distributors to terminate business relationships with N–Tron). As to each of these causes of action, N–Tron seeks to recover compensatory damages in the amount of $34,768,000.

**II. Plaintiff's Motion to Amend Complaint.**[2]

**\*2** On January 12, 2010, just over three weeks after Rockwell moved to dismiss the Complaint, N–Tron filed its Motion to Amend Complaint. The proposed First Amended Complaint would modify N–Tron's pleading by deleting the

breach of contract count, deleting references to the MoM, and adding language to differentiate N–Tron's distributor contracts and business relationships from its participation in the Encompass Program. By all appearances, this Motion to Amend was a direct reaction to Rockwell's Motion to Dismiss; after all, the Motion to Dismiss is rooted in N–Tron's non-compliance with the dispute resolution clause set forth in the MoM. By sanitizing their pleading of references to the MoM and claims directly concerning same, and by further alleging that the business relationships and contacts with which Rockwell interfered had nothing to do with the MoM or the Encompass Program, N–Tron seeks to distance its causes of action against Rockwell from the requirements of the dispute resolution clause.

Under the recently amended Rule 15(a), Fed.R.Civ.P., N–Tron was entitled to "amend its pleading once as a matter of course within ... 21 days after service of a motion under Rule 12(b)." Rule 15(a)(1)(B). Rockwell's Rule 12(b) motion was filed on December 21, 2009; therefore, the 21–day period for amendment as of right expired on January 11, 2010. Plaintiff did not file its Motion to Amend until January 12. As such, N–Tron admits that it cannot amend its Complaint as a matter of course under Rule 15(a)(1), and that its Motion is instead governed by Rule 15(a)(2).[3] That rule continues to authorize amendment of the pleadings after the Rule 15(a)(1) deadlines "only with the opposing party's written consent or the court's leave." Rule 15(a)(2). Rockwell has not provided such written consent here.[4] Accordingly, the amendment is permissible only with leave of court.

The plain language of the rule provides that "a court should freely give leave when justice so requires." Rule 15(a)(2).[5] Notwithstanding this liberal standard, courts have properly denied leave to amend in the presence of circumstances such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Equity Lifestyle Properties, Inc. v. Florida Mowing and Landscape Service, Inc.,* 556 F.3d 1232, 1241 (11th Cir.2009) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also Carruthers v. BSA Advertising, Inc.,* 357 F.3d 1213, 1218 (11th Cir.2004) (explaining that despite "freely given" language of Rule 15(a), leave to amend may be denied on such grounds as undue delay, undue prejudice, and futility).

Rockwell has filed a Response opposing the proposed amendment; however, its grounds for opposition are difficult to discern. After all, N–Tron is proposing to withdraw one of its causes of action, a course of conduct that would narrow the lawsuit and reduce the breadth of claims against which Rockwell must defend itself. On its face, this modification would redound to Rockwell's benefit, and surely would not work any material prejudice. Defendant does not suggest otherwise. At most, Rockwell reiterates arguments from its Motion to Dismiss that NTron filed this lawsuit in violation of the MoM's dispute resolution clause, but it offers no explanation for how that contention figures into a Rule 15(a)(2) analysis or cuts against the requested amendment. Rockwell does not allege that N–Tron unduly delayed in seeking leave to amend, that N–Tron's request is animated by bad faith or dilatory motive, that N–Tron has amended the pleadings previously, that Rockwell will suffer prejudice if the amendment is allowed, or that the proposed amendment is futile. Simply put, Rockwell has not proffered any sound reason why the interests of justice might militate against granting N–Tron leave to amend its Complaint in the requested manner under the liberal standard of Rule 15(a)(2).

**\*3** For all of the foregoing reasons, the Motion to Amend Complaint (doc. 16) is **granted.** Pursuant to Section II.A.6. of this District Court's Administrative Procedures for Filing, Signing and Verifying Documents by Electronic Means, N–Tron is **ordered,** on or before **February 24, 2010,** to file as a freestanding pleading its First Amended Complaint, in substantially the same form as the proposed amended pleading appended to the Motion as Attachment A.

**III. Defendant's Motion to Dismiss.**

The Court now turns to Rockwell's Motion to Dismiss, or alternatively Motion for Summary Judgment, filed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[6] Rockwell contends that N–Tron failed to comply with the dispute resolution provision set forth in the MoM, and that such omission divests this Court of subject matter jurisdiction. Alternatively, Rockwell asserts that even if jurisdiction lies, N–Tron's failure to satisfy the dispute resolution provision prior to initiating this lawsuit necessitates its dismissal for failure to state a claim. Because N–Tron has been granted leave to amend its pleading, the Motion to Dismiss will be evaluated by reference to the First Amended Complaint (as found at doc. 16, Attachment A), rather than the now-superseded original Complaint.

N-Tron Corp. v. Rockwell Automation, Inc., Not Reported in F.Supp.2d (2010)

*A. Relevant Facts.*

The salient facts presented by the parties are both straightforward and uncontested. First, both sides agree that all iterations of the MoM entered into between N–Tron and Rockwell included a dispute resolution provision which stated as follows:

> "The parties will attempt in good faith to resolve any dispute arising out of Member's membership in the Program by negotiations between representatives who have authority to settle the controversy. If unsuccessful, the parties further will attempt in good faith to settle the dispute by non-binding third-party mediation, with fees and expenses of such mediation apportioned equally to each side. Any dispute not so resolved by negotiation or mediation may then be submitted to a court of competent jurisdiction in accordance with the terms of this MoM. These procedures are the exclusive procedures for the resolution of all such disputes between the parties."

(Doc. 11, Exh. A, at 2, 5, 8, 11, 14.)

Second, it is undisputed that "[p]rior to commencing this litigation, N–Tron made no effort to conduct negotiations or mediation as agreed to under the ... Memorandums of Membership." (Nandi Decl., at ¶ 1.) N–Tron has expressly agreed to this fact, and has acknowledged that the first time it notified Rockwell of this dispute was in connection with service of process in this action. (Doc. 17, at 2.)[7]

*B. Rule 12(b)(1).*

As an initial matter, Rockwell asserts that N–Tron's failure to comply with the MoM's dispute resolution clause before filing suit strips this Court of subject matter jurisdiction and mandates dismissal of this action without prejudice pursuant to Rule 12(b)(1). As Rockwell phrases it, "negotiation and mediation are conditions precedent to filing a lawsuit and N–Tron's failure to do so renders this Court without subject matter jurisdiction." (Doc. 11, at 7.)

**\*4** The fundamental problem with defendant's Rule 12(b)(1) argument is that it conflates non-performance of a contractual condition precedent with deprivation of subject matter jurisdiction. There is no question that the failure to satisfy a condition precedent to suit under a contract may negate a party's ability to recover damages.[8] But federal courts have held in a variety of contexts that the question of subject matter jurisdiction is analytically distinct from that of failure to satisfy conditions precedent to suit. *See, e.g., Griffin v. Dugger,* 823 F.2d 1476, 1482 n. 12 (11th Cir.1987) (in Title VII context, a plaintiff's "failure to satisfy the conditions precedent [to filing suit] does not, standing alone, deprive federal district courts of subject matter jurisdiction"); *Harris v. Amoco Production Co.,* 768 F.2d 669, 680 (5th Cir.1985) ("while the failure to comply with a condition precedent usually means that a plaintiff cannot bring suit ..., it does not mean that the district court lacks subject matter jurisdiction if the case is otherwise before it"); *Nova Design Build, Inc. v. Grace Hotels, LLC,* 2008 WL 4450305 (N.D.Ill. Sept. 30, 2008) (in copyright context, distinguishing between conditions precedent to suit and subject matter jurisdiction); *Batesville Services, Inc. v. Funeral Depot, Inc.,* 2004 WL 2750253, *3 (S.D.Ind. Nov. 10, 2004) ("In general, whether a condition precedent has been satisfied does not affect the court's subject matter jurisdiction in the strong sense of that term.").

To be sure, Rockwell has offered a handful of (mostly unpublished) authorities that have deemed a party's failure to satisfy a contractual dispute resolution clause to be an omission of jurisdictional proportions. These decisions are symptomatic of the widespread epidemic of fuzzy, shorthand, imprecise and variegated usage of the term "jurisdiction" by courts, litigants and commentators, a propensity that the Supreme Court and Courts of Appeals have recognized (and lamented) on numerous occasions. *See, e.g., Rockwell Int'l Corp. v. United States,* 549 U.S. 457, 467, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007) ("It is true enough that the word 'jurisdiction' does not in every context connote subject-matter jurisdiction."); *International Union of Operating Engineers, Local 150, AFL–CIO v. Rabine,* 161 F.3d 427, 430 (7th Cir.1998) ("[j]urisdiction is a many-hued term, and its use does not always mark a case as beyond our reach") (citation and internal quotation marks omitted); *United States v. Vanness,* 85 F.3d 661, 663 n. 2 (D.C.Cir.1996) ( "Jurisdiction is a word of many, too many, meanings ."). When lawyers bandy about the term "jurisdiction," a rose is not necessarily a rose.

In its strict sense, however, "jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Steel Co. v. Citizens for a Better Environment,* 523 U .S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation

omitted); *see also Nesbit v. Gears Unlimited, Inc.,* 347 F.3d 72, 79 (3rd Cir.2003) ("courts normally should not conflate subject matter jurisdiction with elements of an action's merits"); *Davoll v. Webb,* 194 F.3d 1116, 1128 n. 3 (10th Cir.1999) ("the difference between a question of subject matter jurisdiction and one of failure to state a claim is a lesson that has been taught as often in decision as it has been ignored in argument and dicta," and "courts should carefully consider whether a dismissal is truly jurisdictional") (citations and internal quotation marks omitted). "Not all mandatory prescriptions, however emphatic, are ... properly typed jurisdictional.... Subject-matter jurisdiction properly comprehended ... refers to a tribunal's power to hear a case, a matter that can never be forfeited or waived." *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Cent. Region,* — U.S. ——, 130 S.Ct. 584, 596 (2009) (citations and internal quotation marks omitted).

**\*5** Viewed through the prism of those governing principles, it is abundantly clear that NTron's admitted non-compliance with the mandatory dispute resolution procedures embodied in the MoM does not implicate jurisdictional concerns. Federal subject matter jurisdiction properly lies in this case pursuant to 28 U.S.C. § 1332, given that N–Tron and Rockwell are of diverse citizenship and the amount in controversy vastly exceeds the $75,000 statutory floor. The Court is therefore empowered to hear this case. As for the dispute resolution clause, Rockwell could have waived or forfeited it. As such, it is plainly not of jurisdictional import. Stated differently, while N–Tron's failure to abide by the agreed-upon pre-suit dispute resolution procedures may prove fatal to its claims on the merits and support a finding that the First Amended Complaint fails to state a claim on which relief can be granted, it does not impinge upon this Court's power to hear the case.

For all of the foregoing reasons, defendant's Motion to Dismiss is **denied** insofar as it is brought pursuant to Rule 12(b)(1). Subject matter jurisdiction properly lies here.

*C. Rule 12(b)(6).*

In the alternative, Rockwell seeks dismissal of the First Amended Complaint for failure to state a claim upon which relief can be granted. The crux of this Rule 12(b)(6) theory is that N–Tron's failure to comply with the contractual dispute resolution requirements precludes it from seeking relief here and requires the dismissal of all claims.

*1. Counts I and II are Subject to the Dispute Resolution Provision.*

It is undisputed that the MoM contracts that N–Tron executed in each year of its membership in Rockwell's Encompass Program included a mandatory, exclusive dispute resolution provision. It is further undisputed that such a provision is valid and enforceable under Wisconsin law. [9] *See, e.g., Omni Tech Corp. v. MPC Solutions Sales, LLC,* 432 F.3d 797, 799 (7th Cir.2005) ("what matters is that Wisconsin respects the parties' ability to make agreements of this kind"); *Wisconsin Auto Title Loans, Inc. v. Jones,* 696 N.W.2d 214, 219 (Wis.App.2005) (in gauging validity of arbitration clause, "the usual defenses to a contract such as fraud, unconscionability, duress and lack of consideration may be applied"); *see generally Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.,* 524 F.3d 1235, 1241 (11th Cir.2008) (recognizing that agreements to mediate "might be specifically enforceable in contract or under other law"). [10] The parties' areas of disagreement over the Rule 12(b)(6) Motion concern whether N–Tron's claims lie within the scope of the dispute resolution provision and, if so, whether dismissal is the appropriate remedy. The Court will consider each of these issues in turn.

On its face, N–Tron's contractual obligation to participate in negotiation and mediation with Rockwell applies to "any dispute arising out of Member's membership in the Program." Although the parties devote considerable effort to debating whether this language is "broad" or "narrow" in some normative way, its construction is actually quite straightforward. [11] Under Wisconsin law, "[i]n ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning." *Huml v. Vlazny,* 716 N.W.2d 807, 820 (Wis.2006); *see also Steinmann v. Steinmann,* 749 N.W.2d 145, 153 (Wis.2008) ("When the language of a contract is unambiguous, we will apply its literal meaning."); *Raasch v. City of Milwaukee,* 750 N.W.2d 492, 497 (Wis.App.2008) ("In construing the terms of a contract, where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands, even though the parties may have placed a different construction on it.") (citation omitted). The relevant contract language in this case is unambiguous; therefore, extrinsic evidence may not be utilized to gauge the parties' intent. *See Huml,* 716 N.W.2d at 820 (citations omitted) ("Absent ambiguity, it is improper to consider extrinsic evidence of intent.") (citations omitted). [12]

*6 Under the relevant contract provision, N–Tron had agreed to negotiate and mediate any dispute "arising out of" its membership in the Encompass Program. The plain, ordinary meaning of "arising out of" equates to such concepts as "originating from, growing out of, or flowing from." Thus, the question is whether N–Tron's claims in the First Amended Complaint originate from, grow out of, or flow from its membership in the Encompass Program. If so, then the condition precedent of the dispute resolution provision is in play, N–Tron is in breach of same, and Rockwell is entitled to relief. If not, then the condition precedent is inapplicable and poses no obstacle to this litigation moving forward immediately. [13]

Careful scrutiny of the First Amended Complaint reveals that at least certain of N–Tron's causes of action are firmly rooted in its membership in the Encompass Program. All references to the MoM have been stripped from the "Facts" section of the First Amended Complaint, but it nonetheless describes the Encompass Program, and N–Tron's membership in and termination from it, in considerable detail. (*See* doc. 16, Exh. A, at ¶¶ 8–10, 12–13, 15, 17.) In the fraudulent misrepresentation cause of action (Count I), N–Tron alleges that Rockwell misrepresented facts to induce N–Tron "to contribute money to the Program, to contribute valued resources to the Program, and to remain in the Program." (*Id.* at ¶ 25.) In that same cause of action, N–Tron claims as damages "the amount of money that N–Tron was fraudulently induced into investing in the Program and ... the value of the services that N–Tron provided ... in connection with its training of Rockwell personnel" pursuant to the Program. (*Id.* at ¶ 27.) Similarly, N–Tron alleges in its deceit/fraudulent failure to disclose claim (Count II) that Rockwell had a duty to disclose its competitive ambitions "at all times during N–Tron's participation in the Program," and that N–Tron "would have discontinued its participation in the Program immediately" had such disclosure taken place. (*Id.* at ¶ 29.) The First Amended Complaint pleads that Rockwell's course of conduct deceived N–Tron "into participating in, and remaining in, the Program and, during that time, investing money, resources, and time into the Program." (*Id.*)

Unquestionably, there is a close nexus between Counts I and II and N–Tron's membership in the Encompass Program. Indeed, N–Tron is claiming that it is only because of Rockwell's misrepresentations and deceit that N–Tron joined the Program at all, and that it remained a member only because of those continuing misrepresentations and nondisclosures. N–Tron seeks to recover as damages from Rockwell the funds it invested as a member of the Program, as well as the value of services it provided to Rockwell as a member of the Program. Simply put, the harm that N–Tron ascribes to Rockwell's alleged tortious conduct is N–Tron's membership and participation in the Program. Under any rational construction, then, the dispute embodied in Counts I and II arises out of (*i.e.,* originates from, grows out of, or flows from) NTron's membership in the Encompass Program because N–Tron seeks recovery from Rockwell for damages incurred pursuant to (and solely by virtue of) its membership and participation in the Program. As such, Counts I and II of the First Amended Complaint fall within the plain, ordinary meaning of the unambiguous language of the MoM's mandatory dispute resolution provision. The corollary to this determination is that N–Tron, by pursuing Counts I and II against Rockwell without first engaging in the mandatory negotiation and mediation procedures prescribed by the contract, has failed to perform a condition precedent to suit. [14]

## 2. Remedy for Plaintiff's Non–Performance of Condition Precedent.

*7 The final question presented by the Motion to Dismiss concerns the appropriate remedy for N–Tron's failure to comply with the dispute resolution provision as to Counts I and II before filing suit. Rockwell requests that the Complaint be dismissed without prejudice, even though the practical effect of such dismissal would be to foreclose N–Tron from ever re-asserting those tort claims because the applicable statute of limitations has expired in the interim. By contrast, N–Tron proposes that this action be stayed and the parties be ordered to submit to mediation, with N–Tron vowing that it "will most certainly mediate in good faith." (Doc. 17, at 17.)

N–Tron has the better argument. When confronted with objections that plaintiffs have initiated litigation without satisfying arbitration or mediation requirements, courts routinely stay rather than dismiss the proceedings to allow for implementation of the agreed-upon dispute resolution mechanism. *See, e.g., Halim v. Great Gatsby's Auction Gallery, Inc.,* 516 F.3d 557, 561 (7th Cir.2008) ("the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright") (citations omitted). [15] It is true, of course, that examples in the case law do exist wherein actions have been dismissed for non-compliance with dispute resolution provisions. [16] But that course of action is not mandatory;

N-Tron Corp. v. Rockwell Automation, Inc., Not Reported in F.Supp.2d (2010)

rather, district courts are vested with discretion to determine whether stay or dismissal is appropriate.

In that vein, it is beyond cavil that "[t]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones,* 520 U.S. 681, 706, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *see also Ortega Trujillo v. Conover & Co. Communications, Inc.,* 221 F.3d 1262, 1264 (11th Cir.2000) ("A stay sometimes is authorized simply as a means of controlling the district court's docket and of managing cases before the district court."); *Dominguez v. Hartford Financial Services Group, Inc.,* 530 F.Supp.2d 902, 905 (S.D.Tex.2008) ("The stay of a pending matter is ordinarily within the trial court's wide discretion to control the course of litigation...."); *Utah v. Eli Lilly and Co.,* 509 F.Supp.2d 1016, 1019 (D.Utah 2007) (recognizing discretion to stay proceedings to save time and effort for parties and court). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). Thus, in determining whether a stay is appropriate in a particular case, "the court, in its sound discretion, must assess and balance the nature and substantiality of the injustices claimed on either side." *Feld Entertainment, Inc. v. A.S.P.C.A.,* 523 F.Supp.2d 1, 3 (D.D.C.2007) (citations omitted). The Eleventh Circuit has observed that "district courts have inherent, discretionary authority to issue stays in many circumstances, and *granting a stay to permit mediation (or to require it) will often be appropriate.*" Advanced Bodycare, 524 F.3d at 1241 (footnote omitted & emphasis added).

*\*8* Here, granting a stay to require N–Tron and Rockwell to negotiate and mediate in good faith concerning Counts I and II is a more appropriate remedy than dismissal without prejudice for three reasons. First, the harm to N–Tron of not granting a stay would be considerable, inasmuch as a dismissal without prejudice would be tantamount to a dismissal with prejudice, effectively barring it from ever litigating its fraud and deceit claims against Rockwell because of the now-expired limitations period. Second, the harm to Rockwell of staying these claims, rather than dismissing them, is negligible. Rockwell is entitled to insist on performance of the condition precedent before this lawsuit goes forward, and staying this action for a discrete period of time to require negotiation and mediation pursuant to the MoM would place

Rockwell in precisely the same bargained-for position it would have occupied had N–Tron complied with the dispute resolution clause before filing suit in the first place. There is no perceptible prejudice to Rockwell, and it has not argued otherwise. Third, it bears emphasis that only Counts I and II trigger the dispute resolution provision. Counts III and IV do not. By staying the entire action to allow for submission of Counts I and II to the contractual mediation mechanism, the Court ensures that all four causes of action will be litigated together in a single proceeding if mediation of Counts I and II should fail, rather than being inefficiently splintered across multiple proceedings at differing stages of the litigation process.

In light of these considerations, including the balancing of the harms and the Eleventh Circuit's express recognition of the propriety of granting stays to permit or require mediation, the Court will not dismiss Counts I and II without prejudice based on N–Tron's failure to submit them to agreed-upon pre-suit dispute resolution mechanisms. Instead, the Court will stay this action in its entirety for a reasonable period of time to enable the parties to conduct negotiation and mediation on those counts. [17]

### IV. Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1. Plaintiff's Motion to Amend Complaint (doc. 16) is **granted.** N–Tron is **ordered,** on or before **February 24, 2010,** to file as a freestanding pleading its First Amended Complaint, in substantially the same form as the proposed amended pleading appended to the Motion as Attachment A.

2. Plaintiff's Motion for Leave of Court to File Reply (doc. 20) is **granted,** and the Court has considered the proposed reply brief appended to that Motion as if it had been filed as a separate document.

3. Defendant's Motion to Dismiss, Alternatively Motion for Summary Judgment (doc. 10) is **denied.**

4. Defendant's Motion to Strike (doc. 25) is **moot** because it is not necessary to consider the averments of the Nicholson Declaration (including specifically averments regarding N–Tron's intent in entering into the contract, N–Tron's self-serving interpretation of the scope of the dispute resolution provision, and NTron's belief in the veracity of its assertion in the First Amended Complaint

that the distributor relationships addressed in Counts III and IV are totally separate from N–Tron's participation in the Encompass Program) to resolve the pending motions.

**\*9** 5. Based on the finding that Counts I and II are within the ambit of the mandatory dispute resolution clause contained in the applicable contracts, the parties are **ordered** to negotiate and (if necessary) mediate those claims in good faith in accordance with that agreed-upon provision. Counts III and IV are not included in this directive because those claims are beyond the scope of the dispute resolution provision; however, nothing herein would forbid or foreclose the parties from engaging in negotiation and/or mediation of those causes of action contemporaneously with Counts I and II, should they mutually agree to do so.

6. The Court exercises its broad discretion to control its docket and manage cases by staying this action in its entirety, rather than dismissing Counts I and II

without prejudice. Accordingly, this action is **stayed** for a period of 90 days, through and including **May 19, 2010**, to enable the parties to perform their dispute resolution obligations identified in Paragraph 5, *supra*. On or before **May 17, 2010**, the parties are **ordered** to file a joint report setting forth the status of their negotiation/mediation efforts. Given the ample period allotted for the relatively simple dispute resolution procedures identified in the MoM, it is not anticipated that any extension of the stay will be needed to enable the parties to complete those procedures. The parties are expected to act diligently to implement the contractual dispute resolution mechanism without delay.

7. Defendant is **ordered** to file an answer within 10 calendar days after the stay is lifted, after which the matter will be referred to Magistrate Judge Cassady for issuance of a Preliminary Scheduling Order.

DONE and ORDERED.

## Footnotes

1    *See, e.g., Sinaltrainal v. Coca–Cola Co.,* 578 F.3d 1252, 1260 (11th Cir.2009) (on Rule 12(b)(6) motion, "the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged ... in the complaint as true"); *Cottone v. Jenne,* 326 F.3d 1352, 1357 (11th Cir.2003) ("In reviewing a complaint, we accept all well-pleaded factual allegations as true and construe the facts in the light most favorable to the plaintiff.").

2    Although several motions are pending, N–Tron's Motion to Amend Complaint is logically considered first, to ensure that the Motion to Dismiss will not be evaluated with respect to a superseded pleading. Also, while the relevant briefing Order (doc. 18) did not allow for reply briefs, plaintiff submitted a Motion for Leave of Court to File Reply (doc. 20), along with a concise two-page proposed reply in support of its request for leave to amend the pleadings. In its discretion, the Court **grants** the Motion for Leave of Court to File Reply, and will consider the proposed reply appended to that Motion as Exhibit A, without the need for N–Tron to refile it.

3    Plaintiff has not invoked Rule 6(d), and the Court will not consider *sua sponte* the impact of that rule on the timeliness of plaintiff's proposed amendment.

4    Counsel spar on the consent issue, with Rockwell suggesting that N–Tron somehow mischaracterized defense counsel's position in the Motion to Amend Complaint. It does not appear that any impropriety occurred, although plaintiff's counsel could have worded Paragraph 4 of its Motion with greater precision to minimize any risk of misunderstanding. But the Court need not delve into the minutiae of counsel's interactions on this point, inasmuch as it is quite clear that Rockwell has never furnished written consent to the proposed amendment, as required by Rule 15(a)(2) to effectuate amendment without leave of court.

5    *See also Community State Bank v. Strong,* 485 F.3d 597, 611 n. 19 (11th Cir.2007) ("the rule contemplates that leave shall be granted unless there is a substantial reason to deny it"); *Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 470 F.3d 1036, 1041 (11 th Cir.2006) ("Unless a substantial reason exists to deny leave to amend, the discretion of the District Court is not broad enough to permit denial.") (citation omitted); *Spanish Broadcasting System of Fla., Inc. v. Clear Channel Communications, Inc.,* 376 F.3d 1065, 1077 (11th Cir.2004) ("leave to amend must be granted absent a specific, significant reason for denial").

6    Before delving into the merits of the Motion, a pair of points about briefing are in order. First, the Court observes that the footnotes found in both sides' briefs utilize a microscopic font that is markedly smaller than the font in the body of the briefs. The parties are reminded that Local Rule 5.1(a) requires that typed matter be submitted in 12–point type, or larger. No allowances or exceptions are created for footnotes; therefore, it is expected that footnotes likewise comport with the 12–point standard. Otherwise, parties could circumvent established page limitations by simply shrinking footnote font sizes. Second, the relevant briefing Order (doc. 23) provided that briefing on the Motion to Dismiss would close on January 26, 2010, with the filing of defendant's reply brief, and that the Motion would be taken under submission on that date. Notwithstanding this schedule, plaintiff filed an unauthorized sur-reply

N-Tron Corp. v. Rockwell Automation, Inc., Not Reported in F.Supp.2d (2010)

(doc. 26) on February 2, 2010, without requesting leave of court. (That N–Tron combined its sur-reply on the Motion to Dismiss with a permissible opposition brief on the Motion to Strike does not cure this defect.) Parties are not free to continue filing memoranda at will after the close of a briefing schedule and after the matter has been taken under submission; rather, they may do so only with the Court's permission. N–Tron failed to obtain such authorization before submitting its 13–page sur-reply. And of course, sending an e-mail to judicial staff members to apprise them that a sur-reply is in the works is not a viable substitute for applying for leave of court to file that sur-reply. In its discretion, the Court will consider these non-conforming materials; however, future filings that deviate from proper formatting requirements and briefing protocols may be stricken.

7    Neither the MoM nor the Declaration of Melissa Nandi are attached to the First Amended Complaint, and that pleading does not reference either the dispute resolution provision or N–Tron's admitted non-compliance with same. "Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." *Financial Sec. Assur., Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1284 (11th Cir.2007); *McElmurray v. Consolidated Government of Augusta–Richmond County,* 501 F.3d 1244, 1251 (11th Cir.2007) (characterizing limitation as a "safeguard" for plaintiffs); *Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir.2002) (proscription on consideration of extrinsic materials in Rule 12(b) motions prevents "the circumvention of the Rule 56 notice and opportunity to be heard provisions"). Nonetheless, consideration of these facts is appropriate, notwithstanding their extrinsic nature, because Rockwell has raised a "factual" jurisdictional challenge under Rule 12(b)(1). *See, e.g., Sinaltrainal,* 578 F.3d at 1260 (in the 12(b)(1) context, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered") (citation and internal quotation marks omitted). The Court will also consider these facts for purposes of Rockwell's Rule 12(b)(6) motion because N–Tron (the party whom the restriction on extrinsic materials was designed to protect) has expressly stipulated to their veracity and has asked that the Court resolve these issues now. *See* doc. 17, at 2 ("The factual assertions ... are not disputed, and, therefore, the issues postured by Rockwell in its motions are questions of law for this Court."). In light of N–Tron's urging this Court to address these legal issues based on the stipulated facts of the terms of the dispute resolution provision and N–Tron's noncompliance with same, no further notice or opportunity to be heard must be furnished to N–Tron before those limited extrinsic matters may be considered. To the extent that it is or may be error for this Court to consider these facts outside the four corners of the Complaint for purposes of the Rule 12(b)(6) motion, it is error that N–Tron has invited.

8    *See, e.g., Mullins v. TestAmerica, Inc.,* 564 F.3d 386 (5th Cir.2009) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.") (citation omitted); *TSC Research, LLC v. Bayer Chemicals Corp.,* 552 F.Supp.2d 534, 539 (M.D.N.C.2008) ("Agreements containing an unmet condition precedent are also unenforceable.").

9    Wisconsin law governs the construction and enforcement of the dispute resolution clause because the MoM included a choice of law provision stating that "[t]his MOM, the Program and all disputes arising thereunder will be governed by and interpreted in accordance with the internal laws of the State of Wisconsin." (Doc. 11, Exh. A, at 2, 5, 8, 11, 14.)

10   Mediation provisions are favored in the law. As the Eleventh Circuit has opined, "We encourage parties to make liberal use of [mediation], and we encourage district courts to liberally employ any authority they have under local rules to order mediation *sua sponte* when doing so may expedite the resolution of a case." *Advanced Bodycare,* 524 F.3d at 1241.

11   For all of N–Tron's insistence that "arising out of" is narrow language, Wisconsin courts have repeatedly indicated otherwise in a variety of contexts. *See, e.g., Mikula v. Miller Brewing Co.,* 701 N.W.2d 613, 620 (Wis.App.2005) ("The phrase 'arising out of' has been construed broadly-commonly understood to mean originating from, growing out of, or flowing from ....") (citation and internal quotation marks omitted); *see also Littrall v. Indemnity Ins. Co. of North America,* 300 F.2d 340, 344 (7th Cir.1962) ("It must be admitted that 'arising out of' is a very broad phrase."); *Pretasky v. MarineMax, Inc.,* 2002 WL 32345612, *2 (W .D.Wis. Mar. 7, 2002) ("An arbitration provision that extends to 'all disputes arising out of the agreement' is a broad one."). N–Tron's point—that the clause would have been even broader had Rockwell added the phrase "or related to" to it—is really *a propos* of nothing. Nor is it illuminating for NTron to suggest that interpretation of the relevant contract language is governed by authorities construing dispute resolution provisions that apply to disputes "arising out of" a contract. (Doc. 17, at 7–10; doc. 26, at 5–6.) After all, the relevant provision in this case requires negotiation and mediation not of disputes arising out of the MoM, but of disputes arising out of N–Tron's membership in the Encompass Program. N–Tron's argument largely glosses over this significant distinction.

12   For that reason, the Court does not consider the portions of the Declaration of Warren Nicholson (the President of N–Tron), wherein he explains his intent with respect to the dispute resolution clause (*i.e.,* this clause "was never envisioned by me to encompass the types of claims that my company has had to file in this litigation"). (Doc. 17, Exh. A.) In the face of unambiguous contract language, such extrinsic evidence of intent is improper under Wisconsin law.

13   Throughout its memoranda, N–Tron insists that "[a] core point to remember is that N–Tron is making no claims regarding the terms of the contract nor is it making any claims that Rockwell breached the contract." (Doc. 26, at 4.) This characterization of the First Amended Complaint is accurate, but it is also of little consequence. Again, the condition precedent is phrased as applying to disputes arising out of N–Tron's membership in the Encompass Program, not disputes arising out of the contract. Whether N–Tron's claims

**N-Tron Corp. v. Rockwell Automation, Inc., Not Reported in F.Supp.2d (2010)**

against Rockwell allege breach of the MoM is really beside the point; rather, the appropriate inquiry is whether those claims arise from N–Tron's membership in the Program. N–Tron's arguments thus traverse a dead-end trail that diverges from the issues properly presented by Rockwell's Motion to Dismiss.

14   It bears noting, however, that Counts III and IV of the First Amended Complaint are on a different analytical footing vis a vis the dispute resolution clause. In Count III, N–Tron alleges that Rockwell interfered with N–Tron's separate contracts with its distributors in an attempt to induce the distributors to breach them. (Doc. 16, Exh. A, at ¶ 34.) In Count IV, NTron alleges that Rockwell interfered with N–Tron's business relationships with its distributors in an effort to induce the distributors to terminate those relationships. (*Id.* at ¶ 38.) Although it is a self-serving statement made to combat Rockwell's Motion to Dismiss, the First Amended Complaint specifically alleges that these "contracts, distribution arrangements, and business relationships [between N–Tron and its distributors] were separate aspects of N–Tron's business and were, therefore, totally unrelated to N–Tron's then-terminated participation in Rockwell's Encompass Program." (*Id.* at ¶ 22.) So the gravamen of Counts III and IV is that, *following* NTron's termination from the Program, Rockwell began meddling in N–Tron's separate relationships with its distributors. Rockwell makes the irrelevant observation that N–Tron has not identified the distributors with whom Rockwell allegedly interfered, but it does not articulate any persuasive argument that Counts III and IV "arise out of" N–Tron's membership in the Program, so as to lie within the ambit of the dispute resolution provision. The Court finds that these claims clearly are not subject to the dispute resolution clause. The alleged interference happened after N–Tron's membership in the Program was terminated, involved business relationships that were entirely separate from the Program, and was in no way predicated on or rooted in N–Tron's prior involvement in the Program. As such, the dispute embodied in Counts III and IV has nothing to do with N–Tron's membership in the Program, and N–Tron did not violate any condition precedent by suing Rockwell on Counts III and IV without first submitting those claims to negotiation and mediation.

15   *See also Omni Tech,* 432 F.3d at 800 (where the parties had entered into an alternative dispute resolution provision, "the suit should have been stayed" pending ADR proceedings); *Tracfone Wireless, Inc. v. Blue Ocean's Distributing, LLC,* 616 F.Supp.2d 1284, 1285 (S.D.Fla.2009) (proper remedy for party's failure to comply with arbitration provision was stay, rather than dismissal, where party had requested stay); *R & F, LLC v. Brooke Corp.,* 2008 WL 294517, *2 (D.Kan. Jan. 31, 2008) (where plaintiff filed suit despite provision requiring parties to engage in mediation before going to court, proper remedy was to stay the litigation pending mediation); *Scurtu v. International Student Exchange,* 523 F.Supp.2d 1313, 1328 (S.D.Ala.2007) (electing to stay, rather than dismiss, plaintiff's claims that were subject to binding arbitration agreement); *RoadTechs, Inc. v. MJ Highway Technology, Ltd.,* 79 F.Supp.2d 637, 640 (E.D.Va.2000) ("it is within the district court's discretion whether to dismiss or stay an action after referring it to arbitration"); *Cecala v. Moore,* 982 F.Supp. 609, 613 (N.D.Ill.1997) ("if the dispute at issue is found to arise out of or relate to the instant contract and so to be within the scope of the mediation clause, then this court concludes that it has the authority to stay the proceedings"); *Schulz v. Nienhuis,* 448 N.W.2d 655, 656 (Wis.1989) (where plaintiff failed to participate in mediation as prescribed by state statute before filing suit, dismissal is not required, and circuit court may determine appropriate remedy).

16   *See, e.g., 3–J Hospitality, LLC v. Big Time Design, Inc.,* 2009 WL 3586830, *2 (S.D.Fla. Oct. 27, 2009) ("Where the parties' agreement requires mediation as a condition precedent to arbitration or litigation [and no such mediation has taken place], the complaint must be dismissed."); *Brosnan v. Dry Cleaning Station Inc.,* 2008 WL 2388392, *1 (N.D. Cal. June 6, 2008) ("Failure to mediate a dispute pursuant to a contract that makes mediation a condition precedent to filing a lawsuit warrants dismissal."); *Darling's v. Nissan North America, Inc.,* 117 F.Supp.2d 54, 61 (D.Me.2000) (where statute required plaintiff to make written demand for nonbinding mediation before filing suit, and plaintiff did not comply, proper remedy was to dismiss claim without prejudice, allowing plaintiff to refile upon fulfilling mediation requirement).

17   Rockwell objects to the stay remedy on the grounds that it would amount to the exercise of "some undefined equity powers to recraft or redraft or otherwise disregard the express terms of the MoMs and the condition precedent of mandatory alternative dispute resolution." (Doc. 24, at 9.) But granting a stay would not rewrite or disregard the contractual terms; to the contrary, it would enforce them by obliging N–Tron to adhere to the agreed-upon negotiation and mediation procedures before this litigation moves forward. As for Rockwell's suggestion that such a stay would flow from "some undefined equity powers," those powers are actually meticulously defined in the case law, as demonstrated by the foregoing discussion.

**End of Document**                                                 © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2374728
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

AMERICAN CENTER FOR LAW AND
JUSTICE–NORTHEAST, INC., Plaintiff,

v.

AMERICAN CENTER FOR LAW AND JUSTICE,
INC., and Jay Alan Sekulow, Defendants.

Civil No. 3:12cv730 (JBA). | June 22, 2012.

**Attorneys and Law Firms**

Todd D. Steigman, William G. Madsen, Madsen, Prestley &
Parenteau, LLC–HTFD, Hartford, CT, for Plaintiff.

Amanda B. Barry, Frank F. Coulom, Jr., Robinson &
Cole, LLP–HTFD, Hartford, CT, Andrew J. Ekonomou, The
Lambros Firm, Atlanta, GA, Mary K. Qualiana, Dow Lohnes
PLLC, Washington, DC, for Defendants.

**Opinion**

### RULING ON MOTION FOR PRELIMINARY
### INJUNCTION AND ON MOTION TO
### STAY AND COMPEL ARBITRATION

JANET BOND ARTERTON, District Judge.

**\*1** Plaintiff American Center for Law and Justice Northeast
("ACLJ Northeast") moves [Doc. # 11] for a preliminary
injunction to prevent Defendants American Center for Law
and Justice ("ACLJ National") and its General Counsel Jay
Alan Sekulow from withholding funds from Plaintiff and to
continue paying Plaintiff in accordance with their Agreement
until July 31, 2012. Plaintiff also asks the Court to order
Defendants to release any funds to Plaintiff that are being
held in escrow, and to continue paying funds to Plaintiff
after July 31, 2012 until "after a full trial is had." Defendant
moves [Doc. # 19] to stay the proceedings and to compel
arbitration, citing Section 8 of the Agreement between ACLJ
Northeast and ACLJ National. For the reasons discussed
below, Plaintiff's motion will be **denied**, and Defendants'
motion will be **granted**.

### I. Factual Background

ACLJ Northeast is a not-for-profit 501(c)(3) organization
with its principal place of business in Connecticut. Mr.
Vincent McCarthy is the President of ACLJ Northeast, which
has a staff of two lawyers, Mr. McCarthy and his wife, Anne
Louise Lohr. Its offices are located in Mr. McCarthy and Ms.
Lohr's home.

In 1997, Plaintiff entered into a contract with Defendant
ACLJ National in which Defendant "provid[ed] a sustaining
grant to ACLJ Northeast to help cover the costs and expenses
of ACLJ, Northeast in developing and establishing its
organization." (Agreement at 1.) Defendant ACLJ National
was to provide funds to Plaintiff in order to provide free
legal representation to individuals and organizations whose
First Amendment rights or "family rights" had been violated.
(Pl.'s Mem. Supp. at 2.) The initial grant period lasted for
five years, in accordance with Section 5 of the Agreement,
and was thereafter renewed for an additional five years.
From 2007 to 2011, Defendant renewed Plaintiff's funding
on an annual basis, as provided for in Section 5. In January
2012, Defendant notified Plaintiff that it would be terminating
the relationship between the parties and discontinuing the
funding provided by ACLJ National as of July 31, 2012.
On May 16, Plaintiff commenced this lawsuit, and on May
22, 2012, Defendant ceased all remaining payments to ACLJ
Northeast, in spite of its previous communications that
payments would continue until July 31, 2012, representing
that the funds were being held in escrow with its attorney.

### II. Discussion

### A. Motion for a Preliminary Injunction

"[A] preliminary injunction is an extraordinary remedy that
should not be granted as a routine matter." *JSG Trading Corp.
v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990). To succeed
on such a motion, a plaintiff must show a likelihood of success
on the merits, and that (1) she is likely to suffer irreparable
injury in the absence of an injunction; (2) remedies at law,
such as monetary damages, are inadequate to compensate
for that injury; (3) the balance of hardships tips in her
favor; and (4) the public interest would not be dis-served
by the issuance of a preliminary injunction. *Rex Medical v.
Angiotech Pharmaceuticals, Inc.,* 754 F.Supp.2d 616, 629
(S.D.N.Y.2010) (citing *Salinger v. Colting,* 607 F.3d 68, 74–
75 (2d Cir.2010)). [1]

**\*2** Plaintiff argues that it will suffer irreparable harm
absent an emergency injunction, and that there is no adequate
remedy at law for the harms it has and will continue to suffer.

(Pl.'s Mem. Supp. at 3.) In opposition, Defendant argues that Plaintiff's motion for a preliminary injunction must be denied because Plaintiff cannot demonstrate that it will suffer irreparable harm in the absence of an injunction, which should terminate the analysis. In the alternative, Defendant argues that Plaintiff cannot demonstrate a likelihood of success on the merits on their breach of contract claim (Count One), tortious interference with business relations claim (Count Two), or their declaratory judgment (Count Three) claim seeking declaration that it can operate under its corporate name.

### 1. Irreparable Injury

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd.,* 437 F. Appx. 57, 58 (2d Cir.2011). Where money damages are adequate to compensate the moving party for its harm, injunctive relief is inappropriate. *See, e.g., Savage v. Gorski,* applied to "preliminary injunctions in the context of copyright cases" but also observed that it saw "no reason that *eBay* [*v. MercExchange, L.L.C.,* 547 U.S. 388 (2006) ] would not apply with equal force to an injunction in *any* type of case." *Id.* at 607 F.3d at 78 n. 7 (emphasis in original). The "historical" standard requires that Plaintiff show "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor; and (3) that the public's interest weighs in favor of granting an injunction," *Metro. Taxicab Bd. of Trade v. City of N.Y.,* 615 F.3d 152, 156 (2d Cir.2010). However, under either standard, the Court concludes that Plaintiff fails to meet its burden. 850 F.2d 64, 67 (2d Cir.1988) ("Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief.") Here, what Plaintiff seeks is clearly calculable—ACLJ Northeast seeks payment of the remainder of the funds for the contract term ending on July 31, 2012, and seeks continuation of its contract for another term, as well as damages for breach of contract.

ACLJ Northeast has not demonstrated that it will suffer irreparable injury if an injunction is not issued, nor that money damages at the conclusion of the case will not be sufficient. The record shows that the grant funds that Plaintiff received from ACLJ National were used almost entirely to fund the salaries of its two lawyer-employees, Mr. McCarthy

and his wife Ms. Lohr. In the loss of employment context, "an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson v. Murray,* 415 U.S. 61, 92 n. 68 (1974) (probationary employee's discharge did not give rise to irreparable injury).

**\*3** Plaintiff seeks to distance itself from such rationale, likening its circumstances to "distributorship" cases in which the Second Circuit has found that a business's loss of a key product could constitute irreparable injury for the purposes of a preliminary injunction. *See, e.g., Roso–Lino Beverage Distrib., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) ( "The loss of Roso–Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages."); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970) (right to continue twenty-year old dealership "is not measurable entirely in monetary terms"). However, the Second Circuit has also found, in other distributorship/ service provision cases, that the loss of business alone is insufficient to prove irreparable harm, particularly where a plaintiff has the ability to find new customers. *See Freeplay Music v. Verance,* 80 F. Appx. 137, 138–39 (2d Cir.2003) ("Freeplay has only suggested that it will lose profits and concedes that it can contract with another company for similar, if not identical services. Its allegation that it will lose its entire business is not borne out by the record.").

While Plaintiff is technically correct that this is not an employment termination case, the principle behind *Samson* remains pertinent to the Court's analysis: Plaintiff is a not-for-profit corporation whose sole service is provided by the two attorneys and their "insufficiency of savings or difficulties in immediately obtaining other employment," *Sampson,* 415 U.S. at 92 n. 68, while they continue to provide their particularized free legal services, is not enough to rise to the level of irreparable harm. *See, e.g., Ahmad v. Long Island Univ.,* 18 F.Supp.2d 245, 249 (E.D.N.Y.1998) ("Dr. Ahmad is not precluded from seeking other employment, and continuing his research and teaching elsewhere, once his termination comes to pass.... Significantly, he is a professional who holds a doctorate .... [w]ith reasonable certainty, he will continue to practice his learned profession. While the Court does not dispute the plaintiff's suggestion that

his loss of employment will occasion some loss of reputation and interruption in his research and work, this does not amount to "irreparable harm."). Here, as in *Ahmad*, Plaintiff has not offered evidence that stopping the money stream which primarily pays Plaintiff's only two employees shows the kind of harm that is irreparable, nor the circumstances that could constitute the "extraordinary case" contemplated in *Sampson*. [2]

Further, Plaintiff has not shown that its attorneys will be unable to continue providing its "product," i.e., free law services to certain clients without on-going funding from ACLJ National, nor that Plaintiff's product is substantially more than these attorneys' legal services. ACLJ National stated to Mr. McCarthy in a January email from James Murphy, ACLJ National Vice President of Administration, "this does not preclude you from taking on new clients or cases in your private practice that come directly to you." (*See* Jan. 19, 2012 Email from James Murphy to Vincent McCarthy, Pl.'s Ex. 4 to Prelim. Inj. Hrg.) There has been no testimony about any client that ACLJ Northeast was forced to turn away because of this grant money interruption. While Mr. McCarthy testified that most of his clients do not seek monetary damages and thus a contingent fee arrangement would be meaningless, he offered no reason why clients should not be responsible for litigation costs, nor why a statutory attorney fee award as a "prevailing party" would not be available, particularly since the primary focus for Plaintiff is claims of First Amendment violations. In fact, Plaintiff has also not offered evidence that it even has any cases right now that require ongoing work, as Mr. McCarthy testified that he currently has only one case, which awaits ruling on argued dispositive motions. ACLJ Northeast's office will remain intact, as it is located at the home of its two employees, and no evidence is offered that ACLJ Northeast will not remain incorporated as a non-profit entity. That Mr. McCarthy and ACLJ Northeast may have to seek new grants for their work from other sources, or may need to make different fee or cost arrangements to provide compensation for their specialized legal services does not constitute irreparable harm, nor does the cessation of $305,000 guaranteed annual income stream to Plaintiff's attorneys. Deferred or discounted payment of legal fees is a common law office business model and provision of some pro bono service is a professional obligation of all attorneys. *See* Model Rules of Prof. Conduct, Rule 6.1 ("Every lawyer has a professional responsibility to provide legal services to those unable to pay.").

*2. Goodwill*

**\*4** Plaintiff claims that the loss of goodwill also distinguishes this case, as it provides evidence of irreparable harm entitling Plaintiff to a preliminary injunction. Goodwill is defined as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase." Black's Law Dictionary 763 (9th ed.2009). Under Virginia law, [3] the loss of goodwill is recognized as potential irreparable harm. *See, e.g., Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir.1994) ("However, when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").

Plaintiff proffered no credible evidence of its claim that its "reputation, patronage, and other intangible assets" will be irreparably harmed by "the anticipated breach by Defendant ACLJ National ... because Plaintiff ACLJ Northeast will lose all of the 'goodwill' that it has developed and created as an organization since its formation." (Am. Comp. [Doc. # 27] ¶ 55.) Other than Mr. McCarthy's speculations, the only testimony related to goodwill was from Peter Wolfgang, a former client, friend, and fan of Vincent McCarthy's, who testified that if Mr. McCarthy continued to provide legal services for free, he would continue utilizing those services. This does not support Plaintiff's claim of imminent loss of goodwill, and the Court concludes that no potential loss of goodwill has been shown to support a finding of irreparable harm.

**B. Defendant's Motion to Stay and Compel Arbitration**

Though Defendant agreed at the preliminary injunction hearing that the Court should rule on the motion for preliminary injunction, it also moves to stay and compel a merits arbitration, citing Section 8 of the Agreement.

Section 8 provides: "Any controversy or claim arising out of or relating to this Agreement between ACLJ National and ACLJ, Northeast shall be submitted by arbitration before and in accordance with the rules of the Christian Conciliation Service with an independent licensed or mutually agreed to arbitrator present during the arbitration process." (Agreement ¶ 8A.) Part B of Section 8 provides, "In the event that arbitration fails, either party has the right to seek relief in any court of competent jurisdiction." (*Id.* ¶ 8.B.) Thus, while the Agreement clearly requires an arbitration, it only requires a

non-binding arbitration, and in accordance with the rules of the Christian Conciliation Service.

The Rules of Procedure for the Institute of Christian Conciliation state as the purpose of Christian Conciliation:

> The purpose of Christian conciliation is to glorify God by helping people to resolve disputes in a conciliatory rather than an adversarial manner. In addition to facilitating the resolution of substantive issues, Christian conciliation seeks to reconcile those who have been alienated by conflict and to help them learn how to change their attitudes and behavior to avoid similar conflicts in the future.

**\*5** (Christian Conciliation Services Rules of Procedure ¶ A(1).) The Rules defining "arbitration" as potentially binding, i.e., "the submission of a dispute to a single arbitrator or a panel of arbitrators for a legally binding decision that may become and have the same effect as a judgment of a civil court" (Rules of Procedure, Ex. 2 to Pl.'s Opp'n ¶ A(3)(H) at 2), conflict with the Agreement's provision for judicial remedy "[i]n the event that arbitration fails." On the other hand, and perhaps closer to the parties' purposes, this Service offers 'mediation,' "utiliz[ing] one or more neutral intermediaries who assist the parties in arriving at their own voluntary and mutually satisfactory resolution. Mediators may provide the parties with an advisory opinion, but that opinion shall not be legally binding." (*Id.* ¶ A(3)(G) at 2.)

For the purposes of Defendant's motion to compel arbitration, however, it is necessary to determine whether "arbitration" within the meaning of the Federal Arbitration Act ("the FAA") was in fact contemplated by the parties. The FAA evinces a strong commitment to the validity of arbitration agreements, and provides in pertinent part:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, ... *shall be valid, irrevocable, and enforceable,* save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

As a general matter, the Second Circuit instructs courts that "[t]he federal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible." *S.A. Mineracao Da Trindade–Samitri v. Utah Intern., Inc.,* 745 F.2d 190, 194 (2d Cir.1984). While the Second Circuit has not explicitly considered whether non-binding arbitration of the type apparently contemplated in the Agreement is enforceable under the FAA, several district courts in the Circuit have held that "[i]f the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration. The arbitrator's decision need not be binding in the same sense that a judicial decision needs to be to satisfy the constitutional requirement of a justiciable case or controversy." *AMF Inc. v. Brunswick Corp.,* 621 F.Supp. 456, 460 (E.D.N.Y.1985) (applying the FAA to require a manufacturer to comply with its agreement with a competitor to obtain a non-binding advisory opinion); *see also Allied Sanitation, Inc. v. Waste Mgmt. Holdings, Inc.,* 97 F.Supp.2d 320, 327 (E.D.N.Y.2000) ("The concept of arbitration plausibly embraces all contractual dispute resolution mechanisms, consistent with Congress's design to foster alternative means to resolving litigation."); *CB Richard Ellis, Inc. v. American Env'tal Waste Mgmt.,* 98–CV–4183, 1998 WL 903495, at *2 (E.D.N.Y. Dec. 4, 1998) (finding mediation to fall within FAA's definition of arbitration).

**\*6** Plaintiff points to *Harrison v. Nissan Motor Corp.,* 111 F.3d 343, 350 (3rd Cir.1997), which framed the inquiry as "whether the arbitration at issue ... might realistically settle the dispute." 111 F.3d at 350. In *Harrison,* a case in which the purchaser of an automobile sued the automobile manufacturer for failure to comply with its warranty, the Third Circuit concluded that because of the particularities of Lemon Law mechanisms, "it cannot be said, ... that claimants under all circumstances undertake to settle their disputes when they submit them to Lemon law arbitration." *Id.* The Third Circuit determined that the ADR contemplated in the contract in that case was not enforceable under the FAA, defining 'arbitration' as follows:

> [T]he essence of arbitration, we think, is that, when the parties agree to submit their disputes to it, they have agreed to arbitrate these disputes through to completion, i.e. to an award made by a third-party arbitrator. Arbitration does not occur until the process is completed and the arbitrator makes a

decision. Hence, if one party seeks an order compelling arbitration and it is granted, the parties must then arbitrate their dispute to an arbitrators' decision, and cannot seek recourse to the courts before that time.

*Id.* Plaintiff contends that the arbitration clause in Section 8 does not require that the parties reach a resolution or settlement prior to resorting to litigation,[4] and thus arbitration is not likely to settle this dispute, and so it should not be compelled.

The Court disagrees with Plaintiff's reasoning, particularly where here, unlike in *Harrison,* a consumer protection case, the parties are two organizations that share a common mission and have worked together to advance their shared view of constitutional law since 1997. ACLJ Northeast and ACLJ National expressly intended that any disputes "arising out of or relating to this Agreement between ACLJ National and ACLJ, Northeast shall be submitted by arbitration before and

in accordance with the rules of the Christian Conciliation Service." (Agreement ¶ 8A.) Guided "by a need to protect the intent of the parties," *S.A. Mineracao,* 745 F.2d at 194, it is evident that the parties specifically included Section 8 in their Agreement because they contemplated a private adjudication to guide resolution of the merits of their dispute. Assuming the good faith of the parties, a neutral third party may well help to resolve this dispute in a conciliatory, rather than adversarial, manner.

**III. Conclusion**

For the reasons discussed above, Plaintiff's motion for a preliminary injunction [Doc. # 11] is DENIED, and Defendant's motion [Doc. # 19] to stay and compel arbitration is GRANTED. The case is STAYED and will be administratively closed, and may be restored to the active docket upon either party's motion within 45 days of the arbitrator's decision.

IT IS SO ORDERED.

**Footnotes**

1    The court in *Salinger v. Colting,* 607 F.2d 68 (2d Cir.2010) stated that its 1 holding applied to "preliminary injunctions in the context of copyright cases" but also observed that it saw "no reason that *eBay [v.MercExchange, L.L.C.,* 547 U.S. 388 (2006) ] would not apply with equal force to an injunction in any type of case." *Id.* at 607 F.3d at 78 n. 7 (emphasis in original). The "historical" standard requires that Plaintiff show "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor; and (3) that the public's interest weighs in favor of granting an injunction," *Metro. Taxicab Bd. of Trade v. City of N.Y.,* 615 F.3d 152, 156 (2d Cir.2010). However, under either standard, the Court concludes that Plaintiff fails to meet its burden.

2    The Supreme Court in *Sampson* also noted that "[w]e recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence." *Id.*

3    The Agreement contains a choice of law provision which provides: "This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without regard to its conflict of laws provisions." (Agreement ¶ 10.)

4    Plaintiff also asserts that Christian Conciliation Service does not exist, however, that appears to be incorrect: a search for "Christian Conciliation Services," directs you to http://www.peacemaker.net/si te/c.nulWL7MOJtE/b.5394441/k.BD56/Home.htm, the website for The Institution for Christian Conciliation. "Christian Conciliation Services" appears to be in reference to the "rules" of Christian Conciliation, and that the Agreement specifies that the parties are to agree upon an Arbitrator/mediator who will follow these rules.

**End of Document**                                   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 53 of 88

Bakoss v. Certain Underwriters at Lloyds of London..., Not Reported in...

2011 WL 4529668
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Imad John BAKOSS, M.D., Plaintiff,
v.
CERTAIN UNDERWRITERS AT LLOYDS OF
LONDON ISSUING CERTIFICATE NO. 0510135.

No. 10–CV–1455 (DLI)(LB). | Sept. 27, 2011.

**Attorneys and Law Firms**

Ira S. Lipsius, Lipsius-Benhaim Law, LLP, New York, NY,
for Plaintiff.

Henry Nicholas Goodman, Nicholas Goodman & Associates
PLLC, New York, NY, for Certain Underwriters at Lloyds of
London Issuing Certificate No. 0510135.

**Opinion**

### *MEMORANDUM & ORDER*

DORA L. IRIZARRY, District Judge.

**\*1** Plaintiff Imad John Bakoss, M.D. ("Bakoss") initiated
this action in state court against Defendant Certain
Underwriters at Lloyds of London Issuing Certificate No.
0510135 ("Underwriters") seeking $550,000 in disability
benefits pursuant to the terms of the above-named policy.
Defendant removed the instant action to this court pursuant
to 28 U.S.C. § 1331, the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards (the "Convention"),
and Chapter 2 of the Federal Arbitration Act, 9 U.S .C. §
201 *et seq.* (the "FAA"). (Docket Entry 1, Notice of Removal
¶ 7.). Defendants now move pursuant to Federal Rule of
Civil Procedure 56(c) for summary judgment dismissing the
complaint, or, in the alternative, for an Order compelling
Plaintiff to submit to arbitration pursuant to 9 U.S.C. § 1 *et
seq.* Plaintiff opposes the motion, and moves to remand this
case to state court, arguing that this court lacks jurisdiction.
For the reasons set forth below, the court grants Defendants'
motion for summary judgment and denies Plaintiff's motion
in its entirety.

### BACKGROUND

Bakoss is a licensed medical doctor specializing in pulmonary
and internal medicine who claims to have retired from
the practice of medicine due to permanent coronary artery
disease. (Notice of Removal ¶ 2; Bakoss Aff. ¶ 2.)
Underwriters is comprised of numerous individuals and/or
corporations or other juridical entities, at least one of which
is a citizen or subject of a nation other than the United States,
that are the underwriters and issuers of the insurance policy
at issue. (Notice of Removal ¶ 1; Compl. ¶ 2.)

Defendants issued Plaintiff a Certificate of Insurance
("Certificate") against permanent total disability, with
effective dates of January 20, 2005 through January 20,
2008, to provide coverage for his obligation to repay a bank
loan if he became disabled. (Aff. of H. Nicholas Goodman
("Goodman Aff.") Ex. A; Bakoss Aff., Ex. A (both, the
"Certificate"). The Certificate provided for payment of a
Principal Sum Benefit to Plaintiff in the event he became
"Permanently Totally Disabled," which was defined in the
Certificate as follows: "Permanent Total Disability means
that, in the opinion of a Competent Medical Authority [y]ou
will not recover from the effects of a Sickness or Injury to the
extent that [y]ou will ever be able to resume the Material and
Substantial duties of Your occupation." (Certificate at 3.) The
Certificate was amended by Endorsement effective January
20, 2005 as follows: "Total Disability means that as a result
of sickness or injury you cannot perform in any professional
capacity as a medical doctor." (Certificate at 12.)

The Certificate contains the following Notice of Claim
provision:

> Written notice of a claim must be given
> to us within twenty (20) days after the
> date of potential qualifying loss, or as soon
> after that as is reasonably possible. Notice
> given to the Coverholder which is sufficient
> to identify You will be deemed sufficient
> notice.

**\*2** (Certificate at 8.)

Plaintiff communicated his intent to claim benefits under the
Certificate in either late July or August 2007. (*Compare* Def.
Local Rule 56.1 Stmt. of Facts ("Def. 56.1 Stmt.") at ¶ 4 *with*
Pl. Resp. to Local Rule 56.1 Stmt. of Facts ("Pl. 56.1 Resp.")
at ¶ 4.) In the "Insured's Statement—Details Outlining Proof
of Loss for Disability Insurance" ("Insured's Statement"),
dated August 9, 2007, Plaintiff claimed October 7, 2006, as
"Date First Noticed Sickness" and October 9, 2006 as "Date

First Consulted Physician," as well as the date upon which he became permanently totally disabled and his last day of work. (Goodman Aff. Ex. B).

On or about August 20, 2007, Defendants received an Attending Physician's Statement dated July 10, 2007, signed by Dr. John Sayad ("Sayad") stating that Plaintiff suffered from "severe chest pain angina pectoris multiple acute myocardial infarctions" that began on October 9, 2006 and that Plaintiff was permanently totally disabled as of that date. (Goodman Aff. at ¶ 12, Ex. C.) In an accompanying letter, Sayad confirmed Plaintiff's "total permanent disability" as of October 9, 2006, opining that "the permanency of his condition is spelled out by the recurrent nature of his symptoms and the fact that his anaphylactic fish allergy does not allow for any contrast angiography, which is necessary for any interventional cardiac therapies." (*Id.*)

In a response to Plaintiff, dated August 30, 2007, Defendants cited the Certificate's "Notice of Claim" provision and requested an explanation for Plaintiff's delay in reporting the claim. (Goodman Aff. Ex. D.) Several subsequent letters, dated September 18, 2007, October 19, 2007, November 21, 2007, December 21, 2007, and February 15, 2008, reiterated Defendants' request for an explanation for Plaintiff's delay in reporting the claim. (Goodman Aff. Ex. E.)

On March 14, 2008, Defendants wrote to advise Plaintiff of their position. (*See* Goodman Aff. Ex. F.) Citing to relevant policy language, the letter explained that, because it was unclear to Defendants whether Plaintiff fell within the policy definition of permanently totally disabled, Plaintiff was requested to submit to examinations by an allergist and a cardiologist. (*Id.* at 7.) Citing to the Notice of Claim provision, the letter further stated that Defendants "continue[ ] to reserve their right to deny coverage for failing to give immediate advice to [Defendants] of the potential loss ..." (*Id.* at 8.)

By letter dated April 2, 2008, counsel for Plaintiff addressed the notice of claim issue. (Goodman Aff. Ex. G.) Citing to the Elimination Period provision in the Certificate, [1] counsel maintained that, since the first day of the elimination period was October 9, 2006, Plaintiff's potential qualifying loss did not occur until October 2007, and thus Plaintiff's claim was timely filed. (*Id.*)

Plaintiff subsequently underwent two independent medical examinations arranged by Defendants. On July 2, 2008, Bernard A. Feigenbaum, M.D. ("Feigenbaum"), an allergist,

examined Plaintiff to address his fear of a serious allergic reaction to the radiocontrast media ("RCM") used in cardiac intervention studies. (*See* Goodman Aff. Ex. J.) Feigenbaum reported that while Plaintiff has a history suggestive of a possible food allergy to shellfish or fish, he has not undergone any testing to confirm such results. (*Id.* at 4.) Feigenbaum explained that, in the past, it was believed that a food allergy to fish or shellfish significantly increased the risk of an adverse reaction to RCM, due to iodine content, but the allergy literature no longer supports this conclusion. (*Id.* at 5–6.) Feigenbaum further opined that, if one had further concerns about the "mildly increased risk" of adverse reactions to RCM in "allergic individuals" and wanted to decrease the risk of an adverse reaction, possible prophylactic treatment options exist. (*Id.* at 6.) Feigenbaum concluded: "Because of all the issues that relate to Allergy, consultation with a treating allergist, preferably one who specializes in RCM allergy, would be suggested." (*Id.*)

**\*3** On September 25, 2008, Jeffrey Rade, M.D. ("Rade"), an Interventional Cardiologist, examined Plaintiff. (Goodman Aff. Ex. K.) Rade opined that, while Plaintiff likely has some degree of coronary artery disease, "[h]ow extensive that disease is, how likely it is to account for the severity of his symptoms and what the best treatment and/or revascularization options might be are unclear given his refusal to undergo coronary angiography out of a fear of experiencing a reaction to radiocontrast dye." (*Id.* at 7.) Rade concluded: "While Plaintiff appears to have some element of disability due to recurrent chest pain, at present I do not believe that he can truly be considered completely and totally unable to perform in any professional capacity as a physician." (*Id.* at 9.) Rade based his opinion on Plaintiff's continued treatment of patients in his office after the date the disability is alleged to have begun and continuing through the date of Rade's examination, as well the objective findings of the stress echocardiogram, which indicate that Plaintiff "likely has the physical capacity to reasonably function as a physician without objective evidence of inducible ischemia." (*Id.* at 10.)

A letter dated February 10, 2009 advised Plaintiff that his claim was not covered by the policy, or was excluded from coverage. (Goodman Aff. Ex. I.) More specifically, the letter advised that Defendants did not agree to coverage because Plaintiff had not satisfied the definition of Permanently Totally Disabled, "since without proper cardiac catheterization, it would be impossible to confirm the full extent of [his] alleged condition, if any, and whether it [was] permanent in nature." (*Id.* at 10.) Defendants maintained

Case 1:12-cv-00584-NAM-DJS    Document 12    Filed 06/29/12    Page 55 of 88

Bakoss v. Certain Underwriters at Lloyds of London..., Not Reported in...

that Plaintiff's alleged condition, if any, can be corrected with proper medical treatment should he submit to cardiac catheterization. (*Id.* at 10–11.) Furthermore, the Certificate requires that, as a result of Total Disability, the insured cannot perform in any professional capacity as a medical doctor, and Plaintiff admittedly continued to work as a medical doctor up until sometime after the expiration of the policy in 2008. (*Id.* at 11.) Finally, Plaintiff's claim was submitted on August 9, 2007, "nearly ten (10) months after [his] alleged date of loss," and, as such, Defendants "den[ied] any obligation to indemnify [Plaintiff] for failing to effectuate timely notice of this claim." (*Id.* at 15.)

Plaintiff subsequently invoked the formal review process provided for in the Grievance Procedures of the Certificate. (Goodman Aff. at ¶ 29; *see* Certificate at 10.) On December 1, 2009, Defendants completed their formal review and advised Plaintiff that Defendants continued to maintain that Plaintiff was not entitled to benefits under the Certificate. (Goodman Aff. at ¶ 30.) In subsequent correspondence, Defendants invoked the Certificate's Third Physician Provision, because of Plaintiff's continued claim of permanent disability. (*See* Goodman Aff. at ¶ 31, Ex. L.) That provision states:

> **\*4** Benefits will be paid if it is determined by the Physician providing your Regular Care that You are Permanently Totally Disabled. We reserve the right to have You examined by a Physician of Our choice. Should your Physician and Our Physician not be able to agree that You are Totally Disabled, Your Physician and Our Physician shall name a third Physician to make a decision on the matter which shall be final and binding.

(Certificate at 6.)

In a letter dated December 2, 2009, Plaintiff refused to comply with the third physician provision unless Defendants conceded coverage and challenged only whether Plaintiff is permanently and totally disabled. (*See* Goodman Aff. Ex. L.) Shortly thereafter, Plaintiff commenced this action in the Supreme Court of the State of New York, Richmond County, seeking a declaratory judgment that there is coverage for Plaintiff under the Certificate, and damages of $550,000, as well as interest and costs. (Goodman Aff. Ex. M.) Defendants removed the action pursuant to 28 U.S.C. § 1331, the Convention and the FAA. (Goodman Aff. Ex. N., Notice of Removal).

## DISCUSSION

### I. Subject Matter Jurisdiction

Defendants assert that the court has subject matter jurisdiction under 28 U.S.C. § 1331 by virtue of the federal question raised by application of the Convention, which is implemented by Chapter Two of the FAA, 9 U.S.C. §§ 201–208. (Def. Opp. to Rem. at 1.) Plaintiff moves to remand the case to state court, arguing that the FAA does not apply, and therefore this court lacks jurisdiction. (*See* Pl. Mot. Rem. at 1–2)

The requirement that jurisdiction be established as a threshold matter is "inflexible and without exception." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). *See Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 577, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). The Second Circuit has reiterated that jurisdictional questions should be addressed in the first instance by the District Court. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 433 F.3d 181, 203 (2d Cir.2005). This obligation extends to removal cases. *McRae v. Arabian American Oil Co.,* 293 F.Supp. 844, 846 (S.D.N.Y.1968).

### A. Federal Jurisdiction, the Convention and the FAA

Federal question jurisdiction is invoked where the plaintiff's claim arises "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. 9 U.S.C. § 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States."

"The goal of the Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions." *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir.1999). The adoption of the Convention by the United States promotes the strong federal policy favoring arbitration of disputes, particularly in the international context. *Mitsubishi% Motors Corp. v. Soler Chrysler–Plymouth, Inc. .,* 473 U.S. 614, 638–40, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). *Accord Republic of Ecuador v. Chevron Corp.,* 638 F.3d 391 (2d Cir.2011).

**\*5** The Convention and the implementing provisions of the FAA set forth four basic requirements for enforcement of arbitration agreements under the Convention: (1) there must be a written agreement; (2) it must provide for arbitration

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 56 of 88

Bakoss v. Certain Underwriters at Lloyds of London..., Not Reported in...

in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope. *See Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 249–50 (2d Cir.1991).

The Second Circuit has held that "when we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable." *See Smith/Enron,* 198 F.3d at 95. *See David L. Threlkeld & Co.,* 923 F.2d at 249–50; *Borsack v. Chalk & Vermilion Fine Arts, Ltd.,* 974 F.Supp. 293, 299 n. 5 (S.D.N.Y.1997). Where there is a question as to whether claims are arbitrable, federal arbitration policy requires that "any doubts ... be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp .,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Louis Dreyfus Negoce, S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 223 (2d Cir.2001).

### B. Removal pursuant to Section 205

9 U.S.C. § 205 provides that:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district or division embracing the place where the action or proceeding is pending ... [T]he ground for removal provided in this section *need not appear on the face of the complaint but may be shown in the petition for removal.*

9 U.S.C. § 205 (emphasis added). *Vaden* notes that while Chapter 2 of the FAA expressly grants federal courts jurisdiction to hear actions seeking to enforce an agreement or award falling under the Convention, FAA § 205 "goes further" and overrides the well-pleaded complaint rule *pro tanto, Vaden v. Discover Bank,* 556 U.S. 49, ——, 129 S.Ct. 1271 fn. 9, 173 L.Ed.2d 206, – – – – (2009). *Accord Westmoreland Capital Corp. v. Findlay,* 100 F.3d 263, 268– 69 (2d Cir.1996) (noting that when Congress has intended to create an exception to the "well-pleaded complaint rule," it has done so explicitly, as in 9 U.S.C. § 205).

Although the Second Circuit has not addressed the issue of removal pursuant to § 205 except in dicta,[2] numerous courts in the Circuit have exercised § 205 removal jurisdiction. *See Bogdan Dumitru v. Princess Cruise Lines, Ltd.,* 2 F.Supp.2d 328 (S.D.N.Y.2010), *Celulosa Del Pacifica S.A. v. A. Ahlstrom Corp.,* 1996 WL 103826, at *1, 3 (S.D.N.Y. Mar.11, 1996), *JF Surgutneftegaz v. President and Fellows of Harvard College,* 2005 WL 1863676, *2 fn. 3 (S.D.N.Y. Aug.3, 2005), *York Hannover Holding A.G. v. American Arbitration Association,* 794 F.Supp. 118, 122–23 (S.D.N.Y.1992). *Cf. Samsun Logix Corp. v. Bank of China,* 740 F.Supp.2d 484, 487 (S.D.N.Y.2010) (removal pursuant to Convention unwarranted where arbitration had already been completed.)

**\*6** Noting at the outset that the Second Circuit had not addressed the issue specifically, the court in *Banco de Santander Cen. Hispano, Inc,* engaged in a thorough and well-reasoned analysis of the language of § 205, the relevant case law, and the legislative history, and adopted a "broad" interpretation of § 205. 425 F.Supp.2d 421, 428 (S.D.N.Y.2006). The court in *Banco* focused its discussion on *Beiser v. Weyler,* 284 F.3d 665, 667 (5th Cir.2002), where the Fifth Circuit held that a district court will have jurisdiction under § 205 "over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense." 284 F.3d at 669. The court in *Banco* reasoned that if § 205 removal were limited to only state court actions seeking to compel arbitration or confirm an arbitration award, Congress would not have needed to expressly abrogate the well-pleaded complaint rule. As such, the court in *Banco* held that Congress expressly granted removal jurisdiction to a class of state court actions, even where plaintiffs did not expressly plead claims under the Convention, *i.e.,* alleging only state claims or setting out a vacatur action, so long as defendants could articulate a "federal defense" "related to" the Convention. *Id.* at 430.

### C. The "Arbitration Clause"

The key issue here is whether Defendants have established that the insurance policy at issue contains an arbitration clause that falls under the Convention and provides a defense to the instant action. Defendants' petition for removal states, in pertinent part:

> This dispute is commercial and contractual, and pertains to a written contract, and at least one contracting party is not

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 57 of 88

Bakoss v. Certain Underwriters at Lloyds of London..., Not Reported in...

a citizen of the United States, and the written contract contains provisions requiring binding arbitration of a dispute that has arisen between the parties.

(Notice of Removal at ¶ 6.) Defendants maintain that this dispute, including "any threshold issue of arbitrability," is governed by the Convention. (Notice of Removal at ¶ 7) More specifically, Defendants contend that a dispute has arisen regarding the determination of Plaintiff's medical condition, and that the third physician provision of the Certificate constitutes an arbitration provision. Moreover, because Plaintiff continues to claim disability, but refuses to proceed with the third physician provision, Defendants assert they are entitled to a Declaration and Order compelling arbitration. (*See* Def. Reply in Supp. of Sum. Jmt. at 8.)

In determining whether the agreement in question is in fact an agreement to arbitrate, the issue posed is whether "a controversy" would be "settled" by the process set forth in the agreement. *AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456 (E.D.N.Y.1985). In *AMF*, the clause in question stated, in part, that "[b]oth parties agree to submit any controversy which they may have ... to such advisory third party for the rendition of an advisory opinion. Such opinion shall not be binding upon the parties, but shall be advisory only ...." *Id.* at 458. Conceding that the term arbitration "eludes easy definition," (*Id.* at 459), U .S. District Judge Jack B. Weinstein of this court concluded that case law developed following the passage of the FAA "reflects unequivocal support to have third parties decide disputes—the essence of arbitration," *Id.* at 460. Moreover, "[n]o magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefits of the [FAA];" thus, if the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration. *Id; See also McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825 (2d Cir.1988) (where provision called for the appointment of an independent tax counsel to resolve certain disputes, the fact that the contract language did not employ the word "arbitration" was "irrelevant").

\*7 The third physician provision at issue states, in relevant part, "[s]hould your Physician and Our Physician not be able to agree that You are Totally Disabled, Your Physician and Our Physician shall name a third Physician to make a decision on the matter which shall be final and binding." (Certificate at 6.) Here, although Plaintiff continues to pursue his claim for Total Disability, he refuses to participate in a previously agreed upon procedure for settling that controversy. The

provision requires that a physician for each party name a third Physician who will make a final and binding decision on the matter of Plaintiff's disability. Neither party here disputes that an enforceable contract was formed. In agreeing to the terms of the contract, both parties agreed to this mechanism for resolving disputes as to the disability determination. Thus, heeding the presumption in favor of arbitration as described in *Moses H. Cone, supra,* at 24–26, this court construes the third party physician provision in the Certificate as an arbitration clause. As such, Defendants have established the existence of an arbitration agreement falling under the Convention, and properly have moved to compel arbitration. Accordingly, this court has subject matter jurisdiction over the action and will proceed to the merits.

**II. Summary Judgment**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998), but must affirmatively "set out specific facts showing a genuine issue for trial," FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir.1994) (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)).

Under New York law, "an insurer's duty to indemnify arises under the insurance contract." *Atlantic Casualty Ins. Co. v. C.A.L. Construction Corp.,* 2008 WL 2946060 at \*4 (E.D.N.Y. July 30, 2008) (citing *Trans. Ins. Co. v. AARK Constr. Group,* 526 F.Supp.2d 350, 356 (E.D.N.Y.2007)).

Insurers seeking to deny coverage by virtue of an exclusion "must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Cont. Cas. Co. v. Rapid–Am. Corp.,* 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993). Courts interpret exclusions narrowly and resolve "[a]ny ambiguities ... in favor of the insured." *Marino v. N.Y. Tel. Co.,* 944 F.2d 109, 112 (2d Cir.1991); *Cont. Cas. Co.,* 80 N.Y.2d at 652–55, 593 N.Y.S.2d 966, 609 N.E.2d 506. The insurer bears the burden of showing that the loss claimed by the insured is excluded from coverage. *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.,* 961 F.2d 387, 389 (2d Cir.1992).

**\*8** Under New York law, an insured must comply with the notice provisions contained in its insurance policy once it is aware of a loss. *Atlantic Casualty Ins. Co.,* 2008 WL 2946060 at \*7. An insured is deemed to be aware of a loss "once an insured has obtained facts that would cause a reasonable person" to recognize the potential for a claim under its policy. *See, e.g., Utica Mut. Ins. Co. v. Firemen's Fund Ins. Co.,* 748 F.2d 118, 122 (2d Cir.1984). The requirement that an insured comply with the notice provision of an insurance policy operates as a condition precedent to coverage. *Trans. Ins. Co.,* 526 F.Supp.2d at 358. Absent a valid excuse, the failure to comply with the notice requirement vitiates the policy, and an insurer need not demonstrate prejudice before it can assert the defense of noncompliance. *Id.*

Courts evaluate whether an insured provided timely notice under the standard of reasonableness. *Atlantic Casualty Ins. Co.,* 2008 WL 2946060 at \*7. An insurer establishes unreasonable delay as a matter of law by demonstrating that "(1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay." (*Id.* citing *Trans. Inc. Co.,* 526 F.Supp.2d at 358). *See, e.g., Safer v. Government Empls. Ins. Co.,* 254 A.D.2d 344, 345, 678 N.Y.S.2d 667 (2d Dep't 1998) (delay in reporting an occurrence to insurer more than one month after receiving a complaint amounts to unreasonable delay as a matter of law).

Here, Defendants contend that Plaintiff's delay in notifying Defendants of his "total and permanent disability" constitutes a breach of the notice provision, thus vitiating any duty to indemnify Plaintiff. (Def. Supp. of Sum. Jmt. Mot. at 21–26.) Plaintiff argues that there is a factual issue as to when he "had a reasonable belief that he was permanently disabled to the extent that he would never be able to resume his profession." (Pl. Opp'n to Sum. Jmt. at 7.) Therefore, the

court must determine whether Plaintiff's delay in notifying Defendants is unreasonable as a matter of law.

The Notice of Claim provision in the Certificate provides that Plaintiff is required to notify Defendants within twenty days after the date of a potential qualifying loss, or as soon after that as is reasonably possible. (Certificate at 8.) It is undisputed that Sayad determined that Plaintiff had suffered a "permanent total disability" as of October 9, 2006, and it was either July or August 2007 when Plaintiff first communicated his intent to claim benefits under the Certificate to Defendants. Consequently, there was a nine —or ten-month lapse between the date when Plaintiff was declared permanently and totally disabled by Sayad, and that information was communicated to Defendants.

Plaintiff argues that a question of fact exists as to whether he reported the claim within twenty days or as soon as possible from when he reasonably determined he would never be able to resume the material and substantial duties of his profession. (Pl. Opp'n to Mot. for Sum. Jmt. at 9.) As an initial matter, the court notes that the pertinent definition of Total Disability, amended by the Endorsement effective January 20, 2005, is as follows: "Total Disability means that as a result of sickness or injury you cannot perform in any professional capacity as a medical doctor. (Certificate at 12.)

**\*9** Despite Sayad's recommendation that Plaintiff cease practicing medicine after the October 7, 2006 angina attack, (Bakoss Aff. at ¶ 5), Plaintiff was "too proud to retire" (Bakoss Aff. at ¶ 6 .) Thus, Plaintiff returned to work, and suffered his first heart attack on October 24, 2006. (Bakoss Aff. at ¶ 6.) After suffering his first heart attack, Plaintiff had Dr. Ashkar, his employee, cover his practice. (Bakoss Aff. at ¶ 7.) On or about March 23, 2007, Plaintiff returned to work to fill in for Dr. Ashkar, and suffered a second heart attack a few hours later. (Bakoss Aff. at ¶ 7.)

Despite having suffered multiple heart attacks, Plaintiff contends he believed his condition would not prevent him from resuming his practice. (Pl. Opp'n to Sum. Jmt. at 12.) Until he submitted his claim in August 2007, Plaintiff attempted to return to his medical practice in some capacity. (*Id.*) Plaintiff alleges he tried to recover, and until the summer of 2007, he believed he would be able to resume his occupation. Thus, he provided notice as soon "as is reasonably possible." (*Id.* at 10, 678 N.Y.S.2d 667.)

In order to qualify for disability benefits under the Certificate, Plaintiff must establish that "as a result of a sickness of injury [he] cannot perform in any professional capacity as a medical

Bakoss v. Certain Underwriters at Lloyds of London..., Not Reported in...

doctor." (Certificate at 12.) Plaintiff submitted an Insured's Statement, dated August 9, 2007, signed under penalty of perjury, indicating October 9, 2006 as the date upon which he became totally and permanently disabled. (Goodman Aff. Ex. B.) Yet Plaintiff admits, even in the same Insured's Statement, that he did in fact work after the claimed onset date. (*Id.*) Moreover, on September 5, 2008, during his interview with Rade, Plaintiff admitted continuing to work in the office "several hours a day up to 4 days a week." (Goodman Aff. Ex. K at 5, 10.) If, as he argues, Plaintiff was still working in some capacity after October 9, 2006, then he was not, in fact, permanently and totally disabled as per the terms of the Certificate.

Plaintiff's argument concerning the timing of the "potential qualifying loss" is equally unavailing. Plaintiff contends that the potential qualifying loss was when Plaintiff realized he "could not recover ... to the extent" he would ever resume the "material and substantial duties" of his profession." (Pl. Opp'n to Sum. Jmt. at 12.) A reasonable person would have recognized a potential qualifying loss when he first was

determined by his physician to be permanently and totally disabled. Significantly, Plaintiff does list October 9, 2006 as the onset date of his total and permanent disability in his Insured's Statement.

Defendants have demonstrated that the facts regarding Plaintiff's delay of nearly ten months in reporting his claim are undisputed and Plaintiff has not offered a valid excuse for the delay. Therefore, the court finds that Defendants have established that Plaintiff's delay is unreasonable as a matter of law and, consequently, are not liable to Plaintiff. *Atlantic Casualty Ins. Co.,* 2008 WL 2946060 at \*7.

### CONCLUSION

**\*10** For the reasons set forth above, Plaintiff's motion for remand is denied, and Defendants' motion for summary judgment is granted in its entirety. Defendants' motion for an order to compel arbitration is denied as moot.

SO ORDERED.

Footnotes

1   Elimination Period is defined as "the number of consecutive days [y]ou are Totally Disabled ... before a benefit is payable. The Elimination Period begins on the first day [y]ou are attended by a Physician who determines [y]ou to be Totally Disabled ..." (Certificate at 3.)

2   Dicta in *International Shipping Co. v. Hydra Offshore, Inc.* suggests that the Convention is enforceable where the party invoking its provisions seeks "either to compel arbitration or to enforce an arbitral award," 875 F.2d 388, 391 n. 5 (2d Cir.1989). *Chevron Corp.,* 638 F.3d at 391 fn. 6.

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 903495
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

CB RICHARD ELLIS, INC., Plaintiff,
v.
AMERICAN ENVIRONMENTAL WASTE
MANAGEMENT, Anthony Varuzza,
Vincent Vertuccio, Michael Vertuccio,
and Randolph Alamo, Defendants.

No. 98–CV–4183(JG). | Dec. 4, 1998.

**Attorneys and Law Firms**

Ronald G. Blum, Esq., Kavanagh, Maloney & Osnato, LLP, New York, for Plaintiff.

David M. Fish, Esq., New York, for Defendants.

**Opinion**

**MEMORANDUM AND ORDER**

GLEESON, District J.

**\*1** Plaintiff CB Richard Ellis, Inc. ("CB") brought this action for fraud and related claims arising out of defendants' alleged overbilling and paying of kickbacks in connection with amounts defendants charged plaintiff for disposal and shredding of documents. Defendants American Environmental Waste Management ("American Environmental"), Anthony Varuzza, Vincent Vertuccio, and Michael Vertuccio now move for an order staying the proceedings against them and compelling mediation of this dispute in accordance with the mediation clause in the contract between American Environmental and CB. Oral argument occurred on November 20, 1998.

For the reasons stated herein, the motion to compel mediation is granted, and all proceedings in this Court are stayed until further order of the Court.

**BACKGROUND**

Anthony Varuzza, Vincent Vertuccio, and Michael Vertuccio are principals and employees of American Environmental, a waste removal company. CB manages real estate facilities. In May 1997, CB hired defendant Randolph Alamo as a regional facilities manager for CB's operations in the New York metropolitan area. Shortly thereafter, CB, through Alamo, contracted with American Environmental to perform waste removal at some of the Fleet Bank branches in New York that CB manages. CB and American Environmental memorialized their agreement on August 28, 1997, in a Master Independent Contractor's Agreement, which contains a general mediation clause governing the resolution of "any dispute, claim or controversy arising out of or relating to this Agreement or the Work." Defendant's Ex. A, ¶ m.

Plaintiff asserts that American Environmental and Alamo then entered into a separate, oral agreement for American Environmental to remove and shred documents that had accumulated at some Fleet Bank branches. American Environmental performed this shredding work between September and November 1997, for which it charged CB $479,651. During this period, American Environmental also charged CB for regular refuse removal per the August 1997 contract.

In November 1997, CB began to suspect that Alamo had received kickbacks from contractors that had performed work at Fleet Bank branches. CB consequently launched an investigation, which allegedly revealed that American Environmental had substantially overbilled CB for the document shredding work and had paid Alamo a 10% kickback. On January 9, 1998, CB terminated Alamo's employment. On February 6, 1998, CB informed American Environmental that it intended to terminate the parties' contract on March 2, 1998. On June 11, 1998, CB commenced this action against American Environmental, its principals, and Alamo, alleging fraud, unjust enrichment, and breach of contract.

American Environmental maintains that each of plaintiff's claims arises directly from the relationship created by their August 1997 agreement. Consequently, according to defendants, this dispute falls under the agreement's mediation clause.

**DISCUSSION**

**\*2** Both sides agree that the Federal Arbitration Act, 9 U.S.C. §§ 1–15 (1988) ("the Act"), governs this Court's analysis in whether to grant an order compelling mediation. The Act defines arbitration as a process that will "settle" the controversy. 9 U.S.C. § 2. Because the mediation clause in the case at bar manifests the parties' intent to provide an alternative method to "settle" controversies arising under the

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 61 of 88

CB Richard Ellis, Inc. v. American Environmental Waste..., Not Reported in...

parties' 1997 agreement, this mediation clause fits within the Act's definition of arbitration. *See AMF, Inc. v. Brunswick Corp.,* 621 F.Supp. 456 (E.D.N.Y.1985).

Congressional policy, as embodied in the Federal Arbitration Act, favors enforcement of arbitration clauses in commercial contracts. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625 (1985); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). Section 2 of the Act expresses this preference, stating that written agreements to arbitrate in such contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A further provision requires courts to stay judicial proceedings pending arbitration if the court is satisfied that the issues presented are arbitrable or, in other words, contemplated by an agreement to arbitrate. *See* 9 U.S.C. § 3. These statutory provisions remain mandatory, as the Supreme Court emphasized in *Dean Witter Reynolds v. Byrd,* 470 U.S. 213, 218 (1985):

> [T]he [Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. Thus, insofar as the language of the Act guides our disposition of this case, we would conclude that agreements to arbitrate must be enforced, absent a ground for revocation of the contractual agreement.

*See also Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987). Furthermore, at this stage of the litigation, a court should not consider the merits of the underlying controversy. Rather, the only issue is whether the parties have agreed to mediate the dispute. *Mitsubishi,* 473 U.S. at 628.

Accordingly, a court considering a motion to compel arbitration or mediation must determine whether the issues presented are arbitrable. *See First Options v. Kaplan,* 514 U.S. 938, 944 (1995). First, it must determine whether the parties agreed to arbitrate. If they have, it must then assess the scope of their agreement to determine whether it encompasses the asserted claims. *Genesco,* 815 F.2d at 844. Any doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 248 (2d Cir.) (citing *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–

25), *cert. dismissed,* 501 U.S. 1267 (1991); *see also Coudert v. Paine Webber Jackson & Curtis,* 705 F.2d 78, 81 (2d Cir.1983). Next, the court must decide whether any asserted federal statutory claims were intended by Congress to be nonarbitrable. *See Genesco,* 815 F.2d at 844. Finally, where some but not all of the claims in the case are arbitrable, the court must decide whether to stay proceedings as to the remaining claims. *See id.; see also Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 824–25 (E.D.N.Y.1995).

**A. *The Agreement to Mediate***

**\*3** There is no question that CB and American Environmental expressly agreed to mediate disputes related to their August 1997 agreement. Thus, I need not engage in an analysis of whether the parties reached such an agreement.

**B. *The Scope of the Mediation Agreement***

The next factor in determining whether to compel mediation concerns whether plaintiff's claims fit within the terms of the mediation clause. As stated above, federal policy strongly favors arbitration and mediation. The Supreme Court has stated that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or like defense to arbitrability." *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–25; *see also AT & T Techs., Inc. v. Communications Workers of America,* 475 U.S. 643, 650 (1986) (stating that presence of arbitration clause creates presumption of arbitrability). In conformity with these principles, the Second Circuit has acknowledged that courts must "construe arbitration clauses as broadly as possible." *S.A. Mineracao da Trindade–Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 194 (2d Cir.1984). A court should grant a request for an order to compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs.,* 475 U.S. at 650 (citing *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83 (1960)).

The presumption in favor of arbitration acquires particular significance when the arbitration clause is broadly worded. *See AT & T Technologies,* 475 U.S. at 650; *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 121 (2d Cir.1991) (stating that, in cases of broadly worded arbitration clauses, "the strong presumption in favor of arbitrability applies with even greater force"). Such circumstances call for arbitration of any grievance not expressly excluded by the arbitration clause, unless there exists "the most forceful evidence of

a purpose to exclude the claim from arbitration." *AT & T Techs.*, 475 U.S. at 650 (quoting *Warrior & Gulf*, 363 U.S. at 584–85); *see also Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling of New York*, 749 F.2d 124, 126 (2d Cir.1984); *Wire Serv. Guild, etc. v. United Press Int'l, Inc.*, 623 F.2d 257, 260 (2d Cir.1980) (stressing that language exempting certain disputes from arbitration clause must be "clear and unambiguous" or "unmistakably clear").

In this case, paragraph m of the parties' 1997 agreement states that "any dispute, claim or controversy arising out of or relating to this Agreement or the Work" must go to mediation before the parties engage in litigation. This provision is broadly worded. *See Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc.*, 760 F.Supp. 1036, 1045 (E.D.N.Y.1991). It contains no language excluding particular types of grievances from mediation, and it covers all disputes relating to the parties' agreement, which centers on waste removal.

*\*4* Thus, it creates a strong presumption in favor of arbitration. Even if CB's allegations only "touch matters" covered by the agreement, then claims based on those allegations must go to mediation. *See Genesco*, 815 F.2d at 846 (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 n .13 (1985)).

All of the allegations against American Environmental and its principals relate, broadly speaking, to waste removal, and therefore "touch matters" covered by the August 1997 agreement. Plaintiff alleges that (1) American Environmental submitted false invoices to CB for work performed at Fleet Bank branches; (2) American Environmental received money for work not performed; (3) American Environmental obtained money from CB by fraudulent means; and (4) American Environmental breached the contract by not removing and shredding documents under the terms to which it agreed. As a result of American Environmental's shredding and removal of these documents, CB terminated the contract.

Clearly, then, this dispute and the claims it has spawned relate to the agreement CB alleges American Environmental to have breached. I find, therefore, that the mediation clause in paragraph m of the parties' 1997 agreement covers CB's claims against American Environmental. Accordingly, the moving defendants' motion to compel mediation is granted.

**C. *Nonarbitrable Claims***

CB has asserted no federal statutory claims. Thus, the third prong of this analysis, whether Congress has deemed any federal statutory claims nonarbitrable, does not apply here.

**D. *The Remainder of the Action***

Having determined that all CB's claims against American Environmental and its principals must be referred to mediation, I must now consider whether to stay proceedings in this Court, including those regarding CB's claims against defendant Randolph Alamo, CB's former employee who is not included in the agreement between CB and American Environmental.

The decision whether to stay nonarbitrable claims pending arbitration lies within the trial court's discretion. *See Moses H. Cone*, 460 U.S. at 20 n. 23. Imposition of a stay becomes "particularly appropriate if the arbitrable claims predominate the lawsuit." *Genesco*, 815 F.2d at 856. Because CB's claims subject to mediation represent the bulk of the case before this Court and could affect the disposition of the claims against Alamo, I am ordering a stay of all proceedings in this case pending further order of the Court.

### CONCLUSION

For the reasons stated above, the motion to compel mediation is granted. All proceedings in this case are hereby stayed pending further order of the Court.

So Ordered.

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 701270
Only the Westlaw citation is currently available.
United States District Court,
D. Kansas.

Mark R. LYNN, et al., Plaintiffs,
v.
GENERAL ELECTRIC COMPANY, Defendant.

No. 03-2662-GTV-DJW. | Jan. 20, 2005.

**Attorneys and Law Firms**

David L. Kern, Peticolas, Shapleigh, Kern & Kalman PLLC,
El Paso, TX, John B. Gage, II, The Gage Law Firm, P.C.,
Overland Park, KS, for Plaintiffs.

Keith D. Frazier, William S. Rutchow, Ogletree, Deakins,
Nash, Smoak & Stewart, PC, Nashville, TN, Daniel B.
Boatright, Spencer Fane Britt & Browne, Kansas City, MO,
for Defendant.

**Opinion**

### ORDER

VANBEBBER, Senior J.

**\*1** This case is before the court on the defendant's
objection (Doc. 62) to Magistrate Judge Waxe's Report
and Recommendation (Doc. 61) in which he recommended
that Defendant's Motion to Stay Proceedings and Compel
Alternative Dispute Resolution (Doc. 15) be denied. The
court has reviewed the Report and Recommendation and the
defendant's objection, and concludes that the objection should
be overruled. The Report and Recommendation is adopted.

The motion to stay which was before the magistrate judge
was a nondispositive matter, and as such is governed by
Fed.R.Civ.P. 72(a). The standard of review is that the
magistrate judge's order may be modified or set aside if found
to be clearly erroneous or contrary to law.

In the Report and Recommendation Magistrate Judge Waxse
held that mediation proceedings which form the basis for
Defendant's motion to stay are not subject to enforcement
under the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et
seq.* The Magistrate Judge went on to hold that on the record
before the court, Defendant had not demonstrated that there
is a provision within the employment agreement between

Plaintiffs and Defendant whereby Plaintiffs agreed to mediate
disputes prior to filing suit, and that Defendant had not made
sufficient showing that Plaintiffs had been made aware of or
had ratified changes in their employment agreements to that
effect.

Magistrate Judge Waxse made a careful and detailed analysis
of the facts and the law, all as set forth in his written Report
and Recommendation, and the court does not find that such
analysis is clearly erroneous or contrary to law.

IT IS THEREFORE BY THE COURT ORDERED, that
Defendant's objection (Doc. 62) is overruled, and that the
Report and Recommendation (Doc. 61) of Masgistrate Judge
Waxse is adopted as the order of the court.

The clerk is directed to transmit copies or notices of this order
to counsel of record.

BY THE COURT IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

WAXSE, Magistrate J.

### NOTICE

Within ten days after a party is served with a copy of
these proposed findings and recommendations that party
may, pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P.
72, file written objections to such proposed findings
and recommendations, including any findings of fact and
conclusions of law. A party must file any objections within
the ten-day period allowed; if that party wants to have
appellate review of the proposed findings of fact, conclusions
of law, and the recommended disposition. If no objections are
timely filed, no appellate review will be allowed by any Court.

### REPORT AND PROPOSED FINDINGS

On December 30, 2003, Plaintiffs filed a Collective
Action Complaint pursuant to the Fair Labor Standards
Act ("FLSA") alleging that Defendant GE Transportation
violated the FLSA by failing to award proper compensation
and overtime wages. On June 16, 2004, Defendant filed
a Motion to Stay Proceedings and Compel Alternative
Dispute Resolution (doc. 15). For the following reasons,
the undersigned Magistrate Judge recommends Defendant's
motion be overruled.

### Relevant Factual Background

**\*2** Plaintiffs Mark Lynn, Jeffrey Gordon and Joseph Ragonese were employed within the Rail Operating Component of GE Transportation (formerly known as "GE Transportation Systems") at all times relevant to this action. Plaintiffs' hire dates were as follows:

Ragonese-Sometime prior to April 1996;

Gordon-October 19, 1998; and

Lynn-October 19, 1998.

On June 30, 1999, GE Transportation Systems implemented an internal issue resolution program known as GETS RESOLVED. The procedure guidelines describe the program as "a written agreement for the resolution of employment issues, pursuant to the Federal Arbitration Act, 9 U.S.C.A. Sections 1-14." The program covers various claims related to employment. More specifically, claims "related to compensation" are covered, but workers' compensation claims, ERISA claims, and claims under the National Labor Relations Act are excluded from the program.

The Program's issue resolution process consists of four levels. Levels I and II occur within the company. If an employee is not satisfied with the results there, the employee must submit the claim to Level III mediation. This third level utilizes an outside mediator whose "job is to open up the lines of communication between the employee and the Company and help them to reach a mutually acceptable agreement."

Level III proceedings are confidential and private, and they occur under the guidance of a neutral mediator. Both parties may be represented by counsel during the mediation process, and, except for a $50 initiation fee, GE Transportation Systems pays costs and fees associated with mediation under the program.

If successful, the mediation results in a Settlement Agreement binding on both GE Transportation Systems and the employee. Although GETS RESOLVED does not require that the settlements be approved by a court or the Secretary of Labor, nothing in the GETS RESOLVED Program precludes such approval and GE Transportation Systems does not oppose such a requirement for purposes of this Fair Labor Standards Act matter.

If the parties are unable to reach a settlement through Level III mediation, employees who were employed at the time GETS RESOLVED was implemented may take their claim to court or may proceed to binding arbitration. Upon submission of an issue to the GETS RESOLVED Program, any statute of limitations that had not yet run on the employee's claim is tolled pending completion of the GETS RESOLVED process. GE Transportation Systems specifically agrees not to change, modify or discontinue the GETS RESOLVED Program while an employee's claim is pending at any level of the Program.

Relevant to those employees already working for GE Transportation Systems on June 30, 1999 when the GETS RESOLVED program was implemented, the procedure guidelines provide that

> by continuing employment with GE Transportation Systems ..., all covered employees whose continuity of service date was before the effective date of this procedure (6/30/99), agree as a condition of employment to attempt to resolve their dispute using the first three levels (through mediation) of [the] GETS RESOLVED procedure. If the dispute remains unresolved following mediation, the employee will have the option of pursuing his or her claim through binding arbitration or pursuing the matter in court.

**\*3** In preparation for the implementation of the GETS RESOLVED Program on June 30, 1999, Defendant asserts GE Transportation Systems notified employees of the upcoming Program using the following methods:

(1) On June 16, 1999, a letter from Human Resources Manager William Casey was sent to the home of each covered GE Transportation Systems employee and included

• a copy of the GETS RESOLVED Handbook explaining the program;

• a notification of the June 30, 1999 effective date of the program; and

• an explanation of each employee's obligation to submit employmentrelated claims through the first three levels of the GETS RESOLVED Program, i.e., through mediation.

(2) The June 1999 GE Transportation Systems Company newsletter included an article describing the Program.

(3) During the relevant time period, GE Transportation Systems provided employees with additional information regarding the Program, including a copy of the GETS RESOLVED Guidelines, on its intra-company web site.

(4) During the relevant time period, Angela Walter, GE Transportation Systems Communication Specialist, drafted and sent an e-mail to all covered employees announcing and providing a link to the website.

Notwithstanding the notification process implemented by Defendant, Plaintiffs maintain they

(1) did not receive the June 16, 1999 letter mailed to their homes;

(2) did not read the June 1999 newsletter article;

(3) did not access information regarding the Program on the intra-company web site; and

(4) did not read an e-mail regarding the Program.

### Discussion

#### A. Length of Plaintiffs' Brief

Defendant argues that the 107-page brief filed by Plaintiffs in opposition to Defendant's twelve-page memorandum should be disregarded by the Court on grounds that the brief violates D. Kan. Rules 7.1 and 7.6, which require short and concise statements in opposition to any motion. Although Plaintiffs concede the pleading is voluminous and readily apologize for the length of the brief, Plaintiffs go on to explain that "the defects in both Defendant General Electric's procedure in attempting to adopt GETS RESOLVED and in the substance of what it drafted were too numerous for Plaintiff's counsel not to enumerate the most significant and discuss those in light of the applicable law to the best of his ability." [1]

Upon a rather tedious review of the 107-page brief at issue, the Court is unwilling to embrace Plaintiffs' explanation. The pleading is replete with unnecessary facts, as well as repetitious and irrelevant legal arguments, which not only violates D. Kan. Rules 7.1 and 7.6, but impedes the Court's ability to "secure the just, speedy, and inexpensive determination of every action" as required by Fed.R.Civ.P. 1.

Notwithstanding counsel's violation of local rules and practices, the Court will not disregard Plaintiffs' responsive pleading as requested by Defendant. With that said, counsel

for Plaintiffs is admonished that he must comply with local rules requiring succinct and concise pleadings, as well as the local practice limiting the length of briefs to 30 pages after the entry of a scheduling order. A failure to do so may result in the imposition of sanctions upon both counsel and his clients.

#### B. Staying Litigation Pending Participation in Mediation

**\*4** Before determining whether a stay of this litigation pending participation in mediation is appropriate, the Court must first determine whether an agreement to participate in mediation exists. [2] In other words, the first issue the Court must address is whether implementation by Defendant of the GETS RESOLVED procedure established a valid agreement between the parties to utilize the internal issue resolution procedure.

When deciding whether the parties have made a valid agreement to participate in alternative dispute resolution, the court applies ordinary state law principles that govern the formation of contracts . [3] With that said, if the validity of the contract at issue is an agreement to arbitrate, the agreement must be construed pursuant to The Federal Arbitration Act ("FAA"), [4] which requires

• courts to give due regard to federal policy favoring arbitration in applying general state law contract principles [5]

• a jury trial on the existence of a contract if the record reveals genuine issues of material fact regarding such contract. [6]

Given this legal backdrop, it becomes clear that even before determining whether a valid agreement to mediate exists, this Court first must determine whether or not the potential agreement at issue here would be an agreement governed by the FAA.

#### 1. Applicability of the Federal Arbitration Act

The United States Arbitration Act ("USAA") was unanimously passed by Congress in 1925. [7] The USAA was renamed the Federal Arbitration Act ("FAA") and was formally codified in 1947. [8] The history of the FAA indicates that the motivation for adopting the Act was "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." [9] To that end, the FAA requires the court to enforce a valid arbitration agreement by compelling participation in the arbitration process upon request:

Lynn v. General Elec. Co., Not Reported in F.Supp.2d (2005)

A written provision in ... a contract evidencing a transaction involving commerce to settle by *arbitration* a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to *arbitration* under an agreement in writing for such *arbitration,* the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to *arbitration* ... shall on application of one of the parties stay the trial of the action until such *arbitration* has been had in accordance with the terms of the agreement. [10]

The FAA does not precisely define what processes constitute "arbitration." Relying on *Fisher v. GE Medical Systems,* [11] Defendant argues the word "arbitration" as used in the FAA is a broad term that encompasses all forms of non-court alternative dispute resolution, including the mediation process at issue here.

**\*5** The Court is not persuaded by Defendant's argument. First, this position is not supported by recent Tenth Circuit precedent. Second, reporter notes reveal that adding mediation in its own right to the Uniform Arbitration Act's ("UAA") mandatory enforcement provision recently was considered but rejected as unnecessary. Third, further reporter notes reveal that adding a mandatory enforcement provision to the Uniform Mediation Act ("UMA") likewise was considered and rejected as unnecessary.

### a. Recent Tenth Circuit Precedent: Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.

Although the facts are readily distinguishable from the facts presented here, the recent Tenth Circuit case of *Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.* [12] provides important guidance for this Court in terms of defining the word "arbitration" as used in the FAA.

By way of background, the litigation in *Salt Lake Tribune* involved a contractual Option Agreement to purchase The Salt Lake Tribune newspaper. Under the Option Agreement, the exercise price of the option equaled the "Fair Market Value" of the newspaper's assets. If the parties could not agree on an exercise price, each side was to appoint an appraiser to assess the newspaper's Fair Market Value. If the party

appraisers differed from each other by more than ten percent in their estimation of the newspaper's value, they would jointly select a third appraiser and the exercise price would equal the average of the two closest appraisal values reported by the three appraisers.

Applying arbitration principles to the appraisal process, the district court below granted the considerable deference owed to arbitrators' decisions and, as a result, dismissed the case. On appeal, the Tenth Circuit reversed and remanded, holding the appraisal process does not constitute arbitration under the Federal Arbitration Act. Despite the factual differences between the two cases, the rationale utilized by the Tenth Circuit Court of Appeals in determining the definitional scope of the term "arbitration" as used in the FAA is completely applicable here.

As a preliminary matter, the Tenth Circuit held it is federal law-not state law-that governs the process of defining the term "arbitration" as used in the FAA. [13] The court then followed the rationale set forth in the First Circuit case of *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.* [14] and embraced the following two-prong test to determine whether a particular procedure falls within the purview of "arbitration" as that term is used in the FAA: (1) "how closely the specified procedure resembles classic arbitration;" and (2) "whether treating the procedure as arbitration serves the intuited purposes of Congress." [15]

### i. The Mediation Process Does Not Resemble the Arbitration Process

Applying the first prong of the test, the Court finds arbitration and mediation are completely different processes that do not resemble each other at all. First, the Court finds it helpful to define the processes at issue using Black's Law Dictionary:

**\*6** • mediation. A method of *nonbinding* dispute resolution involving a neutral third party who tries to help the disputing parties reach a mutually agreeable solution. [16]

• arbitration. a method of dispute resolution involving one or more neutral third parties who are usually agreed to by the disputing parties and whose decision is *binding*. Also termed (redundantly) binding arbitration. [17]

• alternative dispute resolution. A procedure for settling a dispute by means other than litigation, such as arbitration or mediation. Abbr. ADR. [18]

As reflected by these definitions, and as noted by the Tenth Circuit Court of Appeals in the *Salt Lake Tribune* case, "[c]entral to any conception of classic arbitration is that the disputants empower a third party to render a decision settling their dispute. [19] This does not happen in the mediation process.

Moreover, although both mediation and arbitration fall under the "alternative dispute resolution" umbrella, arbitration is a binding ADR process and differs significantly from mediation. The most important difference is that when parties agree to binding arbitration, they waive their rights to litigate; whereas parties to non-binding ADR processes preserve their rights to have claims resolved in court.

Binding arbitration is more analogous to the court litigation process: the decision-maker is a neutral disinterested third-party, attorneys speak on behalf of clients and clients participate only as witnesses. Mediation, by contrast, puts the clients at center stage: they are the decision-makers and the focus is not on what happened in the past, but on how to resolve the existing conflict in the future to the satisfaction of the all involved.

With regard to this first prong of the *Salt Lake Tribune* test, the Court finds the mediation process is much too distinct from the arbitration process to constitute arbitration under the Federal Arbitration Act.

### ii. Congress Did Not Intend to Encompass Mediation in the Arbitration Clause

With regard to the second prong of the *Salt Lake Tribune* test, the Court notes that Congress implemented an enforcement mechanism for arbitration agreements due to "a longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." [20] Unlike enforcement of arbitration agreements, there is no historical evidence of hostility by the courts in enforcing mediation contracts; accordingly, there is no reason to believe Congress intended to encompass mediation within arbitration enforcement.

Upon application of the Tenth Circuit's two-prong test to the facts presented here, this Court finds (1) the mediation procedure here does not resemble classic arbitration; and (2) Congress never intended to encompass the mediation process here in the definition of arbitration as used in the FAA. Accordingly, the Court concludes that under the facts presented, mediation does not fall within the purview of

"arbitration" as that term is used in the FAA. As discussed below, this conclusion is supported by recent revisions to the Uniform Arbitration Act and the recent introduction of the Uniform Mediation Act.

### b. The Revised Uniform Arbitration Act ("RUAA")

**\*7** In addition to The Uniform Arbitration Act ("UAA")-drafted by the National Council of Commissioners on Uniform State Laws ("NCCUSL") [21] -recently was revised [22] and, in the process, policy-makers distinguished between the arbitration and mediation processes. More specifically, the NCCUSL declined to extend the UAA to mandate summary enforcement of promises to participate in mediation. [23] The NCCUSL's decision in this regard further supports a finding that the term "arbitration" as used in the Federal Arbitration Act does not include mediation.

### c. The Uniform Mediation Act ("UMA")

The Court also finds compelling the fact that, although included in preliminary drafts of the Uniform Mediation Act ("UMA"), the final version of the UMA drafted by the National Council of Commissioners on State Laws does not require enforcement of agreements to mediate. [24] "Instead, drafters of the UMA assumed that courts order parties to participate in mediation in accordance with contract and equity principles, and therefore determine enforcement in light of public interest, transactional facts, and any irreparable harm due to a failure to mediate." [25] "In addition, the UMA Reporters commented that they assumed courts would more readily enforce mediation, despite courts' traditional hostility to arbitration." [26] The NCCUSL's decision to leave out an enforcement mechanism for agreements to mediate further supports a finding that the arbitration enforcement mechanism within the Federal Arbitration Act does not include mediation.

For the reasons stated above, the Court hereby rejects Defendant's proposition that the word "arbitration" as used in the FAA includes the process of mediation. Accordingly, the Court will apply ordinary state law principles that govern the formation of contracts to determine whether implementation by Defendant of the GETS RESOLVED procedure established a valid agreement between the parties to utilize the internal issue resolution procedure.

### 2. Application of Kansas Common Law Governing Formation of Contracts

Lynn v. General Elec. Co., Not Reported in F.Supp.2d (2005)

Plaintiffs here had no written employment contract; thus, Plaintiffs were at-will employees under Kansas law. Notwithstanding the absence of a written agreement, however, an at-will employee does work under an employment contract: the employee promises to do a certain job and the employer promises payment therefor.[27] The failure to fulfill either promise constitutes a breach of contract.[28] As this Court explained in *Durkin:*

Employment at will is not a state of nature but a continuing contractual relation. Wages, benefits, duties, working conditions, and all (but one) of the other terms are specified and a breach of any of them will give the employee a cause of action for breach of contract. All that is missing is a provision that gives the contract a fixed term or that entitles one or both parties to a specified amount of notice before the other party can cancel the contract without liability.[29]

**\*8** In the present case, Plaintiffs agreed to work for Defendant under certain conditions of employment, while Defendants agreed to compensate them for such work. Thus, a contract between the parties exists. The issue presented, then, is whether that contract contains a certain provision-in this case, an agreement to participate in mediation prior to filing suit.

On this record, Defendant has not demonstrated there is a provision within the employment contract whereby Plaintiffs agreed to mediate disputes prior to filing suit. Fatal to the existence of an agreement here is a complete lack of evidence from Defendant to establish that any of the procedures implemented by GE Transportation Systems to notify employees of the new mediation requirement *actually made Plaintiffs aware* of the new requirement. Such evidence could take the form of a signature verifying receipt of the new policy. Moreover, some type of evidence demonstrating that Plaintiffs actually opened the emails sent to them or accessed

that particular portion of the website containing the Program could work to establish notification.

The only evidence submitted for Court consideration on this issue are affidavits submitted by Plaintiffs swearing under oath that they did not receive the June 16, 1999 letter, did not read the June 1999 newsletter article, did not access information regarding the Program on the intra-company web site, and did not read an e-mail regarding the Program. Plaintiffs do not dispute that Defendant launched the notification process alleged; instead, Plaintiffs argue they never *received* such notice.

This scenario is dramatically different from the one presented in *Durkin,* where the evidence clearly established the plaintiff had actual notice of the policy.[30] In noting the relevance of such notice, the *Durkin* court cited to *Sweet v. Stormont Vail Reg. Medical Ctr,*[31] where the Kansas Supreme Court held that "[w]hen, as in the instant case, the employee is made aware of company policy, which is a part of the terms of the employment contract, the employee will be bound by those terms."

As a matter of law, proof that Defendant disseminated the new policy in and of itself is not sufficient to establish a binding agreement. Defendant has failed to controvert Plaintiffs' assertions under oath that they never read or were aware of the new policy.

### *RECOMMENDATION*

Because Defendant has not submitted evidence sufficient to establish an enforceable agreement to mediate, the Court recommends Defendant's Motion to Stay and Compel Mediation (doc. 15) and Defendant's Renewed Motion to Stay and Compel Mediation (doc. 53) be overruled.

RESPECTFULLY SUBMITTED,

Footnotes

| | |
|---|---|
| 1 | Plaintiffs' Opposition Brief at p.106, 647 P.2d 1274 (doc.). |
| 2 | *Avedon Engineering, Inc. v. Seatex,* 126 F.3d 1279, 1283 (10th Cir.1997) (citing 9 U.S.C. §§ 3 and 4) |
| 3 | *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). |
| 4 | 9 U.S.C. § 1 *et seq.* |
| 5 | *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 475-76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (citing 9 U.S.C. § 2). |
| 6 | See 9 U.S.C. §§ 3-4; *Avedon Eng'g, Inc. v. Seatex,* 126 F.3d 1279, 1283 (10th Cir.1997). |
| 7 | Nicole Karas, Note, *EEOC v. Luce and the Mandatory Arbitration Agreement,* 53 DePaul L.Rev. 67, 77 (Fall 2003). |
| 8 | 9 U.S.C. § 1-16 (1996). |

9     *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *see, also, Durkin v. CIGNA Property & Cas. Corp.,* 942 F.Supp. 481, 484 (D.Kan.1996) (citing *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995); *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

10    9 U.S.C. § 2 (emphasis added).

11    276 F.Supp.2d 891 (M.D.Tenn.2003).

12    390 F.3d 684 (10th Cir.2004).

13    *Id.* at 688-89.

14    374 F.3d 1, 7 (1st Cir.2004)

15    *Id.*

16    Black's Law Dictionary (8th ed.2004) (emphasis added).

17    *Id.* (emphasis added).

18    *Id.*

19    *Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.,* 390 F.3d 684 (10th Cir.2004) (citing *Harrison v. Nissan Motor Corp.,* 111 F.3d 343, 350 (3d Cir.1997) ("the essence of arbitration" is that parties "agreed to arbitrate [their] disputes through to completion, i.e. to an award made by a third-party arbitrator.")).

20    *Gilmer v. Interstate/Johnson Lane,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *see, also, Durkin v. CIGNA Property & Cas. Corp.,* 942 F.Supp. 481, 484 (D.Kan.1996) (citing *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995); *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

21    The drafting of uniform laws is a well-established part of the legislative process in the United States. Gregory Firestone, Ph.D., *An Analysis of Principled Advocacy in the Development of the Uniform Mediation Act,* 22 N.Ill.U.L.Rev. 265, 266 (Spring 2002). The NCCUSL consists of more than 300 commissioners from each state and works to develop uniform and model state laws. *Id.* After adoption by NCCUSL, the membership encourages state enactment of these Acts in order to establish uniformity of law between the various states and jurisdictions.

22    Revised Uniform Arbitration Act ("RUAA").

23    *See* Uniform Mediation Act § 5(i)-(iii) (Annual Meeting Draft, Jul. 23-30, 1999) at *http:// www.law.upenn.edu/bll/ulc/mediat/ medam99.htm* (last visited January 6, 2005) (reflecting that the National Council of Commissioners on State Laws ("NCCUSL") recently considered and rejected the expansion of the UAA to mandate specific enforcement of agreements to mediate).

24    *Compare* July 23-30, 1999 Annual Meeting Draft, *see, id.,* with Uniform Mediation Act, reprinted in 22 N. Ill. U.L.Rev. 165, 166-72 (2002) (providing final draft without summary enforcement provisions).

25    Amy Schmitz, *Refreshing Contractual Analysis of ADR Agreements by Curing Bipolar Avoidance of Modern Common Law,* Harv. Negot. L.Rev. 1, 13 (Spring 2004) (citing Uniform Mediation Act § 5(i) (Annual Meeting Draft, Jul. 23-30, 1999) (discussing court's equitable analysis in determining whether to specifically enforce mediation agreements)).

26    *Id.*

27    *See Durkin v. CIGNA Property & Cas. Corp.,* 942 F.Supp. 481, 487-88 (D.Kan.1996)

28    *Id.*

29    *Id.* (citation omitted); *see, also, Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 438 (7th Cir.1987) (citing Epstein, *In Defense of the Contract at Will,* 51 U.Chi.L.Rev. 947 (1984)).

30    *Id.*

31    231 Kan. 604, 611, 647 P.2d 1274, 1280 (1982); *see, also, Holmes v. Unified School Dist. No. 259,* 46 P.3d 1158, 1161, 273 Kan. 864, 868 (Kan.2002).

**End of Document**
© 2012 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 70 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

2003 WL 23641529
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

PARAMEDICS ELECTROMEDICINA
COMERCIAL LTDA., Plaintiff,
v.
GE MEDICAL SYSTEMS INFORMATION
TECHNOLOGIES, INC., Defendant.

No. 02 Civ. 9369(DFE). | June 4, 2003.

**Attorneys and Law Firms**

William G. O'Donnell, Jr., O'Donnell & Fox, P.C., New York, NY, for plaintiff.

Jose I. Astigarraga, Edward M. Mullins, Paul A. Capua, Astigarraga Davis Mullins & Grossman, P.A., Miami, FL, Michael Luskin, Howard Schiff, Scott A. Burr, Luskin, Stern & Eisler, L.L.P., New York, NY, for defendant.

**Opinion**

**ORDER: A) DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS SEEKING TO STAY ARBITRATION, B) GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION, C) GRANTING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION, AND D) INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

EATON, Magistrate J.

**\*1** This matter came before this Court on May 22, 2003 for hearing on the Motion of Plaintiff Paramedics Electromedicina Comercial Ltda. for Judgment on the Pleadings Seeking To Stay Arbitration (Docket No. 10) and Defendant GE Medical Systems Information Technologies, Inc.'s Motion to Compel Arbitration (Docket No. 15) and Motion for Preliminary Injunction Enjoining Tecnimed from Prosecuting the Brazilian Action (Docket No. 16). This Court has considered the motions, supporting memoranda and exhibits and the rest of the record as well as the oral arguments.

*FINDINGS OF FACT*

The parties have each filed affidavits and exhibits. On the material issues, the facts are not in dispute. Accordingly, being fully advised in the premises, the Court makes the following findings of fact.

1. Plaintiff Paramedics Electromedicina Comercial Ltda. ("Tecnimed") is a Brazilian company that markets, sells, and services medical products and equipment in Brazil.

2. Defendant GE Medical Systems Information Technologies, Inc. ("GEMS–IT") is a Wisconsin corporation, with its principal place of business in Milwaukee, Wisconsin. It manufactures and sells, among other things, medical products and equipment in Brazil and elsewhere. GEMS–IT was formerly known as GE Marquette Medical Systems.

3. In 1999, Tecnimed negotiated and entered into an International Distribution Agreement (sometimes denominated the "Distribution Agreement") and an International Sales and Service Representative Agreement (sometimes denominated the "Representative Agreement") (collectively "the Agreements"), for the distribution, sale and service of GEMS–IT's medical equipment and products in Brazil. According to the Agreements, Tecnimed became a GEMS–IT authorized, distributor and sales and service representative in Brazil.

4. The Agreements were for a term of two years, from May 1, 1999 to May 1, 2001. Sales made after the expiration of the Agreements are, nevertheless, expressly to be governed by the terms of the Agreements.

5. The International Distribution Agreement contains an arbitration clause that provides that any and all disputes pertaining to the Agreement would be resolved by binding arbitration before the IACAC:

> 24.1 This Agreement shall be governed by, and in accordance with, the internal laws of the State of New York, USA, without giving effect to the conflict of laws principles hereof.

> 24.2 The Parties agree that any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement which the Parties are unable to resolve by mutual negotiation will be submitted to good faith, non-binding mediation before a qualified mediator in Miami, Florida, USA....

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

24.3  In the event of any controversy, dispute or difference between the Parties hereto, with respect to the interpretation of the provisions of this Agreement or to the breach or termination thereof or the determination of the rights and obligations of the Parties hereunder, either party may give notice to the other in writing of the existence of such controversy, dispute or difference specifying its nature and the points at issue. If the same shall not be amicably resolved by negotiation or mediation within thirty (30) days from the receipt of such notice, either party shall be entitled to have such controversy, dispute or difference finally settled by arbitration, in accordance with the rules of the Inter–American Commercial Arbitration Commission in effect on the date of this Agreement. The arbitration shall be conducted in Miami, Florida, USA ...

**\*2**  Emphasis added.

6. The International Sales and Service Representative Agreement contains a similar provision in Article 19, which states in relevant part:

19.2  The Parties agree that any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement which the Parties are unable to resolve by mutual negotiation will be submitted to good faith, non-binding mediation before a qualified mediator in Miami, Florida, USA ...

19.3  In the event of any such controversy, claim or dispute, either Party may give notice to the other in writing of the existence of such controversy, claim or dispute specifying its nature and the points at issue. If the same shall not be amicably resolved by negotiation or mediation within thirty (30) days from the receipt of such notice, either party shall be entitled to have such controversy, dispute or difference finally settled by arbitration, in accordance with the rules of the Inter–American Commercial Arbitration Commission in effect on the date of this Agreement. The arbitration shall be conducted in Miami, Florida, USA ...

Emphasis added.

7. GEMS–IT alleges that during the term of the Agreements, GEMS–IT sold and delivered medical equipment to Tecnimed, which Tecnimed accepted. By March 2000, Tecnimed allegedly had stopped paying GEMS–IT's invoices when they became due, as required under the International Distribution Agreement. GEMS–IT claims that in reliance upon Tecnimed's assurance that it would pay GEMS–IT's outstanding invoices, it continued to deliver additional goods to Tecnimed and, pursuant to the terms of the Agreements, continued to do so even after the expiration of the terms of the Agreements in May 2001. Tecnimed allegedly owes GEMS–IT an amount in excess of $1 million and has refused to make payment.

8. Before the expiration of the term in May 2001, GEMS–IT attempted to negotiate with Tecnimed to obtain repayment of Tecnimed's past due debt. By letter of December 8, 2000, Tecnimed wrote to GEMS–IT informing GEMS–IT that Tecnimed was "directing all [its] attention and disposition to find a solution attending to the best interest of GE and Tecnimed" and proposing "some possibilities to diminish [Tecnimed's] debt."

9. During 2001, GEMS–IT and Tecnimed met and communicated on several occasions to discuss and negotiate repayment of Tecnimed's outstanding debt to GEMS–IT, which debt by then had allegedly reached approximately $1.2 million. As part of these discussions, Tecnimed allegedly repeatedly assured GEMS–IT that it would become current on all outstanding payments, causing GEMS–IT to further deliver goods to Tecnimed.

10. By letter of October 24, 2001, Tecnimed informed GEMS–IT that it would not pay its debt and, instead, enumerated a series of expenses that it had allegedly incurred to be able to market GEMS–IT's products and claimed $3,640,000 in damages. By letter of November 21, 2001, GEMS–IT informed Tecnimed that it rejected Tecnimed's demands.

**\*3**  11. On March 18, 2002, GEMS–IT sent a letter to Tecnimed requesting mediation of its claim as well as Tecnimed's claims. This letter requested that all these disputes "be submitted to a qualified mediator in Miami, Florida" and cited the articles quoted above (Article 24.2 and Article 19.2). On or about March 25, 2002, Tecnimed sent a letter to GEMS–IT rejecting mediation and demanding damages. Tecnimed's letter did not remotely suggest that Tecnimed was asking for further negotiation, to be followed (if unsuccessful) by mediation. Instead, Tecnimed's letter made seven points, including:

1. We do not agree with the date you suggested.

2. We do not agree with the way established for the mediation, foreseen in the contract, by lack of equilibrium in the contract, between the parties[.]

3. We do not accept an indication of a mediator[.]

12. On March 28, 2002, Tecnimed served GEMS–IT with an "Extrajudicial Notice" in anticipation of filing a lawsuit in Brazil.

13. On April 22, 2002, GEMS–IT filed a Request for Arbitration with the Inter–American Commercial Arbitration Commission ("IACAC") pursuant to Article 3 of the IACAC Rules of Procedure and the applicable provisions of the Agreements (the "IACAC Arbitration").

14. On May 2, 2002, GEMS–IT and Tecnimed representatives met in Miami, Florida to negotiate further. The parties, however, were unable to reach any agreement.

15. In response to GEMS–IT's Request for Arbitration, Tecnimed informed the IACAC that it would not participate in arbitration.

16. Thereafter, GEMS–IT named an American attorney as its party-appointed arbitrator, the IACAC appointed a Brazilian attorney as the second arbitrator in view of Tecnimed's failure to designate an arbitrator, and the IACAC appointed a Canadian attorney as the Chair (hereafter the three arbitrators are referred to as the "IACAC Arbitral Tribunal").

17. On May 23, 2002, Tecnimed filed a complaint in the Tenth Civil Circuit Court of Porto Alegre, Brazil (the "Brazil Court"), entitled *Tecnimed Paramedics Eletromedicina Comercial Ltda v. GE Marguette Medical Systems and General Eletric do Brasil* (the "Brazil Action"). As mentioned earlier, GEMS–IT was formerly known as GE Marquette Medical Systems. General Eletric do Brasil ("GE Brasil") is an affiliate of GEMS–IT. In the Brazil Action, Tenimed's complaint asserts seven (7) principal claims against GEMS–IT and GE Brasil ("the GE Defendants"), which this Court has examined. The claims include:

(a) A request that the Brazil court void the International Sales and Service Representative Agreement and International Distribution Agreement because these Agreements allegedly lacked "contractual equilibrium" and are, therefore, "abusive."

(b) A request that the Brazil court declare that Tecnimed is not bound to arbitrate its dispute with GEMS–IT in Miami, Florida, pursuant to the arbitration clauses contained in the International Sales and Service Representative Agreement and the International Distribution Agreement, because those agreements expired and are, therefore, not enforceable.

**\*4** (c) A request that the Brazil court declare that the non-exclusive distributorship relationship agreed upon by the parties in Article 2 of the International Distribution Agreement was modified so that Tecnimed became the exclusive distributor of GEMS–IT's line of medical products and equipment in Brazil.

(d) A claim that GEMS–IT wrongfully terminated the International Sales and Service Representative Agreement and the International Distribution Agreement, allegedly causing the loss of profits that should be awarded to Tecnimed.

(e) A claim for "declaration of non-existence of debt" to the GE Defendants for the medical products and equipment Tecnimed purchased from GEMS–IT under the Agreements.

18. On August 19, 2002, the GE Defendants responded to the Complaint in the Brazil Action and opposed the action on the basis that the claims asserted by Tecnimed are subject to the mandatory arbitration provisions of the Agreements. On August 29, 2002, Tecnimed filed its Reply to GEMS–IT's defenses.

19. No material ruling has been issued in the Brazil Action.

20. On November 13, 2002, Tecnimed filed, in the Supreme Court of the State of New York in the County of New York, a Verified Petition for a Permanent Stay of the [IACAC] Arbitration. [1]

21. On November 22, 2002, GEMS–IT removed Tecnimed's Verified Petition to this Court (hereinafter the "New York Action"). Jurisdiction of the New York action is based on (a) federal question jurisdiction pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (known as the "New York Convention") and its implementing legislation, 9 U.S.C. §§ 201 *et seq.*, and the Inter–American Convention on International Commercial Arbitration (known as the "Inter–American Convention"), and its implementing legislation, 9 U.S.C. § 301 *et seq.;* and (b) diversity of citizenship, pursuant to 28 U.S.C. § 1332.

22. On November 27, 2002, GEMS–IT filed its Answer to the Verified Petition and asserted its counterclaims for (a) an order to compel arbitration and for (b) an anti-suit injunction to enjoin Tecnimed from proceeding with the Brazil Action.

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 73 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

23. On December 20, 2002, Tecnimed filed its Reply to the counterclaim and a motion for judgment on the pleadings, seeking to stay the IACAC Arbitration.

24. On January 3, 2003, GEMS–IT filed (a) a motion to compel arbitration of the claims Tecnimed is advancing in the Brazil Action and memorandum of law in support of that motion and (b) a motion for a preliminary injunction enjoining Tecnimed from prosecuting the Brazil action.

25. Tecnimed elected not to participate in the IACAC Arbitration. It did, however, file with the IACAC Arbitral Tribunal a copy of the memoranda and motions filed in this case, including the memoranda asserting that the IACAC Arbitral Tribunal lacked jurisdiction and the IACAC Arbitration should be stayed.

26. On April 4, 2003, the IACAC Arbitral Tribunal entered an award ("Award") ruling that: (a) the arbitration clauses in the two agreements between Tecnimed and GEMS–IT are valid and binding on Tecnimed; (b) the disputes submitted by GEMS–IT are within the scope of the arbitral clauses and are arbitrable; and (c) the alleged conditions precedent to arbitration (good faith negotiation, mediation, etc.) have been met and the Tribunal may proceed to adjudicate the disputes before it.

  **\*5** 27. On May 14, 2003, the parties consented to proceed before the undersigned United States Magistrate Judge Douglas F. Eaton, pursuant to 28 U.S.C. § 636(c).

28. On May 22, 2003, this Court heard oral argument on Tecnimed's Motion for Judgment on the Pleadings Seeking To Stay Arbitration (Docket No. 10) and GEMS–IT's Motion to Compel Arbitration (Docket No. 15) and GEMS–IT's Motion for Preliminary Injunction Enjoining Tecnimed from Prosecuting the Brazilian Action (Docket No. 16).

### CONCLUSIONS OF LAW

Tecnimed has moved for an order, pursuant to Fed.R.Civ.P. 12(c), granting it a judgment on its pleading—specifically, the Verified Petition Tecnimed filed in this action—and a stay of the arbitration of all claims by GEMS–IT against Tecnimed, on the basis that the arbitration agreements are invalid and that GEMS–IT has failed to comply with the conditions precedent for initiating an arbitration against Tecnimed under the International Distribution Agreement and the international Sales and Service Representative Agreement, which provide for arbitration.

GEMS–IT has moved to compel arbitration of the claims that Tecnimed is attempting to litigate in the Brazil Court and to enjoin Tecnimed from prosecuting such suit.

Essentially, the same legal principles apply to Tecnimed's motion and to GEMS–IT's motion to compel arbitration.

### I. The Federal Arbitration Act and Case Law.

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), in conjunction with the inter-American Convention, implemented by 9 U.S.C. § 301. provides the Court with subject matter jurisdiction.[2]   The federal arbitral laws are divided into three chapters: Chapter One, 9 U.S.C. §§ 1–16. contains the general provisions; Chapter Two, 9 U.S.C. §§ 201–208, implements the provisions of the New York Convention; and Chapter Three, 9 U.S.C. §§ 301–307, implements the provisions of the Inter–American Convention.

Because the parties are from the United States and Brazil, and both countries are signatories to the Inter–American Convention, *see* 9 U.S.C. § 301, this case involves both Chapter One, the general provisions, and Chapter Three, implementing the Inter–American Convention. *See* 9 U.S.C. § 305.

Section 307 of Chapter Three provides that the provisions of Chapter One, 9 U.S.C. §§ 1–16, apply to actions and proceedings brought pursuant to Chapter Three to the extent that the two chapters do not conflict with each other. Section 4 of Chapter One provides, in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed in the manner provided for in such agreement ... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 74 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

**\*6** 9 U.S.C. § 4 (emphasis added).

Thus, under Federal law, where the facts presented to the Court establish that (a) an arbitration agreement exists, and (b) that a party to such agreement is not in compliance with it, an order compelling arbitration without holding further proceedings may issue. *Evans & Sutherland Computer Corp. v. Thomson Training & Simulation Ltd.,* 1994 WL 593808, \*3 (S.D.N.Y. Oct.28, 1994).

## II. *Tecnimed's Motion For Judgment on The Pleadings and To Stay the IACAC Arbitration.*

### A. *Federal Policy Favors Arbitration.*

"Federal policy strongly favors arbitration as an alternative dispute resolution process." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 248 (2d Cir.1991). While parties are not required to arbitrate when they have not agreed to, *see Volt information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), they are bound by provisions to which they have agreed. *See Genesco, Inc. v. T. Kaiuchi & Co.,* Ltd, 815 F.2d 840, 845 (2d Cir.1987). In accordance with that policy, courts should "construe arbitration clauses as broadly as possible." *Threlkeld,* 923 F.2d at 250 (internal quotation and citation omitted), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.,* 473 U.S. 614, 625–26, 105 S.Ct. 3346, 87 L.Ed.2d 444(1985).

The federal policy in favor of arbitration is even stronger in the context of international business transactions. *Mitsubishi Motors Corp.,* 473 U.S. at 629–31; *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 516–18, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Enforcement of international arbitral agreements promotes the smooth flow of international transactions by removing the threats and uncertainty of time-consuming and expensive litigation. The parties may agree in advance as to how their disputes will be resolved should their business relationship sour. *See Scherk,* 417 U.S. at 516–17. Thus, a district court should compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute ." *Threlkeld,* 923 F.2d at 250.

### B. *The Arbitration Provisions Are Valid.*

Against that backdrop, the arbitration provisions contained in the Agreements are valid and enforceable. In *Prima Paint Corp. v. Flood & Conklin Mfg.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court instructed that an arbitration clause is to be treated as conceptually "separable" from the rest of the agreement, and that under the FAA, the role of the court is to consider only issues relating to the making and performance of an agreement to arbitrate and not issues relating to the enforceability of the contract generally. *Id; see also Belship Navigation, Inc. v. Sealift, Inc.,* 1995 WL 447656 at \*5 (S.D.N.Y.1995) (citing cases).

**\*7** The validity of the arbitration provisions is governed by 9 U.S.C. § 2, entitled "Validity, irrevocability and enforcement of agreements to arbitrate." Section 2, although contained in Chapter One of Title 9, is incorporated by reference under Chapter Three, which implements the Inter–American Convention. *See* 9 U.S.C. § 302. Section 2 provides:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

The Distribution Agreement and the Representative Agreement clearly contain written provisions to the effect that "any controversy, dispute or difference between the Parties" as to the "interpretation of the provisions of th[e] Agreement or to the breach or termination thereof or the determination of the rights and obligations of the Parties hereunder" shall be settled by arbitration. Accordingly, the issue for determination is whether Tecnimed agreed to the written arbitration provisions contained in the Agreements. *See, e.g., Siderurgica Del Orinoco, C.A., v. Linea Naviera De Cabotaje, C.A.,* 1999 WL 632870 at \*5 (S.D.N.Y. Aug.19, 1999); *Ocean Products, Inc. v. Molinaos Rio De La Plata, S.A.,* 1999 WL 239692, \*2 (S.D.N.Y. April 22, 1999).

In determining whether parties have agreed to arbitrate, the Court must apply accepted principles of contract law. *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 46 (2d Cir.1993);

*Genesco,* 815 F.2d at 844–45. Under New York law, which governs the Agreements, "[w]here the contract is unambiguous, courts must effectuate its plain language." *Seabury Const. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 68 (2d Cir.2002). "It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations." *Marshall v. Marshall,* 264 A.D.2d 826, 695 N.Y.S.2d 595, 596 (2d Dept.1999) (citations omitted).

A party who signs a contract in the absence of fraud or other wrongful acts on the part of another contracting party is presumed as a matter of law to know its contents and to have assented to them. *Progressive Casualty Ins. Co.,* 991 F.2d at 46; *DeGaetano v. Smith Barney, Inc.,* No. 95 Civ. 1613(DLC), 1996 WL 44226, *7–8 (S.D.N.Y. Feb.5 1996). There is no suggestion that the arbitration provisions were procured by fraud or that the arbitration provisions were hidden or kept from Tecnimed. Accordingly, this Court concludes that the arbitration agreements are valid and binding upon Tecnimed. [3]

### C. The Condition Precedent Was Excused

**8** GEMS–IT argues that once this Court determines that the arbitration provisions are valid, this Court's work is finished, because the parties agreed to submit the issue of the arbitrability of claims to the IACAC Arbitral Tribunal, and thus that there is no need for this Court to determine whether GEMS–IT has complied with conditions precedent for the arbitration. As well, GEMS–IT has argued that the IACAC Arbitral Tribunal has already ruled upon the issue finding that any condition precedent to arbitration has been excused.

In contrast, Tecnimed argues that the determination of whether the conditions precedent to arbitration have been satisfied is the province of this Court, not the arbitrators.

Assuming without deciding that it is for the Court and not the arbitrators to determine compliance with conditions precedent to arbitration, this Court concludes that such conditions have been excused.

The Distribution Agreement provides, *inter alia:*

> 24.2 The Parties agree that any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement which the Parties are unable to resolve by mutual negotiation will be submitted to good faith, non-binding mediation before a qualified mediator in Miami, Florida, USA....

This Court does not regard the mention of "mutual negotiation" in the Distribution Agreement or the Representative Agreement as creating a condition precedent to arbitration but rather regards this as descriptive language setting the stage for a mediation. In any event, to the extent that such language were to create a condition precedent, the record is clear that any such condition was more than satisfied as the parties had extensive mutual negotiations within the meaning of the Agreements.

This Court does, however, regard the requirement of a "good faith, non-binding mediation before a qualified mediator in Miami, Florida, USA" to constitute a condition precedent to arbitration. It is undisputed that a mediation was not held. However, this does not end the inquiry.

It is an elemental principle of contract law that "[a] party cannot insist upon a condition precedent, when its non-performance has been caused by himself". *Rochester Community Individual Practice Ass'n, Inc. v. Finger Lakes Health Ins. Co., Inc.,* 281 A.D.2d 977, 722 N.Y.S.2d 663, 666 (N.Y.A.D.2001); *Roberts v. H. Gin Realty Co.,* 185 A.D.2d 209, 586 N.Y.S.2d 264 (N.Y.A.D.1992) ("[i]t is a familiar principle that one who frustrates the other party's fulfillment of a condition precedent by unilateral termination cannot avail himself of that condition precedent as a defense").

The record is clear that once the negotiations reached an impasse, Tecnimed refused to participate in mediation. By letter dated March 18, 2002, GEMS–IT requested that Tecnimed mediate and even suggested dates and location. Beyond that, GEMS–IT expressed that it was open to Tecnimed's suggestions for how the mediation should proceed, including any dates for the mediation that would be convenient for Tecnimed. Although GEMS–IT "rejected" Tecnimed's claims in the letter, GEMS–IT expressly stated that Tecnimed's claims as well as GEMS–IT's claims would be the subject of the mediation. Exhibit E. Affidavit of Eva Reynoso. Tecnimed, however, refused to participate, instead, sending a letter demanding damages, and in no way indicating any desire to mediate. See above. Finding of Fact ¶ 11.

**9** Tecnimed cannot now use its own refusal to mediate to avoid arbitration. *See, e.g., Glover v. St. Louis-san Francisco Railway,* 393 U.S. 324, 329–30, 89 S.Ct. 548,

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 76 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

21 L.Ed.2d 519 (1969) (employees not required to exhaust grievance procedure "where the effort to proceed formally with contractual or administrative remedies would be wholly futile"); *Welborne Clinic v. MedQuist, Inc.,* 301 F.3d 634, 638 (7th Cir.2002) ("a party cannot avoid arbitration because of the other party's failure to comply with the negotiation steps of a grievance procedure."); *Local 744, Int'l Bhd. Of Teamsters v. Skokie Valley Beverage Co.,* 213, 218 (N.D.Ill.1986) (employer precluded from raising as defense to arbitration Union's failure to fulfill contractual prerequisites to arbitration when employer "has refused from the outset to process" the grievance).

Accordingly, this Court concludes that any condition precedent to arbitration has been excused by Tecnimed's conduct.

### D. *Arbitrability of GEMS–IT's Claims*

Assuming without deciding that this Court is the proper forum to determine the arbitrability of the claims that GEMS–IT has asserted in the IACAC Arbitration, this Court concludes that such claims are arbitrable, and accordingly, that Tecnimed's motion for judgment on the pleadings must be denied.

The Agreements entered into by Tecnimed with GEMS–IT provide for mandatory arbitration of disputes between the parties arising out of or relating to the Agreements, including "any controversy, dispute or difference between the Parties hereto, with respect to the interpretation of the provisions of this Agreement or to the breach or termination thereof or the determination of the rights and obligations of the Parties hereunder...." GEMS–IT's arbitral claims against Tecnimed relate to the interpretation of, the breach of, the termination of, and the obligations of the parties under, the Agreements. Accordingly, GEMS–IT's claims all fall within the scope of the arbitration provisions of the Agreements, and Tecnimed's motion for judgment on the pleadings and to stay the IACAC Arbitration must be denied.

### III. *The Arbitrability of Tecnimed's Claims*

GEMS–IT has moved to compel the arbitration of the claims that Tecnimed is prosecuting in the Brazil court. As noted, the Federal Arbitration Act provides in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed in the manner

> provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement .....

9 U.S.C. § 4 (emphasis added).

Federal law instructs that:

> Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself, or an allegation of waiver, delay, or a like defense to arbitrability.

**\*10** *Progressive Casualty Ins. Co.,* 991 F.2d at 48, *quoting Mitsubishi Motors Corp.,* 473 U.S. at 626. "Indeed, unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should be submitted to arbitration."[4] *Progressive Casualty Ins. Co.,* 991 F.2d at 48. "Whether a particular claim falls within the scope of the parties' arbitration agreement, [the court] focus[es] on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims "touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Smith/Enron Cogeneration Limited Partnership, Inc. v. Smith Cogeneration International Inc.,* 198 F.3d 88, 99 (2d Cir.1999).

In this Court's view, a review of Tecnimed's claims asserted in the Brazil Action against GEMS–IT and GE Brasil indicates that they are within the scope of the arbitral clauses of the Agreements. Accordingly, the Court grants GEMS–IT's motion to compel Tecnimed to arbitrate the claims that Tecnimed is prosecuting in the Brazil Court.

### A. *Tecnimed's Joinder of GE Brasil in the Brazil Action Does Not Alter the Result.*

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 77 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

Tecnimed has sued not only GEMS–IT in its Brazilian lawsuit but also a related corporation, GE Brasil. The claims against GE Brasil, however, are intertwined with and indistinct from the claims that Tecnimed has asserted against GEMS–IT. Under the law, if non-signatories to a forum selection clause are "closely related" to one of the contracting parties, then all such parties can be encompassed by the clause. "[C]losely related" is broadly defined to encompass those non-signatory, parties whose enforcement of the clause is foreseeable. *See e.g., Direct Mall Prod. Servs. Ltd. v. MBNA Corp.,* 2000 WL 1277597 (S.D.N.Y.2000) (non-party to an agreement containing a forum selection clause may invoke such a clause if "the relationship between the non-party and the signatory [is] sufficiently close that the non-party's enforcement of the forum selection clause is 'foreseeable' by virtue of the relationship between the signatory and the party sought to be bound"); *Scher v. Bear Steams & Co., Inc.,* 723 F.Supp. 211 (S.D.N.Y.1989) (non-signatory agent of principal who was party to arbitration clause was bound thereby); *Puerto Rico v. Airborne Group PLC,* 882 F.Supp. 1212, 1216 (D.P.R.1995) (forum clause in contract benefited defendants other than signatories to the contract where such parties were related thereto as agent or parent or sister company); *Hirschfeld Productions, Inc. v. Mirvish,* 88 N.Y.2d 1054, 651 N.Y.S.2d 5, 673 N.E.2d 1232 (N.Y.1996) (noting that "[f]ederal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation").

**\*11** Here, Tecnimed's claims are substantially identical with respect to each defendant. Tecnimed has sued both defendants together in each claim. The claims alleged against them arise directly out of their relationship with each other. Tecnimed alleges that GE Brasil was acting as GEMS–IT's agent. Thus, it was clearly foreseeable to Tecnimed that GEMS–IT's alleged agent would seek to enforce the arbitration provision at issue. Based upon Tecnimed's allegations, both GE defendants are equally entitled to enforce the arbitration provision. [5]

**IV. *GEMS–IT's Motion and Petition For Anti–Suit Injunction***

GEMS–IT additionally moved for an anti-suit injunction enjoining Tecnimed from prosecuting the Brazilian lawsuit. In its Memorandum of Law in Support of its Verified Petition at page 19, Tecnimed stated that it intends to pursue the Brazil Action "no matter what happens in the Arbitration and with

this Petition." To assure compliance with the Court's order compelling arbitration, GEMS–IT's motion for injunction is hereby granted as set forth below.

**A. *Applicable Legal Standards***

**1. *Preliminary Injunction***

To obtain a preliminary injunction, the moving party must show: (a) irreparable harm and (b) either (1) the likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Beal v. Steam,* 184 F.3d 117, 122 (2d Cir.1999); *International Fashion Products. B.V., v. Calvin Klein, Inc.,* 1995 WL 92321 (S.D.N.Y. March 7, 1995) (granting preliminary injunction enjoining plaintiff from prosecuting its injunction application in the Netherlands), *citing Citibank. N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985); *Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd.,* 876 F.Supp. 482, 487 (S.D.N.Y.1994) (granting preliminary injunction in aid of arbitration).

**2. *Anti–Foreign Suit Injunction***

"The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is well-established." *China Trade & Development Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35–36 (2d Cir.1987); *see also United States v. Davis,* 767 F.2d 1025, 1038 (2d Cir.1985); *Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 926 (D.C.Cir.1984). [6] Such injunctions operate directly on the parties themselves, rather than on a foreign court. *Mastercard Int'l Inc. v. Argencard Sociedad Anonima,* 2002 WL 432379, \*9 (S.D.N.Y. March 20, 2002), *citing Laker Airways,* 731 F.2d at 926.

In order to obtain an anti-foreign-suit injunction, the moving party must first make two threshold showings: first, that the parties to both suits are substantially the same, and second, that "the resolution of the case before the enjoining court would be dispositive of the enjoined action." *China Trade,* 837 F.2d at 36. If these requirements are established, the court should then consider: (1) whether the foreign litigation poses a threat to the enjoining court's jurisdiction; (2) whether the foreign litigation would frustrate important United States policies; (3) whether the foreign action is vexatious; (4) whether adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment; and (5) other equitable considerations,

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 78 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

including the possibility of prejudice to either party if the foreign action were to proceed. *Id.*

**\*12** GEMS–IT meets the *China Trade* requirements for injunctive relief.

**B. *GEMS–IT Will Suffer Irreparable Harm If Tecnimed is Not Enjoined From Prosecuting the Brazil Action.***

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuonon,* 175 F.3d 227, 233–34 (2d Cir.1999); *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Jayaral v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995). Further, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." *Reuters,* 903 F.2d at 907. A federal court has the power to enjoin a party before it from prosecuting similar litigation in a foreign tribunal where the foreign action presents a threat of irreparable harm to the party seeking injunctive relief. *International Fashion Products, B.V.,* 1995 WL 92321 at *2; *National Trust Co. v. American Home Assurance Co.,* 1987 WL 5837, *6 (S.D.N.Y. Jan.22, 1987).

GEMS–IT will be irreparably harmed if a preliminary injunction is not entered enjoining Tecnimed from continuing the Brazil Action. First, GEMS–IT will be required to litigate claims relating to the Agreements, both here and in Brazil, in contravention of agreed-to forum selection provisions calling for arbitration before the IACAC in Miami, Florida.

The deprivation of GEMS–IT's contractual right to arbitrate its claims, a right protected by international, federal, and state law, constitutes irreparable harm. *See Reliance Nat., Ins. Co. v. Seismic Risk Ins. Service, Inc.,* 962 F.Supp. 385, 391 (S.D.N.Y.1997), *citing Olde Discount Corp. v. Tupman,* 805 F.Supp. 1130, 1135 (D.Del.1992), *aff'd,* 1 F.3d 202 (3d Cir.1993), *cert. denied,* 510 U.S. 1065, 114 S.Ct. 741, 126 L.Ed.2d 704 (1994) ("loss of [plaintiff's] federal substantive right to arbitrate, should injunctive relief be denied, constitutes irreparable harm clearly distinguishable from purely economic loss"); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 482 F.Supp. 788, 792 (D.Fla.1980), *rev'd on other grounds,* 677 F.2d 391 (4th Cir.1982) (risk of engaging in discovery and going to trial "over a controversy for which this court ordered arbitration" constitutes irreparable harm); *see also Borden, Inc. v. Meiji*

*Milk Prods. Co.,* 919 F.2d 822, 826 (2d 1990) (New York Convention does not preclude injunction in aid of arbitration).

Tecnimed has submitted the issue of arbitrability to this Court. This Court has ruled on and rejected Tecnimed's contention. If Tecnimed is permitted to proceed in the Brazil Action, the possibility exists of conflicting judgments as to arbitrability. In addition, GEMS–IT faces the prospect of conflicting judgments on the merits from the IACAC Arbitral Tribunal and the Brazilian court. *See International Fashion Products, B.V.,* 1995 WL 92321 at *2 (court finding irreparable harm where CKI was "compelled to litigate on two continents and may be subject to inconsistent rulings"); *Allendale Mutual Ins. Co. v. Bull Data Systems, Inc.,* 1993 WL 171359, *5 (N.D.Ill.1993) (court finding irreparable harm on basis that plaintiffs will not have had an opportunity to litigate the arson issue fully in a French court, and if French court reaches merits of the claims first, the French judgment will have a *res judicata* effect).

**\*13** Accordingly, GEMS–IT will be irreparably harmed if a preliminary injunction is not entered enjoining Tecnimed from prosecuting the Brazil Action.

**C. *GEMS–IT Has Demonstrated That Tecnimed Should Be Enjoined From Prosecuting the Brazil Action.***

The two *China Trade* threshold requirements and both of the *China Trade* specific circumstances that warrant an injunction against prosecution of a foreign litigation are met.

**1. *The Parties to the Brazil Action Are Sufficiently Similar To The Parties in this Action.***

GEMS–IT and Tecnimed are parties in both this action and the Brazil Action. Although General Electric Company's subsidiary, GE Brasil, has been named in the Brazil Action, the claims made by Tecnimed against GEMS–IT and GE Brasil relate to the contractual relationship between GEMS–IT and Tecnimed. Tecnimed has alleged no independent claim against GE Brasil. Furthermore, as noted earlier, Tecnimed alleges GE Brasil acted as GEMS–IT's agent in GEMS–IT's dealings with Tecnimed.

Finally, GE Brasil is entitled to the benefit of GEMS–IT's arbitration agreements where its alleged misconduct relates to its behavior as an alleged agent of GEMS–IT. *See Campaniello Imports. Ltd v. Saporiti Italia,* 117 F.3d 665, 668 (2d Cir.1997); *Thomas v. A.R. Baron & Co., Inc.,* 967 F.Supp. 785, 788 (S.D.N.Y.1997); *Hirschfeld Productions, Inc. v. Miryish,* 88 N.Y.2d 1054, 651 N.Y.S.2d 5, 6, 673 N.E.2d

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 79 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

1232 (N.Y.1996) (cases applying arbitration agreements to non-signatories who served as agents to signatories).

Accordingly, the present cases are sufficiently similar in terms of parties to meet the first threshold criterion for an anti-foreign-suit injunction against Tecnimed. *Mastercard Int'l Inc.,* 2002 WL 432379 at *10; *Farrell Lines Inc. v. Columbus Cello–Poly–Corp.,* 32 F.Supp.2d 118, 130 (S.D.N.Y.1997), *aff'd* 161 F.3d 115 (2d Cir.1998).

### 2. *An Order in this Action Compelling Arbitration Would Be Dispositive of the Brazil Action.*

The second threshold criterion is "whether the resolution of the case before this Court would be dispositive of the enjoined action. *China Trade,* 837 F.2d at 36. A comparison of GEMS–IT's Statement of Claim in the arbitration with Tecnimed's Brazilian Complaint shows that they raise the same issues.

As noted previously, in the IACAC Arbitration GEMS–IT seeks a ruling that its claims are arbitrable and an award ruling that: (a) Tecnimed has breached the International Distribution Agreement and the International Sales and Service Representative Agreement; (b) Tecnimed is liable to GEMS–IT for breach of the Distributorship Agreement in the amount of $1,159,129.61, for goods sold and delivered; (c) the disputes asserted by Tecnimed in the Brazil Action are arbitrable under the terms of the Agreements and may not be prosecuted in the Brazilian courts; (d) GEMS–IT has fully complied with its obligations and is not liable to Tecnimed; and (e) any claims of Tecnimed are in any event barred by the terms of the Agreements limiting the liability of GEMS–IT.

**\*14** In the Brazil Action, Tecnimed seeks (a) a declaration that GEMS–IT's claim for indebtedness is not subject to the arbitration requirements set forth in the Agreements, (b) money damages for the termination of the Agreements, (c) the revision of the contractual clauses of the terminated Agreements, and (d) a declaration that it owes nothing to GEMS–IT.

Thus, in both actions, GEMS–IT and Tecnimed both seek rulings regarding the (a) arbitrability or non-arbitrability of their claims, (b) monetary damages for alleged breaches of the Agreements, and (c) declarations of no liability of indebtedness as to the other party. Similarly, in this New York Action, Tecnimed seeks an adjudication of the arbitrability or non-arbitrability of GEMS–IT's claims and GEMS–IT seeks to compel arbitration of Tecnimed's claims.

Accordingly, the resolution of this action and the arbitration before the IACAC will resolve the Brazil Action. Therefore, the second threshold requirement is met

### 3. *Tecnimed's Prosecution of the Brazil Action Also Violates Two Additional Factors Required for An Anti-suit Injunction.*

GEMS–IT also meets the additional factors required by *China Trade* for an injunction: (a) Tecnimed's Brazil Action threatens this Court's jurisdiction, and (b) Tecnimed's Brazil Action violates a public policy of this forum. *See Mastercard Int'l Inc.,* 2002 WL 432379 at *10, *citing China Trade,* 837 F.2d at 36.

### a. *Tecnimed's Brazil Action Threatens the Court's Jurisdiction Over The Matters at Issue.*

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full and fair justice to litigants." *Laker Airways Ltd. V. Sabena Belgian World Airlines,* 731 F.2d 909, 927 (D.C.Cir.1984); *see also China Trade,* 837 F.2d at 37. "[W]hen the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceeding." *Laker Airways,* 731 F.2d at 927. Moreover, "[w]hen the availability of the domestic courts is necessary to a full and fair adjudication of the plaintiff's claims, a court should preserve that forum." *Id.* at 931–32.

Under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* and the IACAC Rules of Procedure [Ex. 6], a court of law and an arbitral tribunal may not have concurrent jurisdiction over a cause of action; only one of the forums may have jurisdiction. *See Paine Webber v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990) ("if a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside the substantive scope of the agreement, it is obliged to enjoin arbitration. If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute"); IACAC Rules, Articles 21, Ex. 4 (provides that the Arbitral Tribunal shall have the power to determine whether the parties agreed to arbitrate); *accord, Laitasalo,* 196 B.R. at 925 ("Since, I now find that Kansa General is bound by that arbitration agreement, Kansa General must arbitrate this dispute in the U.S. and not litigate in Finland...."); *Smoothline,* 2002 WL 273301 at *6 (court

stating that "neither Smoothline nor Greatsino may continue the Liechtenstein action in so far as they seek to challenge in that suit the validity of the obligations encompassed by their respective agreements to arbitrate").

**\*15** Tecnimed has submitted the issue of arbitrability to this Court. But Tecnimed has also asked the Brazilian court to declare that the Agreements are unenforceable and it is not required to arbitrate. [Ex. 9 at 11–15]. This Court has determined that Tecnimed did agree to arbitrate. Accordingly, once this Court has ruled, jurisdiction over such claims lies with this Court, and hereafter with the IACAC Arbitral Tribunal. Any decision to the contrary in the Brazilian court would undermine the jurisdiction of this Court and the IACAC Arbitration Tribunal. Upon referral to arbitration, this Court will retain jurisdiction to enforce its order. *Satcom Intern. Group v. Orbcomm International Partners, L.P.,* 49 F.Supp.2d 331, 336 (S.D.N.Y.1999), *citing Europcar Italia, S.p.A. v. Maellano Tours, Inc.,* 156 F.3d 310, 316 (2d Cir.1998).

Accordingly, Tecnimed's continued prosecution of the Brazil Action Imperils this Court's jurisdiction (and the jurisdiction of the IACAC Arbitral Tribunal) and its order compelling arbitration.

**b. *Tecnimed's Brazil Action Violates United States Policy Favoring Enforcement of Forum Selection Clauses.***

"An anti-suit injunction may ... be appropriate when a party seeks to evade important policies of the forum by litigating before a foreign court." *China Trade,* 837 F.2d at 37; *see also Laker Airways Ltd.,* 731 F.2d at 931 n. 73 ("An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied, and which is designed to effectuate important state policies.").

The United States has a well-established public policy of enforcing forum selection agreements and, in particular, arbitration agreements, and mandating the speedy removal of arbitral disputes from the courts. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *M/S Bremen v. Zapata Off– Shore Co. .,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Moses H. Cone Memorial Hosp. V. Mercury Construction Corp.,* 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218–20, 105 S.Ct. 1238, 84 L.Ed.2d

158 (1985); *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 233, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Vimar Seguros v Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 537–39, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995); *International Fashion Products, B.V. v. Calvin Klein, Inc.,* 1995 WL 92321, \*2 (S.D.N.Y. March 7, 1995); *Babcock & Wilcox Co. v. Control Components, Inc.,* 161 Misc.2d 636, 641, 614 N.Y.S.2d 678, 681 (Sup.Ct.N.Y.Co.1993).

Tecnimed does not deny that it filed the Brazil Action to avoid arbitral agreements. In paragraphs 16 through 20 of the Verified Petition, Tecnimed acknowledges that it filed the Brazil Action only after receiving notice of GEMS–IT's intent to submit its dispute to arbitration before the IACAC in Miami, Florida, USA:

16. Upon receiving GE's [March 18, 2002] letter, Tecnimed feared that just as GE was trying to proceed prematurely to mediation, it would next try to force arbitration on Tecnimed without taking the steps called for by the Rep Document or the Distribution Document. Tecnimed also knew it had uniquely Brazilian law claims against GE which were best heard by a Brazilian court. Thus, Tecnimed promptly sent GE an Extrajudicial Notice. Under Brazilian law, this event (on March 28, 2002) is the first step in filing suit....

**\*16** 17.... GE's response, on April 22, 2002, was to begin the Arbitration, filing the Notice in Manhattan....

19. On May 19, 2002, Tecnimed wrote the IACAC in Manhattan (and GE), stating that the Arbitration was invaild, and it would not participate, and would keep pursuing its remedies under Brazilian law and in Brazil....

20. On May 23, 2002, Tecnimed filed a Complaint in the Tenth Circuit Court of Porto Alegre, seeking, *inter alia,* declaratory relief and damages....

In addition, Paulo Werlang, president of Tecnimed, states at paragraph 15 of his Affidavit in support of the Verified Petition, that Tecnimed filed its Extrajudicial Notice "to avoid being dragged into an arbitration process that GE had no right to force upon it."

Judges in our Court have enjoined parties from proceeding in foreign lawsuits that were filed in violation of agreed-upon forum selection clauses, as here. *See Farrell Lines Inc.,* 32 F.Supp.2d at 130–31 (issuing anti-suit injunction against insurers from prosecuting lawsuit in Italy where parties were bound by forum selection clause in bill of lading

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 81 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

to litigate in New York); *International Fashion Prods., B.V. v. Calvin Klein. Inc.,* 1995 WL 92321, *2 (S.D.N.Y. March 7, 1995) (issuing anti-suit injunction against distributor from prosecuting an injunction application in the District Court of Amsterdam, The Netherlands where parties were bound by forum selection clause in distribution agreement to litigate in New York).

Judges in our Court have enjoined parties from proceeding in foreign actions where the parties have agreed to *arbitrate* their disputes in a particular forum. *See Smith/Enron Cogeneration Limited Partnership, Inc.,* 198 F.3d 88, 99 (2d Cir.1999) (affirming issuance of anti-suit injunction against SCI from prosecuting Dominican lawsuit where bound by arbitration agreement to arbitrate in New York); *Smoothline Ltd.,* 2002 WL 273301 at *6 (issuing anti-suit injunction against Smoothline and Greatsino from proceeding against NAFT in Princely Court of Liechtenstein seeking damages for NAFT's alleged failure to pay its share of Smoothline's tooling costs and a declaration of "non-liability" that Smoothline and Greatsino had no obligation to repair or replace CRUs where NAFT was bound by arbitration agreement to arbitrate in New York); *In re Laitasalo,* 196 B.R. at 924 (issuing anti-suit injunction against Kansa General from prosecuting in Helsinki, Finland District Court action seeking return of Letter of Credit where Kansa General is bound by arbitration agreement to arbitrate dispute in United States).

The issuance of a preliminary injunction here to preserve the *status quo,* pending arbitration, therefore, will fulfill this Court's obligation under the FAA and the Inter–American Convention to enforce a valid agreement to arbitrate. *Blumental,* 910 F.2d at 1054. In *Blumental,* the Second Circuit held that preliminary injunctions are appropriate whenever they are necessary to protect the integrity of a pending arbitration: "Arbitration can become a hollow formality if parties are able to alter irreversibly the *status quo* before the arbitrators are able to render a decision in the dispute. A district court must ensure that the parties get what they bargained for—a meaningful arbitration of the dispute." 910 F.2d at 1053.

**\*17** Since Tecnimed agreed to arbitrate "any controversy, dispute, or difference" between the Parties arising out of or relating to the Agreements, GEMS–IT is entitled to enjoin Tecnimed from prosecuting the Brazil Action.

### D. *Permanent Injunction*

GEMS–IT moved for a preliminary injunction pending this Court's ruling on its motion to compel arbitration, and in its

counterclaim, GEMS–IT requested a permanent injunction barring Tecnimed from prosecuting the Brazil Action. As noted, to obtain a preliminary injunction (setting aside for the moment the question of whether the standards for anti-suit injunction are different), "[t]he moving party must show (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief." *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992); *see also Richard Feiner & Co., Inc. v. Turner Entertainment Co.,* 98 F.3d 33, 34 (2d Cir.1996). The standard for a permanent injunction is "essentially the same" as for a preliminary injunction with the exception that plaintiff must actually succeed as to the merits rather than merely make a showing that such success is likely in a future proceeding. *See Rodriguez v. DeBuono,* 44 F.Supp.2d 601, 606 (S.D.N.Y.1999); *National Helicopter Corp. of America v. City of New York,* 952 F.Supp. 1011, 1018 (S.D.N.Y.1997).

This Court has the discretion to consolidate the motion for a preliminary injunction with the request for permanent injunctive relief with the result that "the papers submitted and oral argument shall constitute the full trial on the merits." *American Train Dispatchers Assoc. v. Metro–North Commuter Railroad Co.,* 698 F.Supp. 1102, 1107 (S.D.N.Y.1988); *see also Rodriguez v. DeBuono,* 162 F.3d 56, 62 n. 9 (2d Cir.1998). Rule 65(a)(2) of the Federal Rules of Civil Procedure expressly permits the Court to order consolidation of trial on the merits with a hearing on an application for a preliminary injunction "(b)efore or after the commencement of the hearing" on the application. *Reese Publishing Co., Inc. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 12 (2d Cir.1980). Although notice of intent to consolidate is ordinarily required, that requirement may be excused when no prejudice to the parties would result. *Id.* (holding that district court did not err in providing notice of consolidation at the close of preliminary injunction proceedings because the parties were not prejudiced); *Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n,* 725 F.2d 564, 568 (10th Cir.1984) (district court's notice of its intent to consolidate on the second day of testimony was not error where the adverse party failed to ask for a continuance to present additional evidence and admitted in oral argument that it would not have significantly changed the presentation of evidence even if it had received more timely notice).

**\*18** At the hearing on the subject motions, this Court inquired of the parties whether there was anything further to

be considered, and specifically questioned Tecnimed through its counsel about any other matters that would bear on this Court's rulings on the pending motions. The parties did not indicate that any other matters would be needed to dispose of the merits of this proceeding, as the motions in fact frame and present the substance of the dispute. Once this Court compels arbitration of the Tecnimed claims in the Brazil Action, and denies Tecnimed's motion to stay the IACAC Arbitration, nothing remains for this Court to do. GEMS–IT having demonstrated that it is not only likely to prevail on the merits, but in fact entitled to prevail, this Court exercises its discretion to treat this matter as the trial and to treat GEMS–IT's application for a preliminary anti-suit injunction as one for permanent injunctive relief as well, thus bringing this matter to a conclusion. *See* Fed.R.Civ.P. 65(a)(2); *National Helicopter,* 952 F.Supp. at 1018; *American Train Dispatchers,* 698 F.Supp. at 1107 n. 5.

### Conclusion

Accordingly, in light of the foregoing considerations, and this Court being fully advised in the premises and having considered the motions, memoranda of law, supporting affidavits, legal arguments and all other pertinent matters of record, it is ORDERED and ADJUDGED as follows:

1. Paramedics Electromedicina Comercial Ltda.'s Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c) on its Verified Petition Seeking To Stay Arbitration (Docket No. 10) be and the same is hereby denied.

2. GE Medical Systems Information Technologies, Inc.'s Motion To Compel Arbitration (Docket No. 15) be and the same is hereby granted.

3. GE Medical Systems Information Technologies, Inc.'s Motion for Preliminary Injunction (Docket No. 16) be and the same is hereby granted.

4. This Court shall enter judgment separately in accordance with Federal Rules of Civil Procedure 58 and 65(a)(2), in a Final Judgment of Injunction.

DONE AND ORDERED.

### *FINAL JUDGMENT OF INJUNCTION*

This matter came before this Court on May 22, 2003 for hearing on the Motion of Plaintiff Paramedics Electromedicina Comercial Ltda. for Judgment on the

Pleadings Seeking To Stay Arbitration (Docket No. 10) and Defendant GE Medical Systems Information Technologies, Inc.'s Motion to Compel Arbitration (Docket No. 15) and Motion for Preliminary Injunction Enjoining Tecnimed from Prosecuting the Brazilian Action (Docket No. 16). This Court has considered the motions, supporting memoranda and exhibits and the rest of the record as well as the oral arguments.

This Court has entered a separate order: a) denying plaintiff's motion for judgment on the pleadings seeking to stay arbitration, b) granting defendant's motion to compel arbitration, c) granting defendant's motion for preliminary injunction, and d) including findings of fact and conclusions of law. This Final Judgment of Injunction is entered pursuant to Rules 58 and 65(a)(2) of the Federal Rules of Civil Procedure.

**\*19** In light of the foregoing considerations, it is ORDERED and ADJUDGED as follows:

1. Paramedics Electromedicina Comercial Ltda. shall immediately cease prosecution of that certain action it filed on or about May 23, 2002, in the Tenth Civil Circuit Court of Porto Alegre. Brazil (the "Brazil Court"), entitled Tecnimed Paramedics Eletromedicina Comercial Ltda v. GE Marquette Medical Systems (now known as GE Medical Systems Information Technologies, Inc.) and General Eletric do Brasil, Case No. 110057156 (the "Brazil Action").

2. Subject only to the terms below, Paramedics Electromedicina Comercial Ltda. is hereby permanently enjoined and prohibited from prosecuting or pursuing any "Arbitral Claim" (as defined herein) in any forum other than that certain arbitration proceeding filed on April 22, 2002 before the Inter–American Commercial Arbitration Commission ("IACAC"), Case No. 50T 181 00195 02 (the "IACAC Arbitration").

3. If the arbitral tribunal in the IACAC Arbitration rules that any "Arbitral Claim" (as defined herein) is not arbitrable before it, then Paramedics Electromedicina Comercial Ltda. may petition this Court, on notice to GE Medical Systems Information Technologies, Inc. ("GEMS–IT"), for a modification of this Final Judgment of Injunction to allow it to pursue prosecution of such claims. Nothing herein shall operate to predetermine GEMS–IT's contention that the litigation of any such claims should be stayed pending the conclusion of the IACAC Arbitration.

Case 1:12-cv-00584-NAM-DJS   Document 12   Filed 06/29/12   Page 83 of 88

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

4. As used herein, "Arbitral Claims" means any and all of the following:

i. Any and all claims and causes of action asserted by Paramedics Electromedicina Comercial Ltda. before the Brazil Court in the Brazil Action; and

ii. Any and all claims and causes of action within the scope of the arbitral clauses of either or both of the International Distributorship Agreement dated as of May 1, 1999, and/or the International Sales and Service Representative Agreement, dated as of May 1, 1999.

5. Nothing herein is intended to stay or enjoin the Office of the Attorney General of Brazil, or other Brazilian licensing and governmental authorities, from investigating and prosecuting GE Medical Systems Information Technologies, Inc., GE Marquette Medical Systems, Inc. or General Eletric do Brasil Ltda. for any alleged violations of Brazilian licensing laws or import regulations, including without limitation the investigation and prosecution by such authorities of any matters referred to them by Judge Roberto Carvalho Fraga.

6. Paramedics Electromedicina Comercial Ltda. (i) shall immediately apprise the presiding judge or judges in the Brazil Action of the entry of this Final Judgment of Injunction, and (ii) shall immediately take all steps necessary to cause dismissal of the Brazil Action without prejudice to any refiling which this Court might authorize in accordance with Paragraph 3 of this Final Judgment of Injunction. If such dismissal is not entered by June 17, 2003, then Paramedics Electromedicina Comercial Ltda. must provide a written explanation to this Court on or before June 20, 2003, and may also make any related application to this Court on or before June 24, 2003.

**\*20** 7. This Final Judgment of Injunction shall bind and enjoin Plaintiff Paramedics Electromedicina Comercial Ltda., its officers, agents, servants, employees, and attorneys and all persons in active concert or participation with them having actual notice of this Final Judgment of Injunction by personal service or otherwise.

8. This Court hereby retains jurisdiction over the cause, the parties and the subject matter of this lawsuit, in order to enforce the terms of this Final Judgment of Injunction.

9. The Clerk of this Court is directed to close this case administratively.

DONE AND ORDERED.

Footnotes

1   In its pending petition in the IACAC Arbitration, GEMS–IT seeks essentially the following relief: (a) a declaration that Tecnimed has breached the Distribution Agreement and the Sales Agreement; (b) a finding that Tecnimed is liable to GEMS–IT for breach of the Distribution Agreement and an award ordering Tecnimed to pay for goods sold and delivered in the amount of U.S. $1,159,129.61 plus agreed upon interest of 12%, costs, legal fees and damages for Tecnimed's failure to provide services and other support as required by the Agreements; (c) a declaration that the disputes asserted by Tecnimed in the Brazil Action are arbitrable under the terms of the Agreements and may not be prosecuted in the Brazilian Courts; (d) a declaration that GEMS–IT has fully complied with its obligations and is not liable to Tecnimed; and (e) a finding that Tecnimed's claims are in any event barred by the terms of the Agreements limiting the liability of GEMS–IT.

2   In addition, the Court has subject matter jurisdiction by virtue of the diversity of the citizenships of Tecnimed, a citizen of Brazil, a foreign state, and GEMS–IT, a citizen of a state of the United States. 28 U.S.C. § 1332.

3   Tecnimed contends that the Agreements expired and are therefore not binding upon it. The issue of whether or not the Agreements expired as Tecnimed asserts, voiding the obligation to arbitrate, involves interpretation of the Agreements, termination of the Agreements, and the parties' obligations under the Agreements, and therefore is arbitrable. This Court notes that a court may compel arbitration of a dispute that arose after the expiration of the arbitration provision. *See e.g. Litton Fin. Printing v. NLRB,* 501 U.S. 190, 206, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *Fleck v. E.F. Hutton,* 891 F.2d 1047, 1052–53 (2d Cir.1989); *see also CPR. Inc. v. Spray,* 187 F.3d 245, 254 (2d Cir.1999). Moreover, as held by the Arbitral Tribunal, the arbitral clauses are deemed to constitute agreements separate from the terms of the main agreements, and the expiration of the main agreements do not operate to extinguish the arbitral clauses. *See Award* ¶ 78, Ex. 19; *see Sphere Drake Ins. Ltd. v. Clarendon Natl. Ins.,* 263 F.3d 26, 30–32 (2d Cir.2001), *citing, Prim a Paint Corp. v. Food & Conklin Mfg. Co.,* 388 U.S. 395, 402–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). An arbitration claim survives after the contract's expiration "where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where normal principles of contract interpretation, the disputed contractual right survives expiration of the agreement." *Gordon v. New York Times Employees Fed. Credit Union,* 2001 WL 1142174, *2 (S.D.N.Y. Sept.26, 2001). The determination of whether a contract containing an arbitration clause has expired is

Paramedics Electromedicina Comercial Ltda. v. GE Medical..., Not Reported in...

for the arbitrator to decide. *4200 Avenue KLLC v. Fishman,* 164 F.Supp.2d 339, 342 (S.D.N.Y.2001). *Fishman v. Towers,* 2001 WL 1338897, *4n. 8 (S.D.N.Y. Oct. 31, 2001).

4    Paragraphs 19 and 24 of the Agreements, respectively, provide that the "Agreement" shall be "governed by and interpreted in accordance with" New York law. Tecnimed has argued that New York law of arbitration should govern by virtue of such language. In *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 60–64, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), the Supreme Court ruled that the mere inclusion of a choice-of-law provision in an arbitration provision does not thereby incorporate state arbitration law. *Accord National Union Fire Ins. Co. v. Belco Petroleum Corp.,* 88 F.3d 129, 134–35 (2d Cir.1996); *cf. Coleman & Co. Securities, Inc. v. Giaguinto Family Trust,* No. 00 Civ. 1632, 2000 WL 1683450, at *3 (S.D.N.Y. Nov.9, 2000) (holding that provision for "agreement and its enforcement" to be governed by New York law did not evidence parties' intent to be bound by New York arbitration law).

5    Even if the claims asserted against GE Brasil were sufficiently separate from the claims asserted against GEMS–IT as to be non-arbitrable, then, at a minimum, this Court would enjoin Tecnimed from litigating in Brazil Court its claims against GE Brasil pending the arbitration of the GEMS–IT/Tecnimed dispute. *See WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 76 (2d Cir.1997), citing with approval *IDS Life Ins. Co. v. Sun America, Inc.,* 103 F.3d 524 (7th Cir.1996); *Societe Nationale Pour La Rechereche,* 430 F.Supp. 1332, 196 (S.D.N.Y.1977). in *IDS,* Chief Judge Posner noted that where a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, "[s]uch a maneuver should not be allowed to succeed, [and] ... is blocked ... by the principles of parallel-proceeding abstention, which ... require the court to stay the proceedings before it and let the arbitration go forward unimpeded." 103 F.3d at 530.

6    When a party seeks affirmative relief from a court, as Tecnimed has done, it submits itself to the jurisdiction of the court with respect to the adjudication of the claims arising from the same subject matter. *Paine Webber Inc. v. The Chase Manhattan Private Bank,* 260 F.3d 453, 460 (5th Cir.2001); *Bel Ray Co. Inc. v. Chemrite (Pty) Ltd.,* 181 F.3d 436, 443 (3d Cir.1999).

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

Hoguet Newman Regal & Kenney, LLP v. Rubin, Slip Copy (2011)

2011 WL 5838362
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

HOGUET NEWMAN REGAL
& KENNEY, LLP, Plaintiff,
v.
David RUBIN, Defendant.

No. 11 Civ. 5377(JFK). | Nov. 18, 2011.

Opinion

**MEMORANDUM OPINION & ORDER**

JOHN F. KEENAN, District Judge.

**\*1** Before the Court is Defendant David Rubin's ("Rubin" or "Defendant") motion to dismiss in favor of mediation or, failing that arbitration. For the reasons stated below, the Defendant's motion to dismiss is denied, and the action is stayed pending mediation and arbitration, with court-imposed deadlines.

**I. Background**

Hoguet Newman Regal & Kenney, LLP ("HNRK" or "Plaintiff") has brought the instant action to recover $262,840.22 in legal fees allegedly owed by the firm's former client, David Rubin ("Rubin" or "Defendant"). (Compl.¶¶ 2–3). HNRK represented Rubin in an ongoing criminal matter until April 2011, when Rubin engaged new counsel and asked HNRK to withdraw. HNRK complied, having billed $798,698.97 in fees and expenses, of which Rubin has paid $535,858.75. (Compl.¶¶ 8–10).

The October 2009 retainer agreement signed by HNRK and Rubin provided that "any fee dispute that may arise between us will be first submitted to non-binding mediation and then, if necessary, to arbitration." (Def. Mem. at 3, Houguet Aff. at 2). The agreement also specifies that the arbitration will be subject to New York's rules on mandatory arbitration of fee disputes, under 22 N.Y.C.R.R. Part 137. (Hoguet Aff. at 2). HNRK agrees that the instant fee dispute falls under the agreement's arbitration provision, but submits that the New York rules do not apply to fee disputes in criminal cases. In addition, HNRK asserts that the action should be stayed,

under Section 3 of the Federal Arbitration Act, and that the Court should set deadlines for Defendant's participation in mediation and arbitration. (Pl. Mem. at 2). Rubin rejects this proposal, requesting that the action be dismissed, and that no deadlines be imposed.

**II. Discussion**

Because the parties agree that the fee dispute falls within the terms of the arbitration clause, only two issues remain: (1) whether the action should be dismissed or stayed; and (2) whether deadlines should be imposed.

A district court has the discretion to choose between dismissing and staying the matter. *Salim Oleochemicals v. M/ V Shropshire,* 278 F.3d 90, 92–93 (2d Cir.2002) (discussing trial courts' ability to stay proceedings or dismiss the action in favor of arbitration). The determination of whether to dismiss or stay a claim governed by an arbitration clause depends on whether any "useful purpose will be served by granting a stay of [the] proceedings." *Berger v. Cantor Fitzgerald Secs.,* 967 F.Supp. 91, 96 (S.D.N.Y.1997). Here, it is not only consistent with Second Circuit jurisprudence, but also prudent in this case to stay the action pending mediation and arbitration.

The Second Circuit has urged courts to "be mindful of th[e] liberal federal policy favoring arbitration agreements when deciding whether to dismiss an action or instead grant a stay" and consider that "[u]nnecessary delay of the arbitral process through appellate review [following dismissal] is disfavored." *Salim Oleochemicals v. M/V Shropshire,* 278 F.3d 90, 93 (2d Cir.2002) (internal citation and quotation marks omitted).

**\*2** Additionally, opting to stay an action, rather than dismissing it, promotes the speed with which the arbitration of the dispute may begin. Dismissal is reviewable by an appellate court under Section 16(a)(3) of the FAA, but a stay is an unappealable interlocutory order under Section 16(b). *Douce v. Origin ID,* No. 08–CV–0483, 2009 WL 382708, at \*5 (S.D.N.Y. Feb. 17, 2009) (exercising discretion to stay pending arbitration rather than dismiss "[t]o promote expeditious resolution of th[e] dispute"). Although the parties do not dispute the validity of the arbitration clause in this case, there is disagreement over the applicability of New York's arbitration rules and the appropriateness of court-imposed arbitration deadlines. Rubin has a criminal trial looming and any delay in commencing mediation and arbitration could forestall the action entirely. The mediation and arbitration

process should not be delayed by interlocutory review; this action is therefore ill-suited for dismissal.

Next, the Court will turn to the issue of setting deadlines for mediation and arbitration. Defendant argues that it would be improper for the Court to set deadlines for mediation and arbitration, as procedural matters fall within the purview of the mediator. Contrary to Defendant's assertion, however, it would be impossible for a mediator to set a deadline for parties to enter mediation; no mediator has been selected, so no deadline can be put in place unless the Court imposes one. Setting a deadline for the commencement of alternative dispute resolution does not hamper the process by injecting the Court into procedural matters that the FAA reserves for the mediator. Rather, a deadline will advance the arbitration process. *See In re A.H. Robins Co., Inc.,* 215 B.R. 112, 116 (E.D.Va.1997) ("The Court finds that imposition of deadlines for the conclusion of all arbitration hearings and at least the commencement of trials will cause both [parties] to focus their attention on their cases, prepare them for final hearing, and then have them tried.").

### III. Conclusion

The instant action is stayed pending mediation, which must take place by December 31, 2011. If no settlement is reached through mediation, the parties are directed to appear for an arbitration hearing by May 31, 2012.

**SO ORDERED.**

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3522141
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court, M.D. Florida,
Tampa Division.

Frances P. SWARTZ, Plaintiff,

v.

WESTMINSTER SERVICES, INC.,
Westminster Communities of St. Petersburg,
Palm Shores Retirement Community,
Inc., Does I Through XX, Defendants.

No. 8:10–cv–1722–T–30AEP. | Sept. 8, 2010.

**Attorneys and Law Firms**

D. Kim Radcliffe, Law Office of Kim Radcliffe, PA, Orlando,
FL, Robert Ted Parker, K & L Gates, LLP, San Francisco,
CA, for Plaintiff.

Brian David Rubenstein, Cole, Scott & Kissane, PA, Tampa,
FL, for Defendants.

**Opinion**

### ORDER

JAMES S. MOODY, JR., District Judge.

**\*1** THIS CAUSE comes before the Court upon Defendants'
Motion to Dismiss Plaintiff's Complaint and Compel
Mediation (Dkt.8) and Plaintiff's Opposition to same (Dkt.9).
The Court, having reviewed the motion, response, and being
otherwise advised in the premises, concludes that the motion
should be granted in part and denied in part.

### DISCUSSION

This case arises from a Residency Agreement between
Plaintiff and Defendant Palm Shores Retirement Community,
Inc. d/b/a Westminster Palms ("Westminster Palms"). The
Residency Agreement covered the terms of Plaintiff's
residency at the Westminster Palms Retirement Center.
Specifically, Plaintiff paid an entrance fee and monthly
service fee to Westminster Palms for the use of an apartment

at the Westminster Palms Retirement Center and the use
of the retirement center's facilities. Plaintiff's claims are
premised on Defendants' alleged refusal to allow Plaintiff
in the main dining room because she was in a wheelchair.
According to Plaintiff, the Defendants' alleged policy that
persons dependent on wheelchairs could not make regular use
of the main dining room was not contained in the Residency
Agreement.

Defendants move to dismiss the entirety of Plaintiff's
complaint, without prejudice, because Plaintiff failed to
comply with the negotiated dispute resolution condition
contained in the Residency Agreement. This provision reads
as follows:

> *Negotiated Dispute Resolution.* In the event of any Dispute,
> Resident and Corporation shall use their best efforts to
> settle the Dispute. To this effect, they shall consult and
> negotiate with each other in good faith and recognizing
> their mutual interests, attempt to reach a just and equitable
> solution satisfactory to both parties. If a solution is not
> reached within a period of thirty (30) days, then, upon
> notice by either party to the other, all Disputes shall be
> submitted to mediation in accordance with Subsection 2
> below.

(Dkt.1–1). Defendants argue that Plaintiff failed to comply
with the mediation requirement prior to filing this action.

Upon review of this language, the Court agrees that the
language is clear that mediation is mandatory upon notice by
either party. The language clearly states that, upon notice by
either party to the other, all Disputes "shall be submitted to
mediation." *Id.* Although Plaintiff points out that Defendants
never provided her with notice of their intent to mediate, the
Court construes Defendants' motion to dismiss as adequate
notice of their desire to submit this matter to mediation.

However, the Court does not agree that the failure to submit
this dispute to mediation warrants dismissal of Plaintiff's
complaint. The law is clear that when confronted with
an objection that a plaintiff has initiated litigation without
satisfying arbitration or mediation requirements, courts
routinely stay rather than dismiss the proceedings to allow
for implementation of the agreed-upon dispute resolution
mechanism. *See N–Tron Corp. v. Rockwell Automation, Inc.,*
2010 WL 653760, at \*7 (S.D.Ala. Feb.18, 2010) (*citing Halim
v. Great Gatsby's Auction Gallery, Inc.,* 516 F.3d 557, 561
(7th Cir.2008) ("the proper course of action when a party

seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright")). [1]

**\*2** It is true, of course, that examples in the case law do exist wherein actions have been dismissed for non-compliance with dispute resolution provisions. *N–Tron Corp.,* 2010 WL 653760, at \*7 (citing examples of same). But that course of action is not mandatory; rather, district courts are vested with discretion to determine whether stay or dismissal is appropriate. *See Ortega Trujillo v. Conover & Co. Commc'ns, Inc.,* 221 F.3d 1262, 1264 (11th Cir.2000) ("A stay sometimes is authorized simply as a means of controlling the district court's docket and of managing cases before the district court").

Here, granting a stay to require the parties to negotiate and mediate in good faith concerning Plaintiff's claims is a more appropriate remedy than dismissal without prejudice. Plaintiff claims mediation will cause a delay to the proceedings in this case but the Court concludes that mediation can be coordinated amongst the parties swiftly, with nominal delay to the entirety of the proceedings. In addition, public policy is fostered by enforcing the mediation provision within the Residency Agreement, where the stay, pending mediation, will further the intent of the parties,

as evidenced in the Residency Agreement, and foster the possibility for a settlement before the attorneys' fees and costs associated with this litigation grow to a point where the option of settling is rendered futile.

It is therefore ORDERED AND ADJUDGED that:

1. Defendants' Motion to Dismiss Plaintiff's Complaint and Compel Mediation (Dkt.8) is hereby GRANTED IN PART AND DENIED IN PART.

2. The Court hereby STAYS this case pending mediation and this case will be administratively closed pending mediation.

3. The parties shall submit their dispute to mediation as set forth in the Residency Agreement and the mediation shall be conducted within sixty (60) days from the date of this Order.

4. The parties shall file a joint status report with the Court advising the Court whether they have resolved their dispute no later than fourteen (14) days from the date of mediation.

**DONE** and **ORDERED.**

Footnotes

1    *See also Tracfone Wireless, Inc. v. Blue Ocean's Distrib., LLC,* 616 F.Supp.2d 1284, 1285 (S.D.Fla.2009) (proper remedy for party's failure to comply with arbitration provision was stay, rather than dismissal); *R & F, LLC v. Brooke Corp.,* 2008 WL 294517, \*2 (D.Kan. Jan.31, 2008) (where plaintiff filed suit despite provision requiring parties to engage in mediation before going to court, proper remedy was to stay the litigation pending mediation); *Scurtu v. Int'l Student Exchange,* 523 F.Supp.2d 1313, 1328 (S.D.Ala.2007) (electing to stay, rather than dismiss, plaintiff's claims that were subject to binding arbitration agreement); *RoadTechs, Inc. v. MJ Highway Tech., Ltd.,* 79 F.Supp.2d 637, 640 (E.D.Va.2000) ("it is within the district court's discretion whether to dismiss or stay an action after referring it to arbitration"); *Cecala v. Moore,* 982 F.Supp. 609, 613 (N.D.Ill.1997) ("if the dispute at issue is found to arise out of or relate to the instant contract and so to be within the scope of the mediation clause, then this court concludes that it has the authority to stay the proceedings").

**End of Document**                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.