IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JAN P. HOLICK, JR., STEVEN MOFFITT,
JUSTIN MOFFITT, GURWINDER SINGH,
JASON MACK, WILLIAM BURRELL, and
TIMOTHY M. PRATT,

|  |  |
|---|---|
| Plaintiffs on behalf of themselves and all others similarly situated, | Case No. 1:12-CV-584 (NAM/DJS) (Lead Case) |

　　　　-against-

CELLULAR SALES OF NEW YORK, LLC, and
CELLULAR SALES OF KNOXVILLE, INC.,

　　　　　　　　Defendants.

_____

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTIONS PURSUANT TO 29 U.S.C. § 216(b)</u>

C. Larry Carbo, III
Julie R. Offerman
1200 Smith, Suite 1400
Houston, Texas  77002
Phone: (713) 356-1712
Fax: (713) 658-2553
*(Pro Hac Vice)*

David T. Luntz
Bar Roll No. 301947
HINMAN STRAUB, P.C.
121 State Street
Albany, NY 12207
Phone: (518) 436-0751
Fax: (518) 436-4751

ATTORNEYS FOR DEFENDANTS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

PROCEDURAL BACKGROUND........................................................... 2

RELEVANT FACTS .............................................................................. 3

   I.   Cellular Sales of New York, LLC's Business ................................. 3

   II.  Plaintiffs' Sales Companies Contracted With Cellular Sales of New York, LLC ............. 3

ARGUMENT AND AUTHORITIES ...................................................... 5

   I.   Plaintiffs Have a Heightened Burden of Proof to Show They Are "Similarly Situated"..... 5

   II.  The Court Should Decertify the Collective Actions Because the Opt-In Plaintiffs Are Not Similarly Situated ................................................................. 6

       A.  Plaintiffs' Widely Disparate Factual and Work Settings Compel Decertification ....... 6

           1.   *The Manner in Which Plaintiffs Classified and Treated Their Sales Company for Tax Purposes Differs Drastically Among Plaintiffs* ........................................ 7

           2.   *The Extent and Degree to Which Plaintiffs Invested in Equipment, Supplies, and Advertising for Their Sales Company Differ Drastically Among Plaintiffs* .. 11

           3.   *Substantial Disparities Exist Among Plaintiffs With Regard to Their Use and Hiring of Other Workers to Perform the Services at Issue* ................................. 13

           4.   *Plaintiffs Gave Conflicting Accounts of Their Ability to Work Outside of Retail Stores*.................................................................................... 14

           5.   *Plaintiffs Provided Varying Accounts As To Their Ability to Set Their Work Schedules*................................................................................. 15

           6.   *Plaintiffs Have Provided Drastically Different Accounts Regarding Their Ability to Set Prices and Negotiate With Customers* ......................................... 16

           7.   *The Permanence, Duration, and Nature of the Contractual Relationship With Cellular Sales Vary Drastically Among Plaintiffs* ............................................. 18

           8.   *Plaintiffs Provided Different Accounts Regarding Supervision and Discipline* ... 18

           9.   *Plaintiffs Provided Conflicting Testimony Regarding Their Ability to Work For Others*................................................................................... 19

          10. *The Purposes for Which Plaintiffs Formed and Used Their Sales Company Differs Drastically Among Plaintiffs* ............................................................. 20

       B.  The Individualized Defenses Available to Cellular Sales Compel Decertification.... 21

       C.  Fairness and Procedural Considerations Compel Decertification ............................. 24

CONCLUSION..................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agerbrink v. Model Serv. LLC*,
   293 F. Supp. 3d 470 (S.D.N.Y. 2018)...................................................................................13

*Barfield v. New York City Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008).............................................................................................7

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
   772 F. Supp. 2d 1111 (N.D. Cal. 2011) ..........................................................................22

*Brock v. Superior Care, Inc.*,
   840 F.2d 1054 (2d Cir. 1988)...........................................................................................7

*Browning v. Ceva Freight*,
   LLC, 885 F. Supp. 2d 590 (E.D.N.Y. 2012)............................................................11, 13, 18

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
   27 F. Supp. 3d 313 (E.D.N.Y. 2014) ........................................................................6, 24, 25

*Ellersick v. Monro Muffler Brake, Inc.*,
   10-CV-6525-FPG-MWP, 2017 WL 1196474 (W.D.N.Y. Mar. 31, 2017)......................22, 23

*Griffith v. Fordham Fin. Mgmt., Inc.*,
   No. 12-CIV-1117 (PAC), 2016 WL 354895 (S.D.N.Y. Jan. 28, 2016)..........................5, 7, 21

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999)..............................................................................................7

*Hernandez v. Fresh Diet, Inc.*,
   No. 12-CV-4339 ALC JLC, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014)................6, 19, 21

*Johnson v. TGF Precision Haircutters, Inc.*,
   No. CIV.A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ..........................22, 23

*Kinney v. Artist & Brand Agency LLC*,
   No. 13CV8864 (LAK) (DF), 2015 WL 10714080, at *18 (S.D.N.Y. Nov. 25,
   2015), *report adopted*, No. 13-CV-8864 (LAK), 2016 WL 1643876 (S.D.N.Y.
   Apr. 22, 2016)...............................................................................................................11

*Landaeta v. New York & Presbyterian Hosp., Inc.*,
   No. 12 CIV. 4462 JMF, 2014 WL 836991 (S.D.N.Y. Mar. 4, 2014)......................................11

*Mendez v. U.S. Nonwovens Corp.*,
   No. CV125583ADSSIL, 2016 WL 1306551 (E.D.N.Y. Mar. 31, 2016) ...............................23

ii

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010).................................................................................6

*Podell v. Citicorp Diners Club, Inc.*,
    112 F.3d 98 (2d Cir. 1997)................................................................................24

*Preacely v. AAA Typing & Resume, Inc.*,
    No. 12 CIV. 1361 AT RLE, 2015 WL 1266852 (S.D.N.Y. Mar. 18, 2015) ..............14, 15, 20

*Quintanilla v. Comm'r of Internal Revenue*,
    111 T.C.M. (CCH) 1017 (T.C. 2016) .................................................................8

*Saleem v. Corp. Transp. Group, Ltd.*,
    854 F.3d 131 (2d Cir. 2017)................................................................6,10, 13, 16, 20

*Sellers v. Royal Bank of Canada*,
    No. 12 CIV. 1577 KBF, 2014 WL 104682 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592
    Fed. Appx. 45 (2d Cir. 2015)............................................................................11

*Shayler v. Midtown Investigations, Ltd.*,
    No. 12 CIV. 4685 KBF, 2013 WL 772818 (S.D.N.Y. Feb. 27, 2013) .....................7

*Stevens v. HMSHost Corp.*,
    No. 10 CV 3571 ILG VVP, 2014 WL 4261410 (E.D.N.Y. Aug. 27, 2014)....................6, 24

*Thind v. Healthfirst Mgmt. Servs., LLC*,
    14 CIV. 9539 (LGS), 2016 WL 7187627 (S.D.N.Y. Dec. 9, 2016) ........................23

*Tracy v. NVR, Inc.*,
    293 F.R.D. 395 (W.D.N.Y. 2013), *aff'd sub nom. Gavin v. NVR, Inc.*, 604
    Fed. Appx. 87 (2d Cir. 2015)............................................................................23

*Velasquez v. Digital Page, Inc.*,
    303 F.R.D. 435 (E.D.N.Y. 2014)........................................................................22

*Zivali v. AT & T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011).................................................................6

**Statutes**

26 U.S.C. §§ 62(a)(1), 162, 212.................................................................................8

29 U.S.C. § 207(i)......................................................................................................21, 23

29 U.S.C. § 216(b) .....................................................................................................2, 5

**Other Authorities**

29 C.F.R. § 778.104 ..................................................................................................22

29 C.F.R. § 779.419 ..........................................................................................................22, 23

Fair Labor Standards Act ("FLSA") .........................................................1, 2, 3, 5, 6, 21

FLSA, Section 7(i) ......................................................................................................21, 22, 23

FED. R. CIV. P. 32(a) (4) .................................................................................................24

## PRELIMINARY STATEMENT

The Court should decertify the collective actions that were conditionally certified pursuant to the Fair Labor Standards Act ("FLSA"). The collective actions consist of forty-three (43) opt-in plaintiffs whose companies ("Sales Companies") contracted with Cellular Sales of New York, LLC ("Cellular Sales"). Plaintiffs claim they were improperly classified as independent contractors and seek overtime and minimum wage under the FLSA. Therefore, a dispositive issue in this case is whether Plaintiffs provided services to Cellular Sales as independent contractors or employees. This issue turns on the degree of control which Cellular Sales exercised over Plaintiffs and whether Plaintiffs were dependent on Cellular Sales for the opportunity to render services or were in business for themselves.

Plaintiffs cannot satisfy their heightened burden to prove the opt-in plaintiffs are similarly situated. To the contrary, discovery has confirmed no two Sales Companies operated the same. In fact, the manner in which a Plaintiff and his or her Sales Company were treated by Cellular Sales *differs drastically* depending on which Plaintiff you ask. Many Plaintiffs testified they had **complete discretion** with respect to when, how, and where they performed the services. They conducted substantial outside sales activities, were not required to work in retail stores, actively used their Sales Company to perform services for other businesses, hired their own workers, worked from home offices, spent thousands of dollars for their own supplies, and had "complete discretion" in setting their schedule, setting prices, and advertising their Sales Company's services. And then some Plaintiffs testified they knew they had this discretion but they chose not to exercise it. On the other hand, other Plaintiffs testified they formed their Sales Company for the sole purpose of performing services for Cellular Sales, they were required to work exclusively in retail stores, Cellular Sales provided all the supplies and equipment, and Cellular

1

Sales supervised them, subjected them to discipline, imposed sales quotas, and gave Plaintiffs no discretion in setting their work schedule, setting product prices, or advertising their business.

As a result, resolving the independent contractor issue on a collective basis would require dozens of mini-trials just to determine whether a particular plaintiff was properly classified. Given the broad variations among Plaintiffs, it would be impossible and patently unfair to Cellular Sales to extrapolate the experiences of a few to all forty-three opt-in plaintiffs, many of whom Cellular Sales has yet to have the opportunity to depose on this threshold issue.[1] In light of the materially disparate factual settings of the Plaintiffs, the highly individualized defenses available to Cellular Sales, and the relevant fairness and procedural concerns, Defendants move to decertify the conditional FLSA collective actions pursuant to 29 U.S.C. § 216(b).

## PROCEDURAL BACKGROUND

On April 4, 2012, Jan P. Holick, Jr., Jason Mack, Justin Moffitt, Steven Moffitt, and Gurwinder Singh filed this lawsuit. (*See* Lead Case, Dkt. No. 1).[2] On June 24, 2013, the named plaintiffs, along with William Burrell and Timothy Pratt, filed a virtually identical lawsuit, which the Court consolidated with this case. (*See* Member Case, Dkt. No. 1). Plaintiffs allege that Cellular Sales of New York, LLC ("Cellular Sales") and Cellular of Knoxville, Inc., as alleged "joint employers," misclassified Plaintiffs as independent contractors. (Lead Case, Dkt. No. 177, ¶¶ 1, 20). Relying on these allegations, Plaintiffs assert claims under the FLSA for minimum wage and overtime compensation. (*Id.* at ¶¶ 170-77, 183-86). Plaintiffs have expressly limited

---

[1]The Court denied Cellular Sales' request to take the deposition of each opt-in plaintiff and limited Cellular Sales to twenty depositions. (Lead Case, Dkt. No. 277). However, the Court noted that Cellular Sales' argument that the depositions have revealed drastic differences among Plaintiffs would be the appropriate subject of a motion to decertify. (*Id.* at pp. 4-5).

[2] "Lead Case" refers to this lawsuit, Case No. 1:12-cv-584. "Member Case" refers to Case No. 1:13-cv-00738, which the Court consolidated with this lawsuit.

their claims to time periods prior to January 1, 2012. (*Id.* at ¶¶ 4-7).

Cellular Sales denies any liability to Plaintiffs. Cellular Sales contends Plaintiffs' Sales Companies were properly classified as independent contractors and Plaintiffs were employees of their Sales Company, and not Cellular Sales. (Lead Case, Dkt. Nos. 180 & 182, p. 22). In the alternative, among other defenses, Cellular Sales claims that Plaintiffs were exempt from overtime under the "retail or service establishment" exemption to the FLSA. (*Id.*).

The parties agreed to conditional certification of collective actions under the FLSA consisting of individuals who performed sales services for Cellular Sales in New York between June 24, 2010 and December 31, 2011 and were classified as independent contractors. (Member Case, Dkt. Nos. 74 & 83; Lead Case, Dkt. No. 95). Forty-seven individuals opted in. (Exhibit A, at ¶ 7). The named and the opt-in plaintiffs are referred to herein collectively as "Plaintiffs."

## RELEVANT FACTS

### I.   Cellular Sales of New York, LLC's Business

Cellular Sales of New York, LLC ("Cellular Sales") is an authorized dealer of Verizon Wireless products and services. (Exhibit B, Decl. Blackburn, ¶ 3). Cellular Sales markets and sells Verizon Wireless services and products in New York. (*Id.*). In connection with its business, Cellular Sales operates retail stores in New York that sell cellular telephones, wireless service plans, data service plans, and other services and equipment related to the cellular telephone industry. (*Id.*). Verizon Wireless pays Cellular Sales certain rates for certain services and equipment sold on behalf of Verizon Wireless. (Ex. C, Decl. John Harris, ¶ 5).

### II.   Plaintiffs' Sales Companies Contracted With Cellular Sales of New York, LLC

In 2010 and 2011, Cellular Sales contracted with companies and corporations ("Sales Companies") owned by Plaintiffs. (Exhibit B, ¶¶ 4, 39-86, 136-37). With the exception of two

opt-in plaintiffs, each Plaintiff entered into a Non-Exclusive Independent Sales Agreement ("Sales Agreement") on behalf of their Sales Company. (*Id.* ¶¶ 4, 87-135; *see* Exhibits B-1 to B-48). Through the Sales Agreements, Plaintiffs, on behalf of their Sales Company, sold cellular products and services in the New York market.  (Exhibit B, ¶ 4).

The Sales Agreements governed the relationship between Cellular Sales and the Sales Companies. (*Id.*). Each Plaintiff specifically agreed that their Sales Company would be an independent contractor and that no employment relationship existed between Plaintiffs and Cellular Sales. (*See* Exhibits B-1 to B-48, p. 4). Each Sales Company's relationship with Cellular Sales terminated on or prior to January 1, 2012. (Exhibit B, ¶ 4).

The parties agreed Cellular Sales would pay commissions based on the sales made by the Sales Companies. (*Id.* ¶¶ 4-6; Exhibits B-1 through B-48, p. 3). The manner in which Cellular Sales calculated commissions was set forth in Commission Schedules, which Plaintiffs signed on behalf of their Sales Company. (*See* Exhibits B-1 to B-48).

There were essentially two sides to a sales transaction—(1) the sale of cellular products and devices and (2) the sale of a wireless service line. (Exhibit C, ¶ 7). Cellular Sales calculated Sales Companies' commissions based on certain agreed factors and contingencies, including the price for which the Sales Company sold the products and devices and the customer not deactivating their wireless line within 180 days of activation (the "Chargeback Period"). (*Id.*). When a line was canceled within the Chargeback Period, Verizon Wireless charged back any commission paid to Cellular Sales on that line activation. (*Id.* ¶ 9). Regardless, Cellular Sales paid commission advances to Sales Companies in the amount the Sales Company would receive if the customer did not cancel the wireless line within 180 days. (*Id.* ¶ 10).

Verizon Wireless set the price of the wireless service lines. (*Id.* ¶ 8). Cellular Sales and

the Sales Companies did not have discretion to vary the prices of wireless service lines. (*Id.*). In addition, Apple set the prices of certain products such as the iPhone. (*Id.* ¶ 12). However, for all other products, Plaintiffs had discretion to negotiate pricing with customers, and their Sales Company's commissions were based on the type of product sold and the amount for which Plaintiffs sold the product above Cellular Sales' "dealer cost" for the product. (*Id.* ¶¶ 12-13). The extent to which a Sales Company sold a cellular device or equipment for above or below the dealer cost affected the overall commission on the transaction. (*Id.* ¶ 13).

While Sales Companies did not earn commissions until the expiration of the Chargeback Period, Cellular Sales advanced commissions to Sales Companies following the reconciliation of internal sales data with sales data provided by Verizon Wireless—a process that was completed, and advances were made, during the second month following the sales month. (*Id.* ¶¶ 25-33). Plaintiffs understood and agreed to the timing of the commission payments. (Exhibit D-1, Holick depo, at 156:7-158:7; Exhibit E, S. Moffitt depo, at 49:11-50:23, 106:17-107:5; Exhibit F, J. Moffitt depo, at 96:21-98:2; Exhibit G-1, Singh depo, at 16:16-19:3, 108:7-19; Exhibit H, Mack depo, at 90:3-13; Exhibit I, Burrell depo, at 110:25-111:8; Exhibit J, Pratt depo, at 27:11-19).[3] Cellular Sales also paid draws to twenty-nine Plaintiffs' Sales Companies. (Exhibit B, ¶¶ 7-36).

## ARGUMENT AND AUTHORITIES

### I.   Plaintiffs Have a Heightened Burden of Proof to Show They Are "Similarly Situated"

An FLSA collective action can be maintained only on behalf of the named plaintiffs and alleged employees who are "similarly situated" to them. *See* 29 U.S.C. § 216(b); *Griffith v. Fordham Fin. Mgmt., Inc.*, No. 12-CIV-1117 (PAC), 2016 WL 354895, at *2 (S.D.N.Y. Jan. 28, 2016). Courts engage in a two-stage analysis in deciding whether to certify an FLSA collective

---

[3] Citations to transcripts are formatted as follows: (page number: line number).

action. *Myers v. Hertz Corp.,* 624 F.3d 537, 554-55 (2d Cir. 2010). At the first stage, the plaintiffs needed only to make a "modest" showing that they were subject to a common policy. *Id*. This case is at the second stage, where the Court applies "heightened scrutiny." *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 319 (E.D.N.Y. 2014). Plaintiffs now have the burden to show the opt-in plaintiffs are similarly situated by a preponderance of the evidence. *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).

## II.   The Court Should Decertify the Collective Actions Because the Opt-In Plaintiffs Are Not Similarly Situated

In deciding whether opt-in plaintiffs are "similarly situated," district courts look at (1) the disparate factual and employment settings of the plaintiffs, (2) the defenses available to defendant which appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339 ALC JLC, 2014 WL 5039431, at *3 (S.D.N.Y. Sept. 29, 2014). When opt-in plaintiffs are not "similarly situated," the court must decertify the collective actions and dismiss the opt-in plaintiffs' claims. *Myers*, 624 F.3d at 555.

### A.   Plaintiffs' Widely Disparate Factual and Work Settings Compel Decertification

Collective actions should be decertified when discovery shows disparate factual and work settings among Plaintiffs. *See, e.g.*, *Hernandez*, 2014 WL 5039431, at *6. Blanket misclassification arguments are insufficient this stage. *Id.* at *4; *Stevens v. HMSHost Corp.*, No. 10 CV 3571 ILG VVP, 2014 WL 4261410, at *5 (E.D.N.Y. Aug. 27, 2014). Plaintiffs must show they are similar in "relevant respects," including with respect to the factors relevant to deciding whether Plaintiffs were independent contractors. *Hernandez, Inc.*, 2014 WL 5039431, at *4.

At the heart of this lawsuit is the parties' dispute over whether Plaintiffs were independent contractors of Cellular Sales. The determination of whether an employment relationship exists for purposes of the FLSA is grounded in "economic reality." *Saleem v. Corp.*

*Transp. Group, Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017). The central question is whether the alleged employer possessed the power to control the workers in question. *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (citations omitted).

Decertification is necessary because "[d]etermining whether Plaintiffs were employees or independent contractors is not capable of resolution by classwide proof, and will instead require highly individualized inquiries." *See, e.g., Griffith*, 2016 WL 354895, at *3 (citing *Shayler v. Midtown Investigations, Ltd.,* No. 12 CIV. 4685 KBF, 2013 WL 772818, at *9 (S.D.N.Y. Feb. 27, 2013)). Employment is "determined on a case-by-case basis by review of the totality of the circumstances." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008). In applying the "economic reality" test, courts consider:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988). "Because the economic reality test is based upon all the circumstances, "any relevant evidence may be examined[.]" *Id*.

As shown below, there are far too many disparate factual circumstances for the opt-in plaintiffs to be "similarly situated," including substantial differences with respect to the manner in which Plaintiffs performed the services at issue. Plaintiffs have also provided varying accounts regarding the degree of control Cellular Sales exerted over them and their Sales Company.

### 1. *The Manner in Which Plaintiffs Classified and Treated Their Sales Company for Tax Purposes Differs Drastically Among Plaintiffs*

As an initial matter, Plaintiffs' tax returns reveal significant differences among Plaintiffs with respect to how they classified and identified their Sales Company to state and federal taxing entities. While Plaintiffs now claim they were Cellular Sales' "employees," many Plaintiffs

identified or classified themselves to the Internal Revenue Service ("IRS") and the New York Department of Taxation and Finance ("New York Department") as "self-employed" or as independent businesses in connection with their work for Cellular Sales. (*See, e.g.*, Exhibit K, Harrington depo, at 37:18-21; Exhibit L, Jaquennette Harris depo, at 48:14-20, 56:6-58:21; Exhibit D-1, Holick depo, at 64:16-68:2, 70:16-78:20, 90:19-91:4, 91:23-94:8; Exhibit M, McDonald depo, at 24:12-25:10, 26:11-27:13, 28:13-25, 29:19-25; Exhibit F, J. Moffitt depo, at 13:3-9; Exhibit N, Noel depo, at 40:21-51:8; Exhibit J, Pratt depo, at 68:2-23, 75:20-78:12; Exhibit O, Winkler depo, at 32:11-14). The relevant portions of Plaintiffs' tax returns are attached as Exhibits A-1 through A-50.[4]

Specifically, five Plaintiffs filed business tax returns, including IRS Forms 1120S and state franchise tax returns, for their Sales Company, separate from their personal tax returns. (Exhibit A, ¶ 12). Similarly, thirty-five Plaintiffs treated themselves or their Sales Company as an independent contractor for tax purposes by filing and reporting business expenses on a Schedule C to IRS Form 1040.[5] (*Id.* at ¶ 13). However, ten Plaintiffs have not produced, and appear not to have filed, any business tax returns or Schedule Cs in connection with their Sales Company's work for Cellular Sales. (Exhibit A, at ¶ 14; Exhibit I, Burrell depo, at 77:1-78:14).

The manner in which Plaintiffs identified themselves also varies among Plaintiffs. For

---

[4] Although Cellular Sales ceased contracting with Sales Companies as of December 31, 2011, several Sales Companies received payments from Cellular Sales in 2012 due to the timing in which Cellular Sales paid commissions. Thus, many Plaintiffs reported compensation from Cellular Sales and claimed deductions relating to their Sales Company's work for Cellular Sales for the 2012 tax year. (*See* Exhibit C, ¶ 25; Exhibit O, Winkler depo, at 56:4-58:5; Exhibit P, Bittel depo, at 42:5-43:22; Exhibit V, Corbelli depo, at 14:18-16:18).

[5] Under federal tax laws, independent contractors and self-employed persons report business expenses on Schedule C, while employees report business expenses on Schedule A. *See* 26 U.S.C. §§ 62(a)(1), 162, 212; *Quintanilla v. Comm'r of Internal Revenue*, 111 T.C.M. (CCH) 1017 (T.C. 2016) (memo).

example, on Schedule Cs, opt-in plaintiff Daniel Becker identified his business as "Independent Contractor Phone Sales." (*See* Schedule C to Exhibits A-1a and A-1c, Becker's 2011 & 2012 IRS returns; Exhibit Q, Becker depo at 15:6-16:17).[6] In addition, several other Plaintiffs identified their occupation as "self-employed" during their Sales Company's contractual relationship with Cellular Sales. (*See, e.g.*, Exhibits A-37c and A-37e, Noel's 2010 and 2011 tax returns; Exhibits A-5a and A-5b, Burrell's 2010 tax returns; Exhibits A-10a and A-10b, Corsette's 2011 tax returns; Exhibits A-34a and A-34b, Monjeau's 2010 tax returns). Moreover, opt-in plaintiff Carolyn Odalovic identified her occupation as "Business Owner" to the IRS during the time her Sales Company contracted with Cellular Sales. (Exhibits A-38a and 38c, Odalovic's 2010 and 2011 IRS returns). Furthermore, some Sales Companies issued Forms W-2 to opt-in plaintiffs, designating the opt-in plaintiff as an employee of the Sales Company. (*See, e.g.*, Exhibits A-3a, A-3c and A-3e, W-2s issued by Bittell's Sales Company; Exhibit A-7c, W-2 issued by Camp's Sales Company; Exhibit A-39c, W-2 issued by Patten's Sales Company).

There are also material and substantial discrepancies among Plaintiffs with respect to the amounts and substance of the business expense deductions they reported to the taxing entities. Some Plaintiffs claimed **tens of thousands of dollars** in business-expense deductions in connection with their work for Cellular Sales, including deductions for advertising expenses, compensation of officers, depreciation, office expenses, supplies, travel, and other expenses. ███

██████████████████████████████████████████████

---

[6] Similarly, opt-in plaintiff Christopher Dursley identified his Sales Company's principal business as "IndependentCell Phon." (Schedule C to Exhibits A-15a and A-15b, Dursley's 2011 returns). Drake Hewitt identified his principal business as "contracting : contractor." (Schedule C to Exhibits A-21c and A-21d, Hewitt's 2010 returns). Steven Moffitt likewise identified the business of his Sales Company as "General Contracting." (Schedule Cs to Exhibits A-33a, A-33b, A-33c, A-33d, A-33e, A-33f and A-33g, Steven Moffitt's 2009, 2010, 2011, and 2012 tax returns; Exhibit E, S. Moffitt depo, at 15:15-20:3, 24:14-25:7, 64:8-14; 66:24-67:4).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Plaintiffs understood that claiming business

expense deductions reduced the taxable income of their business. (Exhibit N, Noel depo, at

40:21-51:8; Exhibit P, Bittel depo, at 21:3-6; Exhibit L, Jaquennette Harris depo, at 57:20-22,

79:8-16; Exhibit E, S. Moffitt depo, at 40:1-23; Exhibit G-2, Singh cont. depo, at 17:3-16).

On the other hand, some Plaintiffs claimed minimal business expenses of a few hundred

dollars.██████████████████████████████████████████████

███████████████████████████████████████████████████

Moreover, several other Plaintiffs appear to have claimed *no business expenses at all* for their

Sales Company. (Exhibit A, Decl. of C. Larry Carbo, III, ¶ 14).

These disparities are significant. Plaintiffs' prior tax filings, including how plaintiffs

represented their status to taxing authorities and whether they deducted business expenses, are

*directly relevant* to the "economic reality" test. *Saleem*, 854 F.3d at 149 (noting "Plaintiffs

classified themselves as independent contractors for tax purposes and took deductions for

business expenses"); *Kinney v. Artist & Brand Agency LLC*, No. 13CV8864 (LAK) (DF), 2015 WL 10714080, at *18 (S.D.N.Y. Nov. 25, 2015), *report adopted*, No. 13-CV-8864 (LAK), 2016 WL 1643876 (S.D.N.Y. Apr. 22, 2016); *Landaeta v. New York & Presbyterian Hosp., Inc.*, No. 12 CIV. 4462 JMF, 2014 WL 836991, at *5 (S.D.N.Y. Mar. 4, 2014) ("Plaintiffs' tax filings are plainly relevant to the independent contractor versus employee inquiries. . . ."). Thus, courts closely analyze plaintiffs' tax returns to assess whether the information provided is indicative of independent contractor status. *See, e.g.*, *Sellers v. Royal Bank of Canada*, No. 12 CIV. 1577 KBF, 2014 WL 104682, at *8 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592 Fed. Appx. 45 (2d Cir. 2015); *Browning v. Ceva Freight*, LLC, 885 F. Supp. 2d 590, 605 (E.D.N.Y. 2012).

Because of the substantial variances among Plaintiffs, an examination of Plaintiffs' tax filings cannot be conducted through "common proof." Plaintiffs, Plaintiffs' accountants, and the state and federal taxing authorities produced hundreds of state and federal tax returns filed by Plaintiffs. (Exhibit A, ¶ 11). Proceeding collectively would deprive Cellular Sales of a detailed examination by the trier of fact of how Plaintiffs certified themselves to the state and federal governments and the relevant business deductions Plaintiffs claimed in the tax filings.

## 2. The Extent and Degree to Which Plaintiffs Invested in Equipment, Supplies, and Advertising for Their Sales Company Differ Drastically Among Plaintiffs

The extent, manner, and degree to which Plaintiffs invested in their Sales Company also vary drastically among Plaintiffs. Many Plaintiffs made significant financial investments in their Sales Company. Some Plaintiffs testified that they expended tens of thousands of dollars, at their own expense, toward the purchase of equipment and supplies in connection with their Sales Company's services for Cellular Sales. Many Plaintiffs also made substantial efforts, at their own expense, to advertise their Sales Company's services for Cellular Sales.

These costs were not insignificant. Daniel Becker reported numerous business expenses

relating to his Sales Company's work for Cellular Sales, ████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████. Becker also set up a website,

had tables at events, purchased magnetic signs for his vehicle, and sent out mass mailings at his

own expense. (Exhibit Q, Becker depo, at 23:12-33:6). Becker testified that "there was minimal

support from Cellular Sales," "it was completely up to you to go out and try to conjure up your

own business," and "[e]verything [was] at your own expense. There was nothing that was

covered by Cellular Sales." (*Id.* at 23:12-24:7, 26:7-16, 31:21-32:9).

James Harrington also made significant investments in an effort to generate business for

his Sales Company. Harrington reported substantial business expenses, ████████████████

██████████████████████████████████████████████████████████████████

████████████████████████. Exhibit K, Harrington depo, at 49:13-51:17, 65:4-11, 78:14-79:2).

At his own expense, Harrington also purchased posters and hosted sales parties. (Exhibit K,

Harrington depo, at 52:25-56:7, 58:23-59:6, 93:22-98:23, 66:7-14, 67:7-16, 72:11-73:19, 75:10-

25, 76:6-14).

Several other Plaintiffs also advertised their Sales Company's services, including by

setting up a table at a hockey game, placing ads in local newspapers, making sales calls, and

creating fliers to distribute at events. (Exhibit J, Pratt depo, at 53:9-55:10, 69:17-70:7, 77:25-

78:9, 75:8-12, 79:3-7, 81:4-82:5; Exhibit E, Steven Moffitt depo, at 110:8-113:18; Exhibit D-1,

Holick depo, at 110:5-111:17, 142:23-144:17, 167:2-16; Exhibit D-2, Holick cont. depo, at

209:19-216:7, 240:18-244:10). Other Plaintiffs also reported spending thousands of dollars

toward equipment, including laptops, tablets, cellular phones, printers, and office supplies, for

their Sales Company in connection with work for Cellular Sales. (Exhibit O, Winkler depo, at

38:13-40:20, 41:3-42:5, 43:2-44:21, 51:22-54:17, 54:22-55:16, 56:5-13, 57:7-60:18; Exhibit S, Patten depo, at 92:20-94:15, 107:8-18, 108:4-111:19; Ex. I, Burrell depo, at 79:5-12, 83:14-19; Ex. J, Pratt depo, at 55:11-56:8, 57:3-60:7, 67:25-69:13, 70:14-18, 72:22-24; Exhibit E, Steven Moffitt depo, at 20:14-21:6, 114:14-25, 115:6-22; Exhibit D-1, Holick depo, at 193:23-194:15).

At the other end of the spectrum, some Plaintiffs claimed they did **no advertising** for their Sales Company. (Exhibit R, Lopez depo, at 65:9-11; Exhibit T, A. Miller depo, at 57:24-58:4, 96:8-10; Exhibit U, J. Miller depo, at 76:14-19; Exhibit M, McDonald depo, at 60:6-61:6; Exhibit S, Patten depo, at 79:10-14, 80:22-24; Exhibit I, Burrell depo, at 131:20-132:24; Exhibit G-1, Singh depo, at 53:12-17; Exhibit P, Bittel depo, at 42:3-4). Others also testified they did not purchase **any** equipment or supplies. (Exhibit U, J. Miller depo, at 50:6-9; Exhibit T, A. Miller depo, at 98:7-11; Exhibit F, J. Moffitt depo, at 41:25-43:19, 46:8-13, 64:1-13).

These substantial disparities strongly militate in favor of decertification because the degree, manner, and extent to which Plaintiffs invested in their business are highly relevant to the "economic reality" test. *See, e.g.*, *Saleem*, 854 F.3d at 144; *Agerbrink v. Model Serv. LLC*, 293 F. Supp. 3d 470, 479 (S.D.N.Y. 2018); *Browning*, 885 F. Supp. 2d at 608.

### 3. *Substantial Disparities Exist Among Plaintiffs With Regard to Their Use and Hiring of Other Workers to Perform the Services at Issue*

Substantial disparities also exist among Plaintiffs with respect to their use of other workers. Some Plaintiffs testified that they were either not allowed to or were unaware they could hire other workers to perform work for Cellular Sales. (Exhibit H, Mack depo, at 68:12-19, 82:6-13, 92:23-93:4; Exhibit O, Winkler depo, at 17:7-12, 19:23-20:5, 75:20-76:6; Exhibit V, Corbelli depo, at 17:23-18:12; Exhibit M, McDonald depo, at 7:2-24, 21:10-15, 21:22-22:2).

In stark contrast, several opt-in plaintiffs hired other workers to perform the services at issue. (Exhibit R, Lopez depo, at 64:15-65:5, 66:10-18, 68:9-69:13; Exhibit S, Patten depo, at

10:10-11:15, 12:21-14:4, 22:11-24:5; Exhibit I, Burrell depo, at 71:8-72:16; Exhibit K, Harrington depo, at 19:16-20, 124:17-125:4). For example, Becker's Sales Company hired others to design advertisements and create a business website. (Exhibit Q, Becker depo, at 26:7-25; Exhibit W, Supp. Response to First Set of Interrogatories to Becker, *No. 16*, p. 6). Other Plaintiffs also hired companies to assist with their Sales Company's payroll. (Exhibit S, Patten depo, at 113:22-114:10, 122:12-123:3; Exhibit P, Bittel depo, at 10:4-11:7).

In addition, the Moffitts made efforts to contract with other companies to use their salesforce to perform sales services for Cellular Sales. (Exhibit E, S. Moffitt depo, at 10:5-8, 11:16-13:6, 25:19-26:2, 93:20-97:16, 98:7-99:10, 127:20-128:11). Several opt-in plaintiffs also identified entities and individuals whom their Sales Company hired. (Exhibit X, Odalovic's Response to First Interrogatories, *No. 16*, p. 28; Exhibit Y, Morabito's Supp. Response to First Interrogatories, *No. 16*, p. 24; Exhibit Z, Biro's Response to First Interrogatories, *No. 16*, p. 28).

Meanwhile, other Plaintiffs knew they could hire other workers, but chose not to. (Exhibit T, A. Miller depo, at 76:20-77:22; Exhibit P, Bittel depo, at 11:8-10, 38:17-23; Exhibit L, Jaquennette Harris depo, at 18:9-19:11, 48:9-13; Exhibit J, Pratt depo, at 65:3-66:22; Exhibit G-1, Singh depo, at 55:4-25; Exhibit D-1, Holick depo, at 52:1-15, 168:16-169:6). These differences among Plaintiffs are significant because hiring other workers indicates independent contractor status. *Preacely v. AAA Typing & Resume, Inc*., No. 12 CIV. 1361 AT RLE, 2015 WL 1266852, at *7 (S.D.N.Y. Mar. 18, 2015).

### 4. *Plaintiffs Gave Conflicting Accounts of Their Ability to Work Outside of Retail Stores*

Plaintiffs provided drastically different testimony regarding their ability to decide where to perform the sales services. Several plaintiffs testified they had the freedom to choose where to work. Indeed, many Plaintiffs worked from home offices, engaged in substantial outside sales

activities, hosted parties, set up booths, and visited businesses to increase their Sales Company's business. (Exhibit Q, Becker depo, at 31:21-32:9, 38:23-39:17; Exhibit M, McDonald depo, at 18:24-19:15, 68:9-15; Exhibit N, Noel depo, at 42:5-25, 45:13-18, 51:17-52:15, 69:20-70:9, 70:21-71:20, 72:13-74:9, 106:18-108:9; Exhibit K, Harrington depo, at 64:9-65:17, 67:7-16, 83:3-7; Exhibit P, Bittel depo, at 23:22-24:24, 25:12-21; Exhibit L, Jaquennette Harris depo, at 59:24-62:22; Exhibit S, Patten depo, at 44:19-25, 47:5-50:4, 72:17-21, 103:3-104:9; Exhibit E, S. Moffitt depo, at 29:23-34:5, 38:17-39:5, 112:13-113:18, 114:5-13; Exhibit I, Burrell depo, at 134:3-14, 136:17-137:9; Exhibit G-2, Singh cont. depo, at 15:7-15).[7]

However, other Plaintiffs testified they worked *solely* at retail stores and did not know they could work elsewhere. (Exhibit O, Winkler depo, at 40:14-41:2, 44:22-45:11, 61:9-13, 63:7-25; Exhibit V, Corbelli depo, at 19:20-20:9). Even further, some opt-in plaintiffs claimed that *Cellular Sales required them* to work solely in the stores. (Exhibit R, Lopez depo, at 34:23-35:4, 67:3-68:2, 77:20-78:14; Exhibit T, A. Miller depo, at 52:12-53:5, 98:12-16). This is in stark contrast to other Plaintiffs who testified that they could elect ***not to work*** at a retail store. (Ex. E, S. Moffitt depo, at 92:17-93:9; Ex. J, Pratt depo, at 53:9-53:24). Plaintiffs' conflicting testimony exemplifies the need for decertification because the freedom to choose where to work is an important factor in analyzing independent contractor status. *Preacely*, 2015 WL 1266852, at *7.

## 5.  *Plaintiffs Provided Varying Accounts As To Their Ability to Set Their Work Schedules*

Plaintiffs have also provided conflicting accounts with regard to their ability to determine their own hours and set their own work schedule at retail locations. For example, some opt-in

---

[7] In addition, several opt-in plaintiffs filed Forms 8829, "Expenses for Business Use of Your Home," indicating they used their homes for business purposes during their Sales Company's contractual relationship with Cellular Sales. (*See, e.g.*, Exhibit A-13a, 2011 tax return of Dellinger; Exhibits A-15a and A-15b, 2011 tax returns of Dursley; Exhibits A-34a, A-34b, A-34c and A34d, 2010 and 2011 tax returns of Monjeau).

plaintiffs testified they would inform Cellular Sales of the days they were unavailable and that Cellular Sales would then assign them to a retail store based on their availability. (Exhibit O, Winkler depo, at 61:14-62:19; Exhibit Q, Becker depo, at 45:13-49:10). Other Plaintiffs testified that they would tell Cellular Sales the days they were available and then Cellular Sales would set the schedule for the retail stores. (Exhibit V, Corbelli depo, at 60:14-22; Exhibit P, Bittel depo, at 46:24-47:13; Exhibit M, McDonald depo, at 66:17-67:16; *see also* Exhibit H, Mack depo, at 85:19-86:2; Exhibit G-1, Singh depo, at 85:4-21, 91:1-18; Exhibit E, S. Moffitt depo, at 89:22-90:23; Exhibit J, Pratt depo, at 29:20-30:12, 53:9-54:10, 57:3-59:18).

In addition, some opt-in plaintiffs testified that Cellular Sales would only ***sometimes*** inquire about their availability, and other times Cellular Sales would simply set the schedule. (Exhibit R, Lopez depo, at 86:20-87:21; Exhibit K, Harrington depo, at 91:4-92:11). Furthermore, some opt-in plaintiffs claimed they had ***absolutely no discretion*** with respect to when they worked at retail stores and, instead, Cellular Sales simply set the schedule and everyone was expected to follow it. (Exhibit N, Noel depo, at 75:4-76:14; Exhibit L, Jaquennette Harris depo, at 91:11-25; Exhibit T, Adam Miller depo, at 93:3-16).

The ability to choose how much to work is an important factor in addressing independent contractor status. *Saleem,* 854 F.3d at 146. Therefore, the conflicting testimony presents a serious obstacle to Plaintiffs' ability to show that the opt-in plaintiffs are "similarly situated."

### 6. *Plaintiffs Have Provided Drastically Different Accounts Regarding Their Ability to Set Prices and Negotiate With Customers*

Plaintiffs' testimony also varies significantly with respect to their ability and discretion to negotiate with customers and set the prices of the cellphones and equipment. Numerous Plaintiffs acknowledged that Cellular Sales did not display prices to customers and that they had substantial discretion to decide the price for which they sold the phones.

For example, Kevan McDonald testified that prices were not shown to customers and he did not have to get approval in deciding the price for which to sell the phone. (Exhibit M, McDonald depo, at 11:17-17:7, 58:2-59:6, 61:7-14). McDonald explained, "It was really to your discretion about how you wanted to handle the customer." (*Id.* at 14:3-9). Other opt-in plaintiffs also testified that they had complete or substantial discretion in setting the price of phones. (Exhibit N, Noel depo, at 24:22-25:4, 59:7-60:25, 64:20-24, 98:16-99:9; Exhibit V, Corbelli depo, at 16:22-17:22, 27:6-19, 37:10-38:20; Exhibit R, Lopez depo, at 13:21-14:13, 20:18-21:10, 26:11-27:19, 88:2-8, 108:3-109:4; Exhibit L, Jaquennette Harris depo, at 31:10-32:12; Exhibit J, Pratt depo, at 28:18-32:21, 56:9-19, 61:6-16; Exhibit H, Mack depo, at 52:2-18, 108:13-17). As Charlene Noel testified, "I set the price." (Exhibit N, Noel depo, at 60:23-25).

However, some Plaintiffs testified they had no or very little discretion to set prices. Chantel Winkler testified that she did not have discretion to discount the prices of phones without authorization ***and*** that Cellular Sales displayed phone prices to customers. (Exhibit O, Winkler depo, at 25:22-30:18, 90:6-91:3). Adam Miller also claimed that prices were displayed on price tags and that Cellular Sales "strongly discouraged" discounts. (Exhibit T, Adam Miller depo, at 53:14-54:24, 100:22-101:11; *see also* Exhibit I, Burrell depo, at 54:15-60:3).

Others testified that they had "some" discretion but they had to first seek approval from Cellular Sales to sell the phone for below a certain amount. (Exhibit U, Julie Miller depo, at 33:15-34:22, 35:23-41:4; Exhibit K, Harrington depo, at 99:15-104:8, 127:6-21; Exhibit P, Bittel depo, at 31:21-33:11). Moreover, Daniel Becker testified he did not have much discretion and he ***never*** set the price of a phone. (Exhibit Q, Becker depo, at 40:7-14, 42:6-24, 44:5-22).

Plaintiffs' freedom to set prices is directly relevant to the "economic reality" test because whether Plaintiffs made more or less money depended on the prices they charged. Thus, the

variances in Plaintiffs' testimony greatly complicate the use of representative proof at trial.

### 7. The Permanence, Duration, and Nature of the Contractual Relationship With Cellular Sales Vary Drastically Among Plaintiffs

In applying the "economic reality" test, courts also examine the duration and permanence of the working relationship. *Browning*, 885 F. Supp. 2d at 610. This prong cannot be analyzed on a collective basis in this case because some opt-in plaintiffs worked for Cellular Sales for limited durations for a specific purpose, while others contracted for much longer periods.

For example, opt-in plaintiffs Jaquennette Harris and Christopher Hendricks came to New York for limited durations to assist as trainers. (Exhibit B, ¶¶ 135-137). Harris only worked in New York for about thirty days. (Exhibit L, J. Harris depo, at 20:18-23:14, 54:24-55:16). Harris's Sales Company did not enter into a Sales Agreement with Cellular Sales. (Exhibit L, at 114:23-115:6, 118:14-17). Instead, Harris's Sales Company contracted with Cellular Sales of Texas, LLC, a separate entity. (*Id.* at 15:15-16:2, 16:9-18:8, 53:2-5). Similarly, Hendricks's Sales Company did not enter into a Sales Agreement with Cellular Sales and instead contracted with Cellular Sales of Northern Florida, LLC. (Exhibit B, ¶ 135). Hendricks performed services in New York for less than three months before returning to Florida. (*Id.* at ¶ 137).

In contrast, some Sales Companies contracted with Cellular Sales for well over a year. (*Id.* at ¶¶ 45, 52, 72, 77). Indeed, the duration of the Sales Companies' services for Cellular Sales ranges from **nineteen months** to as short as **two weeks**. (*Id.* at ¶¶ 39-86). The varying durations and purposes of Plaintiffs' services demonstrate this case is ill-suited for collective treatment.

### 8. Plaintiffs Provided Different Accounts Regarding Supervision and Discipline

Plaintiffs have also provided vastly different accounts regarding the level of supervision and discipline exerted by Cellular Sales. Adam Miller unequivocally testified that he did not report to a manager or supervisor. (Exhibit T, Adam Miller depo, at 76:14-19). Several Plaintiffs

also testified they were never subjected to any discipline by Cellular Sales. (Exhibit N, Noel depo, at 99:10-17, 101:16-18, 102:11-16; Exhibit L, Jaquennette Harris depo, at 92:10-15; Exhibit E, Steven Moffitt depo, at 117:12-118:10; Exhibit G-1, Singh depo, at 32:3-33:6).

In contrast, some Plaintiffs testified that Cellular Sales disciplined them for not meeting sales quotas. (Exhibit V, Corbelli depo, at 39:2-40:7; Exhibit K, Harrington depo, at 148:4-149:11). However, others testified that Cellular Sales *never required* them to meet any quota. (Exhibit P, Bittel depo, at 63:9-64:14; Exhibit H, Mack depo, at 94:12-95:8). Furthermore, Steven Patten testified that he also served as a "store lead" and he sent a worker home for not wearing a suit and tie. (Exhibit S, Patten depo, at 149:17-151:5, 157:9-159:11).

Plaintiffs' different accounts show they were not subject to a common policy of control. Accordingly, decertification is warranted for this reason as well. *See, e.g.*, *Hernandez*, 2014 WL 5039431, at *5 (observing differences among plaintiffs regarding discipline and supervision).

### 9. *Plaintiffs Provided Conflicting Testimony Regarding Their Ability to Work For Others*

Plaintiffs have also provided conflicting testimony regarding their ability to perform other work during their Sales Company's contract with Cellular Sales. For example, Chantel Winkler testified she did not understand her Sales Company could conduct other business operations during the relationship with Cellular Sales. (Exhibit O, Winkler depo, at 10:9-12, 64:1-10, 65:3-5). McDonald testified that he did not use his Sales Company for any other work and he is not aware of anyone else who did. (Exhibit M, McDonald depo, at 27:14-17, 30:8-12). Harrington testified that he understood he could do work for other businesses but "there was no time to do anything else." (Exhibit K, Harrington depo, at 120:19-121:22, 122:21-25, 124:7-10). Other opt-in plaintiffs acknowledged they had the ability to work for others but chose not to. (Exhibit V, Corbelli depo, at 19:8-15; Exhibit N, Noel depo, at 106:3-11; Exhibit T, A. Miller depo, at 93:17-94:8; Exhibit P, Bittel depo, at 37:16-21, 41:23-42:4, 45:19-46:23; *see also*

Exhibit J, Pratt depo, at 66:23-67:9; Exhibit G-1, Singh depo, at 97:8-98:25).

In contrast, other Plaintiffs testified that they did in fact perform work for other businesses during their Sales Company's contract with Cellular Sales. (Exhibit H, Mack depo, at 13:15-16:2, 20:10-12, 24:18-23, 93:5-22; Exhibit U, J. Miller depo, at 8:18-10:3, 43:24-46:24). These disparities are relevant because the ability to work for others weighs in favor of independent contractor status. *Saleem*, 854 F.3d at 141; *Preacely*, 2015 WL 1266852, at *8.

### 10. *The Purposes for Which Plaintiffs Formed and Used Their Sales Company Differs Drastically Among Plaintiffs*

The manner in which Plaintiffs operated their Sales Company prior to, during, and after the contractual relationship with Cellular Sales also varies drastically. These disparities are significant because Plaintiffs' continued and active use of their Sales Company further demonstrates Plaintiffs' lack of economic dependence on Cellular Sales.

For example, several Plaintiffs testified that they formed and used their Sales Company for the ***sole purpose*** of contracting with Cellular Sales. (*See* Exhibit Q, Becker depo, at 17:1-6; Exhibit R, Lopez depo, at 15:2-16; Exhibit I, Burrell depo, at 74:15-18, 131:4-6; Exhibit H, Mack depo, at 68:9-11; Exhibit G-1, Singh depo, at 36:10-37:7, 88:5-13). However, other Plaintiffs formed, operated, and used their Sales Company extensively *prior* to their Sales Company's contractual relationship with Cellular Sales. (Exhibit J, Pratt depo, at 16:12-18:25, 19:7-20:23, 20:24-21:8; Exhibit K, Harrington depo, at 14:8-15:9; 16:9-17:5, 121:14-22). In fact, Steven and Justin Moffitt actively used their Sales Company to contract with other entities before, during, and after their Sales Company's contract with Cellular Sales. (Exhibit F, J. Moffitt depo, at 7:16-9:7, 9:21-10:1; Exhibit E, S. Moffitt depo, at 8:17-10:4, 34:6-35:19, 42:12-43:13, 44:3-6, 63:11-68:19, 79:5-81:2, 130:11-131:2).

Several other Plaintiffs also used their Sales Company extensively to conduct business

after their Sales Company ceased performing work for Cellular Sales. (Exhibit U, J. Miller depo, at 24:12-25:10, 25:18-23, 26:15-24; Exhibit N, Noel depo, at 8:8-9:6, 35:3-25, 103:25-104:9; Exhibit T, A. Miller depo, at 26:9-28:21, 32:24-33:10; Exhibit K, Harrington depo, at 17:16-22; 19:24-22:14; Exhibit D-2, Holick cont. depo, at 209:16-25, 213:6-216:7). In contrast, other Plaintiffs have not used their Sales Company for any other work. (Exhibit V, Corbelli depo, at 28:23-29:7; Exhibit S, Patten depo, at 12:14-16).

Given the broad variations among Plaintiffs, it would be impossible and inherently unfair to Cellular Sales for the Court to make a blanket determination concerning the independent contractor status of the entire class of the opt-in plaintiffs.

### B.  The Individualized Defenses Available to Cellular Sales Compel Decertification

Decertification is also necessary because Cellular Sales' defenses are individual to each plaintiff. For example, Cellular Sales' principal defense that Plaintiffs were independent contractors is "highly individualized" and ill-suited to a collective action. *See, e.g., Griffith*, 2016 WL 354895, at *3 (decertifying collective action alleging plaintiffs were misclassified as independent contractors); *Hernandez*, 2014 WL 5039431, at *6 (same).

Cellular Sales' defense that Plaintiffs were exempt from overtime under the "retail or service establishment" exemption to the FLSA, 29 U.S.C. § 207(i), is also highly individual to each Plaintiff. While Plaintiffs seem to have conceded the applicability of this exemption, to the extent it is not conceded, that defense, too, requires an individualized analysis. Section 7(i) creates an exemption for employees who work in a retail or service establishment if: (1) the employee's regular rate of pay during a workweek exceeds 1.5 times the minimum wage and (2) more than half of the employee's compensation for a representative period represents commissions on goods or services. 29 U.S.C. § 207(i). The regulations explain that the analysis

must be performed on a week-by-week basis. 29 C.F.R. § 778.104.

Courts have found the Section 7(i) exemption cannot be resolved on a collective basis because it is "a highly individualized defense" requiring week-by-week and other calculations specific to each individual plaintiff. *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1126 (N.D. Cal. 2011) (quoting *Johnson v. TGF Precision Haircutters, Inc.*, No. CIV.A. H-03-3641, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005)). In *Ellersick*, the court in the Western District of New York decertified the collective action and explained as follows:

> [T]he Court finds that the highly individualized nature of the § 7(i) . . . leads to the inescapable conclusion that these individualized determinations would predominate over the entire case. Indeed, they would make this case unmanageable and chaotic, and therefore both the procedural considerations and fairness considerations weigh conclusively in favor of decertification.

*Ellersick v. Monro Muffler Brake, Inc.*, 10-CV-6525-FPG-MWP, 2017 WL 1196474, at *7 (W.D.N.Y. Mar. 31, 2017). Similarly, in *Velasquez v. Digital Page, Inc.*, the court in the Eastern District of New York denied the plaintiffs' motion for Rule 23 class certification because deciding whether Section 7(i) applies requires "an individualized review of each particular class member." *Velasquez v. Digital Page, Inc.*, 303 F.R.D. 435, 442 (E.D.N.Y. 2014).

The courts' reasoning in the above cases applies with equal force here. To adjudicate the Section 7(i) exemption, at a minimum, the Court or trier of fact will have to engage in: (1) an analysis of whether each Plaintiff was paid a "bona fide" commission; (2) an analysis of each Plaintiff's time and payroll records to determine whether the Plaintiff was paid primarily on commission in a representative period; and (3) a week-by-week analysis of each Plaintiff's records to determine whether the Plaintiff's "regular rate" of pay exceeded 1.5 times the minimum wage in each workweek in which the Plaintiff worked over forty hours. 29 C.F.R. § 779.419; *Ellersick*, 2017 WL 1196474, at *5. Moreover, in any week in which the Plaintiff

worked over forty hours but did not receive more than 1.5 times minimum wage, the Section 7(i) exemption would only be inapplicable for that particular week. 29 C.F.R. § 779.419.

As explained above, Cellular Sales paid monthly advances on commissions approximately two months after the sale. Adding to the complexity is the fact that many plaintiffs took draws against commissions. (Exhibit B, ¶¶ 7-36). Thus, in addition to the foregoing inquiries, the Court would also need to conduct plaintiff-specific inquiries as to the manner in which the draws and advances should be included in the "statutory regular rate," including the particular weeks to which the draw payments and advances apply. *See* 29 U.S.C. § 207(i). Likewise, the Section 7(i) defense will also require an analysis as to how commission advances should be apportioned over the weeks in the representative periods.

Additionally, the Section 7(i) defense will require the trier of fact to resolve disputes over the hours worked by plaintiffs in each workweek. Plaintiffs' allegation that they worked "off-the-clock" hours adds yet another layer of individualized analysis to the calculations. (Lead Case, Dkt. No. 177, ¶¶ 84-86). Accordingly, decertification is appropriate because "[t]he proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial," resulting in the equivalent of fifty mini-trials for each named and opt-in plaintiff. *Ellersick*, 2017 WL 1196474, at *6 (quoting *Johnson*, 2005 WL 1994286 at *6).

Moreover, Plaintiffs still "must ultimately each prove that [Cellular Sales] had actual or constructive knowledge that they were working more than forty hours a week." *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 399 (W.D.N.Y. 2013), *aff'd sub nom. Gavin v. NVR, Inc.*, 604 Fed. Appx. 87 (2d Cir. 2015). This analysis is highly individual to each plaintiff and also counsels in favor of decertification. *See, e.g.*, *Thind v. Healthfirst Mgmt. Servs., LLC*, 14 CIV. 9539 (LGS), 2016 WL 7187627, at *5 (S.D.N.Y. Dec. 9, 2016); *Mendez v. U.S. Nonwovens Corp.*, No.

CV125583ADSSIL, 2016 WL 1306551, at *6 (E.D.N.Y. Mar. 31, 2016).

The individualized analyses the trier of fact would have to conduct to resolve Cellular Sales' defenses would undermine the benefits of a collective action. Therefore, the Court should find that the individualized defenses prong also weighs heavily in favor of decertification.

## C.  Fairness and Procedural Considerations Compel Decertification

Fairness and procedural considerations further dictate that the collective actions be decertified. When, as here, there are substantially different experiences among opt-in plaintiffs, "the procedural advantages of a collective action cannot be realized." *Stevens*, 2014 WL 4261410, at *8. Under the record before the Court, proceeding collectively would "inevitably lead to one of two results—it would either prejudice defendants' ability to present their defenses, or require mini-trials for each of the opt-in plaintiffs." *Desilva*, 27 F. Supp. 3d at 327.

Proceeding on a collective basis is also procedurally unmanageable in this case. By way of example, most Plaintiffs submitted errata sheets with material changes to their deposition testimony. Plaintiffs' submission of errata sheets greatly complicates the ability for this case to proceed as a collective action. At trial, Cellular Sales would need to introduce deposition testimony of several opt-in plaintiffs because many opt-in plaintiffs whom Cellular Sales deposed are outside the Court's subpoena range. *See* Fed. R. Civ. P. 32(a) (4). Although Plaintiffs submitted errata sheets, the original deposition testimony is still admissible at trial. *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997). Consequently, the jury would face the enormous task of comparing and making credibility determinations regarding the named and opt-in plaintiffs' original testimony and the numerous changes in their errata sheets. This is just one example of the procedural hurdles to this case proceeding on a collective basis.

"The only possible results are unfairness to [Cellular Sales] and manageability problems

for the Court." *Desilva*, 27 F. Supp. 3d at 327. As shown above, the disparate factual circumstances among the opt-in plaintiffs, the individualized defenses at issue, and procedural and fairness concerns weigh heavily against allowing this case to proceed as a collective action.

## <u>CONCLUSION</u>

For each of the foregoing reasons, Defendants respectfully request that the Court decertify the collective action and dismiss the claims of the opt-in plaintiffs without prejudice.

Dated:          October 1, 2018                    Respectfully submitted,

                                                    **CHAMBERLAIN, HRDLICKA, WHITE,**
                                                       **WILLIAMS & AUGHTRY**

                                              By: *C. Larry Carbo, III*
                                                  C. Larry Carbo, III
          State Bar No. 24031916
          larry.carbo@chamberlainlaw.com
          Julie R. Offerman
          State Bar No. 24070360
          julie.offerman@chamberlainlaw.com
          1200 Smith, Suite 1400
          Houston, Texas  77002
          Phone: (713) 356-1712
          Fax: (713) 658-2553
          ***(Pro Hac Vice)***

          -   AND   -

          David T. Luntz
          Bar Roll No. 301947
          HINMAN STRAUB, P.C.
          121 State Street
          Albany, NY 12207
          Phone: (518) 436-0751
          Fax: (518) 436-4751
          E-mail: dluntz@hinmanstraub.com

          **ATTORNEYS FOR DEFENDANTS**

25