**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**JAN P. HOLICK, JR., STEVEN MOFFITT,**
**JUSTIN MOFFITT, GURWINDER SINGH,**
**JASON MACK, WILLIAM BURRELL, and**
**TIMOTHY M. PRATT,**

         **Plaintiffs,**

**v.**

**CELLULAR SALES OF NEW YORK, LLC, and**
**CELLULAR SALES OF KNOXVILLE, INC.,**

        **Defendants.**

**Case No. 1:12-CV-584**
**(NAM/DJS)**

---

**APPEARANCES:**

GLEASON, DUNN LAW FIRM
Ronald G. Dunn, Esq.
Daniel A. Jacobs, Esq.
Christopher M. Silva, Esq.
40 Beaver Street
Albany, New York 12207
*Attorneys for Plaintiffs*

CHAMBERLAIN, HRDLICKA LAW FIRM
Ryan O. Cantrell, Esq.
Charles L. Carbo, III, Esq.
Julie R. Offerman, Esq.
1200 Smith Street, Suite 1400
Houston, Texas 77002
*Attorneys for Defendants*

HINMAN, STRAUB LAW FIRM
Joseph M. Dougherty. Esq.
Benjamin M. Wilkinson, Esq.
David T. Luntz, Esq.
121 State Street
Albany, New York 12207
*Attorneys for Defendants*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiffs Jan Holick, Steven Moffit, Justin Moffit, Gurwinder Singh, Jason Mack, William Burrell, and Timothy Pratt (collectively, "Plaintiffs") bring this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New York State Labor Law ("NYLL"), Article 6, § 190 *et seq.*, Article 19, § 650 *et seq.*, against Cellular Sales of New York, LLC ("CSNY") and Cellular Sales of Knoxville, Inc. ("CSK") (collectively, "Defendants") asserting claims for alleged violations of minimum wage and overtime requirements. (Dkt. No. 177). Plaintiffs further allege NYLL violations related to Defendants': (1) failure to pay for compensable work; (2) unlawful wage deductions; and (3) failure to timely pay wages. (*Id.*).

Now before the Court are Plaintiffs' motion for partial summary judgment, (Dkt. No. 346), and Defendants' motion for summary judgment, (Dkt. No. 388). After careful review of the record, the Court finds that material facts remain in dispute as to whether Plaintiffs were "employees" or "independent contractors" under the FLSA and NYLL. However, there are undisputed facts which support dismissal of Plaintiffs' Fifth, Sixth, and Seventh Causes of Action as a matter of law. Accordingly, for the reasons that follow, Plaintiffs' motion is denied, and Defendants' motion is granted in part and denied in part.

## II. FACTUAL BACKGROUND

CSNY is an authorized Verizon Wireless dealer that markets and sells Verizon Wireless products and services in New York State. (Dkt. No. 404, ¶¶ 1–2). Prior to 2012, CSNY operated more than twenty (20) retail stores in upstate New York. (Dkt. No. 405-1, ¶ 4). At all

relevant times, CSK was a Tennessee corporation headquartered in Knoxville, Tennessee, and was the sole member and parent company of CSNY. (Dkt. No. 406-1, ¶¶ 2–3).

In connection with its business, CSNY operates retail stores that sell cellular telephones, wireless service plans, data service plans, and other related equipment. (Dkt. No. 406-1, ¶ 3). Verizon Wireless pays CSNY certain rates for services and equipment sold on behalf of Verizon Wireless. (Dkt. No. 388-14, ¶ 5). In 2010 and 2011, CSNY contracted with more than three hundred (300) limited liability companies and corporations (hereinafter, "Sales Companies"), owned by individuals including the Plaintiffs, to sell Verizon Wireless service plans, devices, and accessories. (Dkt. No. 388-14, ¶ 5; Dkt. No. 405-1, ¶ 7). Plaintiffs each executed a Non-Exclusive Independent Sales Agreement ("Sales Agreement") with CSNY on behalf of their Sales Companies. (Dkt. No. 388-14, ¶ 6). Pursuant to these Sales Agreements, Plaintiffs sold products and services through their Sales Companies in the New York market. (*Id.*, ¶ 8). Each Sales Agreement contained a provision stating:

> The relationship of the Sales Company to [CSNY] is that of an independent contractor. Each person who is engaged by the Sales Company to render services with respect to those activities for which Sales Company receives Sales Commissions shall be an employee of the Sales Company and not of [CSNY]. Sales Company understands and expressly agrees that nothing contained in this Agreement or arising out of or relating to the relationship between it and [CSNY] is intended or should be construed to create any relationship of franchisee and franchisor between the Parties or create any partnership, joint venture or agency relationship between the Parties. Neither Sales Company nor [CSNY] shall make any express or implied agreements, guarantees or representations or incur any indebtedness or obligations, in the name of on behalf of the other.

(*See, e.g.*, Dkt. No. 388-7, p. 4). Plaintiffs were not personally obligated to perform any services for CSNY, and the Sales Agreements expressly stated that "[e]ach Party shall have the right to

terminate this Agreement at will at any time, with or without cause . . . ."  (Dkt. No. 404, ¶¶ 14, 21; *see also* Dkt. No. 388-7, pp. 3–5).

According to the Sales Agreements, the parties agreed that CSNY would pay each Sales Company commissions based on the sales made by the Sales Company.  (Dkt. No. 388-7, p. 3). CSNY calculated the commissions based on certain factors and contingencies, and made commission payments to the Sales Companies according to the Commission Schedules included in the Sales Agreements.  (*See, e.g.*, Dkt. No. 377-4, pp. 21, 27).  CSNY never paid Plaintiffs or their Sales Companies an hourly wage or a salary for time allegedly spent opening and closing stores or for time allegedly spent in trainings, conferences, and meetings.  (Dkt. No. 404, ¶¶ 37–38).

Defendants did not issue Form W-2s to Plaintiffs or Plaintiffs' Sales Companies, and did not withhold any taxes from the compensation paid to the Sales Companies.  (Dkt. No. 404, ¶¶ 122, 125).  Instead, CSNY issued IRS Form 1099s to the Sales Companies, which reflected the commissions paid to the Sales Companies.  (*Id.*, ¶ 123).  CSNY made no contributions to workers' compensation insurance, unemployment insurance, or Social Security for Plaintiffs or their Sales Companies during the relevant time period prior to 2012.  (*Id.*, ¶ 126).  CSNY did not provide Plaintiffs or their Sales Companies with any fringe benefits, insurance benefits, vacation time or vacation pay, or the opportunity to participate in any CSNY-sponsored retirement plans. (*Id.*, ¶ 127).  None of the Plaintiffs treated or classified themselves as a CSNY "employee" for tax purposes during their Sales Company's contract with CSNY.  (*Id.*, ¶ 184).

Each Sales Company's relationship with CSNY was terminated on or before January 1, 2012.  (Dkt. No. 404, ¶ 22).  From then on, CSNY no longer contracted with Sales Companies for sales support.  (Dkt. No. 406-1, ¶ 378).  Instead, CSNY extended offers of employment to

4

some Sales Representatives to become formal CSNY employees rather than independent contractors. (*Id*., ¶ 376).

## III.    PROCEDURAL HISTORY

In this action, Plaintiffs claim that Defendants misclassified them as "independent contractors" instead of "employees" as defined by the FLSA and NYLL, thus depriving them of employee benefits required by law. (Dkt. No. 177). Plaintiffs' claims are limited to the period prior to January 1, 2012 when their Sales Companies contracted with CSNY. (Dkt. No. 377-2, ¶¶ 1–4). Defendants deny Plaintiffs' allegations and contend that no employment relationship existed during that period. (Dkt. Nos. 180, 182).

In October 2015, the Court approved the parties' stipulation to expand the collective to include members of the following group:

> [A]ll individuals who, during any workweek between June 24, 2010
> [ ] up to and through December 31, 2011, who (a) performed sales
> services for Cellular Sales of New York, LLC or Cellular Sales of
> Knoxville, Inc. in New York; (b) were classified as non-employee
> contractors; and (c) were paid, in whole or in part, on a commission
> basis.

(Dkt. No. 95, ¶ 1). The parties agreed to the dissemination of a notice and opt-in consent form to putative members of the FLSA collective. (*Id*., pp. 6–12). A total of forty-seven (47) opt-in plaintiffs initially joined the action. (Dkt. No. 377-2, ¶ 7).

In October 2018, Plaintiffs moved for class certification under Rule 23 of the Federal Rules of Civil Procedure, (Dkt. No. 345), and Defendants moved to decertify the Court's conditional certification of the FLSA collective action (Dkt. No. 377). In April 2019, the Court denied Plaintiffs' motion for class certification, and granted Defendants' motion for decertification because Plaintiffs failed to demonstrate that the central issue—whether Defendants misclassified class members as independent contractors, rather than employees—was

capable of resolution through classwide proof. *See generally Holick v. Cellular Sales of New York, LLC*, No. 12-CV-584, 2019 WL 1877176, 2019 U.S. Dist. LEXIS 70399 (N.D.N.Y. Apr. 26, 2019). Pursuant to that Order, the Court dismissed all claims of the opt-in plaintiffs without prejudice and ordered that the action proceed on behalf of the above-named Plaintiffs only.

In tandem with the class/collective certification motions, the parties filed rival motions for summary judgment. (Dkt. Nos. 346, 388). Having addressed the former, the Court now turns to summary judgment.

## IV.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citing *Dister v.*

*Continental Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## V.    DISCUSSION

Plaintiffs' motion for partial summary judgment asserts that, prior to January 2012: (1) Plaintiffs were "employees" of the Defendants within the meaning of the FLSA and NYLL; (2) Defendants were "joint" employers; and (3) Plaintiffs are entitled to damages under the NYLL for untimely commission payments and illegal wage deductions.  (*See* Dkt. No. 379).  In response, Defendants counter that "the evidence supports independent contractor status," and further contend that "when it was financially beneficial to them, Plaintiffs boldly and candidly took advantage of the fact [that] they were independent contractors," but now, "when it benefits them to claim employment status, [Plaintiffs] ask the Court to ignore the written agreements and the representations they made to state and federal taxing authorities."  (Dkt. No. 406, p. 9).

In their own motion for summary judgment, Defendants argue that Plaintiffs were independent contractors, and therefore worked outside the purview of the FLSA and the NYLL. (*See* Dkt. No. 388-1).  Specifically, Defendants argue that Plaintiffs: (1) had complete discretion to decide when, where, and how often they performed the services; (2) had complete discretion in advertising their Sales Company's services; (3) were free to hire other workers; (4) made substantial investments in supplies, equipment, and advertising; and (5) had substantial discretion to negotiate and set product prices.  (*Id.*, p. 8).  In response, Plaintiffs contend that they were indeed "employees" because: (1) Defendants exercised and preserved significant and pervasive control over every aspect of Plaintiffs' work; (2) Defendants made capital expenditures

7

and investments into Plaintiffs' work that "far exceeded" Plaintiffs' own investments; (3) Plaintiffs had limited and insubstantial opportunity for profit and loss; and (4) Plaintiffs needed insubstantial skill and independent initiative to perform the work. (Dkt. No. 404-2, p. 5).

## A. Plaintiffs as "Employees" or "Independent Contractors"

### i. Applicable Law

This action centers on the question of whether Plaintiffs, in their relationship with Defendants prior to 2012, were "employees" or "independent contractors" under FLSA and the NYLL. When considering that question, "a court may make that determination when there are no disputed issues of material fact." *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 597 (E.D.N.Y. 2012) (citing *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) ("Finally, '[t]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law.'"); *see also Sikorski v. Burroughs Drive Apartments, Inc.*, 306 A.D.2d 844, 845 (4th Dep't 2003) ("While the determination whether a worker is an employee or an independent contractor 'usually presents questions of fact sufficient to preclude summary judgment, where evidence is undisputed, and the facts are compellingly clear, the issue may be determined as a matter of law.'") (quoting *Greene v. Osterhoudt*, 251 A.D.2d 786, 787 (3d Dep't 1998)).

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "An entity 'employs' an individual under the FLSA" if it "'suffer[s] or permit[s] that individual to work.'" *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (quoting 29 U.S.C. § 203(g)); *see also* 29 U.S.C. § 203(d) (defining "employer" as "any person acting directly or indirectly in the interest of any employer in relation to an employee").

"[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  In weighing the "economic reality," courts consider factors including: (1) the degree of control exercised by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988).

When applying the NYLL in similar cases, the New York Court of Appeals has adopted a control-driven analysis where the critical inquiry "pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003); *see also In re Hertz Corp.*, 2 N.Y.3d 733, 735 (2004) ("An employer-employee relationship exists when the evidence demonstrates that the employer exercises control over the results produced by claimant or the means used to achieve the results.").  Although the FLSA and NYLL standards differ, courts have recognized that "[t]here is general support for giving the FLSA and the [NYLL] consistent interpretations[,] [a]nd there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Hart v. Rick's Cabaret Int'l., Inc.*, 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013); *see also Gyalpo v. Holbrook Dev. Corp.*, 577 B.R. 629, 638 (E.D.N.Y. 2017) ("Because [the NYLL] definition closely resembles the definition in the FLSA, district courts in this Circuit have interpreted the definition of 'employer' under the

9

[NYLL] coextensively with the definition used by the FLSA.") (citing *Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013) (collecting cases)).

### ii. Analysis

Plaintiffs argue that the undisputed facts show that Plaintiffs were employees because: (1) Defendants extensively supervised and controlled almost every aspect of Plaintiffs' work performance as Sales Representatives and prohibited them from working for Defendants' competitors; (2) Plaintiffs did not have a true opportunity for profit and loss; (3) the Sales Agreements and shift rosters show that Plaintiffs entered indefinite and permanent work relationships on a full-time basis; (4) Plaintiffs were integral to Defendants' operation in New York; and (5) Defendants exercised control over the means and results of Plaintiffs' work performance through restriction of outside sales, restraint on competition with Defendants, and the requirement of strict compliance with all marketing directives. (*See generally* Dkt. No. 379, pp. 29–34).

By contrast, Defendants assert that the record contains undisputed evidence showing that Plaintiffs were independent contractors because: (1) Plaintiffs decided when, where, and how often to work; (2) Plaintiffs were free to hire their own workers; (3) Plaintiffs had substantial discretion to set prices; (4) Plaintiffs and their Sales Companies could work for other businesses; (5) Defendants did not require Plaintiffs to wear uniforms or identify themselves as performing services for Defendants; (6) Plaintiffs had the opportunity for profit and loss, and made substantial investments in their business; (7) Plaintiffs relied on their skills and independent initiative; (8) Plaintiffs did not have a permanent relationship with Defendants; and (9) Plaintiffs' work was interchangeable with the work of other Sales Companies. (*See generally* Dkt. No. 388-1, pp. 16–27).

The parties' motion papers illustrate that their contrasting positions are largely the result of each side cherry-picking the record for favorable evidence, while completely ignoring all conflicting evidence. Thus, contrary to the parties' assertions that the undisputed facts show either employee or independent contractor status, the Court finds that material facts remain in dispute as to this critical issue.

Indeed, the parties' response papers reveal a mountain of conflicting evidence. (*See generally* Dkt. Nos. 404, 406-1). For example, the Court finds material disputes as to whether, and the extent to which: (1) Defendants required Plaintiffs to adhere to a minimum hours requirement, a required work schedule, or a required work location (*see, e.g.*, Dkt. No. 406-1, ¶¶ 310, 314–16; Dkt No. 404, ¶¶ 14, 129, 137–138, 147, 282); (2) Defendants required Plaintiffs to adhere to certain dress codes and grooming standards (*see, e.g.*, Dkt. No. 406-1, ¶¶ 324, 349; Dkt No. 404, ¶¶ 18, 148); (3) Defendants required Plaintiffs to meet certain minimum production and/or performance standards (*see, e.g.*, Dkt. No. 406-1, ¶ 295; Dkt No. 404, ¶ 18); (4) Defendants required Plaintiffs to perform certain clerical duties while working in retail stores (*see, e.g.*, Dkt. No. 406-1, ¶¶ 37, 42, 43); (5) Defendants required Plaintiffs to complete certain required trainings (*see, e.g.*, Dkt. No. 406-1, ¶ 46; Dkt. No. 404, ¶¶ 18, 129); and (6) Defendants required Plaintiffs to have Defendants' pre-approval to solicit and make retail sales at public events or outside Plaintiffs' designated market area (*see, e.g.*, Dkt. No. 406-1, ¶¶ 48, 56, 192).

The parties also dispute: (1) the extent of Plaintiffs' discretion in setting product prices (*see, e.g.*, Dkt. No. 404, ¶¶ 58, 63); (2) the extent to which Plaintiffs faced risk of loss in connection with their investments in their work with CSNY (*see, e.g.*, Dkt. No. 404, ¶ 81); (3) the significance of Plaintiffs' investments in advertising (*see, e.g.*, Dkt. No. 406-1, ¶ 324); (4) the extent to which Plaintiffs were supervised, evaluated, and/or reprimanded by Defendants (*see,*

*e.g.*, Dkt. No. 406-1, ¶¶ 123, 159, 192); (5) the extent to which Plaintiffs shared in Defendants' gains and losses through commissions (*see, e.g.*, Dkt. No. 406-1, ¶¶ 191, 224–27); (6) the extent to which Defendants controlled Plaintiffs' advertising to customers (*see, e.g.*, Dkt. No. 406-1, ¶ 203; Dkt No. 404, ¶¶ 40, 213); (7) the extent to which Defendants controlled the mode of communication used by Plaintiffs with customers (*see, e.g.*, Dkt. No. 406-1, ¶¶ 25, 195, 199, 202); and (8) the extent to which Plaintiffs made capital expenditures or investments in essential components of the business operations (*see, e.g.*, Dkt. No. 406-1, ¶¶ 187, 204). Moreover, not only are each of these issues contested collectively across all Plaintiffs, but the record also shows considerable diversity among the individual Plaintiffs as to the nature of their relationships with Defendants. *See Holick*, 2019 WL 1877176, at *4–8, 2019 U.S. Dist. LEXIS 70399, at *11–23.

Further, resolution of any one of these fact questions would not be dispositive on its own. Each factor would need to be considered within the totality of the circumstances as they apply to each individual Plaintiff. Here, the parties' motion papers do not analyze the unique situations of individual Plaintiffs, and instead only offer generalized and skewed interpretations of evidence in their favor. Therefore, on this record, the Court finds that material facts remain in dispute as to the employee/independent contractor issue. Resolution of this issue will ultimately require careful consideration of the conflicting evidence by the finder of fact.

Accordingly, the parties' motions for summary judgment are denied as to whether Plaintiffs were employees or independent contractors under the FLSA and NYLL. *See Leevson v. Aqualife USA, Inc.*, 183 F. Supp. 3d 397, 403–06 (E.D.N.Y. 2016) (denying summary judgment because "[t]he 'economic realities' test—namely, the degree of control defendants had over plaintiffs, plaintiffs' investment in the business, the degree of skill required for plaintiffs' positions, the permanence of plaintiffs' positions, and the extent to which plaintiffs were integral

to defendants' business—present factual issues to be determined by a jury"); *Evans v. MassMutual Fin. Grp.*, 856 F. Supp. 2d 606, 608–10 (W.D.N.Y. 2012) (denying summary judgment on FLSA claims where the plaintiff demonstrated the existence of genuine issues of material fact concerning the nature of the relationship with his employer); *see also Griffith v. Fordham Fin. Mgmt.*, No. 12-CV-1117, 2016 WL 354895, at *2, 2016 U.S. Dist. LEXIS 10459, at *4 (S.D.N.Y. Jan. 28, 2016) (denying summary judgment where issues of material fact as to the plaintiffs' employment status precluded resolution as a matter of law).

### B. Defendants' Liability as a Single "Joint Employer"

Plaintiffs' motion also asserts that CSK and CSNY "were joint employers of Plaintiffs [ ] within the meaning of the FLSA and NYLL." (*See* Dkt. No. 379, pp. 25–29). Essentially, Plaintiffs argue that, if Defendants are ultimately found liable, they should share liability as though they were a "single employer subject to joint and several liability for any violations of the FLSA and NYLL." (*Id.*, p. 23). As Plaintiffs point out, Defendants' response papers do not challenge Plaintiffs' position on this issue. (*See generally* Dkt. No. 406). Arguably, this could be deemed a concession to Plaintiffs' position. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citing *Douglas v. Victor Capital Grp.*, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998)). However, the Court finds that Plaintiffs' argument as to the joint liability of the Defendants is premature at this stage, since their liability under the FLSA and NYLL has yet to be established. Therefore, summary judgment as to joint liability is denied.

### C. Plaintiffs' NYLL Claims

Next, Defendants' motion asserts three separate arguments for dismissal of Plaintiffs' Fifth, Sixth, and Seventh Causes of Action. The Court will address each in turn.

### i. Fifth Cause of Action – Unpaid Compensable Work

Defendants first argue that Plaintiffs' claim for unpaid compensable work "fails because it is not premised on any contractual promise." (Dkt. No. 388-1, p. 29). NYLL Section 191(1)(c) requires that "[a] commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment." N.Y. Lab. Law § 191(1)(c). Defendants cite Second Circuit precedent holding that Section 191 "only involves the timeliness of wage payments, and does not appear to afford to plaintiffs any substantive entitlement to a *particular* wage." *See Myers v. Hertz Corp.*, 624 F.3d 537, 545 (2d Cir. 2010) (emphasis in original). Indeed, courts applying Section 191 focus on a strict application of contractual rights as they apply to a party's claim for unpaid wages. *See, e.g.*, *Williams v. Preeminent Prot. Servs., Inc.*, No. 14-CV-5333, 2017 WL 1592556, at *4, 2017 U.S. Dist. LEXIS 65022, at *11 (E.D.N.Y. Apr. 27, 2017) ("A claim under section 191(c) 'rises and falls with plaintiff's claim for breach of contract,' *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 289 (S.D.N.Y. 2016), and her '[f]ailure to establish a contractual right to wages necessarily precludes a statutory claim under [NYLL].'"). To that end, Defendants argue that "Plaintiffs [did] not have a contract entitling them to an hourly rate for time allegedly spent opening and closing stores and in trainings and meetings," and that "each Plaintiff, on behalf of their Sales Company, agreed and understood that Cellular Sales would compensate them solely by commissions." (Dkt. No. 388-1, p. 30). Defendants add that Plaintiffs admit "they were paid commissions as set forth in their contracts and commission schedules." (*Id.*). The record confirms Defendants' position on these points. (Dkt. No. 404, ¶¶

34, 37–38).  Accordingly, based on the undisputed facts, Defendants are entitled to summary judgment on Plaintiffs' Fifth Cause of Action.[1]

### ii. Sixth Cause of Action – Unlawful Wage Deductions

Defendants next argue that Plaintiffs' wage deduction claim fails as a matter of law "because the commission adjustments for deactivations and equipment loss were not wage deductions, but rather were part of the agreed upon commission calculations."  (Dkt. No. 388-1, pp. 30–31).  Defendants contend that Plaintiffs agreed to and understood that the commissions calculation included adjustments for customers' future deactivations of service and equipment loss.  (*Id.*, pp. 31–35).  Defendants further assert that, pursuant to the Sales Agreements, commissions were not earned on the date of sale, but rather, only after the 180-day "chargeback period" had expired.  (*Id.*, p. 32).  In response, Plaintiffs argue that "the governing contract documents for Cellular Sales' uniform commission program establish that each Plaintiff earned a commission on the date of the sale generating the commission, so long as the necessary sales paperwork and associated money on the sale was submitted to [CSNY]."  (Dkt. No. 404-2, p. 33).  Thus, the dispute here centers on when the commissions were "earned."

Under NYLL Section 193, employers are prohibited from making "any deduction from the wages of an employee" except when such deductions are made "in accordance with the provisions of any law or any rule or regulation issued by any governmental agency," or as "expressly authorized in writing by the employee."  N.Y. Lab. Law § 193(1)(a)–(b).  Where an employee is paid by commission, Section 193 does not prohibit employers from making

---

[1] Plaintiffs did not respond to Defendants' argument, and therefore, their Fifth Cause of Action may also be deemed abandoned.  *See deVere Grp. GmbH v. Op. Corp.*, 877 F. Supp. 2d 67, 70 n.3 (E.D.N.Y. 2012) ("[B]ecause plaintiff did not address defendants' motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed.") (quoting *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005)).

deductions if the deductions were made "before the commissions were earned." *D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 414 (E.D.N.Y. 2015). Thus, Section 193 only bars wage deductions when they were made after the employee *earns* his commission. *Id.* Significantly, under New York law, parties are "free to add whatever conditions they may wish to their agreement," and "may provide that the computation of a commission will include certain downward adjustments from gross sales, billings or receivables. In that event, the commission will not be deemed 'earned' or vested until computation of the agreed-upon formula." *Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 617 (2008).

Here, Section 4 of the uniform Sales Agreement governing "Sales Commissions" states that: "[Defendants] will pay commissions to Sales Company . . . for sales of the Products made by Sales Company within the Territory according to the schedule that is attached to and made part of Annex A of this Agreement." (*See, e.g.*, Dkt. No. 388-7, p. 3). The commission schedule sets forth designated commission payments by product type, all of which are expressly "subject to [a] 180 day chargeback." (*Id.*, p. 9).

Notably, Plaintiffs admit that: (1) it was Defendants' practice to offset Plaintiffs' subsequent regularly scheduled commission payments when a wireless line was cancelled within 180 days of line activation; (2) "it was not possible at the time of Sales Representative's sale of a Verizon Wireless service to determine whether the customer would retain the service for 180 days . . . ."; (3) they "agreed on behalf of their Sales Companies and understood that Cellular Sales' monetary payout on their earned commission for their sales of Verizon Wireless services and related products was subject to chargebacks for customers deactivating services they sold if deactivated within 180 days from the date of sale . . . ."; (4) Defendants "paid the commission advances to Plaintiffs' Sales Companies prior to the last day of the month following the

expiration of the 180-day chargeback period for customer deactivations,"; and (5) "[Defendants'] monthly commission reports specifically reflected the chargebacks against commissions for deactivations when a customer cancelled their wireless service within 180 days of the activation of the wireless service."  (Dkt. No. 404, , ¶¶ 47–50, 99).

Regarding the deductions for equipment loss, although Plaintiffs state that their Sales Agreements "[did] not identify Equipment Loss or discount on the purchase price of a cellular device sold by a Plaintiff as a part of calculating the monetary amount [Defendants] paid out on a commission earned by a Plaintiff," it is undisputed that the April 1, 2010 version of the Sales Commission Schedule expressly states that: "Cellular Sales will split up to $90 in equipment loss with the contractor on a new one year activation and $120 on a new 2 year activation. Additionally, Cellular Sales will split up to $70 in equipment loss on each one year upgrade and $100 on each two year upgrade."[2]  (Dkt. No. 404, ¶¶ 69, 70).  Plaintiffs also admit that "[Defendants] agreed to split with each Plaintiff rather than their Sales Company the equipment loss or discount on the Dealer Cost of a cellular device or other Verizon Wireless-related product sold by a Plaintiff . . . ."  (*Id*., ¶ 69).

Furthermore, Plaintiffs admit that: (1) they "were able to, and often did, discount the cost of the phone to encourage a customer to also activate a wireless service line . . . .";  (2) "[Plaintiffs] could, and usually did, net a positive commission on the bundled sales transaction of both a Verizon Wireless service plan and a cellular device when there was equipment 'loss' associated with the sale of the device . . . .";  (3) "[Defendants] determined and calculated the

---

[2]  Plaintiffs also admit that: "The March 1, 2011 Sales Commission Schedule provided that 'In the event that a cellular device is provided or sold to the customer, Cellular Sales will split up to $70 in the equipment loss with the sales entity on a 1 year activation or upgrade and up to $120 in equipment loss on a 2 year activation upgrade.  Any loss on the equipment which exceeds these amounts will come out of the sales entity's commission.'"  (*See* Dkt. No. 404, ¶ 71).

'dealer cost' for the products and devices sold on behalf of [Defendants] based on the amount the manufacturer charged for the product and other costs associated with the product, such as shipping and any other costs related to transporting the product to retail stores"; (4) "the extent to which a Plaintiff sold a cellular device or product for more or less than the dealer cost affected the Plaintiffs' overall commission on the transaction," and the Sales Companies "were responsible for the equipment loss or discount on the Dealer Cost of a cellular device or other Verizon Wireless-related product sold by a Plaintiff . . . ."; (5) "[p]rior to selling the products and wireless plans for [CSNY], Plaintiffs attended an orientation during which the commission calculations were explained," and that "[t]he formula for calculating commissions based on 'equipment loss' was explained to Plaintiffs during the orientation that Plaintiffs attended prior to selling the products and wireless plans for [Defendants]"; (6) the commission formula "was set forth in detail in [Defendants'] commission reports," and "was [also] explained to Plaintiffs in the Agent Success Guides, which contain[ed] detailed charts explaining how equipment loss factored into the commission formula"; and (7) the "[Defendants'] calculation of 'equipment loss' on each sale was set forth in the monthly commission reports," and "Plaintiffs were [otherwise] able to access [those] reports on the computer system . . . at [Defendants'] retail stores."  (Dkt. No. 404, ¶¶ 58, 61, 72, 78, 88, 93–95, 98, 100).

Despite these admissions, Plaintiffs claim that they "did not underst[and] that their *earning* of a commission for the sale of a Verizon Wireless service was contingent on the Equipment Loss incurred on that sale, but rather that their *payment* of a commission earned on the sale was subject to an after-the-fact offset for that Equipment Loss . . . ."  (Dkt. No. 404, ¶ 79) (emphasis in original).  Plaintiffs further contend that they never agreed to or understood that their "earning" of commissions was contingent upon the service being active throughout the 180-

day chargeback period, or that their commissions were subject to equipment loss adjustments. (*See* Dkt. No. 404-2, pp. 31–33). Rather, Plaintiffs claim that they "earned" their commissions on the date that the paperwork and payments were submitted, and that Defendants' future subtractions from subsequent commission payments violated Section 193's prohibition against wage deductions. (*Id*.). However, Plaintiffs' contentions are inconsistent with their own admissions, which show a clear understanding of the relevant provisions in the Sales Agreements and Commission Schedules which indicated how and when deductions were calculated and made under the Defendants' chargeback policy. (*See* Dkt. No. 404, ¶¶ 88, 93–95).

Notably, Plaintiffs' position has been rejected in numerous cases where courts have upheld similar commission formulas involving chargeback reductions from future commission payments. *See Levy v. Verizon Info. Servs., Inc.*, 498 F. Supp. 2d 586, 600–02 (E.D.N.Y. 2007) (finding that compensation system involving advanced commissions that were later subject to a "true up or down" to reflect the closing of customer accounts did not violate NYLL Section 193); *Gold v. New York Life Ins. Co.*, 153 A.D.3d 216, 226–27 (1st Dep't 2017) (affirming commission chargebacks where the party's agreements allowed for deductions as part of their agreed-upon measure of commission compensations) (citing *Pachter*, 10 N.Y.3d at 618); *see also Linder v. Innovative Commercial Sys. LLC*, 127 A.D.3d 670, 670–71 (1st Dep't 2015) (rejecting a challenge to a conditioned commission structure where the parties' course of dealing and the plaintiffs' regular receipt of commission statements reflected an agreement to the terms). And Plaintiffs do not cite any caselaw to the contrary. (*See* Dkt. No. 404-2, pp. 31–33).

In sum, the evidence shows that Plaintiffs agreed to and were aware of how commissions would be calculated and paid as per the Sales Agreements. (*See* Dkt. No. 404, ¶¶ 88, 93–95). The Sales Agreements and Commission Schedules expressly state that the commissions were

"subject to 180 day chargeback," and conditioned on adjustments for equipment loss. (*See, e.g.*, Dkt. No. 388-7, pp. 3, 9). Thus, the Court finds that, based on the undisputed facts, the challenged "chargebacks" and equipment loss adjustments were not illegal wage deductions, but rather, were a valid and enforceable part of the parties' agreed-to calculation of commissions. Under the Sales Agreements, commissions were "earned" when they became vested—*after* the agreed-to adjustments were calculated. Plaintiffs' arguments to the contrary are unavailing.

Accordingly, the Court finds that Defendants' commission deduction practices did not violate NYLL Section 193, and Plaintiffs' Sixth Cause of Action must be dismissed. *See Levy*, 498 F. Supp. 2d at 600–02 (dismissing NYLL Section 193 claims as a matter of law where evidence showed that the plaintiffs' incentive compensation was not earned or vested until advanced incentive compensation was "trued up or down"); *Pachter*, 10 N.Y.3d at 617 (holding that parties "may provide that the computation of a commission will include certain downward adjustments from gross sales, billings or receivables . . . [and] commission[s] will not be deemed 'earned' or vested until computation of the agreed-upon formula").

### iii. Seventh Cause of Action – Untimely Commission Payments

Finally, Defendants argue that Plaintiffs' Seventh Cause of Action should be dismissed because no private cause of action exists under NYLL Section 191(1)(c) for untimely paid commissions, or alternatively, because Defendants did not violate NYLL Section 191(1)(c). (*See* Dkt. No. 388-1, pp. 35–41). In response, Plaintiffs argue that the law of the case doctrine prohibits this Court from revising its prior decision that NYLL Section 198 creates a private cause of action for failure to timely pay earned commissions consistent with Section 191(1)(c). (Dkt. No. 404-2, pp. 34–35). Plaintiffs do not oppose or address Defendants' substantive argument that Defendants paid commissions in accordance with the law. (*Id.*).

First, the Court declines Defendants' request that the Court revisit its prior finding that a private right of action for untimely commissions exists under Sections 191 and 198 of the NYLL. (*See* Dkt. No. 241, pp. 3–8). The Court has reviewed the authorities cited by Defendants in support of their position, but finds them unpersuasive for the same reasons the Court explained in its prior ruling on the issue. (*See id.*).

Nonetheless, Plaintiffs' untimely payment claim fails on the merits. Relevantly here, Section 191 states that: "A commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies *earned* or payable in accordance with the agreed terms of employment, but not less frequently than once in each month and not later than the last day of the month following the month in which they are earned . . . ." N.Y. Lab. Law § 191(1)(c) (emphasis added). Further, the term "'[e]arned commission' means a commission due for services or merchandise which is *due according to the terms of an applicable contract* or, when there is no applicable contractual provision, a commission due for merchandise which has actually been delivered to, accepted by, and paid for by the customer, notwithstanding that the sales representative's services may have terminated." N.Y. Lab. Law § 191-a(b) (emphasis added).

As noted above, New York law allows parties to agree to certain conditions as to when commissions are earned. *See Pachter*, 10 N.Y.3d at 617 (noting that "a commission will not be deemed 'earned' or vested until computation of the agreed-upon formula"); *D'Amato*, 80 F. Supp. 3d at 414. Here, the Sales Agreements expressly state that the Commission Schedules were "subject to [a] 180 day chargeback." (*See, e.g.*, Dkt. No. 388-7, p. 9). Plaintiffs have acknowledged that it would have been impossible to determine at the time of sale whether the customer would retain service for 180 days. (*See* Dkt. No. 404, ¶ 48). Thus, as explained above,

21

the evidence shows that Plaintiffs understood and agreed to the relevant provisions in the Sales Agreements regarding commission payments.

Notably, Plaintiffs do not dispute Defendants' contention that Defendants paid commissions prior to the last day of the month following the expiration of the applicable chargeback period. (*See* Dkt. No. 404-2, pp. 34–35; *see also* Dkt. No. 404, ¶ 50 (admitting that "[Defendants] paid the commission advances to Plaintiffs' Sales Companies prior to the last day of the month following the expiration of the 180-day chargeback period for customer deactivations")). Here, subject to the Sales Agreements, commissions were not "earned" or "vested" until *after* the agreed-upon formula was calculated. Accordingly, Plaintiffs' Seventh Cause of Action must be dismissed.[3]

### D.  Remaining Claims

To the extent that the parties' motion papers raise additional claims, the Court rejects them as moot under the foregoing analysis and the Court's prior ruling on class certification.

## VI.    CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 346) is **DENIED**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 388) is **GRANTED** as to Plaintiffs' Fifth, Sixth, and Seventh Causes of Action, but is **otherwise DENIED**; and it is further

---

[3]  Moreover, in addition to the evidence indicating that Defendants' complied with their obligations under the law, Plaintiffs' failure to rebut Defendants' substantive argument amounts to abandonment of their Section 191(1)(c) claim. *See Jackson v. Fed. Express*, 766 F.3d 189, 196–98 (2d Cir. 2014).

**ORDERED** that Plaintiffs' Fifth, Sixth, and Seventh Causes of Action are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to terminate the motions at Docket Nos. 346 and 388.

**IT IS SO ORDERED.**

Date:   July 19, 2019
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge