UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAN P. HOLICK, JR., STEVEN MOFFITT,
JUSTIN MOFFITT, GURWINDER SINGH,
JASON MACK, WILLIAM BURRELL and
TIMOTHY M. PRATT,

**AFFIDAVIT OF
RONALD G. DUNN, ESQ.
IN SUPPORT OF
PLAINTIFFS'
APPLICATION
FOR ATTORNEYS' FEES
AND COSTS**

Plaintiffs, on behalf of themselves
and all others similarly situated,

– against –

1:12-CV-00584 (DJS)

CELLULAR SALES OF NEW YORK, LLC, and
CELLULAR SALES OF KNOXVILLE, INC.,

Defendants.

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF ALBANY       )

**RONALD G. DUNN,** being duly sworn, deposes and says:

1.      I am an attorney duly admitted to practice law before this Court and the Courts

of the State of New York, and I am a partner with the law firm Gleason, Dunn, Walsh & O'Shea,

attorneys for Plaintiffs Jan P. Holick, Jr. ("Holick"), Steven Moffitt ("S. Moffitt"), Justin Moffitt

("J. Moffitt"), Gurwinder Singh ("Singh"), Jason Mack ("Mack"), William Burrell ("Burrell")

and Timothy M. Pratt ("Pratt") (collectively "Plaintiffs").  I am fully familiar with the facts and

circumstances of this matter, having been primarily responsible for litigating the proceeding

since its inception.

2.       I make this Affidavit in support of Plaintiffs' Application for Attorneys' Fees, Costs, Expenses and Disbursements as prevailing parties in this litigation, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 et seq., and the New York State Labor Law ("NYLL") Article 6, §190 et seq., Article 19, §650 et seq., New York CPLR § 5001(b), and pursuant to an Order dated May 29, 2020.

3.       Familiarity with the precise facts and procedural background of the underlying action is presumed. Briefly summarized, this is a hybrid collective/class action brought pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 et seq., Articles 6 and 19 of the New York Labor Law (the "NYLL"), and New York common law.

4.       Plaintiffs are individuals who worked as Sales Representatives within New York on behalf of Cellular Sales (hereinafter "Cellular Sales" or "Defendants"). They allege that they were misclassified by Cellular Sales as independent contractors in violation of the FLSA, the NYLL, and New York common law. Plaintiffs argued that as a result of the state-wide misclassification, Cellular Sales was liable for certain damages including unpaid overtime, minimum wage, unlawful wage deductions, late wages and unjust enrichment.

5.       As evidenced by the over 482 docket entries filed, this matter has involved extensive legal work. As of the date of this Affidavit, I along with other attorneys at my firm have spent 5,847.60 hours in legal work devoted to this Action and approximately 101 hours in legal work devoted to the instant fee application. As set forth specifically herein, through this application I am requesting compensation for a total of 4,880.15 hours in the amount of $961,450.50.

6.       To highlight the significance of each activity, I will summarize the legal work performed in each stage of the case in this Affidavit. Furthermore, attached hereto as **Exhibits A**

is a copy of my firm's billing records.  A copy of Docket Reports are also attached as **Exhibit B**.

<u>**PRE-COMMENCEMENT INVESTIGATION**</u>

7.      Our firm was first contacted in April 2011 by the lead plaintiff Jay Holick. He contacted us in connection with his work at Cellular Sales and issues concerning an application for Unemployment Insurance benefits pursuant to the New York State Unemployment Insurance Law. We quickly identified the misclassification of the employees as a central legal and factual issue for Holick. We also quickly determined that Holick was treated precisely the same as all of his co-workers. Based on that our firm sent notice to Cellular Sales putting them on notice of a claim and demanding that it preserve records. We also began investigating the viability of claims on behalf of Holick and his co-workers alleging improper pay practices under the FLSA and the New York State Labor Law. Central to all those claims was the issue of misclassification of employees.

8.      We represented Holick and other Plaintiffs in Unemployment Insurance claim proceedings. The central issue in the Unemployment Insurance Proceedings was the misclassification issue. We used that proceeding to investigate and verify the facts underlying the validity of our claim that Holick and his co-workers were all misclassified as independent contractors rather than employees. That representation included contested hearings where we examined under oath a representative of Cellular Sales questioning them on the misclassification issue.

9.      We are not seeking reimbursement for the work we did in the Unemployment Insurance Hearings even though the facts we learned in those hearings were used in the ultimate litigation. However, we did prevail in those Unemployment Insurance Hearings on behalf of Holick and other plaintiffs on the central issue of misclassification. That process combined with

our actual notice to Cellular Sales in 2011 that we intended to pursue claims under the FLSA and NYS Labor Law framed the events in 2011 as we prepared our litigation documents and communicated with Cellular Sales in pre-litigation efforts to resolve the case.

10.     In 2011 The NYS Labor Department ruled in favor of Holick and others on the unemployment insurance claims, ruling that they were misclassified as independent contractors rather than employees. Cellular Sales appealed those rulings under NYS Labor Department procedures that generated a hearing. The Department of Labor, Holick and Cellular Sales were all parties to that hearing. We are not seeking reimbursement for the time spent in the hearings or the series of appeals and Court challenges Cellular Sales took opposing the Department of Labor conclusion that Holick and others had been misclassified even though the factual and legal issues overlap with the issues in this litigation. We raise it here, because it reveals that misclassification was central to this case at every stage and was vigorously litigated. That vigorous litigation has the natural consequence of driving up the time, complexity and expense of this action.

11.     In 2011 my firm put Cellular Sales on notice of the FLSA and NYS Labor wage claims based on misclassification. Cellular Sales later abandoned the independent contractor business model effective January 1, 2012.

## PLEADINGS, APPELLATE WORK, MOTION PRACTICE AND FAILED MEDIATION

12.     Prior to commencement, our firm conducted a thorough investigation into the Plaintiffs' claims including searches through public records, examining the commission sales compensation plan, examining various commission reports generated by Cellular Sales and shared with Holick and his co-workers and interviews with Holick and others.

13.     During 2011 after identifying several claims, our office attempted to settle this matter without need for any judicial action. That effort was not successful.

14.     Our office commenced this action with a Complaint filed on April 4, 2012 on behalf of Plaintiffs J. Holick, S. Moffitt, J. Moffitt, G Singh, and Mack against Defendants Cellular Sales of New York, LLC ("CSNY") and Cellular Sales of Knoxville, Inc. ("CSOKI")(collectively, "Defendants" or "Cellular Sales") (the "NDNY I Action") (Lead Dkt. No. 1).[1]

15.     Significantly, the timing of our commencement of the NDNY I Action and Cellular Sales' abandonment of its independent contractor structure and its move to an employee-based arrangement in New York, would indicate that we were the catalyst that caused Cellular Sales' to take corrective action. Even after Cellular Sales abandoned the independent contractor business model effective January 1, 2012, it continued to aggressively litigate the misclassification issue at every turn throughout this action. The misclassification issue dominated the litigation throughout discovery, motion practice and ultimately the trial.

16.     On June 8, 2012, Cellular Sales filed two motions rather than answering the complaint. The first motion sought pursuant to Fed. R. Civ. P. Rule 12(b)(1) to dismiss the action for lack of subject-matter jurisdiction, or in the alternative to compel mediation under the FAA, because plaintiffs had not engaged in contractual mediation with Cellular Sales before bringing their claims in court. (Lead Case Dkt. No. 7–8). The second motion sought, pursuant to Fed. R. Civ. P. Rule 12(b)(2), to dismiss CSOKI from the action because of the District Court's purported lacked personal jurisdiction. (Lead Case Dkt. No. 9–11).

17.     In response to Cellular Sales' motions, we drafted and filed Memorandum of Law in opposition to Cellular Sales' two Motions to Dismiss. (Lead Case Dkt. No. 12). By

---

[1] On or about October 21, 2014, the District Court consolidated action 1:23-CV-0584(NAM/CFH) with 1:13-CV-0738(NAM/RFT) and designated 1:12-CV-0584(NAM/CFH) as the "lead case" and 1:13-CV-0738(NAM/RFT) as the "member case". (Dkt. No. 49). Therefore, with respect to references to the record, all citations to lead case are referred to herein as "Lead Case Dkt. No.___" and all citations to member case are referred to as "Member Case Dkt. No___".

Decision and Order dated March 28, 2013, Judge Mordue denied Cellular Sales' Motion to Dismiss for lack of subject-matter jurisdiction, granted Cellular Sales' Motion to Compel non-binding mediation, dismissed the action, and denied the remaining motions as moot. Holick v. Cellular Sales of New York, LLC, 1:12-CV-584, 2013 WL 1336608 (N.D.N.Y. March 29, 2013). (Lead Case Dkt. No. 38–39).

18.        Plaintiffs immediately appealed the District Court's March 28, 2013 Decision. (Lead Case Dkt. No. 40). However, while that Appeal was pending, as a result of Defendants' litigation strategy, the parties were caused to prepare for and attend mediation on or about June 17, 2013. Ultimately, the mediation was unsuccessful and did not resolve any of Plaintiffs' claims.

19.        Thereafter, Plaintiffs commenced a new collective/class action, reasserting Plaintiffs claims previously dismissed by the District Court for failure to engage in mediation.

20.        Ultimately, on or about April 7, 2014, the Second Circuit Court of Appeals reversed the District Court's March 28, 2013, Decision and Order.

21.        In accordance with the Second Circuit's mandate to reopen the case and vacate the March 29, 2013 judgment, the litigation resumed. (Lead Case Dkt. No. 49); (Member Case Dkt. No. 132). Thereafter, the first and second actions were consolidated. (See Lead Case Dkt. No. 49).

22.        Our efforts as highlighted above are only a small portion of the overall time and work spent in the preliminary phases of this action. In addition to the above, we have also drafted and filed responses to Cellular Sales' Motion for Preliminary Injunction (Lead Case Dkt. No. 55, 58, 61), we have drafted and filed a forty-five (45) page Amended Complaint (Lead Case Dkt. No. 68), we responded to yet another Partial Motion to Dismiss filed by Cellular Sales

(Lead Case Dkt No. 70, 76, 78), and we drafted and filed a forty-three (43) page Second Amended Complaint. (Lead Case Dkt. No. 80).

23.     In addition, on October 8, 2016, we filed a Motion for Leave to File a Third Consolidated Master and Amended Collective and Class Action Complaint. (Lead Case Dkt. No. 155). The proposed Amended Complaint added an additional claim for liquidated damages under Article 6 of the N.Y. Labor Law ("NYLL") for Cellular Sales' alleged failure to timely remit commissions to Plaintiffs in violation of NYLL §191. (See Lead Case Dkt. No. 155-2).

24.     On November 15, 2016, the Court granted Plaintiffs' leave to amend the complaint to assert a NYLL untimely commission payment claim. (Lead Case Dkt. No. 176). Plaintiffs filed the Amended Complaint the same day. (Lead Case Dkt. Nos. 177).

25.     Undeterred, Cellular Sales on November 29, 2016, filed a Rule 12(b)(6) Motion to Dismiss the NYLL untimely commission payment claim. (Lead Case Dkt. No. 178).

26.     As set forth in the Memorandum of Law, the fees associated with the untimely commission payment claim are highlighted in green in Exhibit A.

27.     After another lengthy motion process, on September 8, 2017, the Court denied Cellular Sales' Motion requesting dismissal of Plaintiffs' untimely commission payment, and ruled the claim legally actionable. (Lead Case Dkt. No. 241 at pp. 3–8).

28.     In sum and substance, Plaintiffs' spent approximately 425 hours just to get through the pleadings stage of the lawsuit. Each of the aforementioned motion practice, letters, appeals and Court findings were reasonable and necessary given Defendants' strategy to litigate and resist at every turn.

**CLASS CERTIFICATION**

29.     In compliance with the Court's Order (Lead Case Dkt. No. 24), we drafted and filed Plaintiffs' Motion for Conditional Certification of a FLSA collective action pursuant to 29 U.S.C. § 216(b) and for equitable tolling of similarly situated Sales Representatives' FLSA claims who were not yet aware of their rights to join plaintiffs' FLSA collective. (Lead Case Dkt. No. 27). Eventually, Cellular Sales filed its Opposition. (Lead Case Dkt. No. 31). In response, we filed yet another Letter Motion requesting leave to submit a Reply in Response to Defendant's Opposition (Lead Case Dkt. No. 32), which was subsequently granted. We then drafted and filed our Reply. (Lead Case Dkt. No. 33).

30.     On or about February 26, 2014, the case was conditionally certified as a collective action consisting of potential opt-in Plaintiffs. (Member Case Dkt. No. 74, 83, 85).

31.     On or about October 13, 2015, we drafted and filed a Stipulation and Order (Lead Case Dkt. No. 92), wherein the parties agreed to expand the conditionally certified collective to include additional individuals who opted-in. (Lead Case Dkt. No. 92, 94, 95).

32.     Ultimately, the FLSA class was decertified and Plaintiffs' Rule 23 Motion to Certify the State Law claims was denied. (Lead Case Dkt. No. 430).

33.     For the purposes of this application, given that class certification was ultimately denied, Plaintiffs' counsel has redacted fees related to class certification, including but not limited to all efforts and litigation over the Notice to the Class, conditional certification and certification. These fees are highlighted in yellow in the attached billing records (Ex. A), and account for approximately 1,069 hours of time being redacted from this application.

34.     In connection with the motion for class certification, we simultaneously filed a Motion for Partial Summary Judgment (see *infra*), and we used the same material statement of facts for both. It is difficult to separate out the time spent exclusively on class certification as

opposed to the motion for summary judgment. For the purpose of this fee application we have excluded any time entry that refers to the class certification motion even though that undoubtedly reduces time that was spent on the Motion for Summary Judgment.

35.     We have not redacted the time spent with opt in plaintiffs as fact witnesses on the central issue of misclassification of employees. These facts were relevant to the ultimate successful trial for the individual plaintiffs.

## MEDIATION:

36.     On or about June 17, 2013, the parties attended mediation which was ultimately unsuccessful.

37.     Prior to the discovery and depositions, in an attempt to settle the case, we made significant investment in retaining a nationally recognized mediator who had expertise mediating class action FLSA claims. On or about April 26, 2016 the parties attended a second mediation which was ultimately unsuccessful. Thereafter, litigation resumed and was driven by Defendants aggressive litigation strategy including the continued defense of the independent contractor business model.

38.     Ultimately Plaintiffs' counsel spent approximately 230 hours related to preparing and attending mediations. That included the extensive time needed to calculate damages for the workers that were misclassified.

## DISCOVERY:

39.     Both parties timely and efficiently engaged in discovery with respect to calculating the wage and commission to be paid to Plaintiffs.

40.     However, with regard to the central issue in this case, the misclassification of employees as independent contractors, the matter underwent very extensive discovery. The

majority of the time spent in discovery was driven by Defendants' litigation strategy to defend the business model that the NYS Labor Department had previously rejected and Cellular Sales itself abandoned as of January 1, 2012.

41.     In addition to the time spent on depositions and the production of tax returns (as set for the below), Plaintiffs' counsel spent approximately 1058 hours related to the discovery in this Action.

### A. **Depositions:**

42.     The parties engaged in several disputes regarding depositions. Specifically, on September 6, 2016 Cellular Sales filed a Letter Motion requesting authority to conduct the deposition of each opt-in Plaintiff. (Lead Case Dkt. No. 160).

43.     On September 16, 2016, Plaintiffs filed a Letter Motion in opposition to Cellular Sales' Motion (Lead Case Dkt. No. 160), and requested that the depositions be limited to a representative sample of twenty (20) Plaintiffs. (Lead Case Dkt. No. 165). Among Plaintiffs' arguments to Cellular Sales' request was it violated fundamental principles of representative litigation under the FLSA and required the exercise of this Court's power to limit cumulative and duplicative discovery. (Id.).

44.     Following several letter motions and conferences referred to in the attached docket entry, on November 10, 2016, Magistrate Stewart issued a Text Order (Lead Case Dkt. No. 174), which stated "[w]ith regard to depositions, considering all the arguments raised by all counsel, the Court concludes that the appropriate resolution of this dispute will be to allow Defendants' counsel to depose twenty of the Plaintiffs, including the seven named Plaintiffs." (Id.).

45.     Additional deposition-related litigation included *inter alia,* responses to Cellular Sales' Reply to Motion to Compel Depositions (Lead Case Dkt. No. 160, 167, 169), Cellular Sales' Motion to Reopen Depositions (Lead Case Dkt. No. 196, 198); Cellular Sales' second Motion to Reopen Depositions (Lead Case Dkt. No. 236, 239); Cellular Sales' objection to portion of Magistrate Steward's Discovery Order (Lead Case Dkt. No. 254, 264), our Letter Motion requesting that the Court accept filing as timely pursuant to Rule 6 (b) (Lead Case Dkt. No. 265), and our response to Cellular Sales' third attempt to re-open depositions. (Lead Case Dkt. No. 331, 337).

46.     As a result of Defendants' litigation strategy, Plaintiffs' counsel including Christopher Silva, Esq., Daniel A. Jacobs, Esq., and I attended a total of thirty-one (31) depositions, requiring us to travel across New York State from Rochester, Buffalo, Syracuse, and Middletown as well as to various other states including Atlanta, Georgia; Orlando, Florida; Tampa, Florida; Houston, Texas; and El Paso, Texas.

47.     Ultimately Plaintiffs' counsel spent approximately 877 hours litigating over, preparing for, conducting and/or traveling to defend depositions the Defendants insisted on. The central issues covered in those depositions were facts involving the misclassification issue. Those facts turned out to be uniformly relevant whether for individual Plaintiffs or an entire class.

48.     The amount of time spent on depositions and the disputes rising therefrom, was reasonable and necessary for the prosecution of this case, and reflects Defendants' aggressive, defense strategy which drove the course of the litigation in this Action.

**B.   Tax Returns & Business Records:**

49.     Apart from depositions, the production of Plaintiffs' tax returns and business records sought by Defendants was in itself a time consuming and burdensome job.

50.     To summarize, Cellular Sales sought production of the state and federal tax returns for all Plaintiffs in this action including individual returns and returns for each of the Plaintiffs' businesses. Defendants alleged that the returns would illustrate that Plaintiffs' businesses acted independently from Cellular Sales and as such supported Cellular Sale's theory that they were appropriately classified as independent contractors rather than employees. The trial in this action ultimately revealed that the probative value of the returns was far exceeded by the burden to produce them. The record evidence revealed 95% of all revenue generated by Cellular Sales came directly from the sales at Cellular Sales' stores in an environment controlled entirely by the Defendants. Even if the Plaintiffs took deductions related to a home office or deductions related to travel from home to a Cellular Sales Retail establishment, or even printed flyers advertising phone sales, the proof revealed that these expenses did not change the conclusion that plaintiffs were misclassified as independent contractors rather than employees. Yet all the time spent in obtaining tax returns was required because Defendants insisted on their production.

51.     Plaintiffs argued against the production of Plaintiffs' tax returns. In fact, initially, we noted in an August 19, 2016, letter to Cellular Sales that Cellular Sales did not articulate a "compelling need" for the production of tax returns, and we proposed alternative, less intrusive means for obtaining the information claimed relevant within the tax returns. (Lead Case Dkt. No. 158-3).

52.     We also filed numerous motions to limit the intrusiveness of the discovery into Plaintiffs' tax affairs. (See e.g., Lead Case Dkt. No. 164 [20-page Letter Motion]; Lead Case

Dkt. No. 222). However, our efforts at limiting the discovery were unavailing. By Text Order on or about November 10, 2016, the Court granted Defendants' request and ordered Plaintiffs to produce the tax returns, appropriately redacted within 30 days. (Lead Case Dkt. No. 174).

53.     Thereafter, Plaintiffs' counsel spent countless hours working to obtain both the New York State and Federal tax returns for each of the fifty-three (53) Plaintiffs; including individual state and federal tax returns and business state and federal tax returns. The process required us to first obtain a copy of each Plaintiffs' ID, as well as an executed authorization Form 4506 entitled "Request for Copy of Tax Return", and DTF-505 entitled "Authorization for Release of Photocopies of Tax Returns and/or Tax Information". After we received the authorizations and IDs, we submitted them to the relevant taxing authorities. Although we were able to obtain some tax returns, we received numerous rejections from both the IRS and New York State which required us to contact each of the tax authorities separately to understand the reason for said rejections.

54.     We prepared a status report for the Court on or about January 4, 2017, wherein we explained to the Court that since the last conference, 31 out of 53 plaintiffs have served on Cellular Sales physical tax returns ordered to be disclosed by the Court, and/or fully executed releases for Cellular Sales to obtain from the relevant taxing authority the tax returns. (Lead Case Dkt. No. 194). At around the same time, Cellular Sales had advised that it believed that unspecified tax returns "appear to be incomplete or missing pages and are not signed by the taxpayers." (Id.). Evidently, although we complied with the Court Ordered disclosure, Cellular Sales was not satisfied with the sufficiency of the tax returns. Nonetheless, we agreed to work with the Plaintiffs to ensure the insufficient tax returns were corrected and properly disclosed to Cellular Sales. (Id.).

55.     Despite our diligent and good faith efforts, however, Cellular Sales proceeded to file a Motion to Dismiss the claims of seven (7) opt-in Plaintiffs who "failed to…produce their tax return, or authorizations for the release of their tax returns…." (Lead Case Dkt. No. 199, 199-1). Cellular Sales also filed a Letter Motion requesting a conference to address to tax returns issues. (Lead Case Dkt. No. 201).

56.     In response, we filed a Letter Motion that detailed the process of obtaining state and federal tax returns and the myriad of obstacles we were facing from the tax authorities. (Lead Case Dkt. No. 206). We also filed Plaintiffs' opposition to Cellular Sales' Motion to Dismiss. (Lead Case Dkt. No. 210).

57.     To discuss the various tax-return related obstacles, we attended multiple telephone conferences with the Court and opposing counsel including conferences on November 10, 2016, December 14, 2016, January 5, 2017, March 15, 2017, April 11, 2017, and June 12, 2017. During those conferences we explained to the Court that our good faith efforts at obtaining the tax returns were frustrated by the administrative obstacles erected by the Internal Revenue Service and the NYS Department of Taxation and Finance.  Nonetheless, the Court ordered that we continue our efforts and that we contact the tax authorities directly to obtain the rejection explanation or otherwise aid in obtaining the tax returns.

58.     Thereafter, we drafted and filed a status report (Lead Case Dkt. No. 215), concerning the tax returns and authorizations. In the report we explained that because Cellular Sales is the third-party requesting the tax returns, the taxing authority sends directly to Cellular Sales' counsel rejection notices for any authorization not honored by the authority. We also made it clear, that given the current status of obtaining the returns, though no fault of Plaintiffs, that the process of obtaining tax returns from the IRS and NYSDTF would take several more

weeks and numerous additional hours from counsel. (Id.). We asked the court to reconsider the discovery obligation. (Id.).

59.     We drafted and filed another status report (Lead Case Dkt. No. 221), alerting the Court of our progress in obtaining the tax returns and confirming that Counsel has spent approximately 40 hours since the last conference following up with the tax authorities and attempting to obtain the returns. (Id.).

60.     Around the same time, Cellular Sales had notified Plaintiffs of their intent to serve a *subpoenas duces tecum* on non-party accounting firms. In response, we drafted and filed a Letter Motion, requesting a conference to resolve the pending discovery issue- namely, an order to quash the Defendants' subpoenas. (Lead Case Dkt. No. 222).  Cellular Sales filed a response to our Motion (Lead Case Dkt. No. 224), and we drafted and filed a response to Cellular Sales' response. (Lead Case Dkt. No. 226).

61.     Following our subsequent status report (Lead Case Dkt. No. 228), and Cellular Sales' status report (Lead Case Dkt. No. 229), the Court denied Plaintiffs' Motion to Quash the subpoenas in part, and allowed for the discovery of all tax returns and associated schedules during the years identified in the subpoena. (Lead Case Dkt. No. 231).

62.     Our efforts as highlighted above are only a small portion of the overall time and effort spent in the tax-return discovery phase of this action. Plaintiffs' counsel spent approximately 511 hours devoted to the issue of the tax return discovery. All of the time expended was reasonable and necessary to properly represent the Plaintiffs in this action and to comply with demands which were driven by Defendants. Most importantly for this application, all of this time was dedicated to the central factual and legal issue in the case — i.e. misclassification of employee status.

## MOTION PRACTICE:

63.     The litigation path Defendants' chose to pursue caused Plaintiffs to be involved in extensive and time-consuming motion practice. (See generally supra).

64.     As alluded to above, there were over fifty (50) motions filed by Defendants and almost all of those motions required a response by Plaintiffs. The motions ranged from inter alia, Motions to Dismiss, Motions for Summary Judgment, Motions to Compel Discovery, Motion to Decertify, Motion for Reconsideration, Motion to Strike Amendments to Pleadings and Motion to Strike portions of Mandatory Disclosures, Motions to Seal and Motions to Reopen Discovery. (See **Exhibit A & Exhibit B**).

65.      Consequently, Plaintiffs, in effectively litigating their case, drafted and filed approximately forty (40) motions during the pendency of this action.  The motions Plaintiffs filed ranged from inter alia, Motion to Quash Subpoenas, Motion to Amend Pleadings, and Motions to Exclude Expert Testimony. (See Ex. A & Ex. B).

66.     Accordingly, Plaintiffs' counsel spent approximately 755 hours preparing Plaintiffs' motions and responding to Defendants' motions.

67.     The amount expended is reasonable and is a natural and proximate consequence of Defendants' aggressive litigation tactics.

## APPEALS:

68.     As this Court recognized throughout the pre-trial proceedings, and during trial, Cellular Sales' defense to Plaintiffs' claims injected complex factual issues into this litigation.

69.     The complexity of addressing Cellular Sales' defense was compounded by Cellular Sales' "last-ditch and beyond" defense litigation tactics which required Plaintiffs to file

numerous interlocutory appeals with the Second Circuit. In total, we spent approximately 327 hours drafting our appeals and our oppositions to the appeals filed by Cellular Sales.

70.     In particular, on or about July 18, 2013, we appealed the District Court's March 29, 2013, Decision compelling mediation and dismissing the action under the Federal Arbitration Act. (Lead Case Dkt. No. 40). Based on the arguments asserted in our Appeal, the Second Circuit issued a Mandate that vacated the District Court's dismissal of the action and reopened the case. (Lead Case Dkt. No. 49).

71.     Thereafter, Defendants filed an Appeal from the Memorandum-Decision and Order of the District Court entered October 21, 2014, which denied Defendants' Motion to Compel Arbitration of the claims of Plaintiffs Pratt and Burrell. (Lead Case Dkt. No. 50). The Second Circuit affirmed the District Court's judgment. (Lead Case Dkt. No. 93).

72.     Plaintiffs also filed a request for interlocutory appeal with the Second Circuit in light of the District Court's Memorandum-Decision and Order that the District Court entered on April 26, 2019 ("Decision") (Lead Case Dkt. No. 430), which denied Plaintiffs' Motion for Class Certification. Although the Second Circuit denied leave to the interlocutory appeal (Lead Case Dkt. No. 434), we are currently working on challenging the Decertification Order now that final judgment has been reached on the merits. (See Lead Case Dkt. No. 483–487). However, for the purposes of this application, we have redacted the time spent on the interlocutory appeal of the Decertification Order. (See Ex. A).

73.     Ultimately, the amount of time spent on Appellate work was reasonable and necessary for the prosecution of this case, and reflects Defendants' aggressive, defense strategy.

## MOTION FOR SUMMARY JUDGMENT:

74.     Set apart from the other various motions identified above, Plaintiffs' counsel devoted a substantial amount of time to summary judgment. Indeed, both parties respectively filed Motions for Summary Judgment. (Lead Case Dkt. 346; Lead Case Dkt. No. 388).

75.     Plaintiffs' Motion for Partial Summary Judgment included approximately nineteen (19) Plaintiff affidavits with over 200 exhibits, an attorney affirmation with over eighty (80) exhibits, and a thirty-nine (39) page Memorandum of Law in Support of the Motion. (See Lead Case Dkt. No. 346, 349–372, 374-376).

76.     In turn, Plaintiffs also prepared an opposition to Defendants' extensive application by filing a forty (40) page Memorandum of Law including an Attorney Affirmation and over fifty (50) exhibits. This was followed by Reply papers filed on or about March 28, 2019. (Lead Case Dkt. No 422).

77.     The Motions for Summary Judgment were cross motions that focused primarily on the central issue of the case: misclassification of employees. Each and every collateral issue presented in the motions was derivative of this central issue. In fact, the arguments presented on the issue of misclassification in Plaintiffs' motion and opposition were ultimately the same arguments in which Plaintiffs prevailed on at trial.

78.     For these reasons, Plaintiffs seek an award for all of the approximately 463[2] hours of legal work associated with the preparation of Summary Judgment papers.

**TRIAL:**

79.     Ultimately, the central issues of the case left to be decided for a bench trial were:

  a.     Whether each Plaintiff was an employee or independent contractor of Cellular Sales for purposes of the FLSA during the relevant time periods prior to January 1, 2012.

---

[2] These hours are included in the approximately 755 hours listed under the Motions portion of the Affirmation.

b. Whether each Plaintiff was an employee or independent contractor of Cellular Sales for purposes of the NYLL during the relevant time periods prior to January 1, 2012.

(Lead Case Dkt. No. 448).

80.      The parties prepared and submitted extensive pre-trial submissions, including the Joint Pre-Trial Order, proposed jury instructions and verdict forms, proposed exhibits, deposition designations, and a Motion in Limine, as well as the parties' objections and oppositions to the same.   As counsel for the Plaintiffs, we also attended pre-trial judicial conferences.  (See Lead Case Dkt. No. 444–466).

81.      The bench trial in this matter was conducted in Albany, New York during a three (3) day period, on February 24, 25, and 26, 2020.

82.      As this Court recognized throughout the trial, the legal and factual issues in this matter were extremely complex and novel.  As a result, this firm expended significant time and resources in preparation for the trial, the trial itself and preparing post-trial briefs.

83.      Upon conclusion of the trial, on May 29, 2020, Magistrate Daniel J. Stewart issued his Decision and Order wherein he determined that "each of the remaining Plaintiffs were employees of Cellular Sales. . . [a]s such, CSK and CSNY, as stipulated joint employers, are liable to Plaintiffs for their overtime and minimum wage payments jointly and severally." (Lead Case Dkt. No. 483, p. 33).

84.       In so ruling, Magistrate Stewart properly found that Plaintiffs were entitled to damages representing unpaid minimum wages and unpaid overtime amounts. (Id. at 34). Magistrate Stewart also ordered payment of "liquidated damages in the amount equal to 100 percent of the amount of compensatory damages." (Id.).

85.     In its Decision, the Court opted into an "award of damages under the NYLL rather than the FLSA, because it allows for a greater recovery that includes prejudgment interest." (Id. at 35 [Internal citations omitted]). In doing so, the Court held that Plaintiffs "are entitled to an additional 100% of their compensatory damages as recovery in liquidated damages…[and] Plaintiffs are entitled to nine percent annual prejudgment interest on their compensatory damages only." (Id. at 36). Specifically, Plaintiff Holick was awarded a total of $3,224.49 (consisting of $618.44 for unpaid wages and $510.09 for unpaid overtime pay as compensatory damages, plus 100% in liquidated damages, and 9% prejudgment interest), Plaintiff S. Moffitt was awarded a total of $126.85 (consisting of $7.11 for unpaid wages and $37.50 for unpaid overtime pay as compensatory damages, plus 100% in liquidated damages, and 9% prejudgment interest), Plaintiff Singh was awarded a total of $3,981.12 (consisting of $685.90 for unpaid wages and $704.92 for unpaid overtime pay as compensatory damages, plus 100% in liquidated damages, and 9% prejudgment interest), Plaintiff Mack was awarded a total of $299.30(consisting of $21.85 for unpaid wages and $83.25 for unpaid overtime pay as compensatory damages, plus 100% in liquidated damages, and 9% prejudgment interest), Plaintiff Burrell was awarded a total of $1,029.91 (consisting of $192.66 for unpaid wages and $174.17 for unpaid overtime pay as compensatory damages, plus 100% in liquidated damages, and 9% prejudgment interest), and Plaintiff Pratt was awarded a total of $2,459.54 (consisting of $82.79 for unpaid wages and $785.77 for unpaid overtime pay as compensatory damage, plus 100% in liquidated damages, and 9% prejudgment interest). (See Lead Case Dkt. No. 483 & 484).

86.     Significantly, in its Decision, the Court also set forth that "[a]s the prevailing party, Plaintiffs are entitled to an award of reasonable attorneys' fees pursuant to both the FLSA and NYLL." (See Lead Case Dkt. No. 483).

87.     Ultimately Plaintiffs' counsel spent approximately 315 hours dedicated to preparing for and attending trial and preparing post-trial briefs.

88.     On May 29, 2020 Magistrate Stewart entered a judgment on the merits in favor of Plaintiffs on both the FLSA and NYLL claims. (Lead Case Dkt. No. 484).

## THE INSTANT FEE APPLICATION

89.     In light of the extensive time spent in both litigating this action and effectively responding to opposing counsel's tactics — which drove the course of the litigation — this fee application took a total of approximately 101 hours to complete.

90.     In preparing the fee application, we were tasked with reviewing all of the parties' prior submissions and our firm's sizeable time records. Therefore, the amount of time spent on fee application was reasonable and necessary for the prosecution of this case.

## ATTORNEY BACKGROUND AND EXPERIENCE

91.     The firm of Gleason, Dunn, Walsh & O'Shea was established in 1988.  For the entire history of the firm, a significant portion of the firm's practice has focused on Labor and Employment matters, representing individuals with workplace problems.  Gleason, Dunn, Walsh & O'Shea has earned an "AV® Preeminent™" Peer Review Rating from Martindale-Hubbell, reflecting that it is both distinguished in legal skill and committed to high ethical behavior.

92.     The following attorneys from Gleason, Dunn, Walsh & O'Shea have worked extensively on this matter on behalf of the Plaintiffs: partner Ronald G. Dunn; and associate

attorneys Christopher M. Silva, Daniel A. Jacobs, and Sarah D. Baum. From time to time other attorneys have assisted in discrete tasks. (See Ex. A).

93. The partners of Gleason, Dunn, Walsh & O'Shea charge upwards of $350 per hour, while the associate attorneys' time is billed upwards of $200 per hour.

### Ronald G. Dunn, Esq.

94. I have been a practicing attorney for thirty nine (39) years, having first been admitted in March of 1981. I have focused my practice on labor and employment matters for the entirety of my career, and represent individual employees in contested labor and employment litigation matters.

95. I earned an "AV® Preeminent™" Peer Review Rating from Martindale Hubbell;* was named one of the "Best Lawyers in America" for 2008 through the present from "Best Lawyers", in the area of Labor and Employment Law; and was named one of the "Top 10 Lawyers in Upstate New York" (New York Super Lawyers) for 2017, 2018, 2019 and 2020 and one of the "Top 50 Lawyers in Upstate New York" in 2014, 2015 and 2016; and named one of the 500 Outstanding plaintiff employment lawyers in the United States by Lawdragon for 2018 and 2019. All of these are based on the evaluation from my peers in the legal community. I am a Fellow in the College of Labor and Employment Lawyers, and a Fellow of the American Bar Foundation. Both of these "Fellow" designations required extensive peer review and a nomination process. I am a former Chair of the New York State Bar Association Labor and Employment Law Section and a longtime member of that Section' s Executive Committee. That included a four year term as Co-Chair of the Section's Continuing Legal Education Committee.

96. I frequently lecturer on labor and employment law matters including all manner of litigation tactics. Attached as **Exhibit C** is an excerpt of the biographical information

found on our firm web site, reflecting my academic training, legal experience and professional qualifications.

### Christopher M. Silva, Esq.

97.     Associate Attorney, Christopher M. Silva, has been a practicing attorney for more than fifteen (15) years, having first been admitted in 2008.  He has focused his practice primarily on labor and employment matters.   Attached as **Exhibit D** is an excerpt of the biographical information found on our firm web site, reflecting Mr. Silva's academic training, legal experience and professional qualifications.

### Daniel A. Jacobs, Esq.

98.     Associate attorney, Daniel A. Jacobs, joined our firm in 2008 and since 2010 concentrated his practice on representing and counseling employees in all types of employment and labor law matters. Attached as **Exhibit E** is an excerpt of biographical information, reflecting Mr. Jacobs' academic training, legal experience and professional qualifications.  Mr. Jacobs recently left our firm to pursue other professional opportunities and fulfill a longtime goal of living and working in Denver, Colorado.

### Sarah D. Baum, Esq.

99.     Associate Attorney Sarah D. Baum was admitted to practice in 2018, and focuses her practice primarily on labor and employment litigation matters.  Attached as **Exhibit F** is an excerpt of the biographical information found on our firm web site, reflecting Ms. Baum's academic training, legal experience and professional qualifications.  Ms. Baum worked under my direct supervision on this matter. Sarah Baum worked at our firm as a summer intern prior to her graduation from Law School. The time she spent working on this case during that period is reflected as paralegal time. (See Ex. A).

**Christopher Scoville, Esq.**

100.      Associate Christopher Scoville also worked on this matter both before he was admitted and after admission. His time prior to admission is reflected as paralegal time. Christopher Scoville is a graduate of Albany Law School. He is currently an attorney in NYSUT's In House Attorney Office.

**THE SUCCESS ON THE CLAIM**

101.      Plaintiffs are considered a prevailing party in this action with respect to their claims under FLSA and NYLL, as reflected in this Court's award to Plaintiffs of liquidated damages, and in this Court's direction that Plaintiffs file the instant application for attorneys' fees. (See Lead Case Dkt. No. 483).

**THE WORK PERFORMED**

102.      Our firm uses a computer-based system for tracking the work performed by the attorneys.  Attorneys prepare contemporaneous time sheets on a daily basis, which reflect the precise work that is performed, the attorney that performs the work, and the amount of time expended.  These time sheet entries are then entered into a billing software system, which is used to generate summaries reflecting the total amount of work performed.

103.      Attached hereto as **Exhibit J** is a spreadsheet illustrating all work that has been performed on this case since its inception, reflecting the attorney that performed the work, the amount of time that they spent, the applicable billing rate, and a description of the work performed – all through July 10, 2020.

104.      As reflected in Exhibit J, this case involved extensive time spent by myself and certain other associate attorneys in my firm, preparing for, responding to, defending against, and/or completing: (a) paper discovery demands to and from Defendants; (b) preparing for and

conducting thirty-one (31) depositions; (c) drafting countless motions; (d) drafting extensive pre-trial submissions; (e) preparing for and conducting the bench trial that lasted three (3) days; (f) drafting' post-trial briefs; (g) drafting appeals to the Second Circuit; and (g) drafting the instant application for attorneys' fees, costs and expenses.

105.     Summarizing the time spent on this case, we find that the following attorneys performed the following work on this file from April 7, 2011 through July 10, 2020:

| | |
|---|---|
| Ronald G. Dunn, Esq. | 565.00 hours |
| Christopher M. Silva, Esq. | 1372.30 hours |
| Daniel A. Jacobs Esq. | 2,892.15 hours |
| Sarah D. Baum, Esq. | 96.90 hours |
| Christopher Scoville, Esq. | 114.00 hours |
| Lisa F. Joslin, Esq. | 3.20 hours |
| Mark T. Walsh, Esq. | .65 hours |
| Emily E. Keeble, Esq. | 42.90 hours |
| Brendan D. Sansivero, Esq. | 24.20 hours |
| Bryan J. Huebner, Esq. | 31.90 hours |
| Peter N. Sinclair, Esq. | 7.90 hours |
| Ethen M. Felder, Esq. | 65.00 hours |
| Sarah J. Berger, Esq. | 2.60 hours |

The work on this file performed by the Paralegals, including time spent by attorneys prior to their admission amounts to approximately 740.80 hours.

106.    The amount of time spent was reasonable and necessary for the prosecution of this case, and reflects Defendants' aggressive defense strategy, and position that they had no liability whatsoever on Plaintiffs' FLSA and NYLL claims.

107.    All of the time expended was reasonable and necessary to properly represent the Plaintiffs in this Action. Nevertheless, in the exercise of billing judgment, and as reflected within Exhibit J, this firm has reduced its own time by approximately 1,069 hours. Plaintiffs do not seek the time expended by myself and other associates working on either class certification or notice to the class. (See *supra*, ¶¶ 32–33).

## THE REASONABLE RATE

108.    Gleason, Dunn, Walsh & O'Shea charges different rates to clients based on complexity of the matter (more complex matters reflecting a higher rate), the relationship with the client (with more consistent relationships receiving a lower rate), and the frequency of payment (with those clients who are able to pay the bill on the monthly basis receiving a more favorable rate).  The rates charged by our firm for partner time range from $350.00 per hour for the more complex legal matters, to $250.00 per hour for institutional clients where the frequency of work is constant, the downward pressure on the amount of time that we spend on a file is less pronounced, and the work itself is more routine.

109.    Similarly, the rates that Gleason, Dunn, Walsh & O'Shea charges for associate time range from $225 per hour for the more complex legal matters, to $135 for institutional clients where the frequency work is constant, the downward pressure on the amount of time that we spend on a file is less pronounced, and the work itself is more routine.

110.    In light of the various factors in this case – including the novel and complex nature of the claims in this matter, the fact that there were numerous Plaintiffs, the contingency

representation of the Plaintiffs, the Defendants' litigation position and aggressive strategy which drove the course of litigation, the skill and experience of the attorneys hired to represent the Plaintiffs, and the success obtained on behalf of the Plaintiffs, we respectfully request that the following rates be approved for payment in this matter:

| | |
|---|---|
| Partner Ronald G. Dunn | $350.00 per hour |
| Associate Christopher M. Silva | $200.00 per hour |
| Associate Daniel A. Jacobs | $200.00 per hour |
| Associate Sarah D. Baum | $175.00 per hour[3] |
| Associate Christopher Scoville[4] | $175.00 per hour |
| Partner Lisa F. Joslin | $350.00 per hour |
| Partner Mark T. Walsh | $350.00 per hour |
| Associate Emily E. Keable[5] | $175.00 per hour |
| Associate Brendan D. Sansivero | $175.00 per hour |
| Associate Bryan J. Huebner | $175.00 per hour |
| Associate Peter N. Sinclair | $175.00 per hour |
| Associate Ethan M. Felder | $175.00 per hour |
| Associate Sarah J. Burger | $175.00 per hour |
| Paralegals | $80.00 per hour |

In making this request, we have assessed the rates of other attorneys who have been admitted to the Bar for similar periods, and who have attained similar levels of expertise in the

---

[3] Ms. Baum performed work both pre and post admission to the Bar. As such, we apply different rates of $80.00 for pre-admission and $175.00 for post-admission. Pre-admission time is reflected as "Paralegal" time in the attached Exhibit A.

[4] Mr. Scoville performed work both pre and post admission to the Bar. As such, we apply different rates of $80.00 for pre-admission and $175.00 for post-admission.

[5] Ms. Keable performed work both pre and post admission to the Bar. As such, we apply different rates of $80.00 for pre-admission and $175.00 for post-admission.

area of civil rights litigation.  In connection with this application, we submit the Affidavits of Beth A. Bourassa, Esq., sworn to June 30, 2020 (attached hereto as **Exhibit G),** and James E. Hacker, Esq., sworn to July 1, 2020 (attached hereto as **Exhibit H),** which illustrate that the rates sought herein are reasonable and consistent with the hourly rates charged in the Northern District by attorneys with similar experience, legal skills, and expertise in labor and employment law.

111.     We also respectfully submit that these rates are consistent with the hourly rates adopted by U.S. District Court of the Northern District of New York in wage-and-hour and other labor and employment litigation under fee-shifting statutes such as the NYLL, as outlined in Plaintiffs' Memorandum of Law accompanying this application.

112.     Applying these rates, the attorneys' fees through July 10, 2020 on behalf of the Plaintiffs total $961,450.50 – inclusive of the approximately 101 hours spent on the instant fee application and exclusive of the approximately 1,069 hours spent working on either class certification or notice to the class.

113.     All of the time expended was reasonable and necessary to properly represent the Plaintiffs in this Action.

## COSTS

114.     An award of costs (other than attorney's fees) to the prevailing party is presumptive under Federal Rule of Civil Procedure 54(d)(1), and FLSA and NYLL provisions. (See 28 U.S.C. § 1920; 29 U.S.C. § 216; N.Y. Lab. Law § 198).

115.     Attached hereto as **Exhibit I** is the Bill of Costs we filed with the Court on June 26, 2020.

116.     In addition, attached hereto as **Exhibit J** is a complete and detailed list of expenses and disbursements that were incurred in the prosecution of this case on behalf of the Plaintiffs, totaling $46,065.84.

117.     With respect to costs associated with legal research, those costs have been significantly reduced. Specifically, Plaintiffs' counsel incurred $9,569.34 for legal research performed from 2011 through 2017. Initially, when this Action was first commenced, our firm utilized Westlaw and had an "a la carte" membership. (Exhibit J). After September of 2017, our firm transitioned its legal research platform from Westlaw to Bloomberg. The firm's membership with Bloomberg was based on a set fee. The firm has since transition back to Westlaw – the firm's current research platform – based on a set fee. However, in the exercise of billing discretion, all costs associated with the legal research performed at a set fee on both Bloomberg and Westlaw are not included in Exhibit J and are not included in the total amount of costs being sought.

118.     Similarly, in the exercise of billing discretion, the costs associated with photocopying has also been significantly reduced. Initially, the costs amounted to $14,115.22, however, to account for the photocopies of working firm copies, we have reduced the cost amount to $7,057.61— a 50% reduction.

119.     The costs and expenses incurred by Plaintiffs' counsel were reasonable and necessary for the prosecution of this case.

## INTEREST:

120.     Under well-established law and the May 29, 2020, Decision and Order of this Court, Plaintiffs are entitled to and were awarded pre-judgment interest on the full award, at the

9% interest rate provided by New York CPLR §§ 5001, 5004. Plaintiff is also entitled to post-judgment interest on the full award at the same rate, pursuant to CPLR §5003.

121.    For convenience here, Plaintiffs seek post-judgment interest accruing from the date of entry of judgment, on the entirety of the judgment – which will include all attorneys' fees, costs, and disbursements awarded in this action, in the amount to be calculated by the Court. (See CPLR §5003).

## CONCLUSION

122.    Based on the above factors and attached exhibits, it is respectfully submitted that Plaintiffs' attorneys' fees application is reasonable and consistent with prevailing market rates.  This Court should award the Plaintiffs: attorneys' fees in the amount of **$961,450.50;** costs, disbursements, and litigations expenses in the amount of **$46,065.84**; and post-judgment interest, including on the attorneys' fees, costs and disbursements awarded to the Plaintiffs.

123.    On or about June 26, 2020, Plaintiffs served a Notice of Appeal. (Lead Dkt. No. 485). Plaintiff reserves the right to make further application to this Court under NYLL §198 for attorneys' fees, costs, and disbursements in connection with Plaintiffs' Appeal.

Dated: July 13, 2020
     Albany, New York

**GLEASON, DUNN, WALSH & O'SHEA**

By: _____
    Ronald G. Dunn, Esq.
    Bar Roll No. 101553
    *Attorneys for Plaintiffs*
    40 Beaver Street
    Albany, NY 12207
    Tel. (518) 432-7511
    Email: rdunn@gdwo.net

Sworn to before me this
13th day of July, 2020

Notary Public – State of New York

STEPHANIE L. PAULSEN
Notary Public, State of New York
Reg. No. 01PA6336187
Qualified in Albany County
Commission Expires January 25, 202_